1  Jaime Marquart (Bar No. 200344)
    jmarquart@bakermarquart.com
2  Donald Pepperman (Bar No. 109809)
    dpepperman@bakermarquart.com
3  BAKER MARQUART LLP
4  2029 Century Park East, 16th Floor
   Los Angeles, CA 90067
5  Telephone:  (424) 652-7800
6  Facsimile:    (424) 652-7850

7
   James Bailey (*pro hac vice* application pending)
8   james@baileyduquette.com
9  BAILEY DUQUETTE P.C.
   100 Broadway, 10th Floor
10 New York, NY 10005
   Telephone:  (212) 658-1946
11 Facsimile:    (866) 233-5869

12
   Attorneys for Plaintiff
13 Dreamstime.com, LLC

14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DREAMSTIME.COM, LLC, a Florida LLC, | Case No. |
| Plaintiff, | **CIVIL COMPLAINT FOR:** |
| v. | **(1) VIOLATION OF SECTION TWO OF THE SHERMAN ACT;** |
| GOOGLE, LLC, a Delaware LLC; and DOES 1-10, | **(2)  BREACH OF CONTRACT;** |
| Defendants. | **(3)  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; AND** |
| | **(4) VIOLATION OF SECTION 17200 et seq. OF THE** |

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CALIFORNIA BUSINESS & PROFESSIONS CODE - UNFAIR BUSINESS PRACTICES**

**[DEMAND FOR JURY TRIAL]**

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

1   Plaintiff Dreamstime.com, LLC ("Dreamstime"), through its undersigned
2   counsel, hereby brings this Complaint against Google, LLC ("Google"), and DOES
3   1-10 (collectively "Defendants") for violation of Section 2 of the Sherman Act (15
4   U.S.C. § 2), breach of contract, breach of the implied covenant of good faith and fair
5   dealing, and unfair business practices, to secure damages and injunctive relief, and
6   demanding trial by jury, and claims and alleges as follows:

7   ## I.   INTRODUCTION

8   1.   This lawsuit arises out of Google's anticompetitive, discriminatory, and
9   unfair conduct, as well as its related, on-going breaches of its contracts with
10   Dreamstime.  Google has engaged in a strategy to use its monopoly power in the
11   relevant market for online search advertising to squeeze its customer, Dreamstime,
12   and other similarly-situated competitors, out of the online stock photography
13   business.  This strategy is intended to and does further entrench Google's monopoly
14   of the relevant online search advertising market by eliminating sites such as
15   Dreamstime that threaten to be the first place people go to search for high-quality
16   images for purchase on the Internet (instead of searching on Google).

17   2.   Google's presence in online search is so ubiquitous and dominant that a
18   new verb "google," meaning to use an Internet search engine to locate information
19   on the web, has entered the common vernacular.  Google has literally defined online
20   search and, accordingly, dominates it.

21   3.   Google's maintenance and abuse of its online search advertising
22   monopoly is intentional and widely known.  For example, Google's illegal,
23   anticompetitive "search bias" tactics have been widely reported and investigated by
24   governments around the world.  The United States Department of Justice ("DOJ")
25   and Federal Trade Commission ("FTC") have both recognized that Google is a
26   monopolist in the relevant antitrust market of online search advertising.  In this case,
27   Google has brought to bear several complementary and insidious anticompetitive

28

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

- 1 -

tactics to strong-arm Dreamstime and others out of the online stock photography business, so as to strengthen its monopoly in online search advertising.

4. In or about the second half of 2015, sensing an opportunity to exploit its monopoly power in the online search advertising market by restraining trade in other lucrative related lines of commerce like online stock photography repositories, Google began to abuse its monopoly power in the online search advertising market to exclude Dreamstime from the most common online searches for stock photography. As part of its anticompetitive scheme, it entered into a licensing agreement with Dreamstime's biggest competitor, Shutterstock.[1] Google set about using its immense market power in online search advertising to bolster Shutterstock's market position in the online stock photography business, while at the same time unfairly hamstringing Dreamstime's ability to compete and increasing Dreamstime's spending on Google's online advertising services. Google intentionally altered its search algorithm – or, at least, how that algorithm was applied to Dreamstime – to unfairly prejudice Dreamstime and favor Google's own services and those of its partner, Shutterstock, providing them an unearned and crucial competitive advantage over Dreamstime.

5. More recently, in February of 2018, Google announced yet another licensing agreement with Getty Images, another extremely large competitor of Dreamstime. Almost immediately, Getty Images' websites began to receive even more prominence in Google's search results, at times surpassing Shutterstock (which also continues to rank very highly).[2] The implementation of this agreement

---

[1] "Shutterstock" is defined for purposes of this lawsuit to include Shutterstock and the online stock photography websites owned by Shutterstock such as Bigstock (www.bigstockphoto.com).

[2] Since the middle of February 2018, Getty Images has ranked more highly than Shutterstock at times, though Shutterstock also remains highly ranked in Google search results. "Getty Images" is defined for purposes of this lawsuit to include

(footnote continued)

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

is too early to assess completely, but it is sure to increase Google's ability to manipulate and discriminate in the online stock photography industry and to increase the effects of Google's anticompetitive conduct against Dreamstime and others.  Meanwhile, Dreamstime – for years in the top three to five most prominently displayed stock photography Google search results – has vanished from the first several pages of search results, making it invisible to all who google for stock photography.

6.     Because of this change to Google's search algorithm in or around August 2015 (and with material changes continuing to the present), Dreamstime's ranking on Google's search engine plummeted from at or near the top of search results for online stock photographs to 91st (as much as 20 pages deep) – well below Shutterstock and Getty Images, well below other smaller competitors, and even well below unambiguously less relevant search results.  Essentially, Dreamstime is invisible to people googling for online stock photographs.  As a result, Google devastated Dreamstime's business, cost it millions of dollars in sales and threatens its survival.  Google's alteration of its algorithm did not serve to benefit the consumer but was intended to increase its partners' and its own businesses and to discriminate against and harm Dreamstime.  Google has since replicated this monopoly conduct to exclude other similarly-situated competitors, including 123RF, DepositPhotos, and CanStockPhoto, who have all suffered inexplicable drops in online search rankings.  The only significant stock photography competitor that has not announced a partnership with Google and that has not yet been excluded from top search results is Adobe.

---

Getty Images and the online stock photography websites owned by Getty Images such as iStock (www.istockphoto.com) and Thinkstock (www.thinkstockphotos.com).

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

- 3 -

7.     There is no legitimate, procompetitive purpose for Google's intentional tanking of Dreamstime's and others' search rankings, and it hurts consumers in addition to Dreamstime.  Dreamstime's prior higher search ranking has now been usurped in part by much smaller, old or irrelevant websites – including websites that traffic only in public domain images.[3]  Google's manipulation of its algorithm to lower Dreamstime's search ranking makes it harder for users to find what they are looking for – high-quality websites (like Dreamstime) that offer commercially acceptable stock photographs *not* in the public domain.  Dreamstime's prior high ranking reflected and arose directly from the fact that it was a result that consumers found very responsive to their searches.  More alarmingly, the effective exclusion of Dreamstime and other similarly-situated competitors from Google's search results is a banishment from the marketplace and is likely to result in depriving users of an informed search that would allow them to choose the best price/quality options.

8.     The aim and the result of this conduct is to maintain and abuse Google's monopoly over online search advertising to exclude and restrict competition in the online stock photography business through its partners and proxies Shutterstock and Getty Images (as well as its own service, Google Images, as described below).  In addition to harming Dreamstime, this conduct harms competition in the online stock photography business and further entrenches Google's monopoly in online search advertising.  Google's favoritism of

---

[3] Public domain images are, for the most part, unusable as a reasonable substitute for properly licensed stock images because public domain images lack the kind of intellectual property vetting, rights releases, and documentation that would permit use in a commercial context.  Using a public domain image for a commercial website, where a licensed stock image should have appeared, can draw potential claims from the image's author, any models that appear in the image, and/or the owner of any copyrighted material that the image author may have inadvertently captured.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

Shutterstock is most tellingly depicted in "knowledge graphs," which are entries that appear at the very top of organic search results for generic terms like "stock photos." An example is attached hereto as Exhibit "A."  In Exhibit "A," Shutterstock and Bigstock (which Shutterstock owns) are placed prominently alongside search results for generic market terms, giving them an additional unfair advantage over other competitors like Dreamstime.

9.     In addition to its promotion of Shutterstock and Getty Images to the exclusion of Dreamstime and others, Google also benefits by promoting its own image search service, Google Images, to the exclusion of Dreamstime and others. (Notably, as detailed below, Google was fined €2.4 billion when it did the same thing for its own service, Google Shopping, in the European Union.)  Google Images is the biggest repository of images in the world.  Now, anything a user googles that includes words like "photos," "images," "pictures" or "pics," will trigger a set of Google Images results for that thing.  Some of the images that result are "free," yet others of the images are copyrighted stock photos that Google Images enables a searcher to steal without paying for them.[4]  More importantly, Google Images has misused licensed stock photos of Dreamstime and other websites by making high-quality versions of them available in Google Images search results. By simply right-clicking on high-resolution images of these proprietary stock photos in a Google Images result, searchers can essentially steal on a whim.  The Centre of the Picture Industry ("CEPIC") estimates that 85% of pictures found online by visual search systems are unlawful copies and 80% of those illegal images have been spread through search engines such as Google Images.  This practice

---

[4] Of course, even Google Images' "free" images are not free – a user exchanges his or her all-important behavioral data and other private information when acquiring these images.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

1   exemplifies the harm Google can cause through the exercise and abuse of its

2   monopoly power.

3       10.     Google's anticompetitive strategy against Dreamstime, however, is not

4   limited to search bias, or the provision via Google Images of direct access to the

5   proprietary stock photos of Dreamstime and similarly-situated participants.

6   Dreamstime has long been an active participant/consumer in Google's AdWords and

7   DisplayAds online advertising programs, having paid Google over $50 million for

8   these services over the last 12 years.  Dreamstime used AdWords to place targeted

9   ads within Google search engine results relevant to online stock photographs.  Over

10  time and through extensive research and experimentation, Dreamstime developed

11  efficient AdWords and DisplayAds campaigns that resulted in many sales.  Though

12  this efficiency in campaigns lowered Google's AdWords profits, it benefitted

13  consumers by lowering the marginal cost of acquired purchases and allowed

14  Dreamstime to offer a more competitive price for its online stock photographs.

15  After Google used its search bias scheme to artificially tank Dreamstime's search

16  ranking, Dreamstime began to invest even more money in its AdWords and

17  DisplayAds campaigns – millions of dollars – to counter Google's removal of

18  Dreamstime from organic search results.  These inefficiencies increased the

19  marginal cost of Dreamstime's acquired purchases, placing a serious strain on its

20  finances and business model.  Google perversely profited from its anticompetitive

21  search bias scheme by obtaining an unfair and anticompetitive premium for its

22  AdWords service.  After Google's demotion of Dreamstime's organic search

23  ranking, most months Dreamstime barely breaks even or loses money.  The risks

24  and negative impact to Dreamstime's future prospects are obvious and directly

25  attributable to Google's discriminatory conduct, all of which increases Google's

26  monopoly of the online search advertising market.

27

28

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

11.     Google has intentionally and aggressively interfered with Dreamstime's AdWords and DisplayAds campaigns in several material ways.  Among other things, Google has:

- manipulated Dreamstime's organic search ranking unfairly and illegally to force Dreamstime to spend an unreasonable amount of money on additional AdWords campaigns that would not otherwise have been necessary;

- cancelled Dreamstime's most successful ad campaigns without adequate notice or explanation;

- improperly suspended Dreamstime's account based on unfounded accusations of "policy violations;"

- prevented Dreamstime from running successful DisplayAds campaigns while allowing the *exact same* advertisements to be placed by other competitors;

- placed Dreamstime's advertisements on irrelevant websites and error pages in direct violation of the AdWords contract; and

- overdelivered AdWords campaigns, causing daily spending limits for certain campaigns to be exceeded on a regular and systematic basis.

12.     Google's use of the AdWords, DisplayAds, and AdSense programs to harm Dreamstime and others are part of an overall, anticompetitive and exclusionary business strategy that goes hand-in-hand with Google's online search bias scheme. With respect to a similar scheme, the European Union recently issued a record €2.42 billion fine against Google for its abuse of its market dominance as a search engine to promote its own Google Shopping services in its search results and demote those of competitors.  Here, as it was found to have done with Google Shopping in the EU, Google is illegally promoting its proxies' stock photography sites and its own Google Images services by demoting other stock photography sites like

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

Dreamstime.  Google is misusing its monopoly power in the relevant online search advertising market to control and restrict competition among online stock photography websites, which are repositories for an important thing that consumers search for (high-quality, online images to purchase).  In the process, Google's tactics have directly and proximately caused serious, material injuries to Dreamstime in the form of lost revenue, lost customers, potential search engine optimization ("SEO") penalties, and loss of goodwill.  More importantly, Google's unfair tactics have harmed competition in the online stock photography business, reducing consumer choice, and giving Shutterstock and Getty Images, Google's partners and proxies in the online stock photography business, an unwarranted competitive advantage over Dreamstime and other smaller rivals.

13.     Among other things, this conduct resulted in fewer choices of online stock photographs for consumers, stifling of innovation and technology, and harm to competition as a whole.  It also resulted in substantially enhanced market share for Google's partner, Shutterstock, and is likely to do so for Getty Images as well.  Most importantly, it allows Google to maintain and enhance its monopoly in online search advertising by ensuring that stock photography repository websites will increase their reliance on Google and AdWords for new customer acquisitions.  Similarly, Google's monopolistic actions with respect to AdWords and DisplayAds gives rise to civil liability, including but not limited to a violation of Section 2 of the Sherman Act, breach of contract, breach of the covenant of good faith and fair dealing, and violation of California's strict and sweeping unfair competition laws.

## II.     THE PARTIES

14.     Plaintiff Dreamstime.com, LLC is a limited liability company incorporated under the laws of Florida with its principal place of business located at 1616 Westgate Circle, Brentwood, Tennessee 37027.

15.     Defendant Google LLC is a Delaware limited liability company that is

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

a wholly-owned subsidiary of Alphabet, Inc., with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

16.     Plaintiff Dreamstime is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 10, and therefore sues these defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities as they are ascertained.  Plaintiff is informed and believes that each of the fictitiously named defendants is responsible in some manner for the injuries to plaintiff as alleged herein.  Plaintiff further alleges that its injuries were proximately caused by each and all such defendants.

### III.   <u>JURISDICTION AND VENUE</u>

17.     This Complaint is filed and this civil action is instituted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover the damages caused by, and to secure injunctive relief against the named defendant's past, continuing, and on-going violation of Section 2 of the Sherman Act (15 U.S.C. § 2).  This Court has original, diversity, and exclusive jurisdiction over the subject matter of this civil action under 28 U.S.C. §§ 1331, 1332, and 1337 because it involves claims arising under the Sherman Act (15 U.S.C. § 2), and diversity between the parties exists.

18.     Venue is proper in this District as all parties consented to venue and jurisdiction in the state of California, County of Santa Clara as the mandatory forum to enforce or interpret the operative agreements that form part of the basis of this action.  In particular, Google's Advertising Program Terms (the "AdWords Agreement") contain a forum selection clause calling for venue in Santa Clara County, California.  The AdWords Agreement also provides that California law governs the Agreement.  All parties that desire to use Google AdWords must first agree to the AdWords Agreement before they can create an AdWords account at https://adwords.google.com.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

19.     Defendant maintains an office and transacts business on a systematic and continuous basis within this District, and may be found here, within the meaning of 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391.  Further, the unlawful acts alleged herein were performed and occurred in material part within this District.

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.   Google Maintains a Monopoly in the Market for Online Search Advertising

#### 1.     Google Has a Monopoly in the Online Search Market

20.     Google operates in multiple markets.  One of its most important markets is the online search market which is defined for purposes of this action as the domestic market for search engine queries.  As described below, Google monetizes its dominant position in search – which is ostensibly free to users – with a commensurately dominant position in the online search advertising market, in which Dreamstime is a consumer.  This Complaint first describes Google's dominance in free or "organic" search and then how that dominance translates into commensurate dominance in the relevant product/service market of online search advertising.

21.     Google owns and operates the world's largest search engine and has established Google as one of the most influential companies in the world.  A "web search engine" is a software system that is designed to search for information on the World Wide Web.  The search results are generally presented in a line of results often referred to as search engine results pages ("SERPs").  Consumers use search engines to find information on the Internet quickly.  Consumers enter a query into a search engine, typically a few keywords (*e.g*., "stock photos"), and the search engine then returns a list of results.  The usefulness of the search engine depends in large part on the relevance of the result set it gives back.  While there may be millions of web pages that include a particular word or phrase, some pages are more relevant, popular or authoritative than others.  Most search engines, including

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

Google, employ methods to rank the results to provide the "best" results first (its "search results").  Most search engines, including Google, are commercial ventures supported by advertising revenue of various types.

22.    Google's search engine uses a number of proprietary algorithms to rank websites in its search engine results.  Google claims that the algorithms allow its search engines to "return good answers" and help consumers find "pages with relevant information."  Google claims its algorithms "sort through the hundreds of billions of webpages in our Search index to give you useful and relevant results in a fraction of a second."  A website's Google search ranking has a direct, measurable impact on the amount of web traffic to that website.  The Google ranking is so important to businesses (and especially online businesses) that entire industries exist relating to "optimizing" a website's Google search ranking.  Google has stated that the primary purpose of its search algorithms is "giving relevant information."  The other major online search engine companies deploy similar algorithms that rank relevant results based on a user's search.

23.    According to netmarketshare.com, Google maintains 80.52% of the global market for online search engines.  By comparison, its largest competitors Baidu (5.94%), Yahoo (5.35%) and Bing (6.92%) collectively muster approximately 17% of the market share.  Thus, Google has a global monopoly in the online search market.  Google also has a monopoly in the United States online search market.  For example, in 2017, Google's share of the online search market performed from laptops or desktops fluctuated between 78.7% and 69.21 % according to netmarketshare.com.  In the mobile search market in the United States, Google has over 93% market share.  As a "business to business" platform that offers high-resolution stock photographs, most of Dreamstime's business comes from desktop or laptop purchases.  Mobile phones with limited bandwidth and storage are not as suited to downloading high resolution stock photographs.  At the same time, many

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

of Dreamstime's contributors submit content via mobile phones and many potential customers sometimes search for stock photograph offerings on mobile devices and then later make purchases and downloads via desktops or laptops.

24. There are a small number of participants in the online search market, and the market has high barriers to entry. Engineering talent is limited and data centers that can simultaneously support millions of searches are expensive. Moreover, search engines have evolved such that most modern search engines are based on machine-learning algorithms combining thousands of factors. Some of the most prominent factors are historical search query logs and their corresponding search result clicks. One study cited in a 2015 Harvard Business Review article noted that historical search data improves search results up to 31%, meaning that in effect "today's search engines cannot reach high-quality results without this historical user behavior."[5] The result is that new market participants, even those with better algorithms, "cannot enter the market and compete with the established players, with their deep records of previous user behavior." Data on user behavior in turn creates enormous network effects and critical mass that cannot be replicated by new entrants into the market.

25. For example, several years ago Microsoft, currently in the 28th position in the Fortune 500 list, decided to launch a new search engine to compete with Google. After years of struggling with unsuccessful search products and faced with the problem of building a competitive search engine without access to historical data, Microsoft formed an alliance with the internet company Yahoo!. Pursuant to this alliance, Microsoft's Bing search engine would power Yahoo!'s search. The "Yahoo!-Microsoft Search Alliance" deal was formally signed in December 2009

[5] *See* Radinsky, Kira, "Data Monopolists Like Google Are Threatening the Economy," Harvard Business Review March 2, 2015.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

and received legal clearances in 2010.  The alliance, however, never performed to Yahoo!'s expectations, lagging behind revenue projections, and the alliance was restructured in 2015.  Today, despite Microsoft's vast resources and alliance with Yahoo!, Bing still lags well behind Google in the online search market.

26.     Microsoft's experience in the online search market is particularly telling.  Microsoft entered the market with high brand recognition and visibility and as a highly sophisticated and experienced competitor in Internet technology. Notwithstanding its brand recognition and significant financial investment, Microsoft has not been able to significantly penetrate Google's market dominance.

27.     This real-world example demonstrates the significant barriers to entry that exist in the online search market.

28.     Google's dominance in the online search market is so well-recognized that it has added a new verb to the English language.  On the website dictionary.com, there are three definitions for Google.  The first is a noun, referring to the company, Google.  The other two definitions are *verbs*:

2.  verb (used with object), Googled, Googling. (often lowercase) to search the Internet for information about (a person, topic, etc.):  *We googled the new applicant to check her background*.

3. verb (used without object), Googled, Googling (often lowercase) to use a search engine such as Google to find information, a website address, etc., on the Internet.

29.     Some commentators have suggested that the zero-cost nature of free online search disqualifies this grouping from being considered a relevant market for antitrust purposes, and for this and other reasons the relevant market for purposes of this case is online search advertising.  To begin with, however, it must be noted that "free" search is not really free – consumers waive many privacy rights and provide very valuable behavioral data to Google when performing free searches.  This

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

behavioral data in turn creates vast network effects, which are large barriers to entry. In any event, the zero-cost aspect of online search does not immunize it from consumer harm.  As John M. Newman recently noted in a law review article for the University of Pennsylvania Law Review entitled *Antitrust in Zero-Price Markets: Foundations*:

> Modern antitrust law is firmly grounded in neoclassical economics, which is in turn centered on price theory.  Steeped in price theory, preeminent antitrust theorists have urged that without prices there can be no markets, and consequently no market power.  This heavy methodological dependence on positive prices has led antitrust courts and enforcement agencies to overlook potentially massive welfare harms.  Unfortunately, recent empirical research confirms that such harms have already occurred . . . The absence of positive prices thus does not foreclose antitrust scrutiny; "trade," for purposes of the Sherman and Clayton Acts, encompasses zero-price transactions.  To continue ignoring welfare harms in these markets would be both unjust and inefficient.

### 2.      Google Has a Monopoly in the Online Search Advertising Market

30.      The online search advertising market is an appropriate relevant product/service market in which to assess Google's market power, and its selection in lieu of online search as a whole has no legal or practical effect on the Sherman Act Section 2 analysis in this case.  Google's dominance in the online search market translates to a commensurate dominance in the online search advertising market. Google's share of the U.S. online search advertising market has steadily increased,

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

from 75.8% in 2016 to an estimated 80.2% by 2019.[6]  Other than Google, only Amazon, which held a mere 1.9% market share in 2016, is expected to increase its market share over the next two years (to a mere estimated 2.2% by 2019).[7]  Dreamstime is a consumer in the online search advertising market, and the allegations herein regarding Google's manipulation of Dreamstime's and its competitors' AdWords campaigns is both a breach of contract and a basis for Google's antitrust liability with respect to this relevant market.

31.     Though the online search market and online search advertising markets are described separately for the sake of precision, and though the online search advertising market is the relevant antitrust market for purposes of this case, they are essentially one and the same, and Google's monopoly power exists in both.  In essence, Google is monetizing a monopoly position in online search by selling advertising on top of search results.  The search function is "free" to the searcher, but the searcher provides extremely valuable private information about the searcher's behavior when he or she conducts a search and is also subjected to advertising paid for by consumers of the ads such as Dreamstime.  No one would go to Google just to see ads, and no ads would be placed on Google without the free search services.  In many ways, this relationship is akin to free over-the-air sports programming that is monetized by commercial advertisements.  The market may be described as that for sports programming or for advertising within sports programming, but it is essentially one market.  Viewers may tune in for free to NBC to watch the Olympics, but NBC (largely) monetizes that experience through ads.  The fact that the Olympics are free to watch with a digital antenna in no way

---

[6] *See*, https://searchengineland.com/google-search-ad-revenues-271188 (last accessed on March 19, 2018).

[7] *Id.*

COMPLAINT

changes the fact that NBC is in the market for sports programming.  The same analogy applies to over-the-air free radio and print newspapers.

32.     The DOJ recognized a relevant market of online search advertising in fighting a proposed advertising agreement between Yahoo! and Google in 2008, which was abandoned on the eve of the DOJ filing an action against it.  In a press release dated November 5, 2008, entitled *Yahoo! Inc. and Google Inc. Abandon Their Advertising Agreement*, the DOJ stated (emphasis added):

> 'The companies' decision to abandon their agreement eliminates the competitive concerns identified during our investigation and eliminates the need to file an enforcement action,' said Thomas O. Barnett, Assistant Attorney General in charge of the Department's Antitrust Division. 'The arrangement likely would have denied consumers the benefits of competition –lower prices, better service and greater innovation.'
>
> . . .
>
> The Department's investigation revealed that Internet search advertising and Internet search syndication **are each relevant antitrust markets and that Google is by far the largest provider of such services**, with shares of more than 70 percent in both markets. Yahoo! is by far Google's most significant competitor in both markets, with combined market shares of 90 percent and 95 percent in the search advertising and search syndication markets, respectively . . . Had the companies implemented their arrangement, Yahoo!'s competition likely would have been blunted immediately with respect to the search pages that Yahoo! chose to fill with ads sold by Google rather than its own ads, and Yahoo! would have had significantly reduced incentives

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

to invest in areas of its search advertising business where outsourcing

ads to Google made financial sense for Yahoo!

33.     The FTC has also recently recognized online search advertising as an appropriate antitrust relevant market, in the context of the merger of Google and traditional online display-ad marketing company, DoubleClick.  Even though the Google-DoubleClick merger would by some industry estimates give Google a 69% share of all online advertising revenues, the FTC did not challenge the merger because Google and DoubleClick were, in its view, in separate relevant markets.  Its official statement, released in December 2007, directly dismissed the argument that other forms of online advertising are appropriate substitutes for online search advertising (emphasis added):

> The evidence in this case shows that advertisers buy online advertising space from both search engine providers, like Google, and content providers (referred to as publishers in the online advertising business). ***However, the evidence in this case shows that the advertising space sold by search engines is not a substitute for space sold directly or indirectly by publishers or vice versa.*** Or, to put it in terms of merger analysis, the evidence shows that the sale of search advertising does not operate as a significant constraint on the prices or quality of other online advertising sold directly or indirectly by publishers or vice versa.
>
> . . .
>
> Advertisers view online content providers differently. A user's visit to a particular content page may reveal some insight into that user's interests. However, users visiting a content page do not declare their interests in the same way they do when they type in a keyword on a search engine. As they do in other media, advertisers wishing to

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

direct their advertising to customers based on their interests must decide where to place advertising after determining which websites are popular with the advertisers' target customers. For example, a manufacturer of hybrid vehicles may purchase advertising space on an online magazine's feature on climate change.

Google, through its AdWords business, is the dominant provider of sponsored search advertising, and most of its online advertising revenue is generated by the sale of advertising space on its search engine results pages. DoubleClick does not sell sponsored search advertising.

. . .

**_Unquestionably, Google is the most popular search engine on the Internet today by almost any metric._** **_As a result, it has a high market share in sponsored search advertising._**

34. Recently, on June 27, 2017, the European Commission fined Google €2.42 billion for "breaching EU antitrust rules" and abusing its dominance in search by giving an illegal advantage to its own comparison-shopping service, Google Shopping, and requiring it to end all anticompetitive conduct going forward. In a press release shortly after the ruling, Commissioner Margrethe Vestager stated: "Google's strategy for its comparison shopping service wasn't just about attracting customers by making its product better than those of its rivals. Instead, Google abused its market dominance as a search engine by promoting its own comparison shopping service in its search results, and demoting those of competitors." The press release further explained (emphasis in original):

From 2008, Google began to implement in European markets a fundamental change in strategy to push its comparison shopping service. This strategy relied on Google's dominance in general internet

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

search, instead of competition on the merits in comparison shopping markets:

- **Google has systematically given prominent placement to its own comparison shopping service**: when a consumer enters a query into the Google search engine in relation to which Google's comparison shopping service wants to show results, these are displayed at or near the top of the search results.

- **Google has demoted rival comparison shopping services in its search results**: rival comparison shopping services appear in Google's search results on the basis of Google's generic search algorithms. Google has included a number of criteria in these algorithms, as a result of which rival comparison shopping services are demoted. Evidence shows that even the most highly ranked rival service appears on average only on page four of Google's search results, and others appear even further down. Google's own comparison shopping service is not subject to Google's generic search algorithms, including such demotions.

As a result, Google's comparison shopping service is much more visible to consumers in Google's search results, whilst rival comparison shopping services are much less visible.

The Commission found that "Google is dominant in general internet search markets throughout the European Economic Area," and that "[t]here are also high barriers to entry in these markets, in part because of network effects: the more consumers use a search engine, the more attractive it becomes to advertisers . . . Similarly, the data a search engine gathers about consumers can in turn be used to improve results."  Finally, the Commission concluded that "Google has abused this market dominance by giving its own comparison

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

shopping service an illegal advantage."  Google Images is remarkably similar to the Google Shopping service at issue in the European Union.  The two screenshots attached as Exhibit "B" hereto compare the Google Shopping service that was prohibited in the European Union with the Google Images service at issue in this case.

35.    States Attorneys General have also begun investigations of Google in recent months.  On November 13, 2017, Missouri Attorney General Josh Hawley issued an investigative demand to Google seeking "to determine if Google has violated the Missouri Merchandising Practices Act. . .and Missouri's antitrust laws."[8]  According to its press release, the attorney general's office was investigating, among other things, "Google's alleged manipulation of search results to preference websites owned by Google and to demote websites that compete with Google."[9]  In a Fortune article covering the investigation, Missouri AG Hawley is quoted as saying that "substantial evidence exists" that Google is manipulating its core search service to list its own Google-websites higher in search results.[10]  An online Wired magazine article dated November 14, 2017, suggests that more state investigations are likely to follow Missouri's lead.[11]

---

[8] *See*, Press Release dated November 13, 2017, https://www.ago.mo.gov/home/breaking-news/ag-hawley-issues-investigative-demands-to-google-inc-. (last accessed March 19, 2018).

[9] (*Id.*)

[10] *See*, http://fortune.com/2017/11/13/google-missouri-attorney-general-investigation/ (last accessed March 19, 2018).

[11] *See*, https://www.wired.com/story/state-attorneys-general-are-googles-next-headache/ (last accessed on March 19, 2018).

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

36.     In its 2016 Annual Report, Google discloses:

The Comision Nacional de Defensa de la Competencia in Argentina, the Competition Commission of India (CCI), Brazil's Council for Economic Defense (CADE), the Federal Antimonopoly Service (FAS) of the Russian Federation, and the Korean Fair Trade Commission have also opened investigations into certain of our business practices. In November 2016, we responded to the CCI Director General's report with interim findings of competition law infringements regarding search and ads. In September 2015, FAS found that there has been a competition law infringement in Android mobile distribution. The appeal against that decision has so far been rejected, so Google has implemented the ruling to the degree possible and is working on product changes to finalize implementation. The appeals process continues. In April 2016, the Canadian Competition Bureau informed us that it was closing its antitrust investigations of our business practices.

**3.      Google Maintains and Abuses its Monopoly in the Online Search Advertising Market to Cause Harm to Competition in Related Dependent Businesses**

37.     While Google's original, famous search engine was essential to its initial success, it has exponentially expanded on that success by acquiring competing search engines, online advertising entities, mobile technologies, video sharing technologies and platforms, social media and gaming communities and artificial intelligence companies at an extraordinarily high rate.  As of December 2016, Google or its parent, Alphabet, Inc., had acquired over 200 companies, while only divesting itself of four of these companies.  Google has exploited ownership of the proprietary technologies acquired along with those companies, as well as their

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

user bases and networks, by integrating them into its increasingly vast and increasingly more dominant position in online search, advertising, e-commerce and mobile devices.

38.     By so doing, Google has progressively and synergistically increased its market power in innumerable related or downstream businesses in those fields, giving it the power to dictate not only economic and compensation rules on those businesses but also to manipulate the very content made available to Internet users, both directly and indirectly.  At an October 31, 2017 hearing of the Senate Judiciary Committee where members of the Committee grilled executives from Google and other large tech companies concerning the ways their platforms were manipulated during the 2016 U.S. presidential election, Republican Senator John Kennedy expressed concern about these companies' "breathtaking" influence: "[y]our power sometimes scares me."[12]

> **4.     Dreamstime Is a Consumer in the Online Search Advertising Market and a Competitor in the Online Stock Photography Business**

39.     In addition to its standing as a consumer and participant in the online search advertising market, Dreamstime has been injured in and competes in the online stock photography business which is defined for purposes of this action as the online business of selling and distributing licensed digital images and includes market participants such as Dreamstime, Shutterstock, Getty Images, Adobe and other smaller competitors.  Shutterstock, Getty Images and Adobe together control the bulk of the online stock photography business.  Along with Dreamstime, these participants comprise a highly concentrated industry.  As described on

---

[12] *See*, https://www.fastcompany.com/40489793/senators-grill-facebook-twitter-google-on-fake-news-your-power-scares-me (last accessed March 19, 2018).

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

Shutterstock's website, "stock photos are images that anyone can license for creative use.  Rather than hire a photographer, designers can search a large database of photos and quickly find one that works for their project."[13]  Shutterstock's website also describes the crucial role that Internet search engines play in the online stock photograph market: "[t]oday, Internet search engines allow anyone to find the perfect stock photo in seconds."[14]  Getty Images' CEO, in announcing its partnership with Google, cited its own "market leading" position and the fact that the partnership is likely to increase its dominant position: "We will license our market leading content to Google, working closely with them to improve attribution of our contributors' work and thereby growing the ecosystem."

40.     So-called "vertical search" websites (websites with a search function that are "downstream" from search engines like Google), including stock photo websites, pose an existential threat to Google's monopoly in the online search advertising market.  Like other "vertical search" websites, stock photo websites are repository sites, places where a consumer can go directly to search for millions of images, instead of starting with Google or Google Images. If they gained sufficient brand recognition and awareness, most consumers would know the primary stock photo URLs by heart (like they know amazon.com or yelp.com by heart) and could start there to search for stock photos, skipping Google as a middle step.  This "cutting out the middleman" takes away searches from Google, which of course then takes away search advertising revenue from Google, because every search pulls up AdWords results that increase Google's online search advertising monopoly.  Google Images would be devastated if more consumers knew they could go to Dreamstime, Getty Images, Adobe or Shutterstock directly instead of going to

---

[13] *See*, www.shutterstock.com/support/articles/en_US/kbat01/What-are-stock-photos. (last accessed on March 19, 2018).

[14] *Id.*

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

Google first.  Then, these dominant stock photo sites could start expanding their offerings to include other things people search for to buy.  This is exactly what Amazon and Yelp have done to some degree.  As noted below, one important way that Google keeps this from happening is partnering with some competitors and excluding others like Dreamstime (a lower cost competitor) that threaten its monopoly of online search advertising.  This gives Google more control over (and information about) what the dominant stock photo websites are doing, which allows it to prevent them from supplanting Google as the place to search for images on the Internet.

41.     Google has long recognized the importance of "vertical search" threats like stock photography repositories to its search dominance, and the FTC also recognized this threat in its prior investigations of Google.  As an article in *International Business Times* entitled "Google Faces Threats From Amazon, Yelp, Retailers As Search Goes Mobile"[15] reported:

> The search wars are back on, but this time it's different . . .
> Google also faces the challenge of competing against Amazon, Yelp and many other services that threaten to eat into its market with specialized or vertical search engines.
>
> This threat to Google's business has been around for years, but it was thrust back into the spotlight this week after documents from the Federal Trade Commission were revealed showing just how much the Mountain View, California, tech titan fears vertical search engines.

---

[15] *See*, http://www.ibtimes.com/google-faces-threats-amazon-yelp-retailers-search-goes-mobile-1861968. (last accessed March 19, 2018).

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

Specialized search engines 'might cause users to shift their searches in those categories away from Google's general Web search platform. As users moved to vertical search websites, those websites could, in turn, become more attractive vehicles for advertisers, thus resulting in potentially significant revenue losses to Google,' the FTC documents, which were obtained by the Wall Street Journal, said.

This fear for Google is more pressing than ever. . .

42.    Dreamstime is one of the leaders among online stock photography repositories and has been a reliable supplier of high quality digital images since 2000.  Dreamstime is a repository of millions of high quality stock images.  It serves a variety of clients in the creative market, from independent private sector customers to Fortune 100 companies.  As of March 2018, Dreamstime had 20,000,000 registered members, more than 400,000 contributing photographers and over 75,000,000 photos, illustrations, clip arts, and vectors.

43.    Dreamstime conducts its business through its website and mobile applications, through which customers can choose from millions of high quality digital photographs, videos and illustrations sold by hundreds of thousands of contributing photographers.

44.    Dreamstime has worked diligently for almost two decades to establish itself as a leader in online stock photography.  Like all its competitors in the online stock photography business, Dreamstime relies heavily upon online search engines and search engine advertising to build its name recognition and generate new customers and sales.  Like most modern stock photography companies, Dreamstime's business is conducted exclusively through the Internet and web-based applications.  As much as 99% of Dreamstime's business comes from the Internet.  As such, search engines are a *critical* component of Dreamstime's sales and customer acquisition strategy.  Roughly two-thirds of Dreamstime's customers find

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

their way to the website from a search-engine search.  Even customers with active Dreamstime accounts will often conduct a Google search for "Dreamstime" (sometimes along with other search terms) instead of typing "Dreamstime.com" in their browser address bar.

45.     High barriers to entry exist in the online stock photography business. Among other things, the major players in this industry all possess vast repositories of digital images for consumers to search for and license.  Shutterstock's website boasts over 183 million images; Getty Images has an archive of over 80 million still images and illustrations and more than 50,000 hours of stock film footage; and Adobe claims "millions" of available images.  Hosting these images and making them available on websites requires significant computing power and engineering. Moreover, existing online stock photography companies employ vast networks of contributors to build their library of digital images.  Like many Internet-based companies, these companies take advantage of network effects whereby a product or service gains additional value as more people use it.  Network effects create the most significant barrier to entry, because photographers only want to license their photos to websites that already attract a large number of potential purchasers. Adobe was the most recent major player to enter the online stock photograph business in 2015, and it was only able to enter the business because of extraordinary, "one of a kind" advantages peculiar to it: Adobe is the publisher of popular image-editing software available through their "Creative Cloud Interface."  Adobe found that 85% of creative professionals who purchase stock photography used their software products and that 90% of all stock photography was edited using their software.  Adobe integrated its online stock photograph business directly into its Creative Cloud interface, which links directly with any Adobe program currently accessing a user's image library.  Even with these advantages, Adobe had recently captured only 2.62% of the market for online stock photography.  Like the

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

Microsoft example in online search, the Adobe example illustrates the significant barriers to entry in the online stock photography business.  It is worth noting that this was Adobe's *third* attempt at entering this business segment.  Adobe had previously paid $800 million to purchase Fotolia, one of Dreamstime's competitors.

### 5.   Google Restricts and Distorts Competition in Online Stock Photography Through Its Deals with Shutterstock and Getty Images

46.   On July 12, 2016, Shutterstock publicly announced a licensing agreement between it and Google.[16]  Among other things, the deal provides advertisers with access to Shutterstock's library of online images to use with their advertisements running through Google's AdSense, AdWords and AdMob platforms.  The day after the deal was announced, Shutterstock's stock price rose 14.2%.   On information and belief, the licensing agreement allows Google to receive revenue from the licensing of Shutterstock's online stock photographs, thereby making Google a participant in the online stock photograph business.  On information and belief, the licensing agreement calls for Shutterstock to share user data with Google, which allows Google to maintain its monopoly in the online search advertising market.

47.   Google also plans to enter the online stock photography business segment directly and is currently using its Google Images service to disrupt the market for stock photos and eliminate (or at least significantly impair) competition in that line of commerce.  One way that Google caused anticompetitive effects in the online stock photography business until very recently was by way of its "view

---

[16] *See, e.g.,* Sullivan, Laurie. "Google, Shutterstock, Licensing Deal Automatically Chooses Images For Ads" available at https://www.mediapost.com/publications/article/280120/google-shutterstock-licensing-deal-automatically.html (last accessed on March 19, 2018).

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

image" button that appeared when a user clicked on an image returned by a Google search.  Clicking on this button allowed a user to open and save the image directly. The view image button encouraged and enabled users to steal copyrighted photographs from photographers, publishers and online stock photography companies, including Dreamstime.  The button allowed users to bypass the websites from which Google obtained the image and provided the image directly to the user. To make matters worse, Google provided users with high resolution copies of these images, which made it even easier and more desirable for users to download and save images without visiting their website of origin.  Of course, by bypassing the original website, Google users were not exposed to relevant copyright and ownership information available on the websites from which the images originated. The "view image" button took business away from Dreamstime and other stock photography companies: users often took and used images from Dreamstime without ever visiting its site.  This often resulted in an infringement of the image's copyright and prevented the user from purchasing the image from Dreamstime or being exposed to Dreamstime's website and its many other stock photograph offerings.  On February 15, 2018, it was reported that Google was removing its "view image" button to encourage users to visit the website that hosts the image.[17] The article notes that "the intention seems to be either stopping people from taking an image altogether or driving them through to the website where the image is found, so that the website can serve ads and get revenue and so that people are more likely to get copyright information."[18]  Just one week after Google removed this button, Dreamstime experienced a 25% increase in traffic to its website and 10% increase in conversion – proving that Google's past conduct with the "view image"

---

[17] *See*, https://www.theverge.com/2018/2/15/17017864/google-removes-view-image-button-from-search-results. (last accessed on March 19, 2018).
[18] *Id.*

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

button stole traffic and customers from Dreamstime.  The button no doubt was popular with some Google users who wanted to easily obtain copyrighted images for free, increasing the popularity of Google's search engine.  To this day, however, searchers are still able to access high-resolution images that show up in Google Images searches by right-clicking and saving the image.  These images are still of a high enough resolution for desktop and mobile screens as to allow abuses to occur.  Google has taken its empowerment of would-be infringers even further, by creating and distributing a script that removes watermarks from images (watermarks are one means by which a copyright owner prevents unauthorized use of an image).

48.     In or around the first week of February 2018, Google and Getty Images announced a "multi-year global licensing partnership, enabling Google to use Getty Images' content within its various products and services."[19]  That deal "effectively" ended a copyright and antitrust dispute filed by Getty Images in the European Union in 2016 involving Google Image's use of high-resolution images "scraped" from Getty Images' and/or its customers' websites.  Ironically, Google may have partnered with Getty Images to avoid antitrust liability in the European Union at the same time as the "partnership" furthers its ability to control and restrict trade in the online stock photography business.  Because this partnership is in its nascent stages, little measure of the effects it will likely have on the online stock photography business is available (though Getty Images has at times received an even higher rank than Shutterstock since the deal).  On information and belief, the licensing agreement allows Google to receive revenue from the licensing of Getty Image's online stock photographs, thereby making Google a participant in the online stock photograph business.  On information and belief, the licensing agreement calls

[19] *See,* www.searchengineland.com/google-getty-images-enter-multi-year-global-licensing-partnership-291831. (last accessed on March 19, 2018).

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

for Getty Images to share user data with Google, which allows Google to maintain its monopoly in the online search advertising market.

**6.    Google Abuses Its Monopoly Power in Online Search Advertising to Harm and Competitively Disadvantage Its Consumer, Dreamstime, in the Online Stock Photography Business**

49.    Google wields its market power in online search advertising discriminatorily by giving some participants in downstream dependent businesses higher search rankings while lowering the search rankings of others to the point that they become invisible.  Google's apparent purpose is to exclude competition, increase Shutterstock's (its partner/proxy's) and Getty Images' (its partner/proxy's) market power and reduce consumer choice, while at the same time maximizing the AdWords revenue Google derives from other large competitors that have significant AdWords campaigns.  When Dreamstime is gone, Shutterstock's and Getty Images' dominant positions will be solidified, and Google will be able to eliminate still other large competitors, starting with those who spend the least on its profitable AdWords services.

50.    Here is how this works in practice:  Google discriminates in the online search market by rigging its search engine algorithm to unfairly privilege its partners, Shutterstock and Getty Images, and to essentially exclude Dreamstime from organic search results for stock photography.  The only other significant stock photo website that is not a partner of Google's and that may have benefited marginally from Google's exclusion of Dreamstime and other competitors is Adobe. Google derives large profits from online advertising purchased by Adobe, creating significant costs in the short term for it to eliminate Adobe.  In addition, Google is aware that eliminating all competitors besides Shutterstock and Getty Images at once would draw more obvious antitrust scrutiny.  Indeed, Google's search engine

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

might lose all credibility if it were to return no relevant searches for stock photography other than Google Images, Shutterstock, Getty Images and their wholly-owned websites.  For the most part, Adobe stays on the first page of organic search results, but it does not generally rank ahead of Shutterstock and Getty Images or receive the other benefits unique to Shutterstock described herein (*e.g.*, "knowledge graphs," at Exhibit "A").

51.     Google has also elevated the search ranking of various websites containing only public domain images and other "Junk Websites," defined for purposes of this lawsuit as results responsive to search terms related to online stock photographs that are of low relevance to customers searching for sources of licensable digital images.  Google's promotion of Junk Websites can only have an anticompetitive purpose and effect, because these sites knock Dreamstime out of view for the consumer googling for stock photography but do not promote viable alternatives in the process.

52.     While Google has focused many of its efforts on Dreamstime (so far), Dreamstime is not the only competitor that has been excluded from organic search results in this fashion.  Google has also intentionally altered its algorithm to harm other similarly-situated competitors, including 123RF, DepositPhotos, and CanStockPhoto, who all suffered inexplicable drops in organic search rankings.

53.     In sum, Google has altered its search algorithm – or, at least, how that algorithm was applied to Dreamstime and others – to unfairly exclude Dreamstime and others in the online stock photography business and to favor Google's own services and those of Shutterstock and/or Getty Images,[20] providing an unearned and

---

[20] Adobe may also benefit marginally in the intermediate term as an indirect consequence of Dreamstime's exclusion.  However, it too risks harm in the long term when Google takes further advantage of its own Google Images, Shutterstock's and Getty Images' increased market power to exclude it.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

crucial advantage to Shutterstock and Getty Images over Dreamstime and others.  In the process, many Junk Websites populate Google's search results, diminishing the consumer experience, and increasing the likelihood that consumers are directed to Shutterstock and Getty Images (or to Google Images, Google's own service).

54.     Google's maintenance and abuse of its online search advertising monopoly to restrict and distort competition for online stock photography has benefited Google directly, and has also benefited its partners Shutterstock and Getty Images.  For example, Google's market power in the online search advertising market has allowed it to extract supracompetitive advertising premiums from its customers because it is not required to compete on price.  That is, most of the commercial websites ranked by Google are also customers of Google's online advertising services.  Those websites that are pushed to the bottom of the search rankings, as Dreamstime has been, are forced to increase their reliance (and spending) on Google online advertising services to drive customers to their website and generate business.  In the past, when Dreamstime's search ranking more accurately reflected its relevance to online stock photography, Dreamstime did not need to spend as extravagantly on its paid advertising on search results pages.  The elimination of Dreamstime from organic search results in turn allows Google to maintain its monopoly power over online search advertising by eliminating an important "vertical search" threat to its search dominance.

55.     Google has long been accused of exactly this kind of discriminatory, anticompetitive manipulation of its search engine.  In a Senate hearing on Google in September 2011, Jeff Katz, CEO of Nextag, Inc., complained that Google "cook[s]' its algorithm … rigging its results, biasing [search results] in favor of [itself.]"  The downstream business for online stock photography is one of several dependent businesses that have been injured through Google's maintenance and improper use of its online search advertising market power, injuring its customer Dreamstime and

COMPLAINT

giving it standing to bring these antitrust claims.  This conduct, in turn, harms consumers of online stock photographs, by eliminating millions of images from their available choices in that online industry.  This industry is at the very foundation of online advertising because it provides high quality images to integrate into advertisements.

56.     By favoring its own additional services in downstream businesses (that are dependent on Google's online search services) through its monopoly of the online search advertising market, Google both pressures current competitors in the downstream businesses to exit their businesses as well as increases the cost (or makes it impossible) for additional competitors to enter those marketplaces.  For example, in Senate testimony of September 2011, Yelp CEO Jeremy Stoppelman indicated that "there's no way" he would have started Yelp, or a business using a similar strategy, if Google had been engaging in the favored placement of its own services in the way that has become Google's routine.

**B.     Google Engages in Predatory, Discriminatory, and Anticompetitive Conduct to Maintain and Exploit its Monopoly**

57.     Google has injured competition in the online business in which Dreamstime competes, online stock photography, through the discriminatory use of its monopoly power in the online search advertising market, excluding Dreamstime (a consumer of Google's search advertising services) and other online stock photography competitors from all common searches for stock photography.  As described below, Google has engaged, and continues to engage, in predatory or anticompetitive conduct directed at accomplishing its unlawful goal of preserving its monopoly and harming competition downstream for its economic benefit. Ultimately, consumers are harmed because Dreamstime, as a large supplier of unique, high-quality stock photo images – one that otherwise would exert downward pricing pressure on a dominant market player like Shutterstock or Getty Images –

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

has essentially become invisible to consumers.  In fact, one of Dreamstime's most important unique selling points that differentiates its stock photography offerings from other competitors like Shutterstock and Getty Images is its competitive pricing. Most of Dreamstime's customers view its pricing as Dreamstime's most important distinguishing feature over other online stock photography competitors.[21]

### 1.   Google's Monopoly Abuse and Exploitation Has Restricted Competition for Stock Photography Directly and Through Its Partners/Proxies Shutterstock and Getty Images

58.    Google, through its partner/proxies, Shutterstock and Getty Images, and buttressed by its unlawful Google Images practices, has restricted competition among stock photography repository websites (which, in turn, eliminates a "vertical search" threat to Google's search advertising dominance).  Shutterstock and Getty Images currently control a dominant share of the online stock photography industry, together representing close to 70% of the market.  Google's strategy in the online stock photography business is transparent: using Google's search algorithm to unfairly sandbag Dreamstime's search ranking, further assisted by other discriminatory conduct against Dreamstime with respect to Google's AdWords and Google Images.  The elimination of competition in "vertical search" websites like those allowing for direct stock photography searches enhances Google's online search advertising monopoly.

59.    The Shutterstock and Getty Images contracts are opportunities for Google to collect more user data and play into the self-reinforcing strength of

---

[21] Because Dreamstime has lost so much traffic after Google downgraded its search ranking and because of its increased costs due to the necessity of countering Google's tactics by increasing its Google AdWords spending, Dreamstime may soon have to raise its prices and risk losing one of its key advantages over larger online stock photography companies.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

Google's search advertising platform as it gathers more data compared to rivals.  Or as Jonathan Rosenberg, Google's *own* VP of Product Management and Marketing, explained in an unguarded statement in 2008:

> We get more users because we have more advertisers because we can buy distribution on sites that understand that our search engine monetizes better.  So more users more information, more information more users, more advertisers more users, it's a beautiful thing, lather, rinse, repeat, that's what I do for a living. So that's . . . the engine that can't be stopped.[22]

Its control over user data creates enormous barriers to entry and unique competitive advantages for Google that increase its monopoly power with every partnership it enters.  In fact, multiple countries have accused Google of (and sanctioned it for) unlawful mining of user data through various platforms and arrangements, including but not limited to Google Maps, Android phones, and alliances with other partners.  In a recent Yale Journal on Regulation article entitled "Search, Antitrust, And the Economics Of The Control Of User Data" (31 Yale J. on Reg. 401, 435-440), Nathan Newman stated: "Beyond entrenching its monopoly on search advertising by expanding into new online markets to control new user data, Google has even more directly used its market power to coerce allies in ways that fortify its position and engaged in flatly illegal activities to reinforce its control of user data."  As spelled out in the Newman article (at pages 435-440), Google

---

[22] Press Release, Senator Richard Blumenthal, Blumenthal Continues to Press Google on Market Power and Competition Policy. *See,* https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-continues-to-press-google-on-market-power-and-competition-policy- (last accessed on March 19, 2018).

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

has engaged in unlawful conduct that violates privacy or consumer fraud laws, all in the interest of maintaining and enhancing its dominance in gathering, organizing, and reselling private information.  The use of that private information in turn enhances Google's revenues and its monopoly in the online search advertising market.

60.     In connection with the DoubleClick merger investigation, the FTC stated: "The popularity of Google's search engine and its technical prowess already give Google abundant customer information even pre-transaction."

61.     Google wields monopoly power in the online search advertising market through its ability to control prices or destroy competition.  It abuses that power by discriminating and restraining trade in the online stock photography business, a "vertical search" business that threatens Google's monopoly.  Google manipulates this competition for its own benefit.  As described above, it chooses winners in the online stock photography industry.  This has a two-fold benefit for Google: (a) it increases its revenue both through its partnership with Shutterstock and Getty Images and through the increase in advertising revenue it derives from excluded websites; and (b) it allows Google to maintain its monopoly power in the online search advertising market.  Google profits from having arrangements with dependent dominant downstream parties because it ensures it will receive the revenue from the party it has helped gain dominant downstream market share.  Google maintains and even enhances its monopoly by creating downstream arrangements, like the ones it has with Shutterstock and Getty Images.  In exchange, Google need only alter its search algorithm (essentially a low-cost undertaking) to promote Shutterstock's and Getty Images' rankings and downgrade Dreamtime's and others' rankings.  A non-discriminatory application of Google's search algorithm would result in Google losing a significant amount of revenue from

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

Shutterstock and Getty Images (as well as its own Google Images) and would foster healthy and fair competition among these websites.

62.     Shutterstock, one source of Google's revenue derived from online stock photography, was recently the second result when a user searched for the terms "stock photography" in Google's search engine.  The website Wikipedia – which is commonly known to be a non-commercial, encyclopedic reference website – ranked first in this search.  In other words, Shutterstock was the first commercial entity ranked on a search for "stock photography."  A knowledge graph also appeared below the first search result very high on the page and the first question in that knowledge graph is "are there free images on Shutterstock" – none of the other three questions in the knowledge graph mentioned any stock photography company by name.  Getty Images also ranked highly in Google's search results (typically in the first two or three) and, through various special arrangements with Google, is likely to enjoy even greater organic search visibility for its images after its licensing agreement with Google.  Adobe ranked fourth.  Other Junk Websites or public domain images websites (which are not stock photography websites) round out the top 10.

63.     In a recent Google search for "stock photos," iStock (owned by Getty Images) and Shutterstock ranked prominently and consistently in the top five.  Shutterstock's website, Bigstock, was also in the top 10.  Of the top 10 results, only iStock (owned by Getty Images), Shutterstock, Bigstock (owned by Shutterstock) and Adobe are online stock photograph competitors – that is, in the crucial first page of Google search results, the only stock photography competitors are Shutterstock, Getty Images and Adobe.

64.     Dreamstime, for so long a standard denizen of the valuable top three search results for this particular search, is generally not even found on the first 20 *pages* of results.  Other competitors have suffered a similar fate.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      **2.**      **Google Has Engaged in Additional Anticompetitive Conduct in Furtherance of Its Maintenance and Abuse of its Online Search Advertising Monopoly**

      65.    Google also has a policy against duplicative content.  Pursuant to that policy, Google prevents substantive blocks of content within or across domains that either completely match other content or are appreciably similar.  In furtherance of its maintenance and abuse of its monopoly in the online search advertising market to restrain and control online stock photography competition, however, Google now selectively enforces this rule to Dreamstime's detriment.  As mentioned above, Dreamstime's competitors Shutterstock and Bigstock are stock photo retailers owned by the same provider.  They offer the same images for license under two different domains without any appreciable difference, yet they both recently appeared as the first and second individual results when searching for the phrase "stock photo."  As a result, Shutterstock would generally receive at least 50% of the Google traffic for the search term "stock photos."  As shown in Exhibit "C" attached hereto, Google inexplicably includes as many as three to five links to the same site on its first page of search results, further pushing Dreamstime (and others) down in results that become less and less useful to potential customers.  In fact, there are some searches where only a single site is displayed on a whole page of results (*i.e.*, 10 out of 10 spots), which further demotes Dreamstime.  *See* Exhibit "D".  These results violate Google's own policy of allowing only two links from the same website owner (a policy that was intended to ensure diverse results).

      66.    Google's "support" services offered to companies further its anti-competitive scheme.  After Dreamstime sought answers from Google regarding its dramatic plunge in organic search ranking, Google refused to substantively discuss Dreamstime's search ranking or provide any rational justification for Dreamstime's unfavorable ranking.  When asked via Google's support forum (the place where

Google insists that companies must go to ask for assistance) about Dreamstime's ranking, Google's representatives have responded with sarcastic and dismissive non-advice to questions about how such low-quality results can wind up so high in organic search results.

67.     As an example of this behavior of dismissing Dreamstime's concerns about Google's search ranking policies, Exhibit "E" depicts a screen capture of a forum discussion wherein a user is asking Google why a site ranks so highly for the general search term "stock photos" when the site's main domain is permanently set to redirect users to another page deep within the indexed site's hierarchy (*i.e.*, a specific page listing images that match the more specific search string "christmas images").  In other words, the site in question employed a "hacking" technique to artificially increase its search ranking – a practice that is purportedly against Google's policies.  This example presented in the forum post involved a site called StockPhoto.com that ranked ahead of Dreamstime in Google search results. Clicking on the StockPhoto.com link in Google's search results, rather than taking users to the homepage of StockPhoto.com, redirected users to the page https://stockphoto.com/search/listen+to+music – which displays only a very narrow subset of images that are not very useful to a potential customer searching for "stock photos."  This would be akin to searching for the broad category "electronics," selecting a top result to click on, and being sent to a page that only provided information about 8-track tape players.  Rather than acknowledging a problem with the search results or volunteering substantive fixes for such a situation, John Muller, an executive on Google's organic search team, responded to the forum question by suggesting that site owners who rank below the offending site should "ask them" why they would use a redirect on their homepage.  This infuriating level of non-support is indicative of Google's attitude toward any company whom Google has not selected as a partner.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

68.     Since early 2016, Dreamstime has followed every guideline and suggestion provided by Google's documentation, as well as many other suggestions by external SEO agencies, in an effort to resolve the damage to its organic search ranking.  Nothing has changed.  In fact, Dreamstime's ranking continued to decline through the end of 2017.  At Google's recommendation, Dreamstime has implemented a bevy of changes, including: switching to https and http2; disavowing links; improving its website quality, diversity, and quantity of content; investing in dedicated hardware for a caching system; and dramatically increasing its crawl rate (10 times) and number of pages.  At Google's suggestion, Dreamstime invested numerous development hours in rebuilding its entire site to be "mobile friendly," because it was claimed that Dreamstime's search rank might be hurt by failing to have a site that worked on cell phones.  Dreamstime diverted precious development resources from other projects in its business plan and doubled its hosting costs, all to no avail.  These "suggestions" were nothing more than cover for Google's anticompetitive search bias scheme.  These suggestions could not possibly alter Dreamstime's ranking, were intended to waste Dreamstime's resources and time, and disguised Google's intentional manipulation of Dreamstime's ranking algorithm.  Dreamstime expended significant resources and time to implement these suggestions and in fact undertook an entire re-design of its website in an ultimately futile attempt to regain the ground it lost in Google's organic search.

69.     Dreamstime paid several expensive search engine "guru" firms for their analysis and opinion of why Dreamstime's Google search ranking might be declining, and not a single one was able to identify any issue with Dreamstime's site that would explain its drop in Google's search ranking.  Based on Google's public guidelines about how its search worked, Dreamstime spent millions of dollars on website hosting to increase the content on its website by adding more images.  These efforts failed to regain its lost ranking.  In addition, Dreamstime hired its own

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

in-house SEO expert to help its efforts to regain its prior search ranking. Like the outside search engine gurus, this experienced professional was unable to identify any issues with Dreamstime's site that would explain how Dreamstime came to be excluded from Google's search ranking. Dreamstime also launched a second website, Megapixl.com, to get more exposure for a subset of its content (just as Shutterstock launched a sister website Offset.com, which contained a subset of its content). Dreamstime also spent substantial sums on AdWords campaigns for Megapixl.com. Despite Dreamstime's significant investment in infrastructure and advertising for Megapixl.com, that website was unable to gain traction in organic search and Dreamstime was only able to recover a fraction of its investment. All told, Dreamstime spent several million dollars hiring search professionals, building out and launching AdWords campaigns for a second website, expanding the content on its primary site and increasing its AdWords budget.

70.    To combat the losses resulting from its effective exclusion from Google's organic search results, Dreamstime was at first forced to spend considerably more on search engine advertising to maintain its position as a leader in online stock photography.[23] This meant increased spending on advertising services including Google's AdWords. The increased reliance on paid search results in turn diminished Dreamstime's competitive standing. Of course, it also benefitted Google directly.

71.    Dreamstime is unaware of any innocuous explanation for its dramatic decline in search ranking – nothing about its website or how customers use its

_____

[23] After dramatically increasing its ad spend and implementing extensive changes recommended by Google to help with search ranking, Dreamstime recently resolved to significantly lower its advertising spending, as its advertising spending did not come close to compensating for the loss of traffic caused by Google's search bias campaign.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

website explain its decline in stock photography searches (and Google has never cited any such innocent reason in the course of Dreamstime's efforts to address the issue with Google).  If anything, Dreamstime has improved in all of the metrics that Google claims are important to search ranking.  During the relevant period (2014-2017), Dreamstime's user engagement has improved over time.  Its "bounce rate" (a metric that indicates that percentage of people who land on a web page and then leave without clicking anywhere else on the website) has declined over time while the average amount of time users have spent on Dreamstime's website has stayed basically constant.  Dreamstime's page load times have also decreased dramatically since Fall of 2015 when the issues with its search ranking became noticeable.

### 3.  Google's Discrimination Against Dreamstime Has Had Anticompetitive Effects

72.  Google has used various tactics and manipulated its search engine algorithm to illegitimately change the ranking of Dreamstime's website (and the websites of other competitors) in the results page for searches related to online stock photography, causing the ranking of Dreamstime's website to plummet several *pages* of search results for the most common searches.

73.  From approximately 2005 to 2015, Dreamstime consistently ranked in the top three in Google's organic search ranking for searches related to stock photography, and always appeared on the first page of the search results.  Due to Dreamstime's longstanding place among the top online repositories of stock photographs and its status as a top five vendor of online stock photography, its ranking made sense.  Along with three other pioneer microstock agencies, iStock, Fotolia and Shutterstock, Dreamstime challenged the traditional stock photography agencies and were major players in the online stock photograph industry.  However, iStock was acquired by Getty Images, Fotolia was acquired by Adobe, and Shutterstock and Getty Images have partnered directly with Google – leaving

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

Dreamstime on its own as the only significant independent microstock agency left from these pioneering sites, despite Dreamstime's historically large community and customer retention.

74.    Given its market position and the breadth and quality of its images, Dreamstime is undoubtedly relevant and popular to computer users that google online stock photographs.  Dreamstime's historical web traffic prior to Google's conduct reinforced this conclusion – its high traffic reflected that many people that google online stock photography ended up using and purchasing stock photographs from Dreamstime.

75.    Yet, since approximately August 2015, Dreamstime's organic search ranking on Google has inexplicably plummeted on several standard searches related to stock photography.  For example, from approximately 2005 to 2015, Dreamstime's Google ranking for the search term "stock photos" ranked either second or third.  By comparison, in or around June 2017, Dreamstime plummeted to the fourth page for the same search term despite being in the stock photography business for over a decade and offering a stock photography library of over 70 million images.  Now, its ranking has fallen to the 20th page within the Google ranking. Bing and Yahoo! both rank Dreamstime as the fourth result for this same search term, while Baidu similarly ranks Dreamstime eighth.  Both rankings would generally place Dreamstime prominently on the critical first page of search results.  These other search engine examples illustrate that Google's exclusion of Dreamstime is not due to any industry-wide change in Dreamstime's content, users' search behavior or any other rational change in circumstances.  They also demonstrate how Google's dominance over search engines harms consumers, by eliminating choices that would otherwise widely be available.

76.    Dreamstime's plummet in Google's organic search ranking significantly reduced the number of new Dreamstime buyers, i.e., new customers

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

who sign up for Dreamstime and make a purchase within one month.  For example, in April 2015, before Dreamstime's ranking drop, it gained a substantial number of new buyers.  In April of 2016, however, it gained 30% fewer buyers.  This steady decline in new buyers because of its drop in Google's rankings has caused Dreamstime to lose tens of millions of dollars in potential revenue and as much as hundreds of millions in market value.  It is safe to assume that other downgraded sites (*e.g.*, 123RF, Canstockphoto, Depositphotos) experienced a similar decline.  Again, this result not only harms Dreamstime and other competitors, it harms consumers, who now may choose only from Google's partners, Adobe or Google's own Google Images section (where images are not safe to use for commercial and legal reasons).

77.     The same holds true for other searches related to stock photography.  For example, Dreamstime's organic search ranking for "stock images" was recently 91st on Google, compared to fifth on Bing, fourth on Yahoo!, and third on Baidu.

//
//
//
//
//
//
//
//
//
//
//
//
//

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

1       78.     This graph shows Dreamstime's position in Google search results for

2   "stock photos" over the last five years, as it recently dropped from third to 91st.



BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

19      79.     Of crucial importance is Dreamstime's drop from page one of Google's

20  rankings to page two (and recently as far as page 20 and below).  According to

21  research by respected online ad network Chitika, 92% of all Google search traffic is

22  limited to the first page of the results, with the top three results receiving 61% of the

23  clicks.  When moving from page one to two, the traffic drops by 95%.  For almost

24  ten years, Dreamstime ranked in the top two to three in the key search for the terms

25  "stock photos" (far and away the most important search for online stock

26  photography due to the number of users searching for these terms).  By relegating

27

28

- 45 -

1  Dreamstime to the 20th or lower *page* in Google's search, Google has effectively

2  banished Dreamstime from the marketplace.

3  80.   This decline in Dreamstime's organic search ranking does not bear any

4  relationship to Dreamstime's overall organic visibility, which improved over the

5  same period of time.  Google intentionally altered its search ranking algorithm's

6  functionality with respect to online stock photography searches to bolster

7  Shutterstock's and Getty Images' search rankings and severely diminish

8  Dreamstime's ranking.  The timing of Dreamstime's dramatic fall in Google search

9  rankings, Dreamstime's historical Google search ranking and Dreamstime's

10  continued excellent performance in non-Google search rankings confirms that

11  Google altered its search rankings to exclude Dreamstime and benefit itself and its

12  partners.[24]

13  81.   To push Dreamstime entirely out of view for any consumer searching

14  for online stock photographs, Google inserts ahead of Dreamstime completely

15  useless Junk Websites.  The low caliber of online stock photography companies that

16  now rank ahead of Dreamstime in Google search results for "stock photos"

17  evidences Google's unfair and discriminatory treatment.  Dreamstime has recently

18  ranked behind clearly inferior competitors including sites with only 30,000 free

19  images (compared with Dreamstime's more than 2 million free images), sites with

20  only 140 images total, and multiple URLs that refer to the same photo site.  Prior to

21  Google's licensing deal with Shutterstock, these sites were never ranked ahead of

22  Dreamstime in online stock photography searches, and rightfully so.  Dreamstime is

23  clearly more "relevant" to "stock photos" than a blog article entitled "Stock photos

---

[24] Again, the effects of Getty Images' licensing agreement are yet to be clearly measured given that this agreement was only recently put into effect.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

that don't suck" that has not been updated since 2014.  Other less relevant websites that are ranked higher than Dreamstime in a search for "stock photos" include:

- "Death to Stock" – a website that emails free photographs to users and has a library of just 1500 photographs;

- Vince Vaughn and Co-stars Pose for Idiotic Stock Photos You Can Have Free – an article about a PR campaign for a movie released in 2015;

- the reddit webpage "WTF Stock Photos" that collects "unnecessary stock photos taken without a realistic intention of selling" for the amusement of the reddit online community;

- the twitter account page for "darkstockphotos," a twitter user that posts "extremely f***** up stock photography" (whose recent twitter posts include a photograph of a woman writing the word "help" in blood on a mirror and a toddler in obvious distress holding a chrome-plated nine-millimeter semi-automatic pistol); and

- an October 20, 2014, article by Casey Ark on the website entrepreneur.com titled "14 Amazingly free stock photo websites."

Were Google's algorithm performing the function of ranking and distinguishing relevant and useful results ahead of less relevant and useful results, these sites *would never* be ranked ahead of Dreamstime.  The obvious anticompetitive purpose and effect of this conduct is to entirely eliminate millions of high-quality, unique stock photographs from a consumer's view, and thereby eliminate a potential "vertical search" threat to Google's online search advertising monopoly.

82.   Google's treatment of Dreamstime is markedly different from Google's treatment of many of Dreamstime's largest competitors.  Through its partnership with Shutterstock and recently announced partnership with Getty Images, as well as its independent offering of images within its search results, Google has become a

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

major force in the online stock photography business, with the distinct advantage of controlling organic and paid searches for customers in that online industry. Shutterstock ranks at or very near number one in organic search ranking for "stock photos" on Google. Bigstock, a website owned by Shutterstock, which carries almost exactly the same images as Shutterstock, also ranks in the top five on Google. Additionally, as depicted in Exhibit "A," both Shutterstock and Bigstock enjoy the significant benefits of "knowledge graph" entries that appear at the very top of organic search results for generic terms like "stock photos." These "knowledge graphs" – which according to Google are intended to show general information about the topic a user is searching for[25] – ultimately function as free advertising for Google's partners when placed alongside search results for generic market terms, giving unfair advantage to those partners over competitors like Dreamstime. The inclusion of images (*i.e.*, company logos) makes knowledge graph entries in search results and paid advertisements (all of which are plain, vanilla text) very noticeable and attractive to users and draws even more clicks away from companies who do not happen to be Google's partner.

83.     Similarly, Google often alerts users to the existence of competitors when users search for a specific brand under a "users also searched for" tag. For example, when users search for the term "Dreamstime" in the search results, Google will inform the user that other users have searched for the term "Shutterstock." However, when a user searches for "Shutterstock," Google does *not* include a tag informing users that others had also searched for Dreamstime. Similarly, Shutterstock is displayed prominently in organic search results for "dreamstime," which is a result that is very difficult to achieve from traditional SEO efforts.

---

[25] *See*, Knowledge Graph feature description, available at https://www.google.com/intl/es419/insidesearch/features/search/knowledge.html. (last accessed on March 19, 2018).

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

1   Again, this is a strategy to draw clicks away from Dreamstime and to divert and

2   funnel those clicks to Shutterstock.

3        84.     Literally any Google user can easily *see* how Google's discrimination

4   against Dreamstime impacts consumers.  Take, for example, the term "peppers"

5   (plural). When one performs a Google Image search of the term "peppers," the first

6   100 image results are pictures of bell or jalapeno peppers.  This result provides some

7   insight into Google's algorithm – for example, the algorithm finds pictures of bell

8   peppers highly relevant to the Image Search for the word "peppers."   Below is a

9   screen capture showing the first images returned for a search for the term "peppers"

10  on Google Images.



23  Dreamstime's website also allows users to search its stock photographs by entering

24  a search term.  Searching for the term "peppers" on Dreamstime's site also returns

25  images of jalapeno and bell peppers.  Almost every image on the first page of results

26  are images of bell or jalapeno peppers (like the results from a Google Image search).

27  Based on the images returned, it seems as if Dreamstime's website and Google's

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

search algorithm both consider images of bell or jalapeno peppers highly relevant to a search for the term "peppers."  Similarly, neither Google Images nor Dreamstime searches for "peppers" include images of *peppercorns* in the first page of image results on a search for "peppers."  That is, Dreamstime's search function returns stock photos of the very thing that Google's own algorithm finds highly relevant to the search.  A consumer looking for stock photographs of bell or jalapeno peppers would find exactly what they were looking for on Dreamstime's website – and this is *precisely* why Dreamstime used to enjoy a very high organic search ranking on Google prior to August 2015.  Below is a screen capture showing the first results returned when a user searches for the term "peppers" on Dreamstime's website.



Like Dreamstime, Shutterstock also allows users to search its stock photographs by keyword.  Searching for the term "peppers" on Shutterstock returns some pictures of bell and jalapeno peppers in the first page of stock photographs, but also returns some seemingly anomalous images including several photographs of peppercorns,

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

what appears to be a white robot named "Pepper," as well as many photographs of salt and pepper shakers.  Shutterstock's image search algorithm returns *less relevant* results than either Google Images or Dreamstime on a search for the term "peppers." Shutterstock's results are less useful to a consumer interested in purchasing stock photos of bell or jalapeno peppers.



85.    Based on how Google Image's algorithm processes a search for the term "peppers" and selects relevant images, one would expect that Dreamstime's website would be *more relevant* than Shutterstock's website when a user searched for stock photos of peppers.  This, however, is no longer the case.   When a user performs a (non-image) Google search for the terms "peppers stock photos," among the first ten web pages returned from this search, positions *two through five* are for Shutterstock websites.  The second result returned is a link to www.shutterstock.com/search/pepper, the third result returned is www.shutterstock.com/search/serrano+peppers and the fourth result is

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

www.shuttterstock.com/search/bell-pepper.  Dreamstime's website, however, is not listed in the first *five* pages of search results for this search (and on information and belief is not returned *at all* in Google's search results pages for this search).  Again, many clearly less relevant websites are featured in the first five pages of results for this search, including a Google books result entitled "Trees in Paradise: a California History," an article on the website Thrillist entitled "Bad Stock Photos – People Smoking Weed," and an article entitled "Hilarious Twitter Thread Points Out Bizarre Cookbook Cover Trend" on the website www.scarymommy.com.  The harm to consumers is obvious.  A consumer seeking to purchase stock photographs of bell or jalapeno peppers and using a commonsense search like "peppers stock photos" would never find Dreamstime – a site highly relevant to this search.  That consumer *would* be not so subtly steered by Google to its partner Shutterstock's page as Shutterstock occupied slots two through five in the top 10 – even though Shutterstock's website is not as helpful to the consumer based on its ability to return relevant results.

86. Dreamstime is not the only player Google has unfairly discriminated against in this fashion.  Others, such as 123RF, DepositPhotos, and CanStockPhoto, have similarly experienced significant drops in their organic search rankings.

87. The graph below shows how the ranking for the websites Dreamstime, 123rf.com, depositphotos.com and canstockphoto.com have changed over the time period September 2016 to February 2018.  The vertical axis plots the search ranking of each website when searching on Google for the term "stock photos."  The graph clearly shows the drastic downward trend toward functional irrelevance for the most important Google search for the online stock photograph industry.  These smaller competitors in the online stock photography industry have seen their ranking in the "stock photos" search experience tremendous declines from September 2016 to February 2018.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850



The graph below shows the ranking for Dreamstime, Shutterstock, stock.adobe.com, and iStock (owned by Getty Images) over the same time.  This graph shows that, while Dreamstime was experiencing a precipitous decline in its ranking for the search "stock photos," Shutterstock, Getty Images (through the website istockphotos.com) and Adobe enjoyed lasting stability near the top of the rankings (in a range that Dreamstime used to enjoy).



BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

- 53 -

Case 3:18-cv-01910-MEJ   Document 1   Filed 03/28/18   Page 56 of 84

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

### 4.      Google's Discrimination Against Dreamstime Has Unfairly Helped Shutterstock Gain Market Share

88.     As described in detail above, Shutterstock is a significant player in the online stock photography industry and competes directly with Dreamstime.  It provides the same or similar services as Dreamstime – *i.e.*, the licensing of online digital images.  Like Dreamstime, Shutterstock allows users to license an image for a period of time by paying a fee (instead of paying a royalty every time the customer used the image).

89.     A company's rank in organic search directly impacts its ability to attract customers and generate revenue.  Many empirical studies have tracked the behavior of search engine use and come to the same conclusion: users tend to focus on the top results for a given search and rarely investigate results beyond the first page of ranked results.

90.     Shutterstock's unfair advantage in organic search has increased its market share significantly.

### 5.      Google Has No Procompetitive Explanation for Its Exclusionary and Disparate Treatment of Dreamstime

91.     In response to these allegations, Google might attempt to point to some material change in Dreamstime's metrics to justify its changed ranking in organic search (or, alternatively, may point to some metrics of Shutterstock, Getty Images and Adobe that justify their current organic search rankings), or claim that it fine-tuned its search engine algorithm for some legitimate purpose in a way that impacted Dreamstime's ranking.  This cannot be the explanation for what has happened to Dreamstime.  First, any such explanation would need to account for the fact that Shutterstock, Getty Images and Adobe have not suffered any similar downgrade in rankings.  Second, any potential explanation would need to account for why clearly irrelevant and poor-quality results such as the examples provided

- 54 -

COMPLAINT

above appear before Dreamstime in Google's search ranking.  Dreamstime as a website is obviously more relevant to organic searches for terms related to stock photography – as evidenced by its long-time excellent performance in organic search prior to Google's anticompetitive scheme.   Moreover, if some legitimate reason for Dreamstime's dramatic plummet in Google's organic search rankings existed (it does not), Google could have provided that explanation to Dreamstime during Dreamstime's extensive efforts to meet with Google to address the issue.  As detailed above, that did not occur.

      **6.**     **Dreamstime and Other Online Stock Photography Competitors Have Suffered Antitrust Injury as Purchasers of Online Search Advertising**

92.     Dreamstime and others – such as 123RF, DepositPhotos, and CanStockPhoto – have been denied a Google search ranking that truly reflects their relevance and credibility in the online stock photography industry.  This has resulted in a diminution of Dreamstime's competitive position.  Dreamstime simply cannot compete with Shutterstock and Getty Images without being accurately and legitimately ranked by Google's search engine.

93.     Google's manipulation of Dreamstime's organic search ranking has also negatively impacted Dreamstime's ranking on other search engines.  Dreamstime has recently started to experience a slow downward decline in its search ranking on other search engines such as Bing (albeit a small decline thus far).  This was an inevitable and foreseeable consequence of Dreamstime's effective exclusion from Google's search rankings: all search engines track consumer behavior and to the extent that Dreamstime's traffic has diminished because of its fall in Google's search ranking, its search ranking on other engines will naturally fall as well.  In addition, some changes that Dreamstime made to its website to reverse its decline in Google's search rankings had consequences for its ranking on other search engines.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

1   For example, when Dreamstime implemented the http/2 upgrade at Google's

2   suggestion, it was removed from Bing's search listing for six months because Bing

3   was not able to track the new technology.  Unlike Dreamstime's experience with

4   Google, however, Dreamstime was able to address its issue with Bing quickly and

5   received input and advice that resolved that issue.

6   94.    Google's unjustified and disparate treatment of Dreamstime has

7   provided Shutterstock and Getty Images (and, in the short term, Adobe) with an

8   unfair commercial advantage vis-á-vis Dreamstime.  Their placement near the top of

9   the rankings for the most impactful online stock photography online searches

10  provides Shutterstock and Getty Images with an unfair competitive advantage over

11  Dreamstime and has by itself caused customers to license images from Shutterstock

12  and Getty Images instead of Dreamstime.

13  95.    The result of Google's abuse and exploitation of its online search

14  advertising monopoly by means of anticompetitive and discriminatory conduct is

15  that competition for online stock photography has been harmed.  Google's acts have

16  threatened to drive many competitors out of the business and created technological

17  barriers to entry into the market which keep out potential new entrants.  Moreover,

18  they have generated confusion in the marketplace and created an online stock

19  photography industry with fewer choices for consumers, diminished pricing

20  competition and reduced innovation.  All of these effects are a direct result of

21  Google's injury to competition.

22  96.    Competition in the online stock photography industry is reduced as

23  Google effectively chooses market winners and puts those market winners in

24  elevated and dominant positions.   In the online stock photography industry,

25  Google's discriminatory actions have enhanced power for favored competitors like

26  Shutterstock and Getty Images while taking market share away from many other

27  disfavored competitors.  In turn, they have allowed Google to gain more control

28

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

over a very significant set of websites that threaten Google's online search advertising market, by ensuring that people still go to Google first when searching for images on the Internet. Essentially, these discriminatory actions allow Google to eliminate some enemies to its online search monopoly, while keeping its remaining enemies closer.

97.     By exercising its entrenched online search advertising monopoly power to discriminate in favor of companies in which it has a direct financial and strategic interest, Google has unlawfully restricted competition and caused antitrust injury to online stock photography competitors and consumers.

98.     Google's strategic manipulation of Dreamstime's and others' search rankings has caused a material reduction in Dreamstime's web traffic and consumer purchases. Because of the reduction in traffic and customers, Dreamstime has been damaged and will, unless the acts complained of here are remedied, continue to be damaged because its prospective revenues are closely tied to its web traffic from Google searches.

99.     Google's conduct is intended to, and does, unlawfully protect the financial and strategic benefits it enjoys by virtue of its partnerships and arrangements with Shutterstock and Getty images, Dreamstime's chief rivals.

100.    Google's conduct deprives smaller rivals in the online stock photography industry of a distribution channel sufficient to achieve efficient scale, thereby raising costs of doing business and slowing or preventing effective market entry and/or expansion.

101.    Most importantly, Google's conduct reinforces its monopoly in online search advertising by diminishing an important "vertical search" threat to Google's search dominance.

102.    Google's conduct restricts competition and harms consumer welfare because it: (a) increases the incentive for Google itself, as a monopolist, to continue

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

to foreclose competitors such as Dreamstime from competition on the merits; (b) effectively deprives competitors, on a discriminatory basis, of access to Google's search engine ranking which is a necessary selling/marketing facility or resource; and (c) has aided Shutterstock and Getty Images in enjoying unfair competitive advantages as online stock photography players, which in turn has left that industry with fewer choices, reduced or stifled innovation and technological advances and diminished pricing competition (in addition to generating consumer confusion).

103.     Prior to Google's discrimination against Dreamstime and other competitors, consumers had more choice.  That is, when Dreamstime was ranked in the top three of search results for online stock photography, users searching for online stock photography had easy, direct access to the 72 million stock photographs on Dreamstime's website.  Due to Google's anticompetitive scheme, a former competitor previously ranked in the top three for online stock photography searches that received a substantial portion of the views from such searches is now gone from Google's search result – along with its 72 million digital images that consumers could choose from.  Consumers searching for online stock photography now have access to only Shutterstock's, Getty Images' and Adobe's digital catalogs, along with various public domain image websites and Junk Websites completely unhelpful for consumers interested in purchasing licensed stock photography.

**C.**     **Google Also Breaches Its AdWords Agreement with Dreamstime and Unfairly Manipulates Its Advertising Service to Enhance Its Monopoly Power in Online Search Advertising**

**1.**     **Dreamstime Has Entered into a Contract with Google as a Purchaser of Google's AdWords Service**

104.     Google generates a significant amount of its revenue from AdWords, its advertising service through which companies pay Google to have advertisements for their websites prominently displayed in Google's search results.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

105.   To use AdWords, advertisers must agree to the Google LLC Advertising Program Terms along with several related terms and conditions (the "AdWords Agreement").  *See* Exhibit "F."  The AdWords Agreement provides that in consideration for an advertiser's payment, Google will display its advertisements, subject to certain limitations.  In part, the AdWords Agreement states that use is subject to applicable Google advertising polices.

106.   Google drafted both the AdWords Agreement and advertising polices. The agreements are adhesion contracts, as Google offers its services on a "take it or leave it" basis without giving consumers opportunities to negotiate terms to benefit their needs or interests.

107.   One recent update to the AdWords Agreement in late 2017 included an arbitration clause with an option to opt out, and Dreamstime elected to opt out of this clause.

108.   In return for the obligations and other consideration to which purchasers agreed in the AdWords Agreement, Google agreed to provide the AdWords program to each and every purchaser executing the standard AdWords Agreement.  This program was and is described in various answers to Frequently Asked Questions (FAQs) in Google's AdWords support pages, which were incorporated by reference into the AdWords Agreement.  Attached as Exhibit "G" is the AdWords agreement in effect around the time Dreamstime became an AdWords purchaser that specifically referenced and incorporated the FAQs.  The AdWords program uses an auction system to determine which advertisements are shown and how much an advertisement costs.  Advertisers bid for relevant search term keywords such as "stock photo" or "digital image."  AdWords then assigns each advertisement a "quality score" based on multiple factors including click-through rate ("CTR") (the percentage of users who view the ad that actually click it), relevance to the keywords, and the quality of the advertiser's website.  Each time a

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

Google user enters search terms that include relevant keywords, AdWords determines which of the competing advertisements are displayed by factoring both an advertiser's bid amount and quality score. Thus, the lower the advertisement's quality score, the higher the bid must be for the ad to compete.

109. Advertisers place bids on the "cost per click" of each advertisement. Advertisers can choose to either manually bid or pay an extra fee to select from automatic bidding options that use algorithms to adjust and optimize bid amounts based on specific advertising goals. Automatic bidding options are referred to by Google as "marketing campaigns." Common marketing campaigns include targeting spending on advertisements with the lowest cost per acquisition or on advertisements that maximize the number of clicks generated. For a specific advertiser, acquisitions might include customer visits resulting in sales, signups, or mobile app downloads.

110. When using marketing campaigns, advertisers specify the amount, on average, they would like to spend each day on a particular campaign. Google then aims to show advertisements as much as possible until the daily budget is met. Google explains that "in a given billing period, you're never charged more than the average number of days in a month (roughly 30.4) times your daily budget."

111. In or around 2005, Dreamstime entered the AdWords Agreement with Google when it began paying Google to display its advertisements on Google's search results. Implicit in this Agreement was Google's duty to provide its advertising services to Dreamstime in good faith and not take actions that unfairly favored Dreamstime's competitors. Dreamstime's decision to enter into the AdWords Agreement and its good faith understanding of the terms of Google's AdWords Agreement and advertising policies were always based on the text of those agreements, Google's stated policies and Google's treatment of competing online stock photography sites.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

112.   Dreamstime has engaged in several different marketing campaigns with the goal of promoting its advertisements with the lowest cost per acquisition.  That is, to promote its advertisements with the best combination of quality score, bid amount, and resulting customer acquisitions.  In doing so, Dreamstime as a customer pays Google daily to determine which of its advertisements are the most effective and to increase their circulation accordingly.

113.   Despite Google's agreement to provide Dreamstime with effective marketing campaigns pursuant to policies that were uniformly agreed to and intended to apply uniformly to all purchasers who executed the standard AdWords Agreement, several of Dreamstime's campaigns have suddenly stopped acquiring customers for no apparent reason.  In other words, Dreamstime was seeing a steady, predictable number of acquisitions from these campaigns each week, and then suddenly these acquisitions dropped to zero and remained at zero without any decline in the number of viewer impressions.  Dreamstime has been unable to get any support from Google on this issue, despite multiple requests for an explanation.  Google's only response has been that the campaigns are working as they should.  As noted below, Google has not uniformly applied its own policies to all of its customers who have executed the standard AdWords Agreement and who are competitors in online stock photography.  Instead, it has disparately applied its policies to Dreamstime as compared to other of Dreamstime's competitors.  In addition, Google has cancelled certain Dreamstime ad campaigns on the basis that they violated stated policies that the ad campaigns did not violate.

**2.   Google Has Engaged in Bad Faith Through Improper Disapproval and Removal of Dreamstime Advertisements from Its Online Network**

114.   Google's advertising policies understandably prohibit the use of misleading content in advertisements, and the standard AdWords Agreement is

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

intended to ensure that these policies apply equally to all purchasers of AdWords. The policies specifically provide the following examples of misleading advertisements that would be subject to rejection or removal: "making false statements about your identity or qualifications; using false claims or claims that entice the user with an improbable result; falsely implying affiliation with, or endorsement by, an individual, organization, product, or service; ads that mislead or trick the user into interacting with them ('trick to click'); or providing a business name that is anything other than the domain."

115.   Google has consistently removed Dreamstime's lowest cost per acquisition advertisements as being "trick to click" despite Dreamstime's competitors running the exact same type of advertisements, without any apparent issue or objection from Google.[26]  Google's purported complaint with these ads concerned the "search box" that invited users to search Dreamstime's website. When a user clicked on this search box, the user was taken to Dreamstime's website (as opposed to search results appearing in the actual box).  Ironically, Google later encouraged Dreamstime to submit HTML5 banners with a non-functional search box that transferred the user to Dreamstime's website.  Google accepted and ran these HTML5 banner ads on Dreamstime's behalf.  Google's technical staff has also given inconsistent or puzzling explanations to Dreamstime about why certain ads were "trick to click."  In a Google hangouts conversation, a Google staff member told Dreamstime that Dreamstime's swirl logo with a white background was "trick to click."  Dreamstime's AdWords contact at Google apologized when passing along this statement to Dreamstime.

_____

[26] *See* Exhibit "H" attached hereto, which provides a snapshot of advertisements currently running on Google's DisplayAds platform for one of Dreamstime's competitors that have the same purported "trick to click" characteristics that Google rejected in Dreamstime's ads, *i.e.* "fake" search boxes.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

116.   Even more telling is the fact that Google continued to remove Dreamstime's low cost per acquisition advertisements as "trick to click" while allowing Dreamstime's high costs per acquisition display advertisements of the same type to remain active.

117.   Each time an advertisement's cost per acquisition began to drop, it was removed as being allegedly "trick to click" despite the fact that other Dreamstime advertisements having the exact same format, but having higher cost per acquisition, were left running.

118.   Dreamstime engaged in extensive efforts to resolve these issues with Google and spent countless hours emailing and calling Google to find out: why its low cost per acquisition advertisements were being removed, how it could modify them so that they would follow Google's advertising polices, and why competitor sites could display advertisements with the same format but without repercussion. Dreamstime also asked Google to reconsider its decision to remove its advertisements.

119.   At Google's suggestion, Dreamstime implemented HTML5 versions of its search bar ads, which added an actual dynamic search input field to the advertisement and thereby removed any likelihood that the consumer might be "tricked" into clicking a search field that was not active.  This dynamic search box could be used by users as if they were searching directly on Dreamstime's website. For example, typing "trees" in the field and pressing the banner's Search button would open a page of "trees" search results on Dreamstime's website.  For several months, Google allowed these ads to run even though the search function was not working properly because of a technical problem with Google's system.  Google then began removing the ads again in the same fashion as the non-dynamic versions. Later, Google updated its ad validation tool to disallow ads with dynamic search boxes from being accepted into Google's ad system.  Thereafter, Dreamstime was

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

only allowed to upload ad banners without a dynamic search box feature. Per Google's new specifications, Dreamstime resubmitted the banners with a search box that did not work. As of March 2018, Dreamstime's banners include a search box that does not work, which behave exactly as the non-dynamic banners initially removed, despite Google's initial assurance that Dreamstime's HTML5 efforts would result in workable, dynamic search ads.

120. Similarly, Google removed Dreamstime's mobile application ("app") because it featured lingerie photographs while Shutterstock's remained active despite featuring explicit nude photographs. While the images from Shutterstock's app are particularly "not safe for work" and therefore not attached as exhibits, Dreamstime can provide at the appropriate time a comparison of the images Google found objectionable on Dreamstime's app and images from Shutterstock's app that demonstrate Google's double standard. When Dreamstime inquired about this discrepancy in treatment, Google stated that its review was limited to Dreamstime's mobile app and that if Dreamstime wanted to address the issue, it should lodge a formal complaint concerning Shutterstock's app. Following Google's instruction, Dreamstime lodged a complaint only to have it summarily ignored.

121. Google wields its immense power in the online search engine advertising market discriminatorily by allowing only some customers in downstream businesses to use effective, low cost advertisements. Google uses selective enforcement of its removal policies as one of its bases for discriminating and to attempt to conceal its competitively unfair behavior. By doing so, Google ensures that disfavored downstream competitors like Dreamstime pay more to Google for displaying less effective advertisements. This provides a huge windfall for Google all at Dreamstime's expense, while simultaneously benefitting Google and its partners such as Shutterstock and Getty Images.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

122.   In addition to being a breach of contract, Google's unfair enforcement of its advertising polices has resulted in diminution of Dreamstime's competitive position among online stock photography repositories.   Dreamstime cannot compete at the level that rival sites compete while Google continues to unfairly discriminate against its low cost per acquisition advertisements.

123.   Google's unjustified and disparate treatment of Dreamstime has provided it and its partners with an unfair commercial advantage vis-à-vis Dreamstime.  The ability to display cost effective advertisements on Google's search results provides Google's favored partners with an unfair competitive advantage that has caused customers to purchase digital images from them instead of Dreamstime.

### 3.   Google has Caused Significant Contractual Damages and Anticompetitive Injury to Dreamstime Though Its Coordinated Manipulation of Online Search and AdWords Campaigns

124.   Since its inception, Dreamstime has spent approximately $50 million on its AdWords campaigns, and spends hundreds of thousands of dollars on AdWords per month.  When Dreamstime began to experience a drop in its organic search traffic caused by Google's manipulation of its search ranking, it increased its monthly AdWords budget by approximately 50% in an attempt to mitigate the damage caused by the changes to Google's algorithm.  Despite the increase in its advertising budget, as a direct result of Google's manipulation of Dreamstime's search ranking and its unfair enforcement of its AdWords policies, Dreamstime has lost millions of dollars, its cost of acquiring new customers has doubled, and its growth has slowed by approximately 50%.

125.   Google's evisceration of Dreamstime's organic search ranking and Google's unfair and uneven enforcement of its AdWords policies worked both independently and in concert to harm Dreamstime and benefit Google.  Of course,

even if Google had not unfairly enforced its AdWords' policies, it would have been basically impossible for Dreamstime to increase its monthly advertising spend enough to "undo" the damage wrought by Google's changes to its search algorithm. This is because Dreamstime's prior, pre-2015 organic search ranking drove five or six times more traffic to its website than its AdWords campaigns.  Importantly, Dreamstime's pre-2015 search ranking was "free" in the sense that it was a natural result of Dreamstime maintaining a quality stock image website highly relevant to stock photography searches and did not require Dreamstime to pay Google anything. Despite Dreamstime's efforts to compensate for the loss in traffic from organic search by spending more on AdWords (a reaction Google no doubt expected and intended when it began to manipulate Dreamstime's search ranking), Dreamstime was unable to sustain the increased AdWords spending on a long-term basis due to the losses in organic search and Google's unfair enforcement of its AdWords policies.  As a result of Google's tinkering with its algorithm to eliminate Dreamstime from organic stock photography searches, Google also experienced an uptick in AdWords revenue as Dreamstime struggled to reach customers it previously reached through organic search.  This, in turn, works to eliminate an important "vertical search" threat to Google's online search advertising monopoly.

## V.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Monopoly Maintenance and Abuse in Violation of
### Section Two of the Sherman Act)

126.   Dreamstime realleges the preceding paragraphs of this Complaint as if fully set forth herein.

127.   The actions complained of herein will continue to restrain trade, allow Google to maintain, exploit, and abuse its online search advertising monopoly power, and adversely affect interstate commerce in that Google provides and sells

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

its services across State lines and on the Internet.  The defendant and plaintiff also each purchase goods and supplies in interstate commerce that are used in the services and offerings that comprise their businesses.

128.   The antitrust laws are concerned with protecting the economic freedom of participants and consumers in the relevant market.  The aims and objectives of the antitrust laws are directed at encouraging innovation, industry, and competition.  The central purpose of the antitrust laws is to preserve competition and it is that interaction of competitive forces that benefits consumers.  The antitrust laws protect customers from harm directly related to the unlawful removal of a competitive service or product from the marketplace.

129.   Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, monopolization of any part of the trade or commerce among the States.

130.   Because of the discriminatory practices and conduct, contracts and agreements with Dreamstime's rivals, and the other exclusionary and anticompetitive actions carried out by the monopolist in the online search advertising market, plaintiff Dreamstime has lost actual and prospective business and Internet traffic – all necessary and essential components to survive and prosper as an online stock photography competitor.

131.   **Relevant Product/Service Markets**.  The relevant product or service market for antitrust purposes in which to assess Google's power and conduct is defined as the online search advertising market.  There are no reasonable substitutes for online search services and there are no other means by which consumers and Internet users can reasonably and efficiently perform automated searches for online data and websites.  Likewise, there are no reasonable substitutes for the provision of online search advertising, a marketplace in which Dreamstime is a purchaser.  The cross-elasticity of demand between online search advertising services and other forms of finding such information is extremely low.  The DOJ and FTC have both

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

recognized a relevant market defined as online search advertising on multiple occasions, specifically as it relates to Google. Dreamstime is dependent upon and a consumer/purchaser of various Google online services. Dreamstime is a distributor and seller of online stock photography. Dreamstime and competition for online stock photography has been excluded, destroyed, and or restrained because of Google's maintenance, exploitation, and abuse of its monopoly power in the relevant market for online search advertising.

132.    Relevant market definition is a fact-intensive determination.

133.    **Relevant Geographic Market**.  The relevant geographic market for antitrust purposes in this case is the United States. The relevant geographic market is the area of effective competition in which the parties operate and to which customers can practicably turn for the desired services. The online services provided by Google in the United States differ from those it offers or provides in foreign countries and different rules and regulations often apply. Further, the federal antitrust laws only reach conduct within the United States that affects domestic consumers.

134.    **Monopoly Power**.  Throughout the relevant period, Google has been the dominant and entrenched player in the domestic online search market and online search advertising market (to the extent those markets are considered distinct), possessing a market share of at least 70%. Generally, a market share of 65% or more is a *prima facie* showing of monopoly power. Accordingly, Google is a monopolist in this market(s). Google has the power to control prices, exclude competition, reduce output and selection, and/or stifle technology and innovation in the relevant market(s).

135.    Market or monopoly power determination is a fact-intensive issue reserved for the fact-finder.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

136.   Google has maintained, exploited, and abused its monopoly power in the online search advertising market in violation of the monopolization proscription of Section 2 of the Sherman Act.  Plaintiff Dreamstime and other of its rivals in the online stock photography industry are customers of various of Google's online advertising services and have suffered antitrust injury and damages as a direct consequence of Google's monopoly exploitation and abuses.

137.   **Significant Barriers to Market Entry and Expansion**.  Significant and high barriers to market entry and expansion exist that preclude or discourage new firms from entering the domestic online search advertising market and challenging the behemoth Google's entrenched monopoly position.  Significant barriers to expansion also exist, which is evidenced by the fact that only a small number of competitors have managed to marginally penetrate this market dominated and controlled by Google.  Indeed, many potential big players have exited the online search advertising market, and none have been able to capture any significant market shares.  Some of these significant barriers to entry and expansion include: (a) requirement of intellectual property and licenses; (b) regulatory controls and restrictions; (c) high capital costs; (d) economies of scale; (e) control and maintenance of technological resources; (f) brand loyalty; (g) entrenched user preferences; and (h) all-important network effects.

138.   **General Intent to Monopolize**.  Google has undertaken its clearly anticompetitive and exclusionary conduct with the purpose of maintaining and abusing its monopoly in the online search advertising market in the United States and to vanquish and injure Dreamstime and other smaller rivals in the online stock photography industry.  Google has acted to eliminate, destroy, or foreclose meaningful competition in the relevant market through the discriminatory tactics described above.  Google's conduct discourages, prevents, and/or precludes consumers from finding, accessing and/or buying services from Dreamstime and

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

other stock photo repositories directly, which in the long run would erode Google's standing as the first place to go to search for stock photos on the Internet.  During the relevant period, Google has provided services to Dreamstime, is keenly aware of its capabilities and has deemed Dreamstime to be a target to be minimized or eliminated.

139.  **Antitrust Standing**.  Plaintiff Dreamstime has the requisite standing to assert and maintain antitrust claims against Google because it has suffered antitrust injury because of Google's maintenance, exploitation, and abuse of its monopoly power through its discriminatory and exclusionary conduct.  Dreamstime is a purchaser/consumer of Google's AdWords services, consumers use Google's online search services to locate, access, and buy online stock photography products from Dreamstime and other market participants, and Google has licensing and other written agreements with various online stock photography competitors such as Shutterstock and Getty Images that are designed to exclude competition.  Indeed, online stock photography providers are critically dependent upon Google's services for website traffic and customers.  Consequently, in addition to injury Dreamstime as a consumer of Internet search advertising, Google's services and monopoly conduct are inextricably intertwined with and materially affect competition in the online stock photography line of commerce.  In addition, by reason of Dreamstime's business relationship and service contracts with Google it is a participant and consumer in the online search advertising market.  Finally, as a "vertical search" website that consumers may access directly to search for something many people commonly google – high-quality images for purchase – Dreamstime poses a direct threat to Google's online search advertising monopoly, and its elimination enhances Google's monopoly in the relevant market.

140.  **Google's Predatory and Exclusionary Conduct**.  Google has willfully acquired and/or maintained its monopoly power in the online search

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

market (and/or online search advertising market) and has abused that power using anticompetitive and exclusionary means, including by excluding and distorting competition in online stock photography.  Google's overall monopolistic and discriminatory scheme is described specifically in Paragraphs 1–13 and 46–125 above.  Such unlawful conduct undertaken by the monopolist, Google, includes: (a) downgrading Dreamstime's online search ranking (making it essentially invisible in Google's search results), without justification, forcing Dreamstime to spend additional funds on Google's AdWords program, thereby raising Dreamstime's costs of competing and threatening to drive it out of business; (b) contracting with Shutterstock to give it a favored status that has not been available to Dreamstime and other rivals; (c) contracting with Getty Images to give it favored status that has not been available to Dreamstime and other rivals; (d) providing favored treatment to Shutterstock and other competitors in online search results or other online search displays, unfairly allowing these favored rivals to poach longstanding customers from Dreamstime, or thwarting efforts of Dreamstime to attract and obtain new customers; (e) selectively enforcing its rules governing its online AdWords program, thereby further undermining Dreamstime's ability to compete; (f) moving, in the online search rankings, inconsequential or underperforming (junk) rivals ahead of Dreamstime and other established, high quality or low-priced online stock photography repositories; and (g) engaging in unlawful activity to capture privacy protected data of consumers, thereby maintaining and enhancing Google's monopoly power.  The purpose of Google's predatory and discriminatory scheme is to limit or foreclose competition for online stock photography and maintain its monopoly in online search advertising.

141.   Google has acted to maintain its monopoly power, and its existing enormous power and anticompetitive conduct has enabled it to do so, in flagrant violation of Section 2 of the Sherman Act.

COMPLAINT

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

142.   The "conduct" element of this offense is the use of monopoly power to foreclose competition or to destroy a competitor.  Conduct is anticompetitive when it unnecessarily excludes or handicaps competitors to gain or maintain a monopoly.  Anticompetitive or exclusionary practices are acts designed to deter potential rivals from entering the market, intervening or preventing access to customers, or preventing existing rivals in the market from increasing their output.  Anticompetitive acts are not fair competition on the merits of price, selection, quality or other factors, but instead acts that have the deleterious effect of preventing or excluding competition or frustrating the efforts of other firms to compete for customers within the relevant market.  Conduct by a monopolist that constitutes a deliberate effort to discourage or thwart customers from doing business with its rivals is anticompetitive.

143.   Conduct or practices that otherwise might comply with antitrust law may be impermissibly exclusionary and unlawful when engaged in by a monopolist.  Indeed, a monopolist is not free to take certain actions that a firm in a competitive (or even oligopolistic) market may take, because there is not a market constraint on a monopolist's behavior.  Consequently, a monopolist is precluded from employing otherwise lawful practices that unnecessarily diminish or exclude competition.

144.   Google's anticompetitive acts affect a substantial amount of interstate commerce in the relevant market and constitute unlawful monopolization.  Google's conduct is not motivated by technological or efficiency concerns and has no valid or legitimate business justifications.  Any purported business justifications that may be proffered by Google are merely pretextual.  In sum, the purpose and effect of Google's anticompetitive conduct is to preserve, exploit, and promote its monopoly stranglehold position in the online search advertising marketplace and to misuse that mighty power to exclude, control, and restrict competition for online stock

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

photography to the detriment of consumer welfare, competition, innovation, and plaintiff Dreamstime.

145.   **Antitrust Injury to Plaintiff, Competition, and Consumers**. Google's monopolistic conduct has caused antitrust injury to plaintiff Dreamstime, competition, and consumers.

146.   As a direct result of Google's abuse of its online search advertising monopoly through anticompetitive conduct and restrictions on competition, Dreamstime and other smaller online stock photography competitors have been restricted from functioning in a competitive open market, output has been reduced or limited, and the quality and freedom of choice of online stock photographs and providers has been reduced and diminished in this concentrated industry. Google's monopolistic and discriminatory conduct has severely hindered plaintiff's ability to attract new customers and traffic to its website, and the number of photographs it may license/sell has diminished significantly.

147.   Google's monopolistic and discriminatory conduct has erected a barrier that precludes effective entry by other would-be competitors into the industry and the quality and variety of online stock photography offerings in that industry have been reduced and constrained to the detriment of consumers.

148.   Google's maintenance and exploitation of its online search advertising monopoly and exercise of predatory and anticompetitive conduct has caused antitrust injury, and unless enjoined by this Court, will continue to produce at least the following actual and demonstrative anticompetitive, exclusionary, and injurious effects upon competition, consumers, and interstate commerce: (a) AdWords spends for lower cost stock repositories like Dreamstime will continue to increase, thereby increasing costs to consumer or eliminating consumer choices; (b) competition in the online distribution and sale of stock photographs has been substantially and unreasonably restricted, lessened, foreclosed, and eliminated; (c) barriers to entry

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

into this highly concentrated industry have been raised which has prevented or delayed entry of new online stock photography competitors; (d) consumer choice has been, and will continue to be, significantly reduced, limited, and constrained as to selection price, and quality of online stock photographs; (e) access to Dreamstime's competitive services has been artificially restricted and reduced, and its service offerings will continue to be excluded; and (f) Google has maintained its entrenched monopoly position in the online search advertising market.

149.   Antitrust injury is a fact question for the jury.

150.   **Damage to Plaintiff Dreamstime.**   Because of, and as a direct and proximate result of Google's past and continuing anticompetitive practices and conduct, plaintiff has suffered, and will continue to suffer, substantial financial injury to its business and property.   Defendant's coordinated and focused anticompetitive and discriminatory conduct has cumulatively, incrementally, and unreasonably restricted competition and devastated Dreamstime's once thriving and growing business.   As a result, plaintiff has been deprived of revenues and profits it would have otherwise made, incurred higher advertising costs, suffered diminished market growth, and sustained a loss of goodwill and going concern value.   Plaintiff has not yet calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it does so, it will seek leave of the Court to insert the amount of the damages sustained herein. Plaintiff also seeks injunctive relief to prevent further irreparable and continuing injury to its business and property caused by Google's unlawful conduct.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

151.   Dreamstime realleges the preceding paragraphs of this Complaint as if fully set forth herein.

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

152.   This Court has jurisdiction over this Second Cause of Action based on diversity jurisdiction.

153.   Dreamstime entered into enforceable contracts with Google whereby Google agreed to provide advertising services for Dreamstime's website in exchange for various fees.  In particular, the AdWords Agreement was an adhesion contract intended to be executed by every single purchaser of AdWords.  It incorporated by reference the AdWords program polices and various FAQ answers and support pages describing Google's policies.  The nature of this standard agreement was that it was intended to be signed in the same form by all purchasers of AdWords, and the policies and descriptions of the services Google was to provide were intended to apply equally to all who executed it.

154.   Despite the AdWords Agreement, Google provided Dreamstime advertising marketing campaigns that did not work and did not meet Dreamstime's expectations, applied its policies and procedures unevenly toward Dreamstime, cancelled some of Dreamstime's ad campaigns for violating stated polices that the ad campaigns did not violate and overcharged and overdelivered AdWords to Dreamstime, all in breach of the AdWords Agreement.  No reasonable explanation for these failures was provided by Google.  Google failed to provide the services, apply the standard policies and perform the obligations that the AdWords Agreement required it to do.

155.   Among other things, Google breached its contract with Dreamstime when it:

- manipulated Dreamstime's organic search ranking unfairly and illegally to force Dreamstime to spend an unreasonable amount of money on additional AdWords campaigns that would not otherwise have been necessary;

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

- cancelled Dreamstime's most successful ad campaigns without adequate notice or explanation;

- improperly suspended Dreamstime's account based on unfounded accusations of "policy violations;"

- prevented Dreamstime from running successful DisplayAds campaigns while allowing the *exact same* advertisements to be placed by other competitors and other parties to the same standard contracts;

- placed Dreamstime's advertisements on irrelevant websites and error pages in direct violation of the AdWords contract; and

- overdelivered AdWords campaigns, causing daily spending limits for certain campaigns to be exceeded on a regular and systematic basis.

156.   Dreamstime has at all times performed all its significant duties and obligations under the AdWords Agreement except to the extent that Dreamstime was excused or prevented from doing so by the acts and omissions of Google.

157.   Google's breaching conduct was the result of fraud or willful injury to Dreamstime, was in violation of law, and/or was at least negligent, such that any limitation of liability clause in the AdWords Agreement is void pursuant to California Civil Code § 1668.  At most, it has acted intentionally and with reckless disregard for Dreamstime's rights.

158.   As a direct and proximate result of Google's breach of the written contracts, Dreamstime has suffered actual, compensatory, and consequential damages in an amount to be determined at trial, plus prejudgment interest at the maximum legal rate. These damages include but are not limited to lost profits and other consequential damages that are not waivable by contract as a matter of law due to Google's heightened culpability.

COMPLAINT

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

## THIRD CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

159.   Dreamstime realleges the preceding paragraphs of this Complaint as if fully set forth herein.

160.   This Court has jurisdiction over this Third Cause of Action based on diversity jurisdiction.

161.   The covenant of good faith and fair dealing is implied in every contract, including the AdWords Agreement, and is intended to prevent one party from unfairly frustrating the other party's right to receive the benefits of the contract.  The covenant of good faith finds particular application, whereas here, Google is invested with discretionary power to affect the rights of Dreamstime.  Google was charged with the duty to exercise that discretion in good faith and in accordance with fair dealing.  Google failed to do either.  Google's unjustified breach deprived Dreamstime of its legitimate expectations under the AdWords Agreement.

162.   Google breached the implied covenant of good faith and fair dealing by improperly disapproving and removing Dreamstime's low cost per acquisition advertisements despite them not being in violation of Google's advertising policies.

163.   Google also breach the implied covenant of good faith and fair dealing by improperly disapproving and removing Dreamstime's low cost per acquisition advertisements as being "trick to click" or for other unreasonable reasons to provide an economic advantage to Dreamstime's competitors and to overcharge Dreamstime for AdWords services.

164.   Google's breaching conduct was the result of fraud or willful injury to Dreamstime, was in violation of law, and/or was at least negligent, such that any limitation of liability clause in the AdWords Agreement is void pursuant to California Civil Code § 1668.  At most, it has acted intentionally and with reckless disregard for Dreamstime's rights.

165.   As a direct and proximate result of Google's breach of the covenant of good faith and fair dealing, Dreamstime has suffered actual, compensatory, and consequential damages in an amount to be determined at trial, plus prejudgment interest at the maximum legal rate.  These damages include but are not limited to lost profits and other consequential damages that are not waivable by contract as a matter of law due to Google's heightened culpability.

## FOURTH CAUSE OF ACTION

### (Unfair Competition in Violation of California Business and Professions Code § 17200 *et seq.*)

166.   Dreamstime realleges the preceding paragraphs of this Complaint as if fully set forth herein.

167.   This Court has jurisdiction over this Fourth Cause of Action based on diversity jurisdiction.

168.   Section 17200 *et seq*. of the California Business & Professions Code ("UCL") is written in the disjunctive and broadly covers three varieties of unfair competition – acts that are unlawful or unfair or fraudulent.  The UCL statute's intent and purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.  The coverage of section 17200 *et seq*. is broad and intended to enjoin on-going wrongful business conduct in whatever context such activity might occur.

169.   Plaintiff Dreamstime is a "person" within the meaning of California Business & Professions Code § 17201.  Google's principal place of business is located within California.

170.   As alleged herein, defendant's predatory, discriminatory, deceptive, monopolistic and/or concerted wrongful conduct constitutes "unfair" business practices.  A practice may be deemed unfair even if not specifically proscribed by some other law.  Conduct that significantly threatens or harms competition, violates

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

the policy or spirit of an antitrust law, or threatens an incipient violation of an antitrust law, may be deemed "unfair" under the UCL.

171.   As alleged herein, defendant's anticompetitive conduct is also "unlawful" under the UCL.  Within the meaning of section 17200, virtually any violation of any civil or criminal federal, state or municipal, statutory, regulatory, court-made or local law can serve as a predicate offense for an "unlawful" claim. The violations of the federal antitrust laws and other concerted and deceptive conduct as alleged herein, satisfies the "unlawful" prong of section 17200.

172.   Dreamstime has standing to pursue this claim as Dreamstime has suffered an injury in fact and has lost money or property resulting from Google's unfair and/or unlawful actions.  Dreamstime has paid tens of millions of dollars for Google's advertising and other services.  Google only provided its services selectively to benefit itself at Dreamstime's expense.  Google also selectively applied its disapproval and removal policies to injure Dreamstime and benefit others such as Shutterstock and Getty Images, Google's partners. Google's anticompetitive and discriminatory actions constitute unfair and/or unlawful business practices and a scheme of unfair competition with respect to Google's advertising services and contracts.  Google has engaged, and continues to engage, in business acts that are unfair, unlawful, discriminatory, deceptive, untrue or misleading with respect to the advertising services it provided to Dreamstime. The harm to consumers and competition caused by Google's conduct is substantial.  There is no legitimate or procompetitive justification for defendant's anticompetitive and discriminatory conduct.

173.   Because of, and as a direct and proximate result of, defendant's unfair and/or unlawful business practices and conduct, Dreamstime has suffered, and will continue to suffer, financial injury to its business and property.  Pursuant to the

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

provisions of the UCL (sections 17203 and 17535), Dreamstime is entitled to restitution from Google for its injury.

174.   Defendant's unfair and/or unlawful conduct has caused economic harm to plaintiff, competition and consumers.  Nonetheless, the UCL is a strict liability statute and it is not necessary to show that defendants *intended* to injure or harm Dreamstime.

175.   Whether a business practice is unfair or unlawful is a question of fact for the fact-finder to determine.

176.   An act may violate the UCL even if the unfair or unlawful practice affects only one victim.

177.   Pursuant to Business & Professions Code section 17203, the entry of permanent and mandatory injunctive relief against Google is necessary to enjoin its on-going unfair and/or unlawful business conduct.  An injunction is needed to enable and restore competition in the market.

## **PRAYER FOR RELIEF**

WHEREFORE, Dreamstime respectfully requests that this Court adjudge and decree and enter judgment in its favor and against Google, as follows:

1.      The conduct alleged in the First Cause of Action herein be adjudged to constitute unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

2.      The conduct alleged in the Second Cause of Action be adjudged to constitute an unjustified breach of contract;

3.      The conduct alleged in the Third Cause of Action be adjudged to constitute a breach of the covenant of good faith and fair dealing;

4.      The conduct alleged in the Fourth Cause of Action herein be adjudged to constitute a violation of section 17200 *et seq.* of the California Business & Professions Code as an unfair and/or unlawful business practice;

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

5.      Pursuant to Section 4 of the Clayton Act (15 U.S.C. §15), plaintiff recover treble the actual amount of its damages sustained by reason of defendant's antitrust violations;

6.      Pursuant to Section 4 of the Clayton Act (15 U.S.C. §15), plaintiff be awarded its reasonable attorneys' fees and costs of litigation;

7.      Pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), the anticompetitive, discriminatory, and/or exclusionary conduct be permanently enjoined to abate to actual and threatened irreparable injury to Dreamstime's business and property;

8.      Plaintiff be awarded actual, compensatory, and/or consequential damages on its breach of contract and breach of the implied covenant of good faith and fair dealing claims;

9.      Pursuant to section 17203 of the California Business & Professions Code, the unfair and/or unlawful business practices of defendant be permanently enjoined;

10.      Pursuant to sections 17203 and 17535 of the California Business & Professions Code, plaintiff be awarded restitution;

11.      Pursuant to section 1021.5 of the California Code of Civil Procedure be awarded reasonable attorneys' fees;

12.      Award plaintiff prejudgment interest at the maximum legal rate; and

13.       For such other and further relief that this Court deems just and proper.

DATED:  March 28, 2018             BAKER MARQUART LLP

By: _____

Jaime Marquart
Attorneys for Plaintiff
Dreamstime.com, LLC

- 81 -

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands, pursuant to Fed. R. Civ. P. 38(b) and Local Civil Rule 3-6, a trial by jury of all issues which are subject to adjudication by a trier of fact.

DATED:  March 28, 2018          BAKER MARQUART LLP

By: _____

Jaime Marquart
Attorneys for Plaintiff
Dreamstime.com, LLC

BAKER MARQUART LLP
2029 CENTURY PARK EAST, 16TH FLOOR
LOS ANGELES, CA 90067
Tel: (424) 652-7800 • Fax: (424) 652-7850

COMPLAINT