1 | JONATHAN M. JACOBSON (NY SBN 1350495)
jjacobson@wsgr.com
2 | BRIAN M. WILLEN (admitted *pro hac vice*)
bwillen@wsgr.com
3 | WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
4 | 1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
5 | Telephone:  (212) 999-5800
Facsimile:   (212) 999-5899
6 |
7 | JOSHUA H. SOVEN (admitted *pro hac vice*)
jsoven@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
8 | Professional Corporation
1700 K Street, NW, 5th Floor
9 | Washington, DC 20006-3814
Telephone:  (202) 973-8800
10 | Facsimile:   (202) 973-8899
11 | LAUREN GALLO WHITE (CA SBN 309075)
lwhite@wsgr.com
12 | WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
13 | One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105-1126
14 | Telephone: (415) 947-2000
Facsimile:  (415) 947-2099
15 |
16 | *Attorneys for Defendant*
**GOOGLE LLC**

17 | **UNITED STATES DISTRICT COURT**

18 | **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

19 |

| | | |
|---|---|---|
| 20 | DREAMSTIME.COM, LLC, a Florida LLC, | ) | CASE NO.:  3:18-CV-01910-WHA |
| 21 | Plaintiff, | ) | **NOTICE OF MOTION AND** |
| 22 | v. | ) | **MOTION OF DEFENDANT GOOGLE LLC TO DISMISS THE COMPLAINT PURSUANT TO FED.** |
| 23 | GOOGLE LLC, a Delaware LLC; and DOES 1-10, | ) | **R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN** |
| 24 | Defendants. | ) | **SUPPORT THEREOF** |
| 25 | | ) | Judge:  Hon. William Alsup |
| 26 | | ) | Hearing Date:  August 16, 2018 |
| 27 | | ) | Time:          8:00 a.m. |
| 28 | | | |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................................1

STATEMENT OF REQUESTED RELIEF .............................................................................1

STATEMENT OF ISSUES TO BE DECIDED......................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................1

FACTUAL BACKGROUND ...................................................................................................3

    A.    Google And Its Search Advertising Business ............................................3

    B.    Dreamstime And Its Stock Photo Business................................................4

    C.    Dreamstime's Allegations Against Google ................................................5

        1.    Allegations Regarding Dreamstime's Performance In Search Results .......5

        2.    Allegations About Dreamstime's Use Of Google AdWords .....................7

        3.    Dreamstime's Lawsuit Against Google ......................................................7

ARGUMENT .............................................................................................................................8

I.    DREAMSTIME FAILS TO STATE A SECTION 2 SHERMAN ACT CLAIM .............8

    A.    Dreamstime Fails To Plead The Existence Of A Stock Photography Market ........9

    B.    Dreamstime Fails To Plead That Google Unlawfully Harmed Competition ........11

        1.    Dreamstime Fails To Allege Competitive Harm In Stock Photography .............................................................................11

        2.    Dreamstime Fails To Allege Competitive Harm In Search Advertising .................................................................................14

    C.    Dreamstime Fails To Plead Antitrust Injury ........................................16

II.    DREAMSTIME FAILS TO STATE A UCL CLAIM......................................................19

III.    DREAMSTIME FAILS TO STATE A CONTRACT CLAIM ......................................20

    A.    Dreamstime's Breach Of Contract Claim Fails....................................20

    B.    Dreamstime's Breach Of Implied Covenant Claim Fails.....................22

    C.    Consequential Damages Are Barred By The Limitation Of Liability Clause.......24

CONCLUSION .......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991) ..................................................................... 10, 11, 12, 13

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ................................................................................ 9, 16

*Apple, Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...................................................................... 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................... 8, 22, 24

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ................................................................................................. 16

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
182 F.3d 1096 (9th Cir. 1999) .................................................................................. 10

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*,
2018 WL 2209518 (M.D. Pa. May 14, 2018) ....................................................... 14, 18

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
222 Cal. App. 3d 1371 (1990) ................................................................................... 22

*Carmaa Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
2 Cal. 4th 342 (1992) ............................................................................................... 23

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ............................................................................................. 20

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) ..................................................................................... 19

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*,
99 F.3d 937 (9th Cir. 1996) ........................................................................................ 9

*Darnaa LLC v. Google Inc.*,
236 F. Supp. 3d 1116 (N.D. Cal. 2017) ............................................................... 24, 25

*Daugherty v. Am. Honda Motor Co.*,
144 Cal. App. 4th 824 (2006) ................................................................................... 19

*e-ventures Worldwide, LLC v. Google, Inc.*,
2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) .......................................................... 3, 18

*Falkowski v. Imation Corp.*,
132 Cal. App. 4th 499 (2005) ................................................................................... 23

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
848 F.2d 976 (9th Cir. 1988) .................................................................................... 13

*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*,
    209 Cal. App. 4th 1118 (2012)..................................................................24, 25

*Frances T. v. Vill. Green Owners Ass'n*,
    42 Cal. 3d 490 (1986)......................................................................................20

*Garon v. eBay, Inc.*,
    2011 WL 6329089 (N.D. Cal. Nov. 30, 2011)................................................12

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
    2010 WL 1541257 (N.D. Cal. Apr. 16, 2010) ................................................11

*Guz v. Bechtel Nat'l, Inc.*,
    24 Cal. 4th 317 (2000).................................................................................23, 24

*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga*,
    175 Cal. App. 4th 1306 (2009)........................................................................25

*Hicks v. PGA Tour, Inc.*,
    165 F. Supp. 3d 898 (N.D. Cal. 2016) ...........................................................19

*In re Anthem, Inc. Data Breach Litig.*,
    162 F. Supp. 3d 953 (N.D. Cal. 2016) ...........................................................20

*In re High-Tech Emp. Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ..........................................................16

*InfoStream Grp., Inc. v. PayPal, Inc.*,
    2012 WL 3731517 (N.D. Cal. Aug. 28, 2012)......................................12, 13, 15

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008)...........................................................................8

*Kinderstart.com, LLC v. Google, Inc.*,
    2007 WL 831806 (N.D. Cal. Mar. 16, 2007) ...................................................9

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
    884 F.2d 504 (9th Cir. 1989) ..........................................................................11

*Levitt v. Yelp! Inc.*,
    765 F.3d 1123 (9th Cir. 2014).........................................................................20

*Lewis v. YouTube, LLC*,
    244 Cal. App. 4th 118 (2015)..........................................................................24

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008).....................................................................19

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*,
    200 Cal. App. 4th 480 (2011)..........................................................................20

*Murphy v. Hartford Accident & Indem. Co.*,
    177 Cal. App. 2d 539 (1960)...........................................................................21

*Nasseri v. Wells Fargo Bank, N.A.*,
    147 F. Supp. 3d 937 (N.D. Cal. 2015) ...........................................................23

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ...................................................................................... 9

*Official Airline Guides, Inc. v. FTC*,
    630 F.2d 920 (2d Cir. 1980) ............................................................................... 14, 18

*Oracle Am., Inc. v. CedarCrestone, Inc.*,
    938 F. Supp. 2d 895 (N.D. Cal. 2013) ....................................................................... 19

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .................................................................................... 17

*Parrish v. NFL Players Ass'n*,
    534 F. Supp. 2d 1081 (N.D. Cal. 2007) ..................................................................... 21

*Person v. Google, Inc.*,
    2007 WL 832941 (N.D. Cal. Mar. 16, 2007) ............................................................... 9

*Person v. Google Inc.*,
    346 F. App'x 230 (9th. Cir. 2009) ............................................................................ 18

*Pool Water Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) .............................................................................. 11, 17

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................................ 15, 17

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) ...................................................................................... 14

*Search King, Inc. v. Google Tech., Inc.*,
    2003 WL 21464658 (W.D. Okla. May 27, 2003) ...................................................... 18

*Song fi Inc. v. Google, Inc.*,
    108 F. Supp. 3d 876 (N.D. Cal. 2015) ....................................................................... 23

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ............................................................................................. 10, 12

*Sterling Merch., Inc. v. Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011) ...................................................................................... 13

*Sweet v. Google Inc.*,
    2018 WL 1184777 (N.D. Cal. Mar. 7, 2018) ............................................................. 23

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) .................................................................................... 10

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974) ................................................................................................... 16

*Universal Grading Serv. v. eBay, Inc.*,
    2012 WL 70644 (N.D. Cal. Jan. 9, 2012) ............................................................... 9, 19

*Verisign, Inc. v. Internet Corp.*,
    2004 WL 1945561 (C.D. Cal. May 18, 2004) ................................................ 11, 14, 18

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ...........................................................................................8, 11, 12

*Wolf v. Walt Disney Pictures & Television*,
    162 Cal. App. 4th 1107 (2008) .......................................................................................21

*Young v. Facebook, Inc.*,
    790 F. Supp. 2d 1110 (N.D. Cal. 2011) .........................................................................20

*Zoslaw v. MCA Distrib. Corp.*,
    693 F.2d 870 (9th Cir. 1982)....................................................................................14, 18

**STATUTES**

15 U.S.C. § 2 ..................................................................................................................*passim*

Cal. Bus. & Prof. Code § 17200....................................................................... 1, 7, 19, 20

Cal. Civ. Code § 1668 .........................................................................................................25

**RULES**

Fed. R. Civ. P. 12(b)(6)...................................................................................................1, 8

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 16, 2018, at 8:00 a.m. in the U.S. District Court for the Northern District of California, Defendant Google LLC ("Google") shall and hereby does move for an order dismissing with prejudice all claims asserted in Plaintiff's Complaint.

## STATEMENT OF REQUESTED RELIEF

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Google requests that the Court dismiss with prejudice all of Plaintiff's claims.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiff fails to state claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, and under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), where it has failed to allege facts plausibly establishing the existence of (a) a relevant antitrust product market; (b) harm to competition within that market; or (c) antitrust injury.

2.      Whether Plaintiff fails to state claims for breach of contract and breach of the implied covenant of good faith and fair dealing where it has failed to plausibly allege that Google engaged in conduct that was not expressly permitted by the AdWords Agreement.

3.      Whether Plaintiff's contract-based claims for consequential damages are barred by the limitation of liability provision in the AdWords Agreement.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Dreamstime.com, LLC ("Dreamstime") alleges that Google manipulated its search engine algorithm and selectively enforced its advertising policies to harm Dreamstime's online stock photography business. Plaintiff claims that Google did so to benefit other stock photo companies with which it had entered into licensing agreements and thereby to protect its position in search advertising against possible competition. This story, as contrived as it is convoluted, is implausible on its face, and it reflects nothing more than an effort to blame Google for Dreamstime's own business failures. But the Court need not go beyond the allegations in the Complaint to resolve this case.

Dreamstime's antitrust claims, under Section 2 of the Sherman Act and California's UCL, fail for three independent reasons. *First*, Dreamstime does not allege a relevant market in

which it incurred harm. Plaintiff's theory is that Google "leveraged" its power in one market (search advertising, in which Dreamstime does not compete) to harm Plaintiff and distort competition in the "downstream" business where it does compete: online stock photography. Proceeding on this theory, however, would require Dreamstime, at a minimum, to allege facts establishing that online stock photography is a relevant antitrust market. Plaintiff does not even try to define such a market, and that defect is fatal.

*Second*, Plaintiff does not plead *harm to competition* within any relevant market. Dreamstime does not claim that Google monopolized or attempted to monopolize any online stock photography market, which it must to state a Section 2 claim under the leveraging theory offered in the Complaint. Moreover, Dreamstime's allegations, even if credited, suggest nothing more than injury to a single stock photo business—itself. Under established law, pleading harm to an individual competitor, rather than harm to the competitive process marketwide, is not enough. As to the putative search advertising market, Plaintiff fails to plausibly allege that Google's actions with respect to Dreamstime enhanced or maintained Google's supposed monopoly power. Nor could it, given the absence of any allegations that Dreamstime or any other stock photo company competes (or plans to compete) in search advertising.

*Third*, Dreamstime fails to adequately plead "antitrust injury"—injury that it suffered as a result of the anticompetitive effects of the claimed violation. Plaintiff's claim of harm at Google's hands is dubious from the start: Dreamstime alleges that it was injured when its ranking in Google's search results for a single, self-selected query ("stock photos") dropped— even though Plaintiff admits that its "overall organic visibility" in Google's search results actually *improved*. But even if a drop for one search query somehow added up to an injury, it is not an *antitrust* injury. The only basis Plaintiff offers for linking its purported drop in search ranking to Google's alleged anticompetitive conduct is the bare assertion that Google acted to benefit other stock photo companies (Shutterstock and Getty Images) by entering into licensing deals with them. Dreamstime merely speculates about such a link; it pleads no facts whatsoever that support its (false) story. And these speculations are undercut by what Plaintiff does allege: according to the Complaint, Dreamstime's search ranking started to fall months, if not years,

*before* Google's licensing agreements with Shutterstock and Getty Images came into being. Dreamstime cannot state a viable antitrust claim with such a baseless and internally inconsistent story.

Plaintiff's contract-based claims also fail as a matter of law. Dreamstime contends that Google breached the agreement that governs the parties' advertising relationship by disapproving and removing certain of Dreamstime's ads from Google's AdWords service. But Dreamstime does not—and cannot—identify any provision of the contract that precludes this behavior. To the contrary, the terms of the governing agreement expressly authorize Google to reject, remove, and place ads as it sees fit. That defeats any claim for breach of contract or of the implied covenant of good faith. And Plaintiff's effort to claim broad consequential damages from the supposed breach is expressly barred by the terms of the parties' agreement.

**FACTUAL BACKGROUND**

### A.   Google And Its Search Advertising Business[1]

Google operates an Internet search engine that helps billions of users find what they are looking for on the Internet. ¶¶ 15, 21. In response to users' search queries, Google's algorithms consider thousands of factors to identify responsive material, which is returned to users in a list of links to particular webpages. ¶¶ 21-22, 24. These "organic" search results reflect Google's opinions about which pages are likely to be the most relevant and useful to users based on their queries. ¶¶ 21-22; *accord e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) (holding that Google's rankings "are the same as decisions by a newspaper editor regarding which content to publish, which article belongs on the front page, and which article is unworthy of publication").

Google does not charge for use of its search engine and does not accept money for placement in its organic search results. ¶¶ 29, 31. Instead, Google earns revenue from advertising. ¶¶ 21, 31, 104. Google's AdWords service sells advertising for display alongside Google's organic search results and throughout Google's display advertising network. ¶ 104. The

---

[1] This background is drawn from the allegations in Plaintiff's Complaint and the materials attached or incorporated by reference. All paragraph and exhibit citations are to the Complaint.

prices that advertisers pay for AdWords ads are set by auction, with each advertiser controlling its own budget and targets to "bid for relevant search term keywords" according to the "cost per click" of each advertisement. ¶¶ 108-109. Google determines which ad to display in response to a given search query "by factoring both the advertiser's bid amount and the advertisement's quality score," which Google assigns "based on multiple factors." ¶ 108. Advertisers can choose to either manually bid for keywords or, for an extra fee, to participate in a "marketing campaign" designed to automatically optimize bid amounts based on specific advertising goals (such as increasing the number of clicks, sales, or downloads) and spending limits. ¶¶ 109-110.

To participate in AdWords, advertisers agree to Google's "Advertising Program Terms along with several related terms and conditions" and "applicable Google advertising policies." ¶¶ 105, 108; Exs. F, G (the "AdWords Agreement" or "Agreement").[2] This Agreement is a contract that "govern[s] participation in Google's advertising programs and services." Ex. F. By its terms, the Agreement gives Google the right to determine whether to approve a given ad and where to place ads that are approved. In particular, Google "***may reject or remove a specific . . . Ad . . . at any time for any reason or no reason.***" Ex. F § 1 (emphasis added). The Agreement also authorizes Google "to place Customer's advertising materials . . . on ***any*** content or property . . . provided by Google or its affiliates on behalf of Google or, as applicable, a third party." *Id.* (emphasis added). While advertisers determine the content of their ads, Google's policies regulate the kinds of ads that can be displayed. Among other things, those policies prohibit the use of misleading content in advertisements, such as "trick-to-click" ads that may mislead a user into clicking on the ad. ¶ 114.

### B.    Dreamstime And Its Stock Photo Business

Dreamstime operates an online stock photography service. ¶¶ 14, 42. Stock photos are images that anyone can license for creative use, in lieu of hiring a photographer to create custom images. ¶ 39. Dreamstime claims to be a competitor in the "online stock photography

---

[2] Dreamstime's Complaint attaches both the AdWords Agreement as it was in 2005 as well as the current version. *See* Exs. F, G. For purposes of this motion, there is no material difference between those versions.

business"—along with companies such as "Shutterstock, Getty Images, Adobe and other smaller competitors." ¶ 39. Dreamstime does not allege that it operates a search advertising service or that it competes (or plans to compete) in that business.

Dreamstime is a customer of Google's AdWords service, which it uses to place targeted ads alongside search results for queries that it believes to be "relevant to online stock photographs." ¶¶ 10, 30, 111-112. Dreamstime alleges that it "relies heavily upon online search engines and search engine advertising to build its name recognition and generate new customers and sales." ¶ 44. Since 2005, when Dreamstime entered into the AdWords Agreement (¶ 111), it has "engaged in several different marketing campaigns with the goal of promoting its advertisements with the lowest cost per acquisition." ¶ 112. In doing so, Dreamstime asserts that it was paying Google "to determine which of its advertisements are the most effective and to increase their circulation accordingly." *Id.*

**C.     Dreamstime's Allegations Against Google**

Dreamstime's claims fall into two buckets: (1) complaints about where Dreamstime's website appears in Google's search results in response to certain user queries (¶¶ 49-103); and (2) complaints about the performance and placement of some of Dreamstime's ads in Google's advertising services (¶¶ 104-125).

**1.     Allegations Regarding Dreamstime's Performance In Search Results**

Dreamstime's allegations about Google's search results are strategically crafted. Plaintiff does not allege that Google removed Dreamstime's website from search results or stopped returning references to its site in response to users' queries. It does not allege that its position in Google's search rankings diminished over a full or representative set of search queries related to its business. It does not even allege that the volume of visitors sent from Google's organic search results to Dreamstime's website dropped over any relevant period of time. ¶ 80.

Instead, Dreamstime complains about where its website appears in Google's search results for a single self-selected query: "stock photos." ¶¶ 75, 78-79, 81-82. Dreamstime alleges that, starting in August 2015, Google altered its search-ranking algorithm in ways that caused Dreamstime's website to drop in ranking in response to that one query. ¶¶ 53, 63-64, 73, 75, 77-

78. The Complaint offers no allegations to suggest that this query was ever responsible for a significant portion of traffic to Dreamstime's website or about the relative importance of this query to Dreamstime's business or that of other online stock photo services. It offers no allegations that users looking to license stock photographs are likely to use this highly general query, rather than some more specific query. Tellingly, moreover, Dreamstime does not allege that it experienced any drop in its search ranking in regard to any other stock photo-related queries, whether general ones such as "clipart images" and "cartoon images," or more specific queries such as "stock photo jazz," "stock photo fruit tart," and "happy holidays images." (Indeed, simple searches reveal that Dreamstime's website continues to rank highly, including on the first page of Google's search results, for those and other similar queries.) Beyond all that, Dreamstime admits that the supposed decline in its organic search ranking for the "stock photos" query "does not bear any relationship to Dreamstime's overall organic visibility, which improved over the same period of time." ¶ 80.

Nevertheless, Dreamstime asserts that this purported drop reduced the number of "new Dreamstime buyers" who purchased photos from Dreamstime, ultimately causing Dreamstime to lose "tens of millions" in "potential revenue." ¶ 76. Dreamstime further alleges that it was "forced" to spend more on search engine advertising from Google "to maintain its position as a leader in online stock photography." ¶ 70. Dreamstime suggests that Google manufactured this drop in rankings in response to a single search query in a scheme to harm Dreamstime at the expense of other, more successful companies in the stock photo business. ¶¶ 4-6, 49-50.

The lynchpin of this story is Google's licensing agreements with Shutterstock and Getty Images—routine commercial agreements whereby Google licensed from those companies the right to use their images in connection with various Google services. ¶¶ 46, 48. Plaintiff asserts—without any foundation or supporting factual allegations—that these deals somehow led Google to manipulate its organic search rankings for the "stock photos" query, to diminish Dreamstime while preserving its larger rivals' position. ¶¶ 4-6, 49-50, 53-54, 58, 61-64, 94-96, 101. Dreamstime makes that claim even though, by its own chronology, its search rankings fell months, even years, *before* Google made deals with Shutterstock and Getty Images. *Compare*

¶¶ 4, 6, 71, 75, 76, 84 (alleging that Dreamstime's ranking fell in August 2015), *with* ¶ 46 (Shutterstock deal entered in July 2016), *and* ¶ 48 (Getty deal entered in February 2018). Also perplexing is Dreamstime's allegation that Google's actions benefited Adobe, another large competitor in the stock photo business, even though, as Plaintiff acknowledges, Google has no relevant agreement or partnership with Adobe. ¶¶ 50, 63.

### 2.   Allegations About Dreamstime's Use Of Google AdWords

Distinct from its allegations about organic search, Dreamstime alleges that Google took various actions in regard to the advertisements Dreamstime was running on Google's AdWords service. ¶¶ 11, 113-125, 154-155. Dreamstime's primary claim in this regard is that "Google has consistently removed Dreamstime's lowest cost per acquisition advertisements as being 'trick to click'" ads. ¶¶ 115-119. Dreamstime acknowledges that Google took this action because the ads included a fake "search box" that did not actually offer search functionality. *Id.* Although it admits that Google's policies prohibit such ads (¶¶ 114, 119), Dreamstime claims that Google has not removed similar ads run by other stock photo companies (¶ 115).

Beyond that, Dreamstime makes a few other scattered allegations about the performance of its ads, though these allegations are conclusory and not supported by any concrete factual assertions. The Complaint vaguely alleges, for example, that "several of Dreamstime's campaigns have suddenly stopped acquiring customers for no apparent reason" (¶ 113), that it "has been unable to get any support from Google on this issue" (*id.*), and that Google "placed Dreamstime's ads on irrelevant websites and error pages" (¶¶ 11, 155). Dreamstime claims that these purported actions breached the terms of the AdWords Agreement, though it points to no relevant language or provision in that agreement that supports its assertion. ¶ 155.

### 3.   Dreamstime's Lawsuit Against Google

Dreamstime filed this lawsuit on March 28, 2018. It asserts four causes of action. Counts I and IV seek to hold Google liable for monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2 (¶¶ 126-150) and for unlawful and unfair competition under California's Unfair Competition Law ("UCL") (¶¶ 166-177). These counts offer nearly identical antitrust claims. Counts II and III assert claims for breach of contract and breach of the implied covenant of good

1   faith and fair dealing, based on the AdWords Agreement. ¶¶ 151-165. These claims are based

2   primarily on Google's supposed actions in connection with Dreamstime's advertisements,

3   although Dreamstime alleges without explanation that its drop in search results also somehow

4   breached the Agreement. ¶¶ 154-155. Dreamstime seeks broad consequential damages—

5   purported business losses it claims were linked to the drop in its ad performance. ¶¶ 158, 165.

6   ## ARGUMENT

7   Rule 12(b)(6) requires dismissal where a complaint fails to "contain sufficient factual

8   matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

9   556 U.S. 662, 678 (2009). Particularly in antitrust cases, where discovery "frequently causes

10  substantial expenditures," "[f]actual allegations must be enough to raise a right to relief above

11  the speculative level." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

12  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

13  allegations, do not suffice." *Iqbal*, 556 U.S. at 678.

14  ## I.   DREAMSTIME FAILS TO STATE A SECTION 2 SHERMAN ACT CLAIM

15  Dreamstime's antitrust claim is premised on the theory that Google used its purported

16  monopoly power in a search and search advertising market to impede Dreamstime's ability to

17  compete in a separate "downstream" business: online stock photography. According to the

18  Complaint, Google did so by changing its search algorithm in ways that caused Dreamstime's

19  website to fall in Google's search ranking in response to a single search query and, later, by

20  disapproving certain of Dreamstime's search ads. Plaintiff asserts that Google took these actions

21  in order to benefit rival stock photo companies (Shutterstock and Getty Images) with which

22  Google entered licensing deals. The fictional nature of its allegations aside, Dreamstime's claims

23  fail as a matter of law.

24  A monopolization claim under Section 2 of the Sherman Act requires the plaintiff to

25  plead that: (1) the defendant possesses monopoly power in a relevant market; (2) the defendant

26  has willfully acquired or maintained that power through anticompetitive conduct; and (3) the

27  plaintiff's injury qualifies as "antitrust injury." *E.g.*, *Verizon Commc'ns Inc. v. Law Offices of*

28

*Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996). Dreamstime cannot establish any of these elements.

**A.      Dreamstime Fails To Plead The Existence Of A Stock Photography Market**

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). Significantly, the "relevant market" in a private antitrust case is not just any market. It must be the *same market* where the plaintiff suffered its alleged injury. *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) (Sherman Act "requires the plaintiff to have suffered its injury in the market where competition is being restrained"); *Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *9 (N.D. Cal. Jan. 9, 2012), *aff'd*, 563 F. App'x 571, 572 (9th Cir. 2014) ("The only market in which eBay was alleged to have monopoly is . . . online auction services, but this is not a relevant market in which [plaintiff] is a competitor."). Here, the "market" that Dreamstime purports to identify is not the market in which it competes and claims to have suffered harm. And Dreamstime does not allege that the business in which it does compete, stock photography, is a relevant antitrust product "market" at all. This deficiency by itself is fatal to Dreamstime's claim.

The Complaint discusses a purported market for "online search" and "online search advertising"; this is the market in which Dreamstime claims that Google exercises monopoly power. ¶¶ 20-33, 131.[3] But while Plaintiff says that it is a "consumer" of search advertising

---

[3] Although the Complaint discusses search and search advertising separately, it also claims that they "are essentially one and the same" market. ¶¶ 30-31. No matter how that market is defined, however, Dreamstime faces a threshold problem: this Court has held that search advertising is not a relevant market independent and distinguishable from "the larger market for Internet advertising." *Person v. Google, Inc.*, 2007 WL 832941, at *4 (N.D. Cal. Mar. 16, 2007); *accord Kinderstart.com, LLC v. Google, Inc.*, 2007 WL 831806, at *6 (N.D. Cal. Mar. 16, 2007) ("Because a website may choose to advertise via search-based advertising or by posting advertisements independently of any search, search-based advertising is reasonably interchangeable with other forms of Internet advertising."). Plaintiff makes no allegations sufficient to evade these rulings. Although the Court need not reach the issue, Plaintiff's Section 2 claim can be dismissed on that basis too, just like the similar claims in *Person* and *Kinderstart*.

(¶ 30), it does not claim that Dreamstime competes, much less suffered a competitive injury, there. Instead, Plaintiff's theory is that Google has tried to leverage its alleged monopoly power in the purported search advertising market to harm to Dreamstime in a separate "downstream" business—online stock photography—in which Dreamstime does compete and in which it claims to have been injured at the expense of its rivals. ¶¶ 1, 4, 12, 39-41, 56-57, 61, 146-148.

This is not a viable Sherman Act claim. As the Ninth Circuit has explained: "Even in the two-market situation, a plaintiff cannot establish a violation of Section 2 without proving that the defendant used its monopoly power in one market to obtain, or attempt to attain, a monopoly *in the downstream, or leveraged, market*." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546-47 (9th Cir. 1991) (emphasis added). Accordingly, to proceed on the kind of theory suggested in its Complaint, Dreamstime must, at a minimum, plead that the downstream business in which it claims to have been injured is itself a "market" defined, as required, by the Sherman Act. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) ("demonstrating the dangerous probability of monopolization . . . requires inquiry into the relevant product and geographic market and the defendant's economic power in that market").

But even though Dreamstime's claim is premised on effects in the online stock photography business (*e.g.*, ¶¶ 5, 8, 57, 61), it does not even try to plead that this business is a relevant market. Indeed, the Complaint does not so much as assert that stock photography is a "market," referring to it at every turn as a mere "business." *E.g.*, ¶¶ 1, 3-4, 8, 12, 39, 45, 47-48, 53, 58, 61. And Dreamstime certainly pleads none of the facts that would be needed to define a proper antitrust market, including facts that establish that "no other goods or services . . . are reasonably interchangeable" for online stock photographs. *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999).

These deficiencies are fatal. As a matter of law, Plaintiff cannot assert a claim based on the alleged anticompetitive effects of Google's actions on online stock photography without alleging facts that establish stock photography as a proper market. *See, e.g.*, *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("[F]ailure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d

1190, 1196 (N.D. Cal. 2008) (same); *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 2010 WL 1541257, at *3 (N.D. Cal. Apr. 16, 2010) (dismissing with prejudice for failure to plead that "all commodities sold by entities who compete in the [relevant market] are reasonably interchangeable with one another"), *aff'd*, 433 F. App'x 598 (9th Cir. 2011).

> ### B. Dreamstime Fails To Plead That Google Unlawfully Harmed Competition

Beyond this core market-definition deficiency, Dreamstime's claim fails because the Complaint does not allege harm to competition within, let alone monopolization of, any relevant market. "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*" *Verizon*, 540 U.S. at 407. More specifically, plaintiffs must "plead and prove a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989). Actions that cause harm to—or even eliminate—a single competitor are not sufficient. *See, e.g.*, *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) ("A decrease in one competitor's market share . . . affects competitors, not competition."); *Verisign, Inc. v. Internet Corp.*, 2004 WL 1945561, at *6 (C.D. Cal. May 18, 2004) (alleged favoritism by defendant which allowed plaintiff's "vigorous competitors . . . to compete more vigorously" does not state a claim under the Sherman Act). Dreamstime has not alleged harm to competition in any market; at most, it alleges harm to itself as a competitor. That is not enough.

> ### 1. Dreamstime Fails To Allege Competitive Harm In Stock Photography

***No allegation of attempted monopolization of online stock photography.*** As discussed above, the core theory suggested by Plaintiff's Complaint is that Google leveraged its purported monopoly in the search advertising market in order to suppress competition in the downstream online stock photo business. But, under established law in this Circuit, such a "leveraging" theory could only be viable if the plaintiff plausibly alleges an actual *attempt to monopolize* the downstream relevant market. In *Alaska Airlines*, the Ninth Circuit squarely rejected the claim that "a single firm may be liable for 'monopoly leveraging,' even in the absence of a threat that the 'leveraged' market will be monopolized." 948 F.2d at 548 ("Unless the monopolist uses its

power in the first market to acquire and maintain a monopoly in the second market, or to attempt to do so, there is no Section 2 violation."). The court held as a matter of law that a defendant's alleged exploitation of monopoly power in one market to "gain a competitive advantage" in another market does not state a claim under Section 2. *Id.* at 547-48; *accord InfoStream Grp., Inc. v. PayPal, Inc.*, 2012 WL 3731517, at *4-6 (N.D. Cal. Aug. 28, 2012) ("leveraging an upstream monopoly to gain power in a downstream market does not violate Section 2 absent achieving, or attempting to achieve, a monopoly downstream").

Dreamstime's claim suffers from precisely the same legal defect identified in *Alaska Airlines* and *InfoStream*. Dreamstime does not allege that Google has obtained, attempted to obtain, or has a "dangerous probability" of obtaining monopoly power in the online stock photography business. *Verizon*, 540 U.S. at 415 n.4 (citing *Spectrum Sports*, 506 U.S. at 459); *accord InfoStream*, 2012 WL 3731517, at *6 (dismissing plaintiff's complaint because it "does not provide any allegations, plausible or otherwise, that PayPal has a dangerous probability of monopolizing the [downstream] Specialty Online Dating Services market"). Indeed, the Complaint does not even allege (nor could it) that Google competes in the stock photo business at all. *See supra* pp. 3-4. Plainly, Google cannot be monopolizing (or attempting to monopolize) a market in which it does not compete in the first place. *Accord Garon v. eBay, Inc.*, 2011 WL 6329089, at *4 (N.D. Cal. Nov. 30, 2011) ("Plaintiffs cannot state a monopolization claim against Defendant based on their effective exclusion from a market in which Defendant is neither alleged to be a monopolist nor a competitor.").[4]

Dreamstime argues only that "Google has injured competition" in the stock photography business. ¶ 57; *see also, e.g.*, ¶ 47 ("disrupt the market for stock photos and eliminate (or at least significantly impair) competition in that line of commerce"); ¶ 58 ("restricted competition"); ¶ 61 ("discriminating and restraining trade"); ¶ 140 ("excluding and distorting competition").

---

[4] Plaintiff's suggestion that "Google also plans to enter the stock photography business segment directly" (¶ 47) is supported by no facts at all. But even if it were, a vague "plan" to enter a field of commerce is worlds away from an actual intent to monopolize it, much less a "dangerous probability" of doing so.

1    Such allegations, however, are precisely what the Ninth Circuit in *Alaska Airlines* and Judge

2    Illston in *InfoSream* (where the plaintiff advanced a theory nearly identical to Dreamstime's

3    here) rejected. *Alaska Airlines*, 948 F.2d at 546-49 (gaining a "competitive advantage" or

4    exercising monopoly power "'to the detriment of competition' in another market" is not enough

5    to state a Section 2 claim (citation omitted)); *InfoStream*, 2012 WL 3731517, at *2, *5-6

6    (dismissing allegations that PayPal "allegedly terminated plaintiffs' accounts in order to 'bestow

7    an unfair competitive advantage on certain dating websites and not others'" and "manipulate[d]

8    the downstream markets for its own benefit"). As in those cases, this Court can dismiss

9    Dreamstime's claim on this basis alone.

10          ***Favoring a customer's rivals is not anticompetitive conduct.*** Even what Dreamstime

11   does allege about "harm to competition" in online stock photography falls short of the mandatory

12   legal standard. Plaintiff's allegations confuse purported harm to individual competitors with what

13   the antitrust laws actually protect against: harm to the competitive process as a whole.

14          What Plaintiff alleges as "harm to competition" in stock photography is essentially just a

15   recitation of what Google supposedly did to Dreamstime alone: impair its organic search ranking

16   for a single query and remove certain of its advertisements. That is plainly insufficient. *See, e.g.*,

17   *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 982 (9th Cir. 1988)

18   ("injury to the antitrust plaintiff alone is not sufficient to prove injury to competition" (citation

19   omitted)). The little Plaintiff has to say about other stock photography companies changes

20   nothing. While Dreamstime alleges that certain of its competitors—such as "123RF,

21   DepositPhotos, and CanStockPhoto"—have seen their search ranking for the query "stock

22   photos" fall, it does not plead any facts suggesting that these changes had any effect on the actual

23   conditions of *competition* in the stock photo business, such as price, output, or quality. ¶¶ 6, 52,

24   76, 86-87, 92; *accord Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011)

25   ("Injury to competition is usually measured by a *reduction in output* and an *increase in prices* in

26   the relevant market." (internal quotation marks omitted)).

27          At most, Dreamstime alleges that Google favored other companies in the stock

28   photography business (Shutterstock, Getty Images, and Adobe) over it (and three others). Even if

that were true, the law is clear that favoring one set of customers over another is not harm to competition. *See, e.g.*, *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 886-87 (9th Cir. 1982) (charging more favorable prices to plaintiff's rivals does not violate the Sherman Act). Thus, for example, in the recent *Cable Line* case, Comcast cut off dozens of cable installation contractors, maintaining just two companies with which it continued to do business. Plaintiff, one of the companies cut off, brought a Sherman Act claim. But the court recognized that these allegations merely pled harm to the plaintiff, not to competition, and so it dismissed the complaint for failure to state a claim. *Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*, 2018 WL 2209518, at *3-5 (M.D. Pa. May 14, 2018). Similarly, in *Official Airline Guides*, the Second Circuit held that, although the dominant (pre-Internet) provider of flight schedules systematically favored major airlines over smaller carriers, that did not establish harm to competition. *Official Airline Guides, Inc. v. FTC*, 630 F.2d 920, 925-28 (2d Cir. 1980); *see also, e.g.*, *Zoslaw*, 693 F.3d at 886-87; *Verisign*, 2004 WL 194561, at *6 ("the fact that [plaintiff] has vigorous competitors who will be able to compete more vigorously" is not harm to competition).[5]

In short, Dreamstime's effort to assert a claim based on the purported effects of Google's actions in the online stock photography business fails as a matter of law.

2.    <u>Dreamstime Fails To Allege Competitive Harm In Search Advertising</u>

Plaintiff's Complaint also hints at a different theory: that Google's actions with respect to Dreamstime reflected an effort to maintain its purported monopoly in what Dreamstime calls the search advertising market. ¶¶ 101, 138, 140. That is, Google supposedly disrupted competition in online stock photography to protect its position in search advertising. But even if this theory were seriously pleaded, it would fail under Section 2.

---

[5] Likewise, even if Google's agreements with Shutterstock and Getty Images are compared to agreements to distribute, it is well settled that entering into such agreements with some, but not all, of a business's competitors—agreements that necessarily favor certain distributors over others—is presumptively lawful. *See, e.g.*, *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987) ("[A]n agreement between a manufacturer and a distributor to establish an exclusive distributorship is not, standing alone, a violation of antitrust laws, and in most circumstances does not adversely affect competition in the market.").

As an initial matter, this is exactly the kind of claim rejected in *InfoStream*. *See* 2012 WL 3731517, at *2 ("According to plaintiffs, 'PayPal manipulates the downstream markets for its own benefit' by 'choosing market winners in downstream markets with the intent to benefit itself by increasing revenue and in maintenance of its market power in the Confidential Payment Services market.'"). Beyond that, nowhere does Dreamstime even try to suggest that its search rankings and advertising performance resulted in higher prices, lower output, or decreased quality in search advertising, or brought about any other marketwide harm to consumers or competitors in the putative search advertising market. *Cf. Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Dreamstime certainly does not allege that any actual competitor in that market—such as Baidu, Microsoft, Yandex, or Yahoo (¶¶ 23, 30)—was harmed by Google's actions or that Google's supposed power relative to those competitors was enhanced by what happened to Dreamstime.

Instead, Dreamstime offers a story that is, at best, convoluted and far-fetched. As Dreamstime tells it, Google forestalled *potential* competition in search advertising by disrupting the online stock photography business—more specifically, by impairing certain stock photo companies' possible growth as "vertical search" players that (hypothetically) might someday challenge Google in search advertising. ¶¶ 40, 61. That is, Plaintiff claims that, but for Google's alleged actions, Dreamstime was poised to leap over Baidu, Bing, Yahoo!, and the many *thousands* of other equally likely "potential" competitors to threaten Google's purported monopoly over search advertising. This story is implausible on its face and supported by no coherent factual allegations. Plaintiff does not so much as allege that Dreamstime—or any other stock photo company—actually competes in the search advertising market or has some tangible plan to do so. Instead, its allegations are entirely theoretical and speculative: "Google Images ***would be devastated if*** more customers knew they could go to Dreamstime, Getty Images, Adobe, or Shutterstock directly instead of going to Google first. Then, these dominant stock photo sites ***could start*** expanding their offerings to include other things people search to buy for." ¶ 40 (emphasis added). Dreamtime cannot state a viable Section 2 claim with such musings.

1   *Cf. United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 (1974) (antitrust law not

2   implicated by "ephemeral possibilities").

3           Not only that, Plaintiff's story is actually undermined by the facts it does allege. The

4   Complaint repeatedly asserts that Google has *strengthened* two of Dreamstime's rival stock

5   photo companies, Shutterstock and Getty Images, by entering into licensing agreements that,

6   according to Plaintiff, are likely to earn those companies greater visibility and market power.

7   ¶¶ 46-54, 94, 96. But if stock photo companies really are Google's nascent competitors—which

8   represent an "existential threat to Google's monopoly in the online search advertising market"

9   (¶ 40)—Google's actions would be counterproductive. On Plaintiff's logic, they would only have

10  threatened Google's position in search advertising by strengthening its potential competitors'

11  hand in the stock photography business. ¶ 49 (alleging that as a result of Google's actions

12  "Shutterstock and Getty Images' dominant positions will be solidified"); ¶ 96. That is

13  inconsistent with any plausible claim of monopoly maintenance.[6]

14          In short, Dreamstime's failure to offer any viable allegations that Google has attempted to

15  monopolize online stock photography or has succeeded in unlawfully impairing competition in

16  search advertising dooms, as a matter of law, any claim under Section 2.

17          **C.      Dreamstime Fails To Plead Antitrust Injury**

18          Finally, Plaintiff's Complaint fails to properly allege antitrust injury. The Sherman Act

19  requires that a plaintiff show that its claimed loss "stems from a competition-*reducing* aspect or

20  effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344

21  (1990); *see also In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1192 (N.D. Cal.

22  2013); *Am. Ad Mgmt.*, 190 F.3d at 1055. Injuries—even substantial ones—that flow from aspects

23

24          [6] Dreamstime's scattered attempts to explain away this paradox—for example, by alleging
    that Google is strengthening its potential rivals in order to "collect more user data" or to "kee[p]
25  its enemies closer" (¶¶ 59, 96)—do nothing to help it state a claim under Section 2. Plaintiff
    offers no account of how Google supposedly getting access to data from Shutterstock or Getty
26  Images, in turn, would help it forestall potential competition from those or other stock photo
    companies. Nor does Dreamstime explain why Shutterstock and Getty Images, if they were truly
27  interested in competing with Google in search advertising, would consent to an arrangement that
    would, according to Plaintiff, solidify Google's market power.
28

1   of a defendant's conduct that are beneficial or neutral to competition are not antitrust injuries.

2   *See Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003); *Pool Water*,

3   258 F.3d at 1034-36; *Rebel Oil*, 51 F.3d at 1433.

4           The injuries that Plaintiff alleges are notably general and vague (¶¶ 76, 98, 146-150), but

5   they purportedly flow primarily from the supposed drop in Dreamstime's search ranking in

6   response to a *single* search query ("stock photos") (¶¶ 73-80). Significantly, however, the

7   Complaint offers nothing to suggest that Dreamstime's ranking based on this lone query is (or

8   ever was) important to competing in the stock photo business, or even that it matters at all.

9   Dreamstime does not allege, for example, that the general "stock photos" query (as opposed to

10  any number of other more specific photo-related queries) ever drove a meaningful amount of

11  traffic to its website or that users who found the site through that query were responsible for any

12  meaningful amount of revenue. *See supra* pp. 5-6. Without such allegations, the Complaint

13  offers no plausible basis to conclude that a drop in ranking for this one query caused whatever

14  business losses Dreamstime now claims to have suffered. And other than this single, hand-

15  selected query, Dreamstime makes no allegation that its performance in Google's search results

16  diminished in any way. To the contrary, Dreamstime acknowledges that the supposed "decline in

17  Dreamstime's organic search ranking" for the "stock photos" query "does not bear any

18  relationship to *Dreamstime's overall organic visibility, which improved over the same period of*

19  *time*." ¶ 80 (emphasis added). That admission renders Dreamstime's basic story of injury linked

20  to Google's supposed changes to its search algorithm even less plausible.

21          But even if the claimed drop in search ranking plausibly qualified as "injury" at all, it still

22  would not qualify as *antitrust* injury. Dreamstime fails to plead any facts establishing that the

23  claimed harm was causally linked to any supposedly competition-reducing aspect of Google's

24  behavior. Plaintiff's theory of causation is that Google was motivated to alter its search

25  algorithm to harm Dreamstime because of the licensing deals Google struck with Shutterstock

26  and Getty Images. ¶¶ 4-6, 49-50, 53-54, 58, 61-64, 80, 94-96, 140. This theory is central to

27  Plaintiff's claim. Without Google supposedly acting to unlawfully help its licensing partners, not

28  only is there no viable antitrust claim, Dreamstime would run squarely into Google's established

1   First Amendment right to determine for itself how to rank websites in its search results. *See e-*

2   *ventures*, 2017 WL 2210029, at *4 ("A search engine is akin to a publisher, whose judgments

3   about what to publish and what not to publish are absolutely protected by the First

4   Amendment."); *Search King, Inc. v. Google Tech., Inc.*, 2003 WL 21464658, at *2-4 (W.D.

5   Okla. May 27, 2003) (holding that Google search rankings are "constitutionally protected

6   opinions"). And without this theory, Dreamstime would have no basis for trying to tie the

7   injuries it claims to have suffered to any supposed anti-competitive conduct. *E.g.*, ¶ 140.

8        But Plaintiff's theory collapses under even the slightest scrutiny. The Complaint does not

9   allege a single concrete fact that supports the idea that Google intentionally altered Dreamstime's

10  search (or ad) performance in order to benefit Shutterstock or Getty Images. Plaintiff's baseless

11  speculation cannot establish antitrust injury. *See, e.g.*, *Person v. Google Inc.*, 346 F. App'x 230,

12  231 (9th Cir. 2009). Not only that, Dreamstime's story is defeated by its own chronology.

13  According to the Complaint, Dreamstime's organic search ranking started to fall in "[f]all of

14  2015" ("in or around August 2015"). ¶¶ 6, 71, 73, 75. But that was long before Google entered

15  into either of the deals that supposedly motivated it to act against Dreamstime. ¶ 46 (Shutterstock

16  deal: July 2016); ¶ 48 (Getty deal: February 2018). Based on Dreamstime's own allegations,

17  therefore, whatever happened to its search ranking in August 2015 could not have had anything

18  to do with Google's much later agreements with Shutterstock and Getty Images. But even if

19  Plaintiff's false allegations had any factual support, they still would not qualify as antitrust injury

20  as a matter of law. Google is under no obligation not to aid Dreamstime's rivals, and entering

21  into commercial arrangements that enhanced the competitive position of those businesses simply

22  is not harm to competition. *See, e.g.*, *Zoslaw*, 693 F.3d at 886-87; *Cable Line*, 2018 WL

23  2209518, at *3-5; *Verisign*, 2004 WL 194561, at *6; *accord Official Airline Guides*, 630 F.2d at

24  925 (even monopolist has no obligation "not to discriminate unjustifiably between the competing

25  classes of [customers] so as to place one class at a significant competitive disadvantage").[7]

26

27        [7] Dreamstime also claims in general terms that it was harmed by Google's "selective
    enforcement" of its AdWords policies. ¶¶ 65, 124-125, 140, 148, 150. But Dreamstime barely

28  even suggests—much less alleges concrete facts to support—that Google's purported actions in
    regard to Dreamstime's ads resulted from and reflected broader harm to competition in any

                                                            (continued...)

## II.    DREAMSTIME FAILS TO STATE A UCL CLAIM

Plaintiff cannot escape the deficiencies in its Sherman Act claim by asserting a claim under California's Unfair Competition Law (UCL). The UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]," Cal. Bus. & Prof. Code § 17200, and Dreamstime invokes the first two of these prongs. ¶¶ 170-171.

Plaintiff cannot proceed under the UCL's "unlawful" prong. "By proscribing unlawful business practices, the UCL borrows violations of other laws and treats them as independently actionable." *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 837 (2006). Here, Dreamstime's UCL claim seeks to borrow from the Sherman Act (¶ 171), but Plaintiff's failure to plead a viable claim under that statute defeats any unlawfulness claim under the UCL. *See, e.g.*, *Universal Grading*, 2012 WL 70644, at *10 ("Because plaintiffs have failed to state a claim under the Sherman Act, [dependent UCL claim] is dismissed."); *Oracle Am., Inc. v. CedarCrestone, Inc.*, 938 F. Supp. 2d 895, 908 (N.D. Cal. 2013) (same).

The same is true of Dreamstime's unfairness claim, which also is based on the same antitrust theory. ¶ 170. As the California Court of Appeal has explained:

> If the same conduct is alleged to be both an antitrust violation and an "unfair" business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers. To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct.

*Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001); *see also LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 558 (9th Cir. 2008) ("Because LiveUniverse fails to state a claim under the Sherman Act, it also fails to state a claim under § 17200."); *Hicks v. PGA Tour,*

---

(...continued from previous page)

search advertising market. The Complaint makes no serious effort to suggest that Google raised advertising prices, diminished advertising supply, or inflicted any other market-based harm across a range of its search advertising customers. Without that critical linkage to competitive harm, however, whatever losses Dreamstime claims to have suffered as a result of its supposedly diminished ad performance is injury only to itself and does not qualify as antitrust injury.

*Inc.*, 165 F. Supp. 3d 898, 911 (N.D. Cal. 2016) (where conduct underlying UCL claim "overlaps completely with the allegations the Court has held fails to state a claim . . . UCL claim fails as a matter of law too").

Even if that were not so, Plaintiff's unfairness claim still would fail because the Complaint does not plausibly allege "actual or threatened impact on competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999); *accord Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014); *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 501 (2011). As discussed above, Dreamstime's allegations establish, at most, harm to its own economic interests, which is not enough. Without plausible allegations that Google's actions in regard to Dreamstime had a broader impact on competition within a relevant market, Plaintiff cannot proceed under the UCL's unfairness prong. *See, e.g., Levitt*, 765 F.3d at 1136-37 (allegation that "Yelp's conduct 'harms competition by favoring businesses that submit to Yelp's manipulative conduct and purchase advertising to the detriment of competing businesses that decline to purchase advertising'" did not establish harm to competition (citation omitted)).

## III.    DREAMSTIME FAILS TO STATE A CONTRACT CLAIM

Dreamstime also tries to assert claims under the AdWords Agreement. ¶¶ 151-165. Dreamstime alleges that Google breached the express provisions of the Agreement as well as the implied covenant of good faith and fair dealing. These claims fail as matter of law.

### A.    Dreamstime's Breach Of Contract Claim Fails

To state a claim for breach of contract under California law, Dreamstime must point to "specific provisions in the contract creating the obligation [Google] is said to have breached." *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 978 (N.D. Cal. 2016) (quoting *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1117 (N.D. Cal. 2011)); *see also Frances T. v. Vill. Green Owners Ass'n*, 42 Cal. 3d 490, 512-13 (1986) ("Plaintiff's allegation that defendants breached that contract . . . must fail because she does not allege that any provision in any of the writings imposed such an obligation on defendant."). Here, however, Dreamstime does not even attempt to ground its claim in the language of the AdWords Agreement.

Insofar as Dreamstime seeks to base its claim on allegations that Google "manipulated Dreamstime's organic search ranking unfairly and illegally" (¶ 155), those allegations have nothing to do with the AdWords Agreement. The Agreement contains no promises or provisions regarding the performance of an advertiser's websites in Google's organic search. Alleged changes to Dreamstime's search rankings, therefore, cannot give rise to a claim for breach of the AdWords Agreement. *See, e.g.*, *Murphy v. Hartford Accident & Indem. Co.*, 177 Cal. App. 2d 539, 543 (1960) ("In order for an action to be based upon an instrument in writing, the writing must express the obligation sued upon.").

Even where Dreamstime's allegations relate to its ads, they still are entirely ungrounded in the actual terms of the Agreement—and, indeed, run directly contrary to those terms. For example, Dreamstime alleges that Google "cancelled Dreamstime's most successful ad campaigns without adequate notice or explanation" and "improperly suspended Dreamstime's account based on unfounded accusations of 'policy violations.'" ¶ 155. These allegations apparently relate to Dreamstime's claims about the "trick to click" penalties that were imposed on some of its ads. ¶¶ 114-117. But Dreamstime cannot premise a breach of contract claim on Google's cancellation of its ads or suspension of its account. The Agreement specifically states that Google "may reject or remove a specific . . . Ad . . . ***at any time for any or no reason***" and that "Google may suspend Customer's ability to participate in the Programs at any time." Ex. F §§ 1, 12 (emphasis added); ¶ 114. There can be no breach of contract claim where Google availed itself of the rights expressly afforded to it by the agreement. *See, e.g.*, *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1124 n.9 (2008) ("If the conduct complained of was expressly bargained for, it cannot, by definition, be considered to be outside the reasonable expectations of the parties.").

It makes no difference in this regard whether Google provided "adequate notice or explanation" when it cancelled the ads or whether it supposedly allowed other companies to run similar ads. ¶ 155. Dreamstime can point to no provision of the contract that requires Google to explain why it cancelled an ad or to enforce its policies with perfect uniformity across all advertisers. *See, e.g.*, *Parrish v. NFL Players Ass'n*, 534 F. Supp. 2d 1081, 1086, 1096-97 (N.D.

1   Cal. 2007) (dismissing breach of contract claim where plaintiffs "failed to allege the terms of the

2   contract on which they base their claims for breach of contract, and what terms within those

3   contracts defendants allegedly breached").[8]

4        Finally, Dreamstime vaguely suggests that Google "placed Dreamstime's advertisements

5   on irrelevant websites and error pages." ¶ 155. This cryptic allegation is not supported by a

6   single concrete factual allegation, and can be rejected for that reason alone. *Iqbal*, 556 U.S. at

7   679.[9] Beyond that, this allegation fails to state a claim. Though Dreamstime suggests that these

8   placements were "in direct violation of the AdWords contract," it cites nothing to support that

9   suggestion, which is clearly belied by the Agreement itself. Section 1 of the Agreement

10  specifically authorizes Google "to place Customer's advertising materials . . . on **any content or**

11  **property** . . . provided by Google or its affiliates on behalf of Google or, as applicable, a third

12  party," without any guarantees as to the relevance or functioning of any ad location. Ex. F § 1

13  (emphasis added). The Agreement also expressly disclaims any warranty for "satisfactory

14  quality" and makes clear that Google provides its advertising programs and service "as is" and

15  "with all faults." Ex. F § 9. As a matter of law, therefore, Google did not breach the AdWords

16  Agreement by placing Dreamstime's ads on websites and in locations that Dreamstime did not

17  like or considered to be undesirable.

18        **B.   Dreamstime's Breach Of Implied Covenant Claim Fails**

19        Dreamstime cannot cure the infirmities in its breach of contract claim by invoking the

20  implied covenant of good faith and fair dealing.[10] It is a "fundamental rule that an implied

21

22       [8] Likewise, as Dreamstime acknowledges, Google has an express policy against "trick to
23  click" ads, and Google determined that Dreamstime's ads ran afoul of that policy by including
    "fake" non-functional search boxes. ¶¶ 114-115 & n.26. That is consistent with the terms of the
24  Agreement, which make clear to advertisers that "Program Use is subject to applicable Google
    policies." Ex. F § 2. Dreamstime cannot manufacture a breach of contract claim by asserting that
25  it disagrees with Google about how Google's policies should have been applied.

26       [9] Dreamstime similarly fails to allege a single concrete fact in support of its conclusory and
    unadorned assertion that Google "overdelivered AdWords campaigns." ¶ 155.

27       [10] Dreamstime's implied-covenant claim is premised on the same conduct as its breach of
28  contract claim. *Compare* ¶¶ 162-163, *with* ¶ 155. It is black-letter law that a breach of an implied
    covenant claim fails if it does "not go beyond the statement of a mere contract breach." *Careau*

                                                                              (continued...)

contract cannot override the terms of an express agreement between the parties." *Falkowski v. Imation Corp.*, 132 Cal. App. 4th 499, 518 (2005). As the California Supreme Court has explained, where there are certain "acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct." *Carmaa Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992); *see also Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349-50 (2000) (rejecting argument that "implied covenant can impose substantive terms and conditions beyond those to which the contract parties actually agreed").

That is what Plaintiff seeks to do here. The implied covenant claim is based on Google's alleged disapproval and removal of Dreamstime's low cost per acquisition ads as "trick to click." ¶¶ 162-163. But, as discussed above, the decision whether to approve or reject an ad is, by the express terms of the AdWords Agreement, a right reserved to Google. The Agreement could hardly be clearer on this point. It says that Google "***may reject or remove a specific Target, Ad, or Destination at any time for any or no reason***." Ex. F § 1 (emphasis added). These provisions confer on Google the categorical right to suspend or remove AdWords ads. Dreamstime cannot use the implied covenant to deprive Google of these express contractual rights. To apply the implied covenant here would be to rewrite the parties' agreement rather than to enforce it. Courts have not hesitated to reject implied-covenant claims in similar circumstances. *See, e.g.*, *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 885 (N.D. Cal. 2015); *Sweet v. Google Inc.*, 2018 WL 1184777, at *4-5, *9 (N.D. Cal. Mar. 7, 2018).

Plaintiff alleges that Google's alleged removals and disapprovals were improper because Dreamstime did not, in fact, violate Google's policies and because Google acted "for other unreasonable reasons to provide an economic advantage to Dreamstime's competitors." ¶¶ 162-163. But the former claim is contrary to the Complaint, which admits that Dreamstime ran trick-to-click ads with fake search bars that were prohibited by Google's ad policies. ¶¶ 114-115. And

---

(...continued from previous page)
*& Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990); *see, e.g.*, *Nasseri v. Wells Fargo Bank, N.A.*, 147 F. Supp. 3d 937, 943 (N.D. Cal. 2015).

1   the latter is a wholly conclusory assertion, which is not supported by any well pleaded facts. *See*

2   *supra* p. 7. There is no factual allegation in the Complaint from which it would be plausible to

3   conclude that whatever Google did in connection with Dreamstime's ads was done to provide an

4   economic benefit to other stock photography companies. Such baseless speculation is "not

5   entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

6          In any event, Plaintiff's assertions are legally irrelevant. In *Guz*, the California Supreme

7   Court squarely held that, where the governing agreement expressly authorizes a particular action

8   (for example, termination of an employee at will), a plaintiff cannot assert a breach of implied

9   covenant claim based on the allegation that the defendant acted "unfairly, such as by refusing to

10  follow its own established policies and practices" or "without probable cause." 24 Cal. 4th at

11  350-51. So it is here. Because the AdWords Agreement allows Google to disapprove ads "for

12  any or no reason" (Ex. F § 1), it cannot violate the implied covenant to do so for a reason that

13  Dreamstime considers to be unreasonable. *Accord Guz*, 24 Cal. 4th at 350 ("Precisely because

14  employment at will *allows* the employer freedom to terminate the relationship as it chooses, the

15  employer does not frustrate the employee's contractual rights merely by doing so.").

16         **C.**     **Consequential Damages Are Barred By The Limitation Of Liability Clause**

17         While Dreamstime's contract-based claims fail as a matter of law, even if they survived,

18  any claim for consequential damages based on those claims is independently barred by the

19  limitation of liability provision in the AdWords Agreement: "GOOGLE, CUSTOMER, AND

20  THEIR RESPECTIVE AFFILIATES WILL NOT BE HELD LIABLE UNDER THESE TERMS

21  OR ARISING OUT OF OR RELATED TO THESE TERMS FOR ANY DAMAGES OTHER

22  THAN DIRECT DAMAGES." Clauses like this one "have long been recognized as valid in

23  California." *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126

24  (2012) (citation omitted). Courts routinely enforce such provisions to dismiss claims at the

25  pleading stage—as this Court did in a recent case against YouTube arising from the relocation of

26  a video. *See Darnaa LLC v. Google Inc.*, 236 F. Supp. 3d 1116, 1126 (N.D. Cal. 2017) (Alsup,

27  J.); *see also Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 121-26 (2015) (affirming grant of

28

1    demurrer on implied-covenant claim based on limitation of liability provision). The limitation of

2    liability applies here to foreclose Dreamstime from any indirect damages for its contract claims.

3        Dreamstime cannot escape that result by invoking Section 1668 of the California Civil

4    Code (*cf*. ¶¶ 157, 164). It is well settled that Section 1668, as its plain language suggests, applies

5    only to claims for intentional tort ("willful injury"), fraud, and statutory violations ("violation of

6    law"). *Food Safety Net*, 209 Cal. App. 4th at 1126. As this Court has held, therefore, Section

7    1668 does not apply to—or invalidate limitation of liability provisions in connection with—

8    contract-based claims, including claims based on the implied covenant of good faith. *See*

9    *Darnaa*, 236 F. Supp. at 1125-26; *accord Food Safety Net*, 209 Cal. App. 4th at 1126-27

10   (holding that, notwithstanding Section 1668, an applicable limitation of liability clause

11   "effectively limits [defendant's] liability for breaches of contractual obligations," including a

12   "bad faith claim, as breaches of the covenant of good faith implied within contracts are not

13   tortious outside the context of insurance policies").[11]

14       In short, even if Dreamstime could state a claim for breach of the express or implied

15   terms of the AdWords Agreement—which it cannot—any claim for consequential damages for

16   those claims still would fail as a matter of law.

                                            **CONCLUSION**

18       For these reasons, Dreamstime's Complaint should be dismissed.

---

25       [11] Dreamstime cannot, through its allegations (¶¶ 11, 157, 164), transform its contractual
26   claims into intentional tort claims. In *Darnaa*, this Court rejected a virtually identical effort,
     holding that, notwithstanding the plaintiff's allegations that Google's breach involved intentional
27   misconduct, a claim for breach of the implied covenant is "nothing more than a cause of action
     for breach of contract." *Darnaa*, 236 F. Supp. 3d at 1126 (quoting *Habitat Trust for Wildlife, Inc.
28   v. City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1344 (2009)).

Dated:  June 4, 2018

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: _____/s/ Brian M. Willen_____
              Brian M. Willen

JONATHAN M. JACOBSON (NY SBN 1350495)
jjacobson@wsgr.com
BRIAN M. WILLEN (admitted *pro hac vice*)
bwillen@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone:  (212) 999-5800
Facsimile:   (212) 999-5899

JOSHUA H. SOVEN (admitted *pro hac vice*)
jsoven@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1700 K Street, NW, 5th Floor
Washington, DC 20006-3814
Telephone:  (202) 973-8800
Facsimile:   (202) 973-8899

LAUREN GALLO WHITE (CA SBN 309075)
lwhite@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105-1126
Telephone:  (415) 947-2000
Facsimile:   (415) 947-2099

***Attorneys for Defendant***
**GOOGLE LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2018, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By: _/s/ Brian M. Willen_
Brian M. Willen