1  BAKER MARQUART LLP
2  Jaime W. Marquart (Bar No. 200344)
    jmarquart@bakermarquart.com
3  Donald R. Pepperman (Bar No. 109809)
    dpepperman@bakermarquart.com
4  777 S. Figueroa Street, Suite 2850
5  Los Angeles, CA 90017
   Telephone:    (424) 652-7800
6  Facsimile:    (424) 652-7850

7  BAILEY DUQUETTE P.C.
8  James Bailey (*pro hac vice*)
    james@baileyduquette.com
9  100 Broadway, 10th Floor
   New York, NY 10005
10 Telephone:    (212) 658-1946
11 Facsimile:    (866) 233-5869

12 Attorneys for Plaintiff
13 Dreamstime.com, LLC

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16                  SAN JOSE DIVISION

17

18 DREAMSTIME.COM, LLC, a            Case No. 3:18-CV-01910-WHA
19 Florida LLC,
                                     **FIRST AMENDED CIVIL**
20           Plaintiff,              **COMPLAINT FOR:**

21      v.                          **(1) VIOLATION OF SECTION TWO
22                                       OF THE SHERMAN ACT;**
   GOOGLE, LLC, a Delaware LLC;      **(2) BREACH OF CONTRACT;**
23 and DOES 1-10,                    **(3) BREACH OF THE IMPLIED
                                         COVENANT OF GOOD FAITH
24           Defendants.                 AND FAIR DEALING; AND**
25                                   **(4) VIOLATION OF SECTION 17200
                                         et seq. OF THE CALIFORNIA
26                                       BUSINESS & PROFESSIONS
27                                       CODE -UNFAIR BUSINESS
                                         PRACTICES**
28

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[DEMAND FOR JURY TRIAL]**

**Judge: Hon. William Alsup**

**Complaint Filed: March 28, 2018**

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Plaintiff Dreamstime.com, LLC ("Dreamstime"), through its undersigned counsel, hereby brings this First Amended Complaint against Defendant Google, LLC ("Google"), and DOES 1-10 (collectively "Defendants") for violation of Section 2 of the Sherman Act (15 U.S.C. § 2), breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair business practices, for damages and injunctive relief, and demanding trial by jury, and claims and alleges as follows:

## I.    INTRODUCTION

1.    This lawsuit arises out of Google's anticompetitive, discriminatory, and unfair conduct, as well as its related, on-going fraudulent practices and breaches of its contracts with Dreamstime.  Google is illegally maintaining a monopoly in the market for online search advertising and is squeezing its direct-purchaser and customer, Dreamstime (and other similarly-situated stock photography websites), out of the marketplace in the process.  This strategy is intended to and does further entrench Google's monopoly of the online search advertising market by crippling or eliminating sites such as Dreamstime that compete for the same web traffic, offer similar services related to images, and sell the same image products as Google.  Dreamstime has standing to bring these claims because it participates in Google's market, and its injuries are inextricably intertwined with harm to competition and consumers in the relevant market.

2.    Dreamstime and Google traditionally compete in different markets.  Google's primary market is online search and/or online search advertising (which are essentially one and the same). Dreamstime's primary market is online stock photography, *i.e.*, selling high-quality, licensed images for marketing and other purposes to online customers.  These two markets overlap substantially, however, as to the economic interests of their participants. Google's monopolistic interests in the online search advertising market and Dreamstime's competitive interests are inextricably intertwined, as follows:

a.    **Image searches are critical to Google's online search and search ad monopoly.**  Google's image service, Google Images, is the largest repository of searchable and browsable images in the world, making Google far and away the

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

first place that users go to search for and browse images of every kind.  Google Images is the most prominent subcategory within Google's search results, and it is an essential driver of web traffic to Google.  Many of the results returned in a Google Images search are copyrighted stock photos (such as Dreamstime's) that Google Images enables a searcher to steal without paying for them.  Google claims it is merely providing images with links to external sites where the images can be purchased but, in reality, most people just right-click and download the image without ever accessing the source website and without leaving Google images.  This enhances Google Images' dominance.  Google does not "sell" stock photos within Google Images (though it now sells them elsewhere, as noted below).  Still, Google profits immensely from the traffic Google Images generates by selling search advertising to customers who start with Google to search for and browse images (including stock photos).[1]  Accordingly, Google Images' dominance is essential to Google's online search dominance.

b. **Stock photos are an essential aspect of Google's online search advertising dominance, and Google now offers millions of stock photos to its search advertising customers.**  High-quality stock photos are a critical component of search-based display ads (ads that include pictures related to keyword searches).  The use of stock photos in search-based display ads allows online search advertisers to create high-quality, engaging display ads that pop up when users enter certain keywords.  Even with its immense online search market power, Google could not immediately start selling stock photos, because stock photo companies have taken decades to acquire the hundreds of millions of individual licenses from photographers required to build their libraries.  But, through

---

[1] When anyone performs a standard Google search related to images, Google prominently displays a handful of Google Images results at the top of the search results page.  This, along with Google anticompetitive acts described herein fits a pattern nearly identical to the Google Shopping conduct that resulted in a record €2.42 billion fine in the European Commission in 2017.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

strategic partnerships with the most dominant stock photo websites, Google now offers hundreds of millions of stock photos within its advertising network, allowing Google's customers to use them in their display ads.  This easily makes Google one of the largest suppliers of stock photos in the world for consumers looking to place them in ads.  Its stock photo partnerships are very valuable to Google's search advertising monopoly and give it a direct economic interest in growing its stock photo partners' vast libraries of licensed images (their libraries are now Google's library).  Therefore, Google's search advertising dominance depends in part upon the dominance of its stock photo partners.

c.   **Dreamstime offers features that can take traffic from Google Images and supplies stock photos that are used in online search advertising.**  As a major stock photography repository, Dreamstime has a searchable repository of tens of millions of images for purchase (*and* millions of free images[2]) that allows one to search for and browse images by keyword like Google Images, with the added benefit of allowing users to immediately purchase the image.  Dreamstime also supplies tens of millions of stock photos that can be used in search-based display ads.  As a result, Dreamstime and other stock photo websites supply a critical input for the online search advertising industry.  Consequently, Dreamstime and Google's economic interests are interwoven.

d.   **As a purchaser of Google's services that also offers products and services important to Google, Dreamstime's competitive standing is inextricably intertwined with Google's maintenance of its online search advertising monopoly.**  Dreamstime obtains its customers, many of whom it shares with

---

[2] Dreamstime's "free" images are genuinely free and legally licensed, as compared to Google's Images (only some of which are licensed).  However this distinction is not perceived in the market by most users, who download and use "free" Google Images and infringe copyrights in the process. Particularly in light of this market confusion (or in some cases intentional infringement), Google and Dreamstime's free image offerings compete for the exact same audience.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Google, through organic searches and by purchasing advertising services from Google.  It is thus a participant in Google's primary market and needs Google's search and search ad services to grow.  Google and its stock photo partners compete with Dreamstime for visibility in the relevant market and for the same Google keywords related to stock photography.  Google and Dreamstime also compete for the same web traffic related to licensed high-quality images, and they now both offer millions of stock photos (Google within its advertising network, and Dreamstime through a traditional stock photo website).  Google and Dreamstime also have a common economic interest in stock photo *supply*, *i.e.*, licensed images from photographers.  Dreamstime directly licenses new stock photos to grow its library, which is essential to its existence.  It relies upon Google's search and search ad visibility to attract new photographers.  Google, on the other hand, obtains new licensed stock photos every time its stock photo partners obtain them from photographers.  Accordingly, Google's search advertising dominance grows as it systematically excludes non-partner stock photo websites from access to its marketplace and as it favors its stock photo partners.

Because Google and Dreamstime's economic interests are interrelated, Dreamstime's antitrust injuries alleged herein are causally-linked to Google's unlawful monopoly maintenance in the online search advertising market.

3.      Dreamstime's potential customers most frequently find Dreamstime through a Google search or search-based ad.  Due to the overlap of Dreamstime's and Google Images' functionality, and the fact that they both offer stock photos directly to their customers (as well as free images to the public), most of Dreamstime's potential customers are also Google's customers.  Google has abused its monopoly power to exclude Dreamstime – a participant in Google's market – from access to these customers.

4.      Specifically, in or about the second half of 2015, Google began to erect an unlawful economic moat in its primary market by increasing its monopoly of image-related

searches and gaining control over online stock photo supply.  As part of its anticompetitive

scheme, it entered into a licensing agreement with Dreamstime's biggest competitor,

Shutterstock,[3] and later partnered with Getty Images as well.[4] (Shutterstock and Getty

Images together control about 70% of the traditional stock photography market.)  Google

has now licensed all of Shutterstock and Getty Image's stock photos to sell in its advertising

network, giving it a crucial competitive advantage over its competitors, such as Yahoo! and

Bing.  Google also used its immense market power in online search advertising to bolster its

stock photo partners' visibility and diminish Dreamstime's visibility in Google searches,

while at the same time applying its policies unevenly to benefit its stock photo partners and

harm Dreamstime.  Google intentionally altered its search algorithm – or, at least, how that

algorithm was applied to Dreamstime – to unfairly prejudice Dreamstime and favor

Google's own services and those of its partners.

5.      Eventually, Dreamstime's ranking on Google's search results page plummeted

from at or near the top of search results for online stock photographs to 91st (as much as 20

pages deep) – well below Shutterstock and Getty Images, well below other smaller

competitors, and even well below unambiguously less relevant search results.  In essence,

Dreamstime is invisible to people googling for online stock photographs.  As a result,

Google devastated Dreamstime's business, cost it millions of dollars in sales and threatens

its survival.  Simultaneously with Dreamstime's injury, Google's alteration of its algorithm

increased its partners' and Google Images' dominance and discriminated against

Dreamstime.  Google has replicated this monopoly conduct to exclude other similarly-

situated online stock photo suppliers, including 123RF, DepositPhotos, and CanStockPhoto.

6.      Google's anticompetitive strategy against Dreamstime and other stock photo

suppliers, however, is not limited to search bias.  It also rigs the bidding in its AdWords

---

[3] "Shutterstock" includes Shutterstock (www.shutterstock.com) and other stock photography
websites it owns, such as Bigstock (www.bigstockphoto.com).
[4] "Getty Images" includes Getty Images (www.gettyimages.com) and the other stock
photography websites it owns, such as iStock (www.istockphoto.com) and Thinkstock
(www.thinkstockphotos.com).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

auction program for common keywords related to stock photography. Dreamstime has long been an active participant/consumer in Google's AdWords and DisplayAds online advertising programs (which Google recently renamed to Google Ads), having paid Google over $50 million for these services over the last 12 years. Dreamstime uses AdWords to place targeted ads within Google search engine results relevant to online stock photographs. Over time and through extensive research and experimentation, Dreamstime developed efficient AdWords and DisplayAds campaigns that resulted in many sales. Though this efficiency in campaigns lowered Google's AdWords profits, it benefitted consumers by lowering the marginal cost of acquired purchases and allowed Dreamstime to offer a more competitive price for its online stock photographs.

7. After Google artificially tanked its search ranking, Dreamstime invested even more money in its AdWords and DisplayAds campaigns – millions of dollars – to counter Google's virtual removal of Dreamstime from organic search results. These inefficiencies increased the marginal cost of Dreamstime's acquired purchases, placing a serious strain on its finances and business model. Google perversely profited from this scheme by obtaining an anticompetitive premium for its AdWords service. Now, because Google has compelled Dreamstime to increase its AdWords spending to offset its organic search invisibility, most months Dreamstime barely breaks even or loses money. The negative impact to Dreamstime's future prospects is directly attributable to Google's discriminatory conduct, all of which increases Google's monopoly of the online search advertising market by removing an important supplier of stock photos for search advertisers, increasing the breadth of Google's library of stock photos and promoting Google Images to the exclusion of sites like Dreamstime with a similar search and browse function.

8. Google has intentionally and aggressively interfered with Dreamstime's ability to fairly compete for visibility within Google's online search advertising market in several material ways. Among other things, Google has:

- manipulated Dreamstime's organic search ranking unfairly and illegally, while favoring Google's stock photo partners and promoting irrelevant

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

websites, to force Dreamstime to spend an unreasonable amount of money on additional AdWords campaigns that would not otherwise have been necessary;

- ranked webpages of a Dreamstime competitor prominently in organic search results for Dreamstime's tradename;

- erroneously designated Dreamstime as a "hacked with spam" website despite all evidence to the contrary and more than 12 months of unsuccessful attempts to resolve the false designation with Google;

- cancelled Dreamstime's most successful ad campaigns without adequate notice or explanation, thereby rigging the AdWords bidding process in favor of Google and its stock photo partners;

- improperly suspended Dreamstime's mobile app based on unfounded accusations of "policy violations," then removed it from the list of apps obtained by searching "stock photos" in the app store;

- prevented Dreamstime from running successful DisplayAds campaigns while allowing the *exact same* advertisements to be placed by Google's stock photo partners; and

- overdelivered advertising campaigns on a regular and systematic basis.

9.      In addition to its search and search advertising bias against Dreamstime, Google Images has also misused licensed stock photos of Dreamstime and other websites by making high-quality versions of them available in Google Images search results.  By right-clicking on high-resolution images of these proprietary photos in Google Images, searchers can essentially steal on a whim.  The Centre of the Picture Industry ("CEPIC") estimates that 85% of pictures found online by visual search systems are unlawful copies and 80% of those illegal images have been spread through search engines such as Google Images.  This unfair and deceptive practice exemplifies Google's immense monopoly power and abuse of that power.  Attached as Exhibit "P" hereto is a collection of statements from various potential customers on the Internet exemplifying the customer confusion and disruption

- 7 -

caused by this practice.  Getty Images sued Google in the European Union for is conduct, alleging that it was anticompetitive, because it was distorted the marketplace and created confusion that led to lost market share for legitimate resellers of licensed, copyrighted images.  As noted below, Google settled that action by partnering with Getty Images.

10.     Google's use of the AdWords, DisplayAds, and AdSense programs to harm Dreamstime and others is part of an overall, anticompetitive and exclusionary business strategy that goes hand-in-hand with Google's online search bias scheme and its unfair favoritism of Google Images and its stock photo partners.  Google's goal is less to dominate traditional stock photo sales, and more to grow its search monopoly by increasing its image-related search dominance and consolidating the market for the supply of stock photos (a valuable product it now offers directly to its ad customers) among its favored partners. Google intends to restrict competition among itself, Yahoo! and Bing, and to extend its dominance over its chief rivals.  Its vehicle for doing so is the exclusion of Dreamstime and several other non-partner stock photography websites (which also compete for some of the same web traffic as Google).  As these tactics injure competition in Google's market, they simultaneously cause material injuries to Dreamstime and other stock photo suppliers in the form of decreased or eliminated visibility in Google's search and ad results, overcharges for AdWords, lost revenue, lost customers, potential search engine optimization ("SEO") penalties, and loss of goodwill.

11.     This anticompetitive and output-restricting conduct has resulted in fewer relevant search results for online stock photography for Google's consumers, stifling of innovation and technology, and harm to competition in the relevant market.  It has also resulted in large increases in market share for Google's stock photo partners and has increased Google Images' dominance in image-based search vis-à-vis its traditional search advertising rivals and stock photo sites that compete for a subset of Google's customers. Because Dreamstime's exclusion happens within Google's market and also increases Google's market position vis-à-vis competing online search advertisers, Dreamstime has suffered antitrust injury. Google's conduct gives rise to civil liability for violation of Section

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

2 of the Sherman Act, breach of contract, breach of the covenant of good faith and fair dealing, and violation of California's strict and sweeping unfair competition laws.

## II.   THE PARTIES

12.    Plaintiff Dreamstime.com, LLC is a limited liability company incorporated under the laws of Florida with its principal place of business located at 1616 Westgate Circle, Brentwood, Tennessee 37027.

13.    Defendant Google LLC is a Delaware limited liability company that is a wholly-owned subsidiary of Alphabet, Inc., with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

14.    Plaintiff Dreamstime is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 10, and therefore sues these defendants by such fictitious names.  Plaintiff will amend this First Amended Complaint to allege their true names and capacities as they are ascertained.  Plaintiff is informed and believes that each of the fictitiously named defendants is responsible in some manner for the injuries to plaintiff as alleged herein.  Plaintiff further alleges that its injuries were proximately caused by each and all such defendants.

## III.   JURISDICTION AND VENUE

15.    This First Amended Complaint is filed and this civil action is instituted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover the damages caused by, and to secure injunctive relief against the named defendant's past, continuing, and on-going violation of Section 2 of the Sherman Act (15 U.S.C. § 2).  This Court has original, diversity, and exclusive jurisdiction over the subject matter of this civil action under 28 U.S.C. §§ 1331, 1332, and 1337 because it involves claims arising under the Sherman Act (15 U.S.C. § 2), and diversity between the parties exists.

16.    Venue is proper in this District as all parties consented to venue and jurisdiction in the state of California, County of Santa Clara, as the mandatory forum to enforce or interpret the operative agreements that form part of the basis of this action.  In particular, Google's Advertising Program Terms (the "AdWords Agreement") contain a

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

forum selection clause calling for venue in Santa Clara County, California.  The AdWords Agreement also provides that California law governs the Agreement.  All parties that desire to use Google AdWords must first agree to the AdWords Agreement before they can create an AdWords account at https://adwords.google.com.

17.     Defendant maintains an office and transacts business on a systematic and continuous basis within this District, and may be found here, within the meaning of 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391.  Further, the unlawful acts alleged herein were performed and occurred in material part within this District.

## IV.     FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.     Google Maintains a Monopoly in the Market for Online Search Advertising (in Which Dreamstime Participates)

#### 1.     Google Has a Monopoly in the Online Search Market

18.     Google operates in multiple interrelated online markets.  One of its most important markets is the online search market, defined for purposes of this action as the domestic market for search engine queries.  As described below, Google monetizes its dominant position in search – which is ostensibly free to users – with a commensurately dominant position in the online search advertising market (or submarket), in which Dreamstime is a consumer and direct purchaser of AdWords.  Revenue from Google's ad business grew by 21 percent from last year and accounts for 84% of Alphabet's total revenue.[5]

19.     Google owns and operates the world's largest search engine.  Consumers use search engines to find information on the Internet quickly.  Consumers enter a query into a search engine, typically a few keywords (*e.g.*, "stock photos"), and the search engine then returns a line of results often referred to as search engine results pages ("SERPs").  Most search engines, including Google, employ methods to rank the results to provide "useful and

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

---

[5] https://www.washingtonpost.com/news/the-switch/wp/2018/02/01/google-parent-alphabet-reports-soaring-ad-revenue-despite-youtube-backlash/?noredirect=on&utm_term=.b5e0dfd31cee (last accessed September 28, 2018).

FIRST AMENDED COMPLAINT

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

relevant" results first (its "search results").  Most search engines, including Google, are commercial ventures supported by advertising revenue of various types.

20.     Google's search engine uses a number of proprietary algorithms to rank websites in its search engine results.  Google claims its algorithms "sort through the hundreds of billions of webpages in our Search index to give you useful and relevant results in a fraction of a second."  A website's Google search ranking[6] has a direct, measurable impact on the amount of web traffic to that website.  The Google ranking is so important to businesses (and especially online businesses) that entire industries exist relating to "optimizing" a website's Google search ranking.  The other major online search engine companies, such as Yahoo! and Bing, deploy similar algorithms that rank relevant results based on a user's search.

21.     According to netmarketshare.com, Google owns 80.52% of the global market for online search engines.  Its largest competitors Baidu (5.94%), Yahoo (5.35%) and Bing (6.92%) collectively muster approximately 17% of the market share.  Thus, Google has a global monopoly in the online search market.  Google also has a monopoly in the United States online search market.  For example, in 2017, Google's share of the online search market performed from laptops or desktops fluctuated between 78.7% and 69.21 % according to netmarketshare.com.  Google's market share in the U.S. mobile search market was 93%.

22.     There are a small number of participants in the concentrated online search market, and the market has high barriers to entry.  Engineering talent is limited and data centers that can simultaneously support millions of searches are expensive.  Moreover, search engines have evolved such that most modern search engines are based on machine-learning algorithms combining thousands of factors.  Some of the most prominent factors are historical search query logs and their corresponding search result clicks.  One study noted that historical search data improves search results up to 31%, such that "today's

---

[6] Google recently changed its terminology to use the term "position" rather than "rank" to refer to where a page falls in search results.  Both terms are used interchangeably herein.

search engines cannot reach high-quality results without this historical user behavior."[7]  The result is that new market participants, even those with better algorithms, "cannot enter the market and compete with the established players, with their deep records of previous user behavior."  Data on user behavior in turn creates enormous network effects that cannot be replicated by new entrants into the market.  Google's impenetrable online search empire is enhanced by network effects because the utility of any user of its search services increases with the number of other users of those services.  In other words, Google's ability to track, collect, and use behavioral and search pattern information from its users expands its data base to the detriment of its competitors.[8]

### 2.   Google Has a Monopoly in the Online Search Advertising Relevant Market (or Submarket)

23.   The online search advertising market is an appropriate relevant product/service market in which to assess Google's market power, and its selection in lieu of online search as a whole has no legal or practical effect on the Sherman Act Section 2 monopoly/market power analysis in this case.  Google's dominance in the online search market translates to a commensurate dominance in the interrelated online search advertising market.  Google's share of the U.S. online search advertising market has steadily increased, from 75.8% in 2016 to an estimated 80.2% by 2019.[9]  Dreamstime is a direct purchaser and consumer in the online search advertising market and therefore is also a participant in that market.

24.   Though the online search market and online search advertising markets are described separately for precision, they are essentially one and the same.  In essence,

---

[7] *See* Radinsky, Kira, "Data Monopolists Like Google Are Threatening the Economy," Harvard Business Review March 2, 2015.

[8] For example, several years ago Microsoft decided to launch a new search engine named Bing to compete with Google, and formed an alliance with the internet company Yahoo!. The alliance never performed to Yahoo!'s expectations, lagging behind revenue projections, and the alliance was restructured in 2015.  Bing still lags well behind Google in the online search market, demonstrating the significant barriers to entry and expansion in the market.

[9] *See*, https://searchengineland.com/google-search-ad-revenues-271188 (last accessed on March 19, 2018).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Google is monetizing a monopoly position in online search by selling advertising on top of search results.  The search function is "free" to the searcher, but the searcher provides extremely valuable private information about the searcher's behavior when he or she conducts a search and is also subjected to advertising paid for by purchasers of the ads.  No one would go to Google just to see ads, and no ads would be placed on Google without these "free" search services.

25.     The U.S. Department of Justice ("DOJ") recognized a relevant market of online search advertising in fighting a proposed advertising agreement between Yahoo! and Google in 2008.  The U.S. Federal Trade Commission ("FTC") has also recently recognized online search advertising as an appropriate antitrust relevant market, in the context of Google's acquisition of traditional online display-ad marketing company, DoubleClick.  On June 27, 2017, the European Commission fined Google €2.42 billion for "breaching EU antitrust rules" and abusing its dominance in search by giving an illegal advantage to its own comparison-shopping service, Google Shopping.  Google Images is remarkably similar to the Google Shopping service at issue in the European Union.  (*See* screenshots at Exhibit "B".)

26.     Google has exponentially expanded on the success of its search engine by acquiring competing search engines, online advertising entities, mobile technologies, video sharing technologies and platforms, social media and gaming communities and artificial intelligence companies at an extraordinarily high rate.  As of December 2016, Google or its parent had acquired over 200 companies, while only divesting four of them.  Google has exploited ownership of the proprietary technologies of those companies, as well as their user bases, by integrating them into its increasingly vast and dominant position in online search, advertising, e-commerce and mobile devices.  By so doing, it has progressively increased its market power in innumerable related businesses in those fields, allowing it to dictate the economics of those businesses and to manipulate the content its users can see.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

3. **Dreamstime and Other Stock Photography Websites Participate in the Online Search Advertising Market as Direct Purchasers-Consumers of Google AdWords**

27.     Dreamstime has standing to sue as a direct purchaser-consumer and participant in the online search advertising market. Dreamstime competes for Google's AdWords with other online stock photo rivals, as well as with Google and its partners.[10] Indeed, the AdWords Agreement states, "Google or its affiliates may participate in Program auctions in support of its own services and products." Dreamstime also competes in the online stock photography business, defined for purposes of this action as the online business of selling and distributing licensed digital images. Market participants in this business include Dreamstime, Shutterstock, Getty Images, Adobe and other smaller competitors. Shutterstock, Getty Images and Adobe together control the bulk of the online stock photography business, and it is a highly concentrated industry. As described by Shutterstock, "stock photos are images that anyone can license for creative use. Rather than hire a photographer, designers can search a large database of photos and quickly find one that works for their project."[11] Shutterstock's website also describes the crucial role that Internet search engines play in the online stock photograph market: "[t]oday, Internet search engines allow anyone to find the perfect stock photo in seconds."[12]

28.     Dreamstime is one of the leaders among online stock photography repositories and has been a reliable supplier of stock photos since 2000. It serves a variety of clients, from independent private sector customers to Fortune 100 companies. One of the most common uses of stock photos is digital display advertisements like those Google sells. As of March 2018, Dreamstime had 20,000,000 registered members, more than 400,000 contributing photographers and over 75,000,000 photos, illustrations, clip arts, and vectors.

---

[10] One example of Google's competition in the mobile space is Google's own photo app, which appears when one searches for "stock photos" in the Google Play app store.
[11] *See*, www.shutterstock.com/support/articles/en_US/kbat01/What-are-stock-photos. (last accessed on March 19, 2018).
[12] *Id.*

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Dreamstime also hosts millions of free images on its websites (which, in addition to Dreamstime.com, include dreamstime.com, Megapixl.com, Stockfreeimages.com and Timelineimages.com).  Dreamstime and other stock photography websites provide a critical input to online search advertisers like Google, Yahoo!, and Bing, in the form of stock photos that can be integrated into the display ads they sell to their ad customers.  Google's strategic partnerships with Shutterstock and Getty (described below) give it a unique advantage over its competitors in this respect, allowing it to integrate millions of stock photos into its search-based display ads.

29.    Dreamstime has worked diligently for almost two decades to establish itself as a leader in online stock photography.  Like all its competitors, Dreamstime relies heavily upon online search engines and search engine advertising to build its name recognition and generate new customers and licenses.  As much as 99% of Dreamstime's business comes from the Internet.  As such, search engines are a *critical* component of Dreamstime's sales and customer acquisition strategy (as well as its licensed photo acquisition strategy).  Roughly two-thirds of Dreamstime's customers find their way to the website from a search-engine search.  Even customers with active Dreamstime accounts will often conduct a Google search for "Dreamstime" (sometimes along with other search terms) instead of typing "Dreamstime.com" in their browser address bar.  Nearly all modern web browsers accept search strings into the address bar and automatically return a search from the use's default search engine.

30.    One of Dreamstime's most important unique selling points is its competitive pricing.  Most of Dreamstime's customers view its pricing as Dreamstime's most important distinguishing feature over other online stock photography competitors (though it may soon lose that selling point due to the acts alleged herein).

31.    Stock photography websites provide a critical input to Google's online advertising industry, because they have hundreds of millions of licensed images available to integrate into search-based ads that include images.  They are natural and highly valuable partners for online search advertisers, because they have accrued vast repositories of

- 15 -

licensable and approved-for-commercial-use images.  Shutterstock's website boasts over 183 million images.  Alamy.com has a library of more than 150 million images.  Getty Images has an archive of over 80 million still images and illustrations and more than 50,000 hours of stock film footage.  And, as noted above, Dreamstime has archives of over 75,000,000 photos, illustrations, clip arts, and vectors.  Network effects create the most significant barrier to entry in the stock photography business, because photographers only want to license their photos to websites that already attract a large number of potential purchasers.

### B. Google's Economic Interests in its Online Search Advertising Monopoly are Inextricably Intertwined with Competition in the Online Stock Photography Business

#### 1. With Its Shutterstock and Getty Images Partnerships, Google Now Offers Stock Photos to Its Ad Customers

32.    Now that Google has access to all of Shutterstock and Getty Images' stock photos, it has instantly become one of the largest distributors of stock photos to customers looking to use those photos in online ads.  On July 12, 2016, Shutterstock publicly announced a multi-year licensing agreement between it and Google.[13]  Google and Shutterstock had been discussing this potential arrangement and testing their potential partnership for several months prior.  Among other things, the deal provides advertisers with access to Shutterstock's library of online images to use with their advertisements running through Google's AdSense, AdWords and AdMob platforms.  The day after the deal was announced, Shutterstock's stock price rose 14.2%.   On information and belief, the licensing agreement allows Google to receive revenue from the licensing of Shutterstock's online stock photographs, thereby making Google a participant in the online stock photograph business.  On information and belief, the licensing agreement calls for Shutterstock to share

---

[13] *See, e.g.,* Sullivan, Laurie. "Google, Shutterstock, Licensing Deal Automatically Chooses Images For Ads" available at https://www.mediapost.com/publications/article/280120/google-shutterstock-licensing-deal-automatically.html (last accessed on March 19, 2018).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

user data with Google, which further allows Google to maintain its monopoly in the online search advertising market.

33.     In or around the first week of February 2018, Google and Getty Images announced a "multi-year global licensing partnership, enabling Google to use Getty Images' content within its various products and services."[14]  That deal "effectively" ended a dispute between Getty Images and Google in the European Union involving Google Image's use of images "scraped" from Getty Images' websites or their customers' websites.  Getty Images' CEO, in announcing its partnership with Google, cited its own "market leading" position and the fact that the partnership is likely to increase its dominant position: "We will license our market leading content to Google, working closely with them to improve attribution of our contributors' work and thereby growing the ecosystem."  On information and belief, the licensing agreement allows Google to receive revenue from the licensing of Getty Image's online stock photographs.  On information and belief, the licensing agreement calls for Getty Images to share user data with Google, which allows Google to further maintain its monopoly in the online search advertising market.

34.     Google's strategic alliances with Shutterstock and Getty Images provide it with a key advantage over its online search advertising competitors, by allowing it to integrate hundreds of millions of licensed images into its search advertising network. Google now offers those same stock photos directly to its advertising customers who wish to integrate them into Google display ads.

## 2.     Google (through Google Images) Competes with Online Stock Photography Websites for the Same Web Traffic

35.     Images are among the most common things people search for on the Internet. Google recognizes the importance of image-related searches to its search dominance, as seen in the design of its Search Results page and the prominence of its Google Images feature.  Every Google Search Results page contains tabs for the most prominent

---

[14] *See,* www.searchengineland.com/google-getty-images-enter-multi-year-global-licensing-partnership-291831. (last accessed on March 19, 2018).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

subcategories of search.  (*See* Exhibit "B.") The "Images" tab, which leads to a set of Google Images results, is a prominently featured subcategory in Google's search results.  In addition, for keyword searches related to images, a set of photos from Google Images is displayed before Google's standard search results.  Google has built Google Images into the largest repository of high-resolution images available on the Internet.  Google Images is a key driver of web traffic to Google, which traffic it monetizes through search advertising.

36.     Dreamstime and other stock photography websites compete for the same web traffic as Google, in that they provide the same search-and-browse functionality as Google Images.  They are repository sites, places where a consumer can search for and browse millions of images.  As noted below, Dreamstime's website looks and works almost exactly like Google Images (except that Dreamstime has the creator's consent to sell their photos and pays creators for the use of their image).  In addition to its licensed stock photos, Dreamstime also offers millions of free images, just like Google Images, except that Dreamstime images are offered with a proper mechanism for licensing the image for use, receiving consent of the images' owners, payment of royalties, and obtaining release of rights from models who may appear in the images.  Recently, Dreamstime also developed an image-based search function that rivals a similar function of Google Images, whereby users can use an image to search for similar images.  If sites like Dreamstime gained sufficient brand recognition and awareness, many consumers could start there to search for stock photos, skipping Google Images as a middle step.  This would take away searches from Google, which would take away search advertising revenue from Google, because every search pulls up ads that increase Google's online search advertising monopoly.  In this sense, Google Images' dominance depends in significant part upon users *not* choosing to search stock repository websites directly. As noted below, one important way that Google keeps Google Images from losing web traffic to stock photography repositories is partnering with some of these entities and excluding others like Dreamstime (a lower cost stock photography repository) that compete with Google Images for the same web traffic.  These strategic partnerships give Google more control over the stock photography market and

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

prevent the most dominant players from competing with Google Images.

**C.    Google Engages in Anticompetitive and Exclusionary Conduct in the Online Search Advertising Market**

37.    Google wields its market power in online search advertising discriminatorily by giving some participants in its search and search advertising market higher search rankings while lowering the search rankings of others to the point that they become invisible.  This conduct excludes competition, increases advertising purchasers' reliance on AdWords, creates an unlevel playing field that favors its stock photo partners, and reduces consumer choice in the marketplace for online search and search advertising visibility.  Google also rigs its AdWords auction program to unfairly privilege its stock photo partners and to essentially exclude Dreamstime (and others) from search results for the most common keywords related to stock photography.  Finally, through affirmative misrepresentations, omissions and other fraudulent concealment, Google has induced Dreamstime to overpay for AdWords in a systematic fashion, which money Dreamstime would not have spent but for Google's intentional deception.

**1.    Google Tanked Dreamstime's Search Results and Unevenly Applied Its Search Policies to Disadvantage Dreamstime and Favor Its Stock Photo Partners in Organic Search**

38.    From approximately 2005 to 2015, Dreamstime consistently ranked in the top three in Google's organic search ranking for searches related to stock photography, and always appeared on the first page of the search results.  Due to Dreamstime's longstanding status as a top five vendor of online stock photography, its ranking made sense.  Along with three other pioneer microstock agencies, iStock, Fotolia and Shutterstock, Dreamstime challenged the traditional stock photography agencies and was a major player in the online stock photography industry.  However, iStock was acquired by Getty Images, Fotolia was acquired by Adobe, and Shutterstock and Getty Images have partnered directly with Google – leaving Dreamstime on its own as the only significant independent microstock agency.

39.    Given its market position and the quality of its offerings, Dreamstime is

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

undoubtedly relevant to users that google online stock photographs.  Dreamstime's web traffic prior to Google's conduct reinforced this conclusion, as many people that googled online stock photography became Dreamstime's customers.

40.     Yet, since approximately August 2015, Dreamstime's organic search rankings on Google has inexplicably plummeted on the most common keyword searches related to stock photography.  For example, from approximately 2005 to 2015, Dreamstime's Google ranking for "stock photos" (far and away the most searched-for term with the highest conversion rate among all terms related to stock photography) was either first, second, or third.  By comparison, in or around June 2017, Dreamstime plummeted to the fourth page for the same search term despite being in the stock photography business for over a decade and offering a stock photography library of over 70 million images.  Bing and Yahoo! both ranked Dreamstime as the fourth result for this same search term, while Baidu ranked Dreamstime eighth.  Both rankings would generally place Dreamstime prominently on the critical first page of search results.  This graph shows Dreamstime's position in Google search results for "stock photos" over the last five years, dropping from to third to 91st:



FIRST AMENDED COMPLAINT

41.     Dreamstime's precipitous drop is not limited to the "stock photos" term.  The same holds true for the other most relevant terms for the stock photo industry as measured by Google's daily traffic estimator, including "free stock photos," "royalty free images," "free stock images," "stock images," "photo stock," "stock photography," "royalty free photos," and "graphic stock."  Dreamstime no longer appears in the top two pages of results for any of these searches.  For example, Dreamstime's search ranking for "stock images" was recently 91st on Google, compared to fifth on Bing, fourth on Yahoo!, and third on Baidu.[15]

42.     Dreamstime's plummet in Google's organic search ranking significantly reduced the number of new customers who sign up for Dreamstime and make a purchase within one month.  For example, in April 2015, before Dreamstime's ranking drop, it gained a substantial number of new buyers.  In April of 2016, however, it gained 30% fewer buyers.  This steady decline has caused Dreamstime to lose tens of millions of dollars in potential revenue and as much as hundreds of millions in market value.  It is safe to assume that other downgraded sites (*e.g.*, 123RF, Canstockphoto, Depositphotos) experienced a similar decline. This result not only harms Dreamstime and other competitors, it harms consumers, who now may choose only from Google's partners or Google Images.

43.     Of crucial importance is Dreamstime's drop from page one of Google's rankings to page two or lower.  According to research by respected online ad network Chitika, 92% of all Google search traffic is limited to the first page of the results, with the top three results receiving 61% of the clicks.  Moving from page one to two, the traffic drops by 95%.  For a decade, Dreamstime ranked in the top two to three Google search

---

[15] It is important to note that the URL for Dreamstime's website homepage (https://www.dreamstime.com) has completely disappeared from search results for the above-listed terms on Google.  Dreamstime only appears at all within the search results by virtue of a "stock-photos" sub-page, which is of significantly-diminished value than a ranking of Dreamstime's home page, and which was only created in an attempt to correct for the invisibility of Dreamstime's home page when googling for "stock photos."  For obvious reasons, the complete elimination of any link to Dreamstime's main homepage demotes that home page and all other pages within the website in significant ways, and a link to a mere subpage does not remotely address this issue.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

results for the most important search term, "stock photos."  By relegating Dreamstime well beyond page two (and removing its homepage altogether), Google has effectively banished Dreamstime from its marketplace.

44.     To push Dreamstime entirely out of view in its results, Google inserts ahead of Dreamstime completely useless "Junk Websites," defined for purposes of this lawsuit as results responsive to search terms related to online stock photographs that are of low relevance to customers searching for sources of licensable digital images.  Dreamstime has recently ranked behind clearly inferior competitors including sites with only 30,000 free images (compared with Dreamstime's more than 2 million free images), old sites with only 140 images total, and multiple URLs that refer to the same photo site.  Before Google's exclusionary conduct, these sites were never ranked ahead of Dreamstime in online stock photography searches, and rightfully so.  Dreamstime is clearly more "relevant" to "stock photos" than a blog article entitled "Stock photos that don't suck" that has not been updated since 2014.[16]  Were Google's algorithm truly ranking relevant and useful results, these sites *would never* be ranked ahead of Dreamstime.  The obvious anticompetitive purpose and effect of this conduct is to entirely eliminate millions of high-quality, unique stock photos from a consumer's view, thereby eliminating a potential threat to Google Images and promoting Google's stock photo partners.

45.     Google has even gone so far as to artificially boost the organic rank of a Shutterstock page to appear within the top 10 results (*i.e.*, first page of search results) for Dreamstime's own tradename, diverting users who were specifically searching for "dreamstime" over to one of Dreamstime's competitors.

---

[16] Other less relevant websites that are ranked higher than Dreamstime in a search for "stock photos" include: (1) "Death to Stock" – a website that emails free photographs to users and has a library of just 1500 photographs; (2) Vince Vaughn and Co-stars Pose for Idiotic Stock Photos You Can Have Free – an article about a PR campaign for a movie released in 2015; (3) the reddit webpage "WTF Stock Photos" that collects "unnecessary stock photos taken without a realistic intention of selling" for amusement; (4) the twitter account page for "darkstockphotos," a twitter user that posts "extremely f***** up stock photography"; and (5) an October 20, 2014, article by Casey Ark on the website entrepreneur.com titled "14 Amazingly free stock photo websites."

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

46.     Google's manipulation of Dreamstime's organic search ranking has begun to negatively impact Dreamstime's ranking on other search engines.  This was an inevitable result of Dreamstime's effective exclusion from Google's search rankings: all search engines track consumer behavior and to the extent that Dreamstime's traffic has diminished because of its fall in Google's search ranking, its search ranking on other engines will naturally fall as well.[17]

47.     Google's treatment of Dreamstime is markedly different from Google's treatment of its stock photo partners.  Through its contractual multi-year partnerships with Shutterstock and Getty Images and its promotion of Google Images, Google has become a major force in searches for stock photos online, with the distinct advantage of controlling organic and paid searches relevant to that online industry.

48.     Shutterstock was recently the second result when a user searched for "stock photography" on Google.  Wikipedia ranked first, meaning Shutterstock was the first commercial entity ranked on a search for "stock photography."  Getty Images also ranked highly in Google's search results (typically in the first two or three).  Adobe ranked fourth.  Other Junk Websites or public domain images websites (which are not stock photography websites) rounded out the top 10.

49.     Searching Google for "royalty free stock photos" turns up search results that do not include any providers of royalty free stock photos on the first page of results.  Dreamstime – a site that provides the exact class of products the user searched for – does not appear in the first five pages of Google search results pages for "royalty free stock photos."  Every search result in the first 10 spots points to a website that provides public domain images, which are not suitable for most commercial uses that a stock photo would

---

[17] In addition, some changes that Dreamstime made to its website to in attempts to reverse its decline in Google's search rankings (some of which were recommended by Google) had consequences for its ranking on other search engines.  For example, when Dreamstime implemented the http/2 upgrade at Google's suggestion, it was removed from Bing's search listing for six months because Bing was not able to track the new technology.  Unlike Dreamstime's experience with Google, however, Dreamstime was able to address its issue with Bing quickly and received input and advice that resolved that issue.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

be suited for.

50.     A knowledge graph – which is an entry that appears at the very top of organic search results for generic terms like "stock photos"[18] – also appeared below the first search result very high on the page of "stock photography" search results. The first question in that knowledge graph was "are there free images on Shutterstock?"  None of the other three questions in the knowledge graph mentioned a stock photography website by name.  An example of a knowledge graph is attached hereto as Exhibit "A."  In Exhibit "A," Shutterstock and Bigstock (which Shutterstock owns) are placed prominently alongside search results for generic market terms, giving them an additional unfair advantage over other stock photo suppliers. Knowledge graphs are free advertising for Google's partners, giving them an unfair advantage over competitors like Dreamstime.  The inclusion of images (*i.e.*, company logos) makes knowledge graphs in search results and paid advertisements (which are plain, vanilla text) very noticeable and attractive to users and draws even more clicks away from companies who are not Google's partner.

51.     In a recent Google search for "stock photos," iStock (owned by Getty Images) and Shutterstock ranked consistently in the top five.  Bigstock (owned by Shutterstock) was also in the top 10.  Of the top 10 results, only iStock (owned by Getty Images), Shutterstock, Bigstock (owned by Shutterstock) and Adobe are online stock photography sites – that is, in the crucial first page of Google search results, the only stock photography sites are Shutterstock, Getty Images and Adobe.

52.     Similarly, Google often alerts users to the existence of competitors when users search for a specific brand under a "users also searched for" tag.  When users search for the term "Dreamstime" in the search results, Google will inform the user that other users have searched for the term "Shutterstock."  However, when a user searches for "Shutterstock," Google does *not* include a tag informing users that others had also searched for Dreamstime.

---

[18] *See*, Knowledge Graph feature description, available at https://www.google.com/intl/es419/insidesearch/features/search/knowledge.html. (last accessed on March 19, 2018).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

FIRST AMENDED COMPLAINT

Similarly, Shutterstock is displayed prominently in organic search results for "dreamstime," which is a result that is very difficult to achieve from traditional SEO efforts.  Again, this is a strategy to draw clicks away from Dreamstime and to divert and funnel those clicks to Shutterstock.

53.     Google also selectively enforced its policy against duplicative content in organic search rankings to Dreamstime's detriment.  Pursuant to that policy, Google has falsely stated that it is committed[19] to preventing substantive blocks of content within or across domains that either completely match other content or are appreciably similar.  Yet, Google does not enforce this policy as to Shutterstock and Bigstock.  They offer the same images for license under two different domains without any appreciable difference, yet they both recently appeared as the first and second results when searching for the phrase "stock photos."  As a result, Shutterstock would generally receive at least 50% of the Google traffic for the search term "stock photos."  As shown in Exhibit "C" hereto, Google inexplicably includes as many as three to five links to the same site on its first page of search results, further pushing Dreamstime (and others) down in results and making the results less useful.  In some cases, only a single site is displayed on a whole page of results (*i.e.*, 10 out of 10 spots), which further demotes Dreamstime.  *See* Exhibit "D".  These results violate Google's own policy of allowing only two links from the same website owner (a policy that was intended to ensure diverse results).

54.     For twelve months beginning in 2015, Google also erroneously flagged Dreamstime's website as being "hacked with spam" in violation of another of its policies when in fact this was not the case.  Google knew Dreamstime had not violated this policy

---

[19] *See, e.g.*, comments of Google executive John Mueller in Oct. 6, 2015 episode of "Google Webmaster Central office hours" video series (available at https://www.youtube.com/watch?v=cxWo4ttPgAc (last visited Sep. 26, 2018) ("[I]f within your content the majority of the content is copied from other sources or the majority of the content is kind of rewritten, repurposed from other sources, then when our algorithms look at your website they're like, well I've seen everything from this website before.  There is nothing of value here that we would miss if we didn't Index this website because all of this content is based on something that's available on different parts of the web.")

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

FIRST AMENDED COMPLAINT

but nevertheless applied it to Dreamstime (while not applying it to its other stock photo partners with similar content) in order to intentionally tank Dreamstime's search ranking. Because Dreamstime's website naturally included images relating certain terms commonly linked to spam – such as pharmacy, casino and male pattern baldness images – Google apparently flagged Dreamstime's website as "hacked by spam" when of course it was not. The "hacked by spam" flag showed up on a performance console provided to Dreamstime by Google, with a link allowing Dreamstime to report that its site was not in fact hacked by spam. Dreamstime repeatedly clicked this link and for a year attempted unsuccessfully to notify Google of the "error," to no avail. Finally, a Dreamstime executive notified another Google executive over Twitter of this obvious mislabeling, and Google only then corrected it. However, Dreamstime suffered a marked diminution in its search ranking for a sustained period of time as a result of this "error."

55.     Literally any Google user can easily *see* how Google's discrimination against Dreamstime impacts consumers. Take, for example, the term "peppers" (plural). When one performs a Google Image search for "peppers," the first 100 image results are pictures of bell or jalapeno peppers. This result shows that Google's algorithm finds pictures of bell peppers highly relevant to the Image Search for the word "peppers." Exhibit "I" contains a screen capture showing the first images returned for a search for the term "peppers" on Google Images.

56.     Dreamstime's website also provides a function very similar to Google Images. Exhibit "J" is a screen capture showing the first results returned when a user searches for "peppers" on dreamstime.com. Almost all the images on the first page of results are of bell or jalapeno peppers (like the Google Images search). Dreamstime's and Google's search algorithms both consider images of bell or jalapeno peppers highly relevant to a search for the term "peppers." Similarly, neither Google Images nor Dreamstime searches for "peppers" include images of *peppercorns* in the first page of image results. That is, Dreamstime's search returns the same types of photos that Google's own algorithm finds highly relevant.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

57.     Shutterstock also allows users to search its stock photographs by keyword. Searching for "peppers" on Shutterstock returns some pictures of bell and jalapeno peppers in the first page or results, but also returns some anomalous images including several photographs of peppercorns, what appears to be a white robot named "Pepper," and many photographs of salt and pepper shakers.  Exhibit "K" is a screen capture of these results for Shutterstock.  Shutterstock returns *less relevant* results than Google Images or Dreamstime for this search.

58.     Based on the "peppers" example, one would expect that Dreamstime's website would be *more relevant* than Shutterstock's when searching for stock photos of peppers and therefore appear higher in Google's search results.  This, however, is no longer the case.   In a recent (non-image) Google search for the terms "peppers stock photos," among the first ten web pages returned from this search, positions *two through five* were for Shutterstock websites.  Dreamstime was not listed in the first *five* pages of results.  Instead, many clearly less relevant websites were featured in the first five pages of the results.  The harm to consumers is obvious.  A consumer seeking to purchase stock photographs of bell or jalapeno peppers and using a commonsense search like "peppers stock photos" would never find Dreamstime.  That consumer *would* be not so subtly steered by Google to its partner Shutterstock's page as Shutterstock occupied slots two through five in the top 10 – even though Shutterstock's website is not as helpful to the consumer.

59.     Dreamstime is not the only stock photo site Google has unfairly discriminated against in this fashion.  Others, such as 123RF, DepositPhotos, and CanStockPhoto, have similarly experienced significant drops in their organic search rankings. The graph attached as Exhibit "L" shows how the ranking for the websites Dreamstime, 123rf.com, depositphotos.com and canstockphoto.com have changed over the time period September 2016 to February 2018.  The graph shows a drastic downward trend toward functional irrelevance for the most important Google search related to stock photography.  These smaller competitors in the online stock photography industry have seen their ranking in the "stock photos" search decline tremendously from September 2016 to February 2018.  The

- 27 -

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

graph at Exhibit "M" shows the ranking for Dreamstime, Shutterstock, stock.adobe.com, and iStock (owned by Getty Images) over the same time.  It shows that, while Dreamstime's ranking for "stock photos" precipitously declined, Shutterstock and Getty Images (through its website istockphotos.com) enjoyed lasting stability near the top of the rankings.

60.    Dreamstime is unaware of any innocuous explanation for its dramatic decline in search ranking – nothing about its website or how customers use its website explain its decline in stock photo searches (and Google has never cited any such innocent reason in the course of Dreamstime's efforts to address the issue with Google).  If anything, Dreamstime has improved in all of the metrics that Google claims are important to search ranking.  During the relevant period, Dreamstime's user engagement has improved over time.  Its "bounce rate" (a metric that indicates that percentage of people who land on a web page and then leave without clicking anywhere else on the website) declined, while the average time users spent on Dreamstime's website stayed basically constant.  Dreamstime's page load times have also decreased dramatically since Fall of 2015 when the issues with its search ranking became noticeable.  In other words, while Dreamstime's page load times and bounce rate were exceptionally good even prior to Fall of 2015 (and were not a cause of any demotion in ranking), these metrics became even better over the period in which its site was demoted in Google's rankings.  While Google might attempt to point to some material change in Dreamstime's metrics to justify its changed ranking in organic search, or claim that it fine-tuned its search engine algorithm for some legitimate purpose in a way that impacted Dreamstime's ranking, none of these explanations make sense.  First, any such explanation would need to account for the fact that Shutterstock and Getty Images have not suffered any similar downgrade in rankings.  Second, any potential explanation would need to account for why clearly irrelevant and poor-quality results are ranked ahead of Dreamstime.  Third, if some legitimate reason for Dreamstime's dramatic plummet in Google's organic search rankings existed (it does not), Google could have provided that explanation during Dreamstime's extensive efforts to meet with Google to address the issue. It did not.  Finally, if some Dreamstime's plummet in ranking were due to some systematic

1   issue, one would expect its rankings on other online search sites to drop.  They did not.

### 2.   Google Fraudulently Concealed and Intentionally Omitted Facts Regarding Its Search Bias Scheme

61.   Google's "support" services furthered its anticompetitive scheme by fraudulently concealing its anticompetitive purpose.  After Dreamstime sought answers from Google regarding its dramatic plunge in search ranking, Google initially refused to substantively discuss Dreamstime's search ranking or provide any rational justification for Dreamstime's unfavorable ranking.  When asked via Google's support forum (the place where Google insists that companies must go to ask for assistance) about Dreamstime's ranking, Google's representatives have responded with sarcastic and dismissive non-advice to questions about how such low-quality results can wind up so high in organic search results.

62.   Specifically, Exhibit "E" depicts a screen capture of a forum discussion wherein Cliff Haley, Dreamstime's SEO Director using the pseudonym "Wilbur Cartwright," is asking Google why StockPhoto.com ranks so highly for "stock photos" when the site's main domain is permanently set to redirect users to  a very narrow subset of images that are not very useful to a potential customer searching for "stock photos" (*i.e.*, a specific page listing images that match the more specific search string "christmas images"). In other words, the site in question employed a "hacking" technique to artificially increase its search ranking – a practice that is purportedly against Google's policies.[20]   Rather than acknowledging a problem with the search results or volunteering substantive fixes for such a situation, John Muller, an executive on Google's organic search team, responded to the forum question by suggesting that site owners who rank below the offending site should "ask them" why they would use a redirect on their homepage.  This infuriating level of non-support is indicative of Google's attitude toward any company whom Google has not

---

[20] Google's published policy is to reduce a page's search rank by 15% if the page is redirected.  *See, e.g.*, Google's video FAQ response entitled "What percentage of PageRank is lost through a 301 redirect?" (available at https://www.youtube.com/watch?v=Filv4pP-1nw, last visited Sep. 26, 2018).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

- 29 -

1  selected as a partner.

2  63.  Since early 2016, Dreamstime has followed every guideline and suggestion

3  provided by Google's documentation and/or the industry's best practices in an effort to

4  resolve the damage to its organic search ranking.  Through these explanations, Google has

5  over several years directed Dreamstime and other members of the public to particular

6  policies and guidelines contained in various blog posts and other statements of policy,

7  knowing at the time that these "fixes" would not resolve the types of issues that Dreamstime

8  was experiencing due to Google's anticompetitive conduct. Dreamstime followed these

9  suggestions and guidelines, but Dreamstime's ranking continued to decline through the end

10  of 2017.[21]  Relying on Google's suggestions, Dreamstime has implemented a bevy of

11  changes, including: switching to https[22] and http2;[23] disavowing links;[24] improving its

12  website quality, diversity, and quantity of content; investing in dedicated hardware for a

13  caching system; and dramatically increasing its crawl rate (10 times) and number of

14  pages.  In each instance, and in a pattern occurring over years, Google's publications

15  pointed Dreamstime and other members of the public to "fixes" that it knew would not work

16  in cases such as Dreamstime's, intending that they rely upon these statements by continuing

17  to spend on ad campaigns to make up the difference in search ranking and expending other

18  resources in a futile attempt to fix problems that were actually the result of Google's

19  anticompetitive conduct.  In reliance upon Google's suggestions and publications,[25]

20  Dreamstime invested significant development hours in rebuilding its entire site to be

21  _____

22  [21] It is interesting to note that Dreamstime's position in Google searches for "stock photos"
improved slightly a few days following service of its original Complaint in this action,
23  suggesting that Google momentarily took its thumb off of the scale after being sued.  This
improvement, however, has not put Dreamstime back to its prior place on the first page of
24  search results.
[22] *See,* https://webmasters.googleblog.com/2014/08/https-as-ranking-signal.html (last visited
25  Sep. 26, 2018).
[23] *See,* https://developers.google.com/web/fundamentals/performance/http2/ (last visited
26  Sep. 26, 2018).
[24] *See,* https://support.google.com/webmasters/answer/2648487?hl=en (last visited Sep. 26,
27  2018).
[25] *See,* https://webmasters.googleblog.com/2018/03/rolling-out-mobile-first-indexing.html
28  (last visited Sep. 26, 2018).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

"mobile friendly," because Google claimed that Dreamstime's search rank might be hurt by failing to have a site that worked on cell phones. Dreamstime diverted precious development resources from other projects in its business plan and doubled its hosting costs, all to no avail. Now it is clear that these "suggestions" were cover for Google's anticompetitive search bias scheme. These suggestions could not possibly alter Dreamstime's ranking and disguised Google's intentional manipulation of Dreamstime's ranking algorithm. Dreamstime justifiably and detrimentally relied on Google's suggestions and publications when it expended significant resources to implement these suggestions and undertook an entire re-design of its website in an ultimately futile attempt to regain the ground it lost in Google's organic search.

64.    In further reliance upon Google's publications indicating that Dreamstime's ranking was a function of some aspect of its website's content, Dreamstime paid several expensive search engine "guru" firms for their analysis of Dreamstime's Google search ranking decline, and none were able to identify any "smoking gun" with Dreamstime's site that would explain its drop in Google's search ranking. Relying on Google's public guidelines about how its search worked, which Google knew were false (at least as applied to Dreamstime's website), Dreamstime spent millions of dollars on website hosting to increase the speed of its website and facilitate Google's indexing bots. These efforts failed to regain its lost ranking. In addition, Dreamstime tasked its own in-house SEO expert with engaging outside search engine gurus to regain its prior search ranking. Each firm was unable to identify any issues with Dreamstime's site that would explain how it came to be excluded from Google's search rankings for keywords most relevant to stock photography. Dreamstime also launched a second website, Megapixl.com, to get more exposure for a subset of its content (as Shutterstock did with Bigstockphoto.com and Offset.com). Dreamstime also spent substantial sums on AdWords campaigns for Megapixl.com. Despite Dreamstime's significant investment in infrastructure and advertising for Megapixl.com, that website was unable to gain traction in organic search and Dreamstime was only able to recover a fraction of its investment. All told, Dreamstime spent several

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

million dollars hiring search professionals, building out and launching AdWords campaigns for a second website, expanding the content on its primary site and increasing its AdWords budget, to no avail.

65.     As a direct result of the losses resulting from its effective exclusion from Google's organic search results, and in reliance upon Google's dishonest explanations for its ranking drop, Dreamstime spent considerably more on search engine advertising to maintain its market position.[26]  This meant significantly increased spending on Google's AdWords, which diminished Dreamstime's competitive standing.  Of course, it also benefitted Google and its partners directly.

### 3.     Google Also Rigged the Bidding Process in its AdWords Program to Enhance its Monopoly Power in Online Search Advertising

#### a.     Dreamstime Has Entered into a Contract with Google as a Direct Purchaser of Google's AdWords Service

66.     Google generates a significant amount of its revenue from AdWords, its advertising service through which companies pay Google to have advertisements for their websites prominently displayed in Google's search results.

67.     To use AdWords, advertisers must agree to the Google LLC Advertising Program Terms and several related policies and procedures (the "AdWords Agreement"). (*See* Exhibit "F.")  The related policies and procedures, which are extremely voluminous, are expressly incorporated into the AdWords Agreement.  Essentially, the AdWords Agreement provides that, in consideration for Google displaying a customer's ad, the customer will pay Google at a price determined by Google's AdWords auction program, subject to important limitations.  The agreement states that use is subject to applicable Google advertising polices.

68.     Google drafted both the AdWords Agreement and the advertising polices

---

[26] After dramatically increasing its ad spend and implementing extensive changes recommended by Google to help with search ranking, Dreamstime recently resolved to significantly lower its advertising spending, as increased spending did not come close to compensating for the loss of traffic caused by Google's search bias.

incorporated into it.  The agreements are adhesion contracts, as Google offers its services on a "take it or leave it" basis without giving consumers opportunities to negotiate terms to benefit their needs or interests.

69.     Section 1 of the AdWords Agreement provides that "Google and its affiliates or Partners may reject or remove a specific Target, Ad, or Destination at any time for any or no reason . . . [and] Google or its affiliates may participate in Program auctions in support of its own services and products."

70.     An update to the AdWords Agreement in late 2017 included an arbitration clause with an opt out option, and Dreamstime opted out of this clause.

71.     In return for the obligations and other consideration to which advertisers agreed in the AdWords Agreement, Google agreed to provide the AdWords program to each and every purchaser executing the standard AdWords Agreement.  This program was and is described in various answers to Frequently Asked Questions ("FAQs") in Google's AdWords support pages, which were incorporated by reference into the AdWords Agreement.  Attached as Exhibit "G" is the AdWords agreement in effect around the time Dreamstime became an AdWords purchaser that specifically referenced and incorporated the FAQs.  The AdWords program uses an auction system to determine which advertisements are shown and how much an advertisement costs.  Advertisers bid for relevant keywords such as "stock photos." AdWords then assigns each advertisement a "quality score" based on multiple factors including click-through rate ("CTR") (the percentage of users who view the ad that actually click it), relevance to the keywords, and the quality of the advertiser's website.  Each time a Google user enters search terms that include relevant keywords, AdWords determines which of the competing advertisements are displayed by factoring both an advertiser's bid amount and quality score.  Thus, the lower the advertisement's quality score, the higher the bid must be for the ad to compete.

72.     Advertisers place bids on the "cost per click" of each advertisement. Advertisers can choose to either manually bid or pay an extra fee to select from automatic bidding options that use algorithms to adjust and optimize bid amounts based on specific

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

FIRST AMENDED COMPLAINT

advertising goals.  Google refers to automatic bidding options as "marketing campaigns."

Common marketing campaigns include targeting spending on advertisements with the

lowest cost per acquisition or on advertisements that maximize the number of clicks

generated.

73.     When using marketing campaigns, advertisers specify the amount, on average,

they would like to spend each day on a particular campaign.  Google then aims to show

advertisements as much as possible until the daily budget is met.  Customers can also elect

to use Google's cost-per-acquisition ("CPA") method, which is intended to use machine

learning to generate bids that result in a targeted average cost for each acquisition they

obtain through the campaign. For a specific advertiser, acquisitions might include customer

visits resulting in sales, signups, or mobile app downloads.

74.     In 2004, Dreamstime entered the AdWords Agreement with Google when it

began paying Google to display its advertisements on Google's search results.  Implicit in

this Agreement was Google's duty to provide its advertising services to Dreamstime in good

faith and not take actions that unfairly favored Dreamstime's competitors.  In particular, to

the extent that Google exercised its absolute discretion to remove ads "at any time for any

reason or no reason" under the AdWords Agreement, it must do so in good faith.

Otherwise, the AdWords Agreement becomes illusory because it makes Google's

performance completely optional.  The only consideration Google provides pursuant to the

agreement is to display ads at the cost-per-click determined (or the alternative cost-per-

acquisition) through advertiser auctions.  If Google is free to remove Dreamstime's ads for

any or no reason, this renders the AdWords Agreement illusory.

75.     Dreamstime's decision to enter into the AdWords Agreement and its good

faith understanding of the terms of Google's AdWords Agreement and advertising policies

were always based on the text of those agreements, Google's stated policies and the

understanding that Google would apply its policies evenly toward participants who bid for

the same keywords and treat them all fairly.

76.     Dreamstime has engaged in several different marketing campaigns with the

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

FIRST AMENDED COMPLAINT

goal of promoting its advertisements with the lowest cost per acquisition.  That is, to promote its advertisements with the best combination of quality score, bid amount, and resulting customer acquisitions.  In doing so, Dreamstime as a customer pays Google daily to determine which of its advertisements are the most effective and to increase their circulation accordingly.

      **b.**    **Google Removed or Canceled Dreamstime's Online Ads in Bad Faith and Fraudulently Concealed and Omitted Facts to Overcharge Dreamstime**

77.    Despite Google's agreement to provide Dreamstime with effective marketing campaigns pursuant to policies that were uniformly agreed to and intended to apply uniformly to all purchasers who executed the standard AdWords Agreement, several of Dreamstime's campaigns have suddenly stopped acquiring customers for no apparent reason.  In other words, Dreamstime was seeing a steady, predictable number of acquisitions from these campaigns each week, and then suddenly these acquisitions dropped to zero and remained at zero without any decline in the number of viewer impressions.  Dreamstime has been unable to receive any support from Google on this issue, despite multiple requests for an explanation.  Each time Dreamstime sought an explanation from Google as to why these campaigns stopped working, Google gave knowingly false explanations and intentionally omitted that it was rigging the AdWords bidding process to cause Dreamstime to overspend on AdWords.

78.    For example, in September of 2017, when Elena Dobra of Dreamstime emailed her support contact at Google, Kyryl Boltenko, to inquire why a previously successful ad campaign had recently stopped delivering customers to Dreamstime without any change from Dreamstime to the campaign, Mr. Botenko forwarded a response from an unnamed member of Google's technical team, stating that "traffic fluctuation had been caused by relatively long conversion delay," and that the system "was working as intended." This explanation was untrue, and Google knew it at the time, intending that Dreamstime rely upon it (as it did) by continuing to spend resources on unsuccessful campaigns.  The

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

explanation, as many others, intentionally omitted that Google was purposefully manipulating the campaign and not delivering targeted CPA as promised in order to cause Dreamstime to overspend on advertising.

79.     In addition, Google has cancelled certain Dreamstime ad campaigns on the basis that they violated stated policies that Google knew the ad campaigns did not violate. Google's advertising policies understandably prohibit the use of misleading content in advertisements, and the standard AdWords Agreement is intended to ensure that these policies apply equally to all purchasers of AdWords.  The policies provide a specific list of prohibited conduct that would subject an advertisement to rejection or removal, including: "making false statements about your identity or qualifications; using false claims or claims that entice the user with an improbable result; falsely implying affiliation with, or endorsement by, an individual, organization, product, or service; ads that mislead or trick the user into interacting with them ('trick to click'); or providing a business name that is anything other than the domain."

80.     Google has consistently and wrongfully removed Dreamstime's lowest cost per acquisition advertisements as being "trick to click" despite Dreamstime's competitors running the exact same type of advertisements, without any apparent issue or objection from Google.[27]  Google's purported complaint with these ads concerned the "search box" that invited users to search Dreamstime's website.  When a user clicked on this search box, the user was taken to Dreamstime's website (as opposed to search results appearing in the actual box).  Google's technical staff has given inconsistent and knowingly false explanations to Dreamstime about why certain ads were "trick to click."  In a Google hangouts conversation, a Google staff member told Dreamstime that Dreamstime's swirl logo with a white background was "trick to click."  Dreamstime's contact at Google apologized when passing along this statement to Dreamstime.

---

[27] *See* Exhibit "H" attached hereto, which provides a snapshot of advertisements currently running on Google's DisplayAds platform for one of Dreamstime's competitors that have the same purported "trick to click" characteristics that Google rejected in Dreamstime's ads, *i.e.* "fake" search boxes.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

81.     Even more telling is the fact that Google continued to remove Dreamstime's low cost per acquisition advertisements, falsely labeling them as "trick to click," while allowing Dreamstime's high costs per acquisition display advertisements of the same type to remain active.  When an advertisement's cost per acquisition began to drop, it was removed as being "trick to click" despite the fact that other Dreamstime advertisements with the exact same format, but with higher cost per acquisition, were left running.

82.     Dreamstime engaged in extensive efforts to resolve these issues with Google and spent countless hours emailing and calling Google to find out: why its low cost per acquisition advertisements were being removed, how it could modify them so that they would follow Google's advertising polices, and why competitor sites could display advertisements with the same format but without repercussion.  Dreamstime also asked Google to reconsider its decision to remove its advertisements. In response to Dreamstime's inquiries, Google fraudulently concealed the true reason for their exclusion.

83.     For example, Elena Dobre of Dreamstime emailed her contact with Google's DisplayAds team, Andreea Simulescu, on April 10, 2017, to inquire about why a batch of Dreamstime's HTML5 banner ads that were performing well had suddenly been disabled as "trick to click," despite following Google's specific instructions for creating such ads.  At the same time, Dreamstime's other HTML5 banner ads, having the same dynamic search box input, which ads were generating a higher fee for Google, were not disabled.  On April 11, 2017, Ms. Simulescu replied that "[s]ometimes there can be certain discrepancies that occur in the approvals due to the complexity of our system."  Google knew this explanation to be false (as it was) as applied to the Dreamstime ad in question at the time it gave it, and it intentionally omitted the fact that lower cost ad was removed merely for arbitrary and anticompetitive reasons to induce Dreamstime's reliance in the form of overspending on advertising.  In reality, the "discrepancy" described by Ms. Simulescu was not due to the complexity of Google's system but its deceptive scheme to overcharge Dreamstime for ads and at the same time interfere with Dreamstime's acquisition of new customers.  Dreamstime reasonably relied upon these misrepresentations and omissions by continuing to

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

overspend on ads.

84.    Justifiably and reasonably relying on Google's suggestions, Dreamstime implemented HTML5 versions of its search bar ads, which added an actual dynamic search input field to the advertisement and thereby removed any likelihood that the consumer might be "tricked" into clicking a search field that was not active.  This dynamic search box could be used by users as if they were searching directly on Dreamstime's website.  For example, typing "trees" in the field and pressing the banner's Search button would open a page of "trees" search results on Dreamstime's website.  For several months, Google allowed these ads to run even though the search function was not working properly because of a technical problem with Google's system.  Google then began removing the ads again in the same fashion as the non-dynamic versions.  Per Google's new specifications, Dreamstime resubmitted the banners with a search box that did not work.

85.    As of March 2018, Dreamstime's banners include a search box that does not work, which behave exactly as the non-dynamic banners initially removed, despite Google's initial assurance that Dreamstime's HTML5 efforts would result in workable, dynamic search ads.  Later, Google updated its ad validation tool to disallow ads with dynamic search boxes from being accepted into Google's ad system.  Thereafter, Dreamstime was only allowed to upload ad banners without a dynamic search box feature.

86.    In sum, Google wields its immense power in the online search engine advertising market discriminatorily by allowing only some of its AdWords customers to use effective, low cost advertisements, and by cancelling similar advertisements of other customers.  Google uses selective enforcement of its removal policies as one of its bases for discriminating and to attempt to conceal its competitively unfair behavior.  By doing so, Google ensures that disfavored customers, like Dreamstime, pay more to Google for displaying less effective advertisements.  This provides a huge monopoly windfall for Google at Dreamstime's expense, while simultaneously benefitting Google and its partners such as Shutterstock and Getty Images.

87.    In addition to being a breach of contract and/or a breach of the implied

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

- 38 -

covenant of good faith and fair dealing, Google's unfair enforcement of its advertising polices has resulted in diminution of Dreamstime's competitive position among online stock photography repositories.   Dreamstime cannot compete at the level that rival sites compete while Google continues to unfairly discriminate against its low cost per acquisition advertisements.  Dreamstime justifiably relief upon Google's intentional misrepresentations and omissions noted above by continuing to spend on AdWords.  But for these misrepresentations, Dreamstime would not have invested in AdWords to the extent that it did.

### c.  Google Overdelivered Advertising to Dreamstime and Systematically Exceeded Targeted CPA Deliveries

88.    Google also consistently and systematically overdelivered advertising, causing campaigns to exceed Dreamstime's budgeted amounts.  One stark example of this was in relation to the alternative CPA bidding format.  In CPA bidding, bidders set a Target CPA, which Google described as the cost-per-acquisition that a customer should expect to pay to get as many conversions as possible within a CPA goal set by the customer.  As explained in the Help Center of Google Ads (support.google.com/google-ads/answer/6268632?hl=en): "Target CPA is a Google Ads Smart Bidding strategy that sets bids to help get as many conversions as possible at the target cost-per-acquisition (CPA) you set. It uses advanced machine learning to automatically optimize bids and offers auction-time bidding capabilities that tailor bids for each and every auction."

89.    Attached as Exhibit "N" is a collection of campaigns in which Dreamstime set a target CPA.  The average CPA for these campaigns was exceeded significantly and systematically by large amounts (and sometimes by factors of three).

90.    In November 2016, while relying on Google's Target CPA system, rather than its daily spending limits system (which, as alleged below, also frequently overcharges Dreamstime) as a means for budgeting for online advertising, Dreamstime noticed that the amount Google was charging for a particular ad campaign suddenly spiked from $400 per day to over $2,400 per day.  When Dreamstime investigated, it found that despite having a

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

Target CPA set for the campaign at no more than $240, Google had favored ads that generated only 17 conversions at a total cost of $16,000 – *i.e.*, CPA of $951 – over other ads that had generated 7 conversions at a total cost of $691 – *i.e.*, CPA of $99.  When Dreamstime's Elena Dobra emailed her support contacts at Google, Carmen Punga and Ana Sipciu, to inquire about this apparent overcharging for Dreamstime's campaign, Ms. Sipciu responded in an email on December 12, 2017 only that the campaign had behaved technically as it was supposed to, according to Google's internal algorithm. Google knew this explanation was false when given, and intended that Dreamstime rely upon it (which it did) by overspending on CPA ad campaigns.

91.     In addition to ignoring Dreamstime's Target CPA settings for its ad campaigns, Google drastically exceeds the daily budgeted limits that Dreamstime sets for its campaigns.  Though Google now claims that its current policy allows it to drastically exceed the daily budgets set by bidders as long as the monthly budget (30.4 times the daily budget) is not exceeded, this was not always the case.  In fact, earlier policies in effect for many years (and until October of 2017) would not allow the daily budget to be exceeded, even by a small amount on a given day, without providing a refund or credit on Dreamstime's next invoice with the description "overdelivery" – a term coined by Google itself.[28]  Google has made changes to this policy that allow it to systematically exceed in extreme ways the daily budget set by Dreamstime for certain campaigns, without adequate notice to Dreamstime.  Google exceeded its then-current overdelivery policies with respect to daily limits and/or changed its policy and extremely exceeded daily budgets without having given fair and adequate notice of any change in policy to Dreamstime.  This conduct is either a breach of contract or a breach of the implied covenant of good faith and fair dealing.  It is also

---

[28] Until October 2017, Google allowed a 20% overdelivery over the daily budget on a given day, refunding anything spent over the daily budget.  After October 2017, Google allowed 100% of the daily budget in overdelivery, without refund (unless the overdelivery exceeded the monthly budget).  Companies are directed by Google to set a daily budget, not a monthly one.  Google uses this change in policy to deliver irrelevant or much less relevant traffic that does not add conversions at any reasonable rate.  Thus, the practice is deceptive and results in AdWords customers overpaying for AdWords.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

anticompetitive.

### 4. Google Also Removed and Manipulated the Visibility of Dreamstime's Mobile App in Google's App Store

92.     Since around the middle of 2015, Dreamstime has provided several mobile applications ("apps") for its users to access and utilize various features of its service on mobile devices.  Two of Dreamstime's apps have been designed specifically for use on Google's Android mobile operating system and, accordingly, have been offered for download in the Google Play app store (https://play.google.com).  The first Android app entitled "Stock Photos by Dreamstime" (the "Buyer App") is specifically designed for users who would like to search for and purchase licenses for images in Dreamstime's library.  The second Android app entitled "Dreamstime: Sell Your Photos" (the "Seller App") is designed for users who would like to upload their photos for inclusion in Dreamstime's library.

93.     Shortly after Dreamstime's Buyer App appeared for the first time in the Google Play app store, Google removed the Buyer App, claiming that lingerie photographs visible in the Buyer App were "adult" content that was prohibited by the app store's policies.  Attached as Exhibit "Q" are examples of the purportedly offending images, none of which contain adult content.  Google's claim was strange, given the fact that Shutterstock's app remained active in the Google Play app store despite featuring explicit nude photographs.  While the images from Shutterstock's app are particularly "not safe for work" and therefore not attached as exhibits, Dreamstime can provide at the appropriate time a comparison of the images Google found objectionable on Dreamstime's Buyer App and images from Shutterstock's app that demonstrate Google's double standard.  When Dreamstime inquired about this discrepancy in treatment, Google stated that its review was limited to Dreamstime's Buyer App and that if Dreamstime wanted to address the issue, it should lodge a formal complaint concerning Shutterstock's app.  Following Google's instruction, Dreamstime lodged a complaint concerning Shutterstock's app only to have it summarily ignored.

94.     More recently, in July of 2018, despite Dreamstime's Buyer App having

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

favorable user reviews and being installed on more than 50,000 Android mobile devices, Google – without any reasonably justification – completely removed Dreamstime's Buyer App from search results in the app store for the keyword "stock photos," the most important search term for the app, even though it was not removed from other searches (indicating a manual, intentional de-indexing by Google). In doing so, Google has removed yet another avenue for new customers looking for stock photos on their mobile device to find Dreamstime.

95.     On September 5, 2018, Elena Dobre of Dreamstime emailed Carmen Punga and Andreea Simulescu of Google's support to ask why Dreamstime's Buyer App had been de-indexed in the Google Play app store for its most significant industry search term. After receiving no response for five days, Ms. Dobre emailed Punga and Simulescu again on September 10th and was instructed by Ms. Simulescu to resubmit Dreamstime's inquiry using a Google Play app store support page that Google knew did not actually accept user submissions. After independently searching and finding another support page that did accept user submissions concerning issues with app publishing, Ms. Dobre received a response from a Google employee identified only as "Travis" using the generic email address googleplay-developer-support@google.com on September 18th asking for more time to investigate, since a "policy question" had been raised concerning Dreamstime's Buyer App. Finally, on September 20th, Ms. Dobre received a second email from the email address googleplay-developer-support@google.com, signed by an individual identified only as "Jay," that did not reference any policy question but instead provided generic information on factors that Google may consider in determining an app's position in search results on the Google Play app store. Google's September 20th response completely ignored the fact that the search results position of Dreamstime's Buyer App could never be improved since it has been entirely removed from search results for "stock photos." Google's responses also, of course, intentionally omitted the fact that none of the "fixes" or explanations posed by Google applied in this case, because Google was simply intentionally de-indexing the app for anticompetitive purposes. All of Google's representations and omissions regarding the

Buyer App were made with knowledge of their falsity and with intent to induce Dreamstime to rely upon them, which Dreamstime justifiably did when it invested significant resources into the Buyer App.

5. **Google Uses Google Images to Help Customers Bypass Dreamstime's Site and Access Its Photos Directly Without Paying for Them**

96. Google unlawfully uses Google Images to disrupt the market for stock photos and eliminate (or at least significantly impair) competition in that line of commerce to benefit its online search advertising monopoly. One way that Google caused anticompetitive effects in the online stock photography business until very recently was by way of its "view image" button that appeared when a user clicked on an image returned by a Google search. This button allowed a user to open and save the image directly. The view image button encouraged and enabled users to steal copyrighted photographs from photographers, publishers and stock photography companies like Dreamstime. The button allowed users to bypass the websites from which Google obtained the image and provided the image directly to the user. To make matters worse, Google provided users with high resolution[29] copies of these images, which made it even easier for users to download and save images without visiting their website of origin. The "view image" button took business away from Dreamstime and other stock photography sites, as users often took images without ever visiting its site or paying for them.

97. On February 15, 2018, it was reported that Google was removing its "view image" button to encourage users to visit the website that hosts the image.[30] Just one week

---

[29] It is significant to note that Google Images grants a higher ranking to images with the highest resolution. In search results, Google Images actually displays and facilitates download of images that have a higher resolution than can even be displayed on the user's device where the search was performed. This feature of Google Images is only useful if Google intends for users to retain and reuse the images from search results, without regard to whether the images can be used without permission from their copyright owners.

[30] *See*, https://www.theverge.com/2018/2/15/17017864/google-removes-view-image-button-from-search-results. (last accessed on March 19, 2018).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

after Google removed this button, Dreamstime experienced a 25% increase in user traffic to its website and 10% increase in paid conversions – proving that Google's past conduct with the "view image" button stole traffic and customers from Dreamstime.  Despite removing this button, to this day searchers are still able to access high-resolution images that show up in Google Images searches by right-clicking and saving the image.[31]

> **D.**   **Google's Monopolistic Scheme Causes Antitrust Injury to Dreamstime (and Others) and Simultaneously Harms Competition and Consumers in the Online Search Advertising Market**

98.   Google's evisceration of Dreamstime's organic search ranking and selective enforcement of its AdWords policies worked independently and in concert to bolster Google's online search advertising monopoly, by increasing Google Images' and Google's stock photo partners' dominance and harming Dreamstime in the process.  Other online stock photo providers, such as 123RF, DepositPhotos, and CanStockPhoto, have been similarly injured.  These stock photography websites cannot compete fairly with Shutterstock and Getty Images without being accurately and legitimately ranked by Google's search engine and without having a fair opportunity to compete on a level playing field with them for AdWords.  Google's intent was to increase reliance on Google Images and corner the market on a critical supply of stock photos vis-à-vis Yahoo! and Bing, and its conduct had this effect in Google's market.  It also, simultaneously, harmed Dreamstime and competition among its rivals.

99.   The result of Google's abuse and exploitation of its online search advertising monopoly by means of anticompetitive and discriminatory conduct is that competition among online search advertisers is harmed at the same time that competition among online stock photography websites has been harmed.  Essentially, Google has cornered the market on image-based searches *and* stock photo supply for search-based display ads.  This all

---

[31] Google has taken its empowerment of would-be infringers even further, by creating and distributing a script that removes watermarks from images (watermarks are one means by which a copyright owner prevents unauthorized use of an image).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

plays out *within Google's online search advertising market*, as all of the affected stock photo websites participate in that market as direct purchasers of, and competing bidders for, the same AdWords. Google's acts have threatened to drive many competitors out of this business and created technological market barriers to entry which keep out potential new entrants. Moreover, they have generated confusion in the online search marketplace by creating online search and search ad results with fewer choices for consumers, diminished pricing competition and reduced innovation.

100. These injuries are not limited to the stock photography business – rather, they are felt in Google's primary market, as Bing and Yahoo! lose market share to Google by virtue of its more dominant search advertising services. These injuries are inextricably intertwined with Google's maintenance of its monopoly in the online search advertising market and with the harms to competition and consumer welfare *in the online search advertising market*. As detailed below, Google's exclusion of Dreamstime and other similarly-situated online stock photography competitors/customers from its online search advertising market enhances Google's monopoly in that market in three important ways: (1) it drives more web traffic to Google and Google Images, which increases Google's search dominance; (2) it enhances the value of its strategic partnerships with Shutterstock and Getty Images (through which Google now offers stock photos to its own search advertising customers); and (3) in the meantime, it increases Google's revenue through the increased AdWords revenue it derives from excluded websites.

      **1.**    **Google's Elimination of a Competitive Threat to Google Images Protects and Enhances Its Monopoly, Harms Competition and Reduces Consumer Choice and Welfare in the Market**

101. Google's exclusionary conduct toward Dreamstime enhances its own monopoly by sending more web traffic to Google Images and ensuring that certain consumers searching for licensed images to purchase online do not go directly to Dreamstime to search for and browse images. Google Images is an unnecessary middleman for those who want to search directly for licensed images to purchase. Dreamstime's site

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

functions in the same way as Google Images, and is more efficient for this subclass of search consumers. Dreamstime also offers over two million free images, making it attractive to an even larger class of image searchers than those looking to purchase images. Image searches are one of the most common subcategories of search, as reflected in Google's prominent "Images" tab in its search results. The exclusion of Dreamstime from the most common search results related to stock photography increases consumers' reliance on Google Images and drives more web traffic through Google, which it monetizes through advertising.

102.   Competition in online search advertising is harmed by Google's promotion of Google Images over Dreamstime and others. Google's competitors, such as Bing and Yahoo!, offer competing search and image services. However, they have been unable to achieve the volume of traffic and associated historical data capable of allowing their image-based services to compete with Google Images. Google's elimination of Dreamstime and other stock photography websites enhances and entrenches Google Images' dominance and secures its competitive advantages over Bing and Yahoo!.

**2.   Google's Favoritism of Its Stock Photo Partners Enhances Its Monopoly, Harms Competition and Reduces Consumer Welfare in Online Search Advertising**

103.   Google's strategic partnerships with and favoritism of Shutterstock and Getty Images enhance its online search advertising monopoly in multiple ways. Stock photography repositories supply a critical input for Google's and its chief rivals' online search advertising networks – stock photos that can be integrated into search-based display ads. Google and its chief rivals compete for this critical supply of licensed images. Google's partnerships and licensing agreements give it access to hundreds of millions of licensed images to integrate into its ad network,[32] whereby Google has instantly become one

---

[32] The Shutterstock and Getty Images contracts are also opportunities for Google to collect more user data and play into the self-reinforcing strength of Google's search advertising platform as it gathers more data compared to rivals. Its control over user data creates enormous barriers to entry and unique competitive advantages for Google that increase its

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

of the largest suppliers of stock photos to consumers intending to use them in online search ads.  These partnerships also reduce Shutterstock and Getty Images' incentives to compete directly with Google Images for imaged-based search traffic, drastically reducing any threat they would otherwise pose to Google Images.

104.    These strategic alliances – and Google's favoritism of its partners – harm competition in the online search advertising market because Yahoo! and Bing are unable to obtain the same access to licensed stock photos for their competing ad networks.  By consolidating control of the stock photography industry among its strategic partners, Google has neutralized and/or suppressed competition and has enhanced its competitive advantage over Bing and Yahoo!.  Ultimately, Google's search consumers (who are also potential consumers of Dreamstime) are harmed because Dreamstime, as a large supplier of unique, high-quality stock photo images – one that otherwise would exert downward pricing pressure on a dominant market player like Shutterstock or Getty Images – has essentially become invisible to Google's search consumers.  A non-discriminatory application of Google's search algorithm would foster healthy and fair competition among these websites for key words crucial to their industry.

### 3.    Google's Exclusionary Conduct Allows It to Drive Up Prices and Restrict Output for Dreamstime's and Google's Own Online Customers

105.    Google's market power in the online search advertising market has allowed it to extract supracompetitive advertising premiums from its customers because it is not required to compete on price.  Websites that are pushed to the bottom of the search rankings, as Dreamstime has been, are forced to increase their reliance (and spending) on Google advertising services to acquire customers.  Since its inception, Dreamstime has spent

monopoly power with every partnership it enters.  In fact, multiple countries have accused Google of (and sanctioned it for) unlawful mining of user data through various platforms and arrangements, including but not limited to Google Maps, Android phones, and alliances with other partners.  *See,* Newman, Nathan, "Search, Antitrust, And the Economics Of The Control Of User Data" (31 Yale J. on Reg. 401, 435-440).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

approximately $50 million on its AdWords campaigns, and spends hundreds of thousands of dollars on AdWords per month.  When Dreamstime began to experience a drop in its organic search traffic caused by Google's manipulation of its search ranking, it increased its monthly AdWords budget by approximately 50% in an attempt to mitigate the damage caused by the changes to Google's algorithm and in justifiably reliance upon the intentional misrepresentations and omissions detailed above.  Despite increasing its advertising budget, as a direct result of Google's manipulation of Dreamstime's search ranking and its unfair enforcement of its AdWords policies, Dreamstime has lost millions of dollars, its cost of acquiring new customers has doubled, and its growth has slowed by approximately 50%. To survive, Dreamstime will have to pass these costs along to its customers, many of whom are also Google's search customers.

106.    The supply of stock photos available to consumers who perform image-related searches in the relevant market is also restricted by Google's conduct.  Before Google's discrimination against Dreamstime and other stock photography websites, consumers googling for licensed images had more choice.  That is, when Dreamstime was ranked in the top three of search results for online stock photography, users searching for online stock photography had easy, direct access to the 72 million stock photos (and over two million free photos) on Dreamstime's website.  By removing Dreamstime and most other significant stock photo websites, Google has left consumers with only two websites specializing in stock photography out of an industry populated with a number of other players and valued in the billions.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**(Monopoly Maintenance and Abuse in Violation of**

**Section Two of the Sherman Act)**

107.    Dreamstime realleges the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

108.    **Section 2 of the Sherman Act.**  The actions complained of herein will

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

continue to restrain trade, allow Google to maintain, exploit, and abuse its online search advertising monopoly power, and adversely affect interstate commerce in that Google provides and sells its services across State lines and on the Internet.  Defendant Google and plaintiff Dreamstime also each purchase goods and supplies in interstate commerce that are used in the services and offerings that comprise their respective businesses.

109.    The antitrust laws are concerned with protecting the economic freedom of participants and consumers in the relevant market.  The aims and objectives of the antitrust laws are directed at encouraging innovation, industry, and competition.  The central purpose of the antitrust laws is to preserve competition and it is that interaction of competitive forces that benefits consumers.  The antitrust laws protect consumers from harm directly related to the unlawful removal of a competitive service or product from the marketplace.

110.    Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, monopolization of any part of the trade or commerce among the States.  A claim for unlawful monopolization under Section 2 has three requisite elements: (1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury.

111.    Dreamstime is advancing a traditional monopoly maintenance antitrust claim asserting that it is a direct consumer-purchaser of Google's AdWords services in the online search advertising market in which Google has maintained and abused its entrenched monopoly position by means of discriminatory, suppressive and anticompetitive conduct directed at Dreamstime, and others.  Google has engaged in this scheme for the anticompetitive purpose of maintaining its monopoly in online search advertising.  Google's maintenance of its monopoly depends upon fostering and maintaining its strategic alliances with its partners, Shutterstock and Getty Images, and shielding its online search website service offering, Google Images, from competition from Dreamstime and other online stock images providers.

112.    Because of Google's discriminatory practices and conduct, contracts and agreements with Dreamstime's rivals, its rigged and tainted AdWords bidding process, and

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

the other exclusionary and anticompetitive actions carried out by Google, the monopolist, in the online search advertising market, plaintiff Dreamstime has lost actual and prospective customers, business and Internet traffic – all necessary and essential components to survive and prosper as an online stock photography competitor.  Simultaneously, Google's primary competitors have lost further market share in image-related search and have a diminished capacity to obtain access to competing stock photo supply to integrate into their search advertising networks.

113.    **Relevant Product/Service Markets – Online Search Advertising**.  The relevant product or service market (or submarket) for antitrust purposes is the online search advertising market.  There are no reasonable substitutes for online search services and no other means by which consumers and Internet users can reasonably and efficiently perform automated searches for online data and websites.  Likewise, there are no reasonable substitutes for the provision of online search advertising, a marketplace in which Dreamstime is a direct purchaser-consumer.

114.    Whether the online search advertising segment is deemed to be a separate and distinct economic relevant market or submarket makes no substantive difference with respect to assessing Google's market or monopoly power because it dominates and controls in excess of a 70% market share in *both* online search and online search advertising.  Moreover, the two segments are wholly interrelated and accessible on the same website of Google.

115.    The product market includes the pool of goods and services that enjoy reasonable interchangeability of use and cross-elasticity of demand.  The cross-elasticity of demand between online search advertising services and other forms of finding such information/advertisements is extremely low.

116.    The DOJ and FTC have both recognized a relevant market defined as online search advertising on multiple occasions, specifically as it relates to Google.

117.    Dreamstime is dependent upon and a direct purchaser-consumer of various Google online search advertising services.  Dreamstime is a distributor and seller of online

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

FIRST AMENDED COMPLAINT

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

stock photography.  Competition for consumers for online stock photography services has been excluded, destroyed, and or restrained because of Google's maintenance, exploitation, manipulation and abuse of its monopoly power in the relevant market (or submarket) for online search advertising.

118.   Relevant market definition is a *fact-intensive* determination.

119.   **Relevant Geographic Market – United States**.  The relevant geographic market for antitrust purposes in this case is the United States.  The relevant geographic market is the area of effective competition in which the parties operate and to which customers can practicably turn for the desired services.  The online services provided by Google in the United States differ from those it offers or provides in foreign countries and different rules and regulations often apply.

120.   **Google Possesses Monopoly Power**.  Throughout the relevant time period, Google has been the dominant and entrenched player in the domestic online search market and the linked and interrelated online search advertising market (to the extent those markets are considered economically distinct), possessing a market share of at least 70%.  Generally, a market share of 65% or more is a *prima facie* showing of monopoly power or when the defendant owns a "dominant share" of the market.[33]  Accordingly, Google is a monopolist in this market(s).  Google has the power to control prices, exclude competition, reduce output and selection, and/or stifle technology and innovation in the relevant market(s).

121.   Market or monopoly power determination is a *fact-intensive* issue reserved for the fact-finder.

122.   Google has maintained, exploited, and abused its monopoly power in the online search advertising market in violation of the monopolization proscription of Section 2 of the Sherman Act.  Plaintiff Dreamstime and other of its rivals in the online stock photography industry are consumer-purchasers of various of Google's online advertising services, are competitors for the purchase of related search terms for Google's AdWords

---

[33] *Image Technical Services, Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1206 (9th Cir. 1997); *see also Rebel Oil Co. v. Atlantic Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995).

business, and have suffered antitrust injury and damages as a direct consequence of Google's monopoly exploitation, manipulation and abuses.

123.  **Significant Barriers to Market Entry and Expansion Exist**.  Significant and high barriers to market exist that preclude or discourage new firms from entering the domestic online search advertising market and challenging the behemoth Google's entrenched monopoly position.  Significant and high barriers to expansion also exist, which is evidenced by the fact that only a small number of competitors have managed to marginally penetrate and expand in this market which is dominated and controlled by Google.  Indeed, many potential big players have exited the online search advertising market, and none, including rivals Bing and Yahoo!, have been able to capture any significant market share.

124.  Some of these significant barriers to entry and expansion include: (1) requirement of intellectual property and licenses; (2) regulatory controls and restrictions; (3) high capital costs; (4) economies of scale; (5) control and maintenance of technological resources; (6) brand loyalty; (7) entrenched user preferences; and (8) immense network effects.

125.  **Google's General Intent to Monopolize**.  Google has undertaken its clearly anticompetitive and exclusionary conduct with the intent and purpose of maintaining and abusing its monopoly in the online search advertising market (by increasing Google Images' dominance and increasing its own stock photo offerings within its ad network) and to vanquish and injure Dreamstime and other smaller rivals in the online stock photography industry.

126.  Google has acted to eliminate, destroy, or foreclose meaningful competition in the relevant market through the discriminatory tactics described above.  Google's conduct discourages, prevents, and/or precludes consumers from finding, accessing and/or buying services from Dreamstime and other online stock photo repositories directly, which in the long-run would erode Google's standing as the first place to go via its Google Images feature to search for, browse and obtain stock photos on the Internet.  During the relevant

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1   time period, Google has provided services to Dreamstime, it has been keenly aware of its

2   capabilities and has deemed Dreamstime to be a target that must be minimized, suppressed

3   and/or eliminated.

4       127.   **Dreamstime Has the Requisite Antitrust Standing to Sue**.  Section 4 of the

5   Clayton Act confers standing to sue for damages to "any person who shall be injured in his

6   business or property by reason of anything forbidden by the antitrust laws." (15 U.S.C.

7   §15(a).  Section 4 "does not confine its protection to consumers, or to purchasers, or to

8   competitors, or to sellers.  The Act is comprehensive in its terms and coverage, protecting

9   all who are made victims of the forbidden practices by whomever they may be

10  perpetrated."[34]

11      128.   Plaintiff Dreamstime has the requisite standing to assert and maintain antitrust

12  claims against Google as a participant in Google's market that has suffered antitrust injury

13  because of Google's maintenance, exploitation, and abuse of its monopoly power through its

14  discriminatory and exclusionary conduct.  Dreamstime is a direct purchaser-consumer of

15  Google's AdWords services.[35]  Consumers use Google's online search and search

16  advertising services to locate, access, and buy online stock photos from Dreamstime, and

17  other market participants, and some of these *same* consumers also access and use Google's

18  "Google Images" online image search service to do the same.  All of these online services

19

20  [34] *Blue Shield v. McCready*, 457 U.S. 465, 472 (1982); *see also Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310-320 (4th Cir. 2007) (non-competitor of defendant Microsoft had

21  standing to advance its monopoly maintenance claim based upon operating system market); *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 172-77 (3rd Cir.

22  2015).

23  [35] *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979) ("[C]onsumers of retail goods and services have standing to sue under" Section 4 of the Clayton Act); *Glen Holly*, 343 F.3d at

24  19985 ("consumer" of alleged violator's goods or services has antitrust standing); *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109, 1118 (N.D. Cal. 1998)

25  (direct purchasers of defendants' product have antitrust standing); *In re Netflix Antitrust Litigation*, 506 F. Supp. 2d 308, 316 (N.D. Cal. 2007) (finding that purchasers of

26  defendant's products are participants in the same relevant market); *Ritz Camera & Image, LLC v. SanDisk Corp.*, 772 F. Supp. 2d 1100, 1108 (N.D. Cal. 2011) (plaintiff, a direct

27  purchaser of products from defendants, "considered a participant in the same market as Defendants"); *In re eBay Seller Antitrust Litigation*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal.

28  2008) (plaintiff vendors/consumers of defendant eBay's online auction services conferred antitrust standing).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

- 53 -

1    are interrelated and share and draw business from the *same* potential customer base. Google

2    also has licensing and other written agreements with various online stock photography

3    competitors of Dreamstime, such as Shutterstock and Getty Images, that are designed to

4    suppress and exclude competition with Google and partnerships with Google's chief search

5    advertising rivals. Dreamstime and other online stock photography providers are critically

6    dependent upon Google's search advertising services for website traffic and customers.

7         129.   In addition to Dreamstime's status as a "consumer" of Internet search

8    advertising, Google's services and monopoly conduct are inextricably intertwined with and

9    materially affect competition in the online stock photography line of commerce, including

10   the Google Images service accessible via a prominent tab on its own search website.[36]

11   Consumers that access and use Google's website to search for online stock photo providers,

12   and many of those who click on AdWords sponsored/generated sites/ads, are also the

13   potential/actual consumers of Dreamstime's online services for free and for-pay stock photo

14   images.

15        130.   Finally, by reason of Dreamstime's consumer business relationship and

16   service contracts with Google, for AdWords and other services, it is a "participant" and

17   consumer in the online search advertising market, and a competitor with respect to Google

18   Images.[37] Consequently, Dreamstime possesses the requisite antitrust standing to bring and

19   maintain this antitrust monopolization claim.

20        131.   **Google's Overall Predatory and Exclusionary Scheme and Conduct**.

21   Google has willfully acquired and/or maintained its monopoly power in the online search

22   advertising market (or submarket) and has wielded and abused that power using

23   anticompetitive and exclusionary means, including by excluding and distorting competition

24

25

_____

[36] *McCready*, 457 U.S. at 479-81, 483-84; *see also In re Qualcomm Antitrust Litigation*, 292
F. Supp. 3d 948, 965-69 (N.D. Cal. 2017); *In re Flash Memory Antitrust Litigation*, 738 F.
Supp. 2d 1011, 1023-24 (N.D. Cal. 2010).
[37] *American Ad Management, Inc. v. General Telephone Co.,* 190 F.3d 1051, 1057-58 (9th
Cir. 1999); *Amarel v. Connell*, 102 F.3d 1494, 1509-10 (9th Cir. 1996); *Yellow Pages Cost
Consultants v. GTE Directories Corp.*, 951 F.2d 1158, 1159-64 (9th Cir. 1991).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1   in online stock photography and among entities that compete for AdWords search terms

2   relating to online stock photos.

3          132.   Section 2 of the Sherman Act prohibits a monopolist from employing even

4   otherwise lawful practices if they unreasonably exclude, suppress or foreclose competition

5   to existing or potential competitors in the relevant market.

6          133.   Google has engaged in a coordinated and calculated monopolistic and

7   discriminatory "overall scheme" which is described specifically and plausibly above.  Such

8   unlawful conduct undertaken by Google, the monopolist in the online search advertising

9   market, includes: (1) utilizing a rigged, biased and tainted subjective bidding process to

10  control the purchase of Google's AdWords advertising services; (2) downgrading and

11  distorting Dreamstime's online search ranking (making it essentially invisible in Google's

12  search results), without justification, forcing Dreamstime to spend additional funds on

13  Google's AdWords program, thereby raising Dreamstime's costs of competing and

14  threatening to drive it out of business; (3) entering into multi-year contractual partnerships

15  with Shutterstock and Getty Images to give them favored status that has not been available

16  to Dreamstime and other smaller stock photography suppliers; (4) selectively enforcing its

17  rules and terms governing its online AdWords advertising program to disadvantage

18  Dreamstime, thereby further undermining its ability to supply stock photos to its customers

19  and Google's rivals; (5) moving and elevating, in the online search rankings,

20  inconsequential or underperforming (junk website) rivals ahead of Dreamstime and other

21  established, high quality or low-priced online stock photography repositories; (6)

22  suspending Dreamstime's mobile app purportedly for violations of its policies that the app

23  did not violate, and later de-indexing Dreamstime's mobile app for the most common search

24  for stock photos within the Google Play app store; (7) allowing users to bypass

25  Dreamstime's licensed images and obtain them directly on Google Images without paying

26  for them; and (8) engaging in unlawful activity to capture and use privacy protected data of

27  its consumers and advertisers, thereby maintaining and enhancing Google's monopoly

28  power and bolster its network effects.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

- 55 -

134.    *Google Has Rigged its AdWords Search Term Bidding Process.*  The purported bidding process or mechanism Google uses to market and sell its AdWords advertising services is not legitimate but instead is rigged, anticompetitive, skewed and biased against Dreamstime as applied.  Google's AdWords bidding protocol is not objectively-based and key search words are not necessarily awarded on a quantitative basis to the highest bidder.  Instead, winning bids are determined by Google itself based on wholly subjective criteria, in addition to the monetary component, used to arrive at a "quality score" which consists of Google's own internal assessment of the bidding advertiser's website, the relevance of the key search words to the bidder's website or business, and other undisclosed factors.  So even in instances where Dreamstime would otherwise outbid its stock photo competitors for AdWords, it could still be an unsuccessful bidder.

135.    Moreover, Google can invalidate or override any bid because it has reserved for itself, and its partners, the right or option to participate in the bidding and outbid Dreamstime, and others.  This alone destroys any notion that the bidding process is above board or is fair.

136.    Google does not disclose the exact weighting of its bidding algorithms.  As such, Google's bidding process, far from competitive, has subjective components and is a black box.  Google has manipulated the subjective components of its bidding process to unevenly and unfairly apply it toward Dreamstimes vis-à-vis Google's stock photo partners and to exclude Dreamstime from many bids.

137.    Even in those instances where Dreamstime has been chosen by Google as the winning bidder for AdWords, based on its arbitrary and infected "quality score," Dreamstime overpays for AdWords because of that artificially deflated quality score.  Even then, there is no guarantee or other assurance that Google will not subsequently cancel and remove Dreamstime's winning advertising campaign for capricious reasons – which it has actually done on numerous occasions.

138.    Consequently, Google's bidding process does not function on a level playing

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

FIRST AMENDED COMPLAINT

field.  To compound matters, Dreamstime enters the bidding process in a competitive hole, since it must overcome the biased "quality score" it has been assigned by Google, and because of its virtually invisible search ranking.  Dreamstime is competitively disadvantaged because it must spend enormous sums to buy-in to AdWords and dig its way out of the hole to be competitive and obtain visibility and exposure.[38]

139.    *Google Has Distorted and Suppressed Dreamstime's Online Search Result Visibility*.  Online organic search results are an essential component of, and are completely interrelated to, the online search advertising market because Google sells ads that seamlessly appear on its website within these results.  Google has distorted and downgraded Dreamstime's online search ranking in this market to the point of making it virtually invisible to users for the most common and logical searches for online stock photography.  This biased practice also negatively impacts Dreamstime's search rankings on other competing search engines over time, such as Yahoo! and Bing, because all search engines base their search results and rankings on user behavior throughout the Internet.

140.    Accordingly, Dreamstime's effective elimination by Google from organic search results forecloses a distribution channel to Dreamstime, causing it to overspend advertising funds on Google's AdWords program as well as significant infrastructure costs aimed at improving and restoring its tainted search ranking.  This raises Dreamstime's costs of competing and reduces its ability to compete for advertising in the AdWords program in

---

[38] AdWords and organic search work in tandem in many important ways for AdWords customers, besides the fact that a reduced organic ranking requires more AdWords spends for acquisitions.  Many times a customer will first click on a free search result, then revisit the site later through an ad, or vice versa, before making a purchase.  Because one of those clicks is free to the AdWords customer, this helps to lower the targeted cost-per-acquisition necessary to obtain a conversion through AdWords.  These "assisted conversions," as Google calls them, lower the targeted CPA.  *See* https://powerdigitalmarketing.com/blog/seo-vs-ppc-how-to-use-seo-ppc-together/; https://www.click.co.uk/blog/assisted-conversions-for-seo/.  Thus, a demotion of organic rank directly increases AdWords costs for an AdWords customer.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

the online search advertising market.

141.   *Google Has Entered into Anticompetitive Multi-Year Contractual Strategic Alliances with Dreamstime's Rivals, Shutterstock and Getty Images.*   Google has partnered with Dreamstime's most significant rivals, Shutterstock and Getty Images, through "multi-year" contracts to license their images for Google to sell directly through its own advertising network.   By virtue of these strategic alliances, Shutterstock and Getty Images' stock photo libraries are now Google's stock photo library, and *Google offers their images directly to its ad customers within its market*.   These strategic alliances give Google a critical competitive advantage over its online search advertising competitors, such as Bing and Yahoo!, because it now has ready access to hundreds of millions of licensed images that it would otherwise have taken years to obtain without these valuable partnerships, thereby further entrenching it monopoly position.

142.   In tandem with these strategic partnerships, Google has provided favored treatment to Shutterstock and Getty Images (who together control an approximate 70% share of the online stock photo business) within the online search advertising market and has allowed them to poach customers from Dreamstime, and thwart its efforts to attract and obtain new customers.   These cooperative arrangements increase Shutterstock and Getty Images' reliance on Google even more, decrease their incentive to compete with Google Images directly, and give Google further access and control over their users' data and profiles and other valuable information about their businesses.   Most importantly, because Google now directly sells Shutterstock and Getty Images' stock photos to its ad customers (instantly making it one of the largest distributors of stock photos in the world), Google directly benefits from their increased dominance.   As their libraries grow, so does Google's offering of stock photos in its online advertising network, thereby directly increasing its online search advertising monopoly.

143.   *Google Has Discriminatorily Enforced the Policies and Procedures Governing its AdWords Program.*   Google violates its own AdWords rules and policies to suppress and exclude Dreamstime and others.   Google has selectively enforced its policies

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

and procedures incorporated into its AdWords Agreement to eliminate Dreamstime's most cost-effective ads, further undermining its ability to effectively and fairly compete for AdWords advertising campaigns.  This conduct has the damaging effect of increasing Dreamstime's advertising costs, and hence the costs to consumers, and facilitates the charging by Google of supracompetitive prices for its AdWords services.

144.   *Google Has Promoted and Elevated Junk Websites over Dreamstime's Legitimate Website.*  Google has promoted and elevated various "Junk Websites" with dramatically less relevant information related to a targeted search, to push Dreamstime out of view on Google's search site and place it at a competitive disadvantage.  This exclusionary and discriminatory conduct reduces consumer choice and degrades the quality of searches in the relevant market.

145.   *Google Has Suspended Dreamstime's Mobile App and De-Indexed It within the Google Play App Store for the Most Common Search Term for Stock Photography.*  Google has suspended Dreamstime's mobile app and eliminated it from view in its Google Play app store for the most common stock photography search.  This exclusionary and discriminatory conduct reduces consumer choice and degrades the quality of searches in the relevant market.

146.   *Google Has Utilized its Google Images Service to Misappropriate Dreamstime's Stock Images and Divert Customers Through its Google Images Tab.*  Through use of the Google Images tab on the Google search website, Google has allowed its user searchers to access and obtain Dreamstime's licensed photos without paying for those images and to divert its actual and potential customers.  Google Images permits users to obtain Dreamstime's and other rivals' photos, as well as photos Google has licensed or acquired, and keeps users captive on the Google search site.  This generates advertising revenue to Google, in lieu of users visiting the Dreamstime website to purchase images or utilizing rivals search sites, such as Bing and Yahoo!, to search for and obtain stock photos.

147.   *Google Has Collected and Captured Privacy Data from its Website Users and Advertisers to Gain an Unfair Competitive Advantage.*  Google unlawfully captures and

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

uses private data it has obtained from users and advertiser on its search website to maintain and enhance its monopoly power.  The valuable data it collects is a significant input and source of Google's impenetrable market position and further raises the already significant barriers to market entry and weakens its existing rivals such as Bing and Yahoo!.  Google has capitalized on the network effect of its data collection efforts.

148.  **Google's Unlawful Overall Scheme Must be Viewed and Assessed as a Whole.**  The purpose of Google's predatory and discriminatory overall scheme is to limit or foreclose competition for online stock photography and maintain its monopoly in online search advertising and protect and insulate Google Images stock photo service from competition.  Under the "overall scheme" doctrine of antitrust liability, each of the alleged anticompetitive acts standing alone need *not* be unlawful for the scheme to be actionable. "[A]cts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme."[39]  Indeed, it is not necessary for Dreamstime to prove that each allegedly anticompetitive act was itself sufficient to demonstrate an abuse of monopoly power.  Finally, it is not proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect – what has been called the "synergistic effect" of the mixture of the elements.

149.  Google has acted to maintain its monopoly power, and its existing enormous power and anticompetitive conduct has enabled it to do so, in flagrant violation of Section 2 of the Sherman Act.

150.  The "conduct" element of this offense is the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor. Conduct is anticompetitive when it unnecessarily excludes or handicaps competitors to gain or maintain a monopoly.  Anticompetitive or exclusionary practices are acts designed to deter potential rivals from entering the market, intervening or preventing access to customers, or preventing existing rivals in the market from increasing their output.  Anticompetitive acts

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

---

[39] *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962).

are not fair competition on the merits of price, selection, quality or other factors, but instead acts that have the deleterious effect of preventing or excluding competition or frustrating the efforts of other firms to compete for customers within the relevant market.  Conduct by a monopolist that constitutes a deliberate effort to discourage or thwart customers from doing business with its rivals is anticompetitive.

151.   Conduct or practices when engaged in by a non-monopolist that otherwise might comply with antitrust law may be impermissibly exclusionary and unlawful when engaged in by a monopolist.[40]  Indeed, a monopolist is not free to take certain actions that a firm in a competitive (or even oligopolistic) market may take, because there is not a market constraint on a monopolist's behavior.  Consequently, a monopolist is precluded from employing otherwise lawful practices that unnecessarily diminish or exclude competition.

152.   Google's anticompetitive acts affect a substantial amount of interstate commerce in the relevant market and constitute unlawful monopolization.  Google's conduct is not motivated by technological or efficiency concerns and has no valid or legitimate business justifications.  Any such justifications that Google may proffer are merely pretextual.  In sum, the purpose and effect of Google's anticompetitive conduct is to preserve, exploit, and promote its monopoly stranglehold position in the online search advertising marketplace and to misuse that mighty power to exclude, control, and restrict competition for online stock photography to the detriment of consumer welfare, competition, innovation, and plaintiff Dreamstime.

153.   The determination of whether conduct is "anticompetitive" under Section 2 is a question of *fact* for the jury to decide.

154.   **Causal Antitrust Injury to Plaintiff, Competition, and Consumers**.
Google's monopolistic conduct has caused antitrust injury to plaintiff Dreamstime, competition (in Google's and Dreamstime's markets), and consumers (in Google's and

---

[40] *Greyhound Computer Corp., Inc. v. International Business Machines Corp.*, 559 F.2d 488, 498 (9th Cir. 1977); *Free FreeHand Corp. v. Adobe Systems Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (Under Section 2, anticompetitive conduct may include otherwise lawful conduct).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Dreamstime's markets).  The elimination of a *single* competitor violates the antitrust laws if it harms competition (though Dreamstime has alleged injury to other similarly-situated competitors).[41] The elimination of market alternatives for products or services and harm to consumer welfare are cognizable antitrust injuries.  Congress designed the Sherman Act as a consumer welfare prescription, and it is the interaction of competitive forces that benefits consumers.  Plaintiff Dreamstime has suffered causal antitrust injury as a consumer and participant in the online search advertising market and the broader market.[42]

155.    As a direct result of Google's abuse of its online search advertising monopoly through anticompetitive conduct and restrictions on competition, Dreamstime and other smaller online stock photography competitors have been restricted from functioning in a competitive open market, output has been reduced or limited, and the quality and freedom of choice of online stock photographs and providers have been reduced and diminished.  Google's monopolistic and discriminatory conduct has severely hindered plaintiff's ability to attract new customers and traffic to its website, and the type and number of stock images it may distribute, license or sell has diminished significantly.  Moreover, Google's monopolistic conduct has hampered Yahoo! and Bing's ability to compete with Google's image-related search function and search-based display ad offerings, which will further erode their market share.

156.    Google's monopolistic and discriminatory conduct has erected a barrier that precludes effective entry by other would-be competitors into the online search advertising market.  In addition, the quality, variety and choice of online stock photography offerings that are visible and accessible on Google's website have been reduced and constrained to the

_____

[41] *E.W. French & Sons, Inc. v. Gen. Portland, Inc.*, 885 F.2d 1392, 1401 (9th Cir. 1989).
[42] *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003) ("Consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."); *American Ad Management*, 190 F.3d at 1057 (Plaintiff, a broker for advertisements, was "a participant in the relevant market and it has suffered an [antitrust] injury in that market'); *In re Netflix Litigation*, 506 F. Supp. 2d at 315 (consumers of defendant Netflix's products "were participants in the same market" and sufficiently plead "that they have suffered an antitrust injury").

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

detriment of consumers in Google's market.

157. Google's unlawful maintenance of its online search advertising monopoly and anticompetitive conduct have caused antitrust injury and, unless enjoined by this Court, will continue to produce at least the following anticompetitive, exclusionary, and injurious effects upon competition, consumers, and interstate commerce: (1) AdWords spends for lower cost stock photography sites like Dreamstime will continue to increase, thereby increasing costs to consumers and/or distorting and eliminating consumer choices; (2) competition for online distribution and sale of stock photographs has been substantially and unreasonably restricted, lessened, foreclosed, and eliminated; (3) output in the online search advertising market has been reduced, suppressed and restricted; (4) barriers to entry to would-be rivals into the online search advertising market have been raised which thereby has limited the possible alternate online search advertising outlets, other than Google, available to Dreamstime and other online stock photo competitors; (5) consumer choice has been, and will continue to be, significantly reduced, limited, and constrained as to selection, price, and quality of online stock photographs; (6) access to Dreamstime's competitive services has been artificially restricted and reduced, and its offerings will continue to be excluded; and (7) Google has maintained its entrenched monopoly position in the online search advertising market to the detriment of smaller rivals, such as Bing and Yahoo!.

158. The issue of "antitrust injury" is a *fact* question for the jury.

159. **Plaintiff Dreamstime's Antitrust Damages.**  As a direct and proximate result of Google's past and continuing anticompetitive practices and conduct, plaintiff has suffered, and will continue to suffer, substantial financial injury to its business and property. Defendant's intentional and focused anticompetitive and discriminatory scheme has cumulatively, incrementally, and unreasonably restricted competition and devastated Dreamstime's once thriving and growing business.  Google's unlawful, collective conduct has been a material and proximate cause of Dreamstime's injuries. As a result, plaintiff Dreamstime has been deprived of revenues and profits it would have otherwise made, incurred higher advertising costs, suffered diminished market growth, and sustained a loss

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1  of goodwill and going concern value.

2      160.    Plaintiff Dreamstime has not yet calculated the precise extent of its past actual

3  damages and cannot now estimate with precision the future damages that continue to accrue,

4  but when it does so, it will seek leave of the Court to insert the amount of the damages

5  sustained herein.  Plaintiff also seeks injunctive relief to prevent further irreparable and

6  continuing injury to its business and property and consumers caused by Google's unlawful

7  monopolization scheme.

8                          **SECOND CAUSE OF ACTION**

9              **(Breach of Contracts – AdWords and Google Play Agreements)**

10     161.    Dreamstime realleges the preceding paragraphs of this First Amended

11  Complaint as if fully set forth herein.

12     162.    This Court has jurisdiction over this Second Cause of Action based on

13  diversity and supplemental jurisdiction.

14     163.    **The AdWords Agreement.**  Dreamstime entered into enforceable contracts

15  with Google whereby Google agreed to provide advertising services for Dreamstime in

16  exchange for various fees.  The AdWords Agreement provides that, in consideration for

17  Google displaying a customer's ads, the customer will pay Google at a price per click

18  determined by Google's AdWords auction program, subject to certain limitations.

19     164.    The AdWords Agreement was an adhesion contract intended to be executed

20  by every single purchaser of AdWords.  It incorporated by reference the AdWords program

21  polices and various FAQ answers and support pages describing Google's policies.  Google

22  intended this standard agreement to be signed in the same form by all purchasers of

23  AdWords, and intended the policies and descriptions of the services Google was to provide

24  to apply equally to all who executed it.

25     165.    In part, Google's advertising policies provide that overdelivery is a breach of

26  contract.  The definition of overdelivery in the AdWords Agreement and the policies and

27  procedures incorporated by reference therein has changed over time.  One of the current

28  policies states that "in a given billing period, you're never charged more than the average

- 64 -

number of days in a month (roughly 30.4) times your daily budget."  As noted above, however, for most of the time this policy only allowed minimal daily excesses above daily spending limits and/or provided for credits to be applied for any excesses.

166.    Another of Google's policies relates to an alternative method for delivering budgeted campaigns based upon the Cost-Per-Acquisition ("CPA"), instead of the traditional cost-per-click.  In CPA bidding, bidders set a Target CPA, which Google describes as the cost-per-acquisition that a customer should expect to pay to get as many conversions as possible within a set CPA goal.  As explained in the Help Center of Google Ads (support.google.com/google-ads/answer/6268632?hl=en): "Target CPA is a Google Ads Smart Bidding strategy that sets bids to help get as many conversions as possible at the target cost-per-acquisition (CPA) you set. It uses advanced machine learning to automatically optimize bids and offers auction-time bidding capabilities that tailor bids for each and every auction."

167.    The polices also include a specific list of prohibited conduct that would subject an advertisement to rejection or removal, including "ads that mislead or trick the user into interacting with them[,]" commonly referred to as "trick to click."  The policies go on to state that "an account may be suspended if you have several violations or a serious violation."

168.    **Google's Breach of the AdWords Agreement.**  Despite the AdWords Agreement, Google provided Dreamstime advertising marketing campaigns that did not work and did not meet Dreamstime's expectations, applied its policies and procedures unevenly toward Dreamstime, cancelled some of Dreamstime's ad campaigns for violating stated polices that the ad campaigns did not violate and overcharged and overdelivered AdWords to Dreamstime, all in breach of the AdWords Agreement.  For example, Google consistently removed Dreamstime's lowest cost per acquisition ads as being "trick to click" even though the ads that were not "trick to click."  Google failed to provide the agreed upon services, apply the standard policies and perform the obligations that the AdWords Agreement required it to do.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

169.    Among other things, Google breached its contract with Dreamstime when it:

- manipulated Dreamstime's organic search ranking unfairly and illegally to force Dreamstime to spend an unreasonable amount of money on additional AdWords campaigns that would not otherwise have been necessary;

- cancelled Dreamstime's most successful ad campaigns based on false accusations of policy violations;

- improperly suspended Dreamstime's account based on unfounded accusations of "policy violations";

- prevented Dreamstime from running successful ad campaigns while allowing the *exact same* advertisements to be placed by other competitors and other parties to the same standard contracts; and

- overdelivered advertising campaigns (including target CPA campaigns), causing spending limits for certain campaigns to be exceeded on a regular and systematic basis.

170.    **The Google Play Agreement.**  Dreamstime and Google have entered into a separate agreement for inclusion of Dreamstime's mobile app in the Google Play app store ("Google Play Agreement").  The Google Play Agreement is similar in all relevant respects to the AdWords Agreement noted above (i.e., it is an adhesion agreement, it incorporates policies and procedures, and it is intended to be executed in the same form by all who publish apps in the Google Play app store).  Exhibit "O" hereto contains the current version of the Google Play Agreement.  The Google Play Agreement incorporates by reference certain policies, including a policy against pornographic materials.  Section 8.3 further states:  "If Google becomes aware and determines in its sole discretion that a Product . . . violates . . . applicable polices, or other terms of service, as may be updated by Google from time to time in its sole discretion . . . then Google may reject, remove, suspend or reclassify the Product from Google Play . . . Google reserves the right, at its sole discretion, to suspend and/or bar any Product . . . from Google Play . . .."

171.    **Breach of the Google Play Agreement**.  Google has breached the Google

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Play Agreement in at least two respects: (1) by removing Dreamstime's mobile Buyer App from the Google Play app store purportedly for violating a policy against pornographic content that it did not violate; and (2) by de-indexing Dreamstime's Buyer App for the most common search for stock photo apps, effectively removing it from the app store.

172.   Dreamstime spent millions of dollars in reliance on Google's recommendations to avoid ad cancellations and account suspensions based on purported policy violations and the knowingly false explanations and material omissions alleged above.  Through its scheme to increase advertising and consulting revenue at Dreamstime's expense, Google fraudulently concealed that those recommendations would never work. Dreamstime suffered direct damages as a result of its reasonably reliance upon Google's misrepresentations and omissions.

173.   **Dreamstime Has Performed Its Obligations Under the AdWords and Google Play Agreements.**  Dreamstime has at all times performed all its significant duties and obligations under the AdWords Agreement and the Google Play Agreement except to the extent that Dreamstime was excused or prevented from doing so by the acts and omissions of Google.

174.   **Google's Breaching Conduct Voids Its Limitations of Liability Clauses.** Google's breaching conduct was the result of fraud or willful conduct and injury to Dreamstime, was in violation of law, and/or was at least negligent, such that any limitation of liability clause in the AdWords Agreement or Google Play Agreement is void pursuant to California Civil Code § 1668.  At most, it has acted intentionally and with reckless disregard for Dreamstime's rights.  In any event, direct damages are recoverable under the AdWords Agreement's limitation of liability clause, and Dreamstime seeks direct damages here in the form of overcharges pursuant to the AdWords Agreement.

175.   As a direct and proximate result of Google's breach of the written contracts, Dreamstime has suffered direct, actual, compensatory, and consequential damages in an amount to be determined at trial, plus prejudgment interest at the maximum legal rate. These damages include but are not limited to lost profits and other consequential damages that are

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

FIRST AMENDED COMPLAINT

not waivable by contract as a matter of law due to Google's heightened culpability.

## THIRD CAUSE OF ACTION

### (Breach of the Implied Covenants of Good Faith and Fair

### Dealing – AdWords and Google Play Agreements)

176.   Dreamstime realleges the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

177.   This Court has jurisdiction over this Third Cause of Action based on diversity and supplemental jurisdiction.

178.   California law implies in every contract a covenant of good faith and fair dealing such that neither party will compromise the rights of the other to receive the benefits of the contract. The covenant aims to effectuate the contract's purposes and promises, and to protect the parties' legitimate expectations.  Indeed, the covenant requires each party to do all things reasonably contemplated by the contract's terms to accomplish its goals.

179.   Through AdWords, Google creates what it refers to as a "competitive" auction environment whereby advertisers bid against each other (and Google) for the right to display ads that appear in search results.  Google determines which ads to display by factoring an advertiser's bid amount and quality score.  All participating advertisers agree to the AdWords Agreement which, through Google's incorporated policies, specifies a detailed list of prohibited conduct that would subject a winning ad to removal.

180.   When Dreamstime entered the AdWords Agreement and began bidding against competitors for ad placement, it did so with the reasonable expectation that Google would apply its policies and procedures evenly and in good faith toward and among all participating advertisers.  Dreamstime also paid Google daily to determine which of its advertisements are most effective and to increase their circulation accordingly.

181.   Google breached the implied covenant when it instead: (1) deliberately used selective enforcement of its policies to remove Dreamstime's compliant, lower cost advertisements; (2) mischaracterized and deleted Dreamstime's advertisements as "trick to click;" (3) removed Dreamstime's app for a policy it did not violate; and (4) overcharged

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

Dreamstime for AdWords services based on pretextual or unreasonable grounds to provide an economic advantage to Google and its stock photo partners.

182. The implied covenant of good faith finds particular application where, as here, Google invested itself with absolute discretionary power to affect the rights of Dreamstime. While the covenant is generally not implied to "prohibit a party from doing that which it is expressly permitted by an agreement,"[43] an exception exists when one party is given absolute discretion over whether or not to perform.[44]  In such cases, the performance of one party's obligation is dependent on that party's own discretion, which renders the contract illusory.  To save such contract terms, courts will read the implied covenant into the term.

183. Google reserved for itself absolute discretion to perform under the AdWords Agreement because it can purportedly remove ads "at any time for any or no reason." However, such power must be exercised in good faith.  Otherwise, the AdWords Agreement is illusory.  The only consideration Google provides pursuant to the AdWords Agreement is to display ads at the cost-per-click determined through advertiser auctions.  If Google is free to systematically remove Dreamstime's ads for any or no reason, Google is free to not perform.  Thus, if Google invokes its power to remove ads "at any time for any or no reason[,]" its decision would still be subject to the good faith and reasonableness standard in the implied covenant of good faith and fair dealing.[45]

184. Google also breach the implied covenant of good faith and fair dealing in the AdWords Agreement by:  (1) improperly disapproving and removing Dreamstime's low cost per acquisition advertisements as being "trick to click" or for other unreasonable reasons to provide an economic advantage to Dreamstime's competitors and to overcharge Dreamstime for AdWords services; and (2) pretending to work in good faith to resolve purported "issues" with Dreamstime's ads while actually intending at all times to remove, misplace, and reject Dreamstime ads on the basis of unfounded violations.

---

[43] *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal. Inc.,* 2 Cal. 4th 342, 374 (1992).
[44] *Third Story Music, Inc. v. Waits,* 41 Cal. App. 4th 798, 805 (1995).
[45] *Third Story Music,* 41 Cal. App. 4th at 805.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

185.   As with the AdWords Agreement, there exists an implied covenant of good faith and fair dealing with respect to the Google Play Agreement.  Also as with the AdWords Agreement, Google incorporates policies into the Google Play Agreement that are intended to apply equally to all who execute the agreement and publish apps in the Google Play store.  Likewise, Google reserves for itself absolute discretion to remove or suspend an app or account.  A covenant of good faith and fair dealing must be implied with respect to that absolute grant of discretion in order to avoid making the contract illusory.

186.   Google has breached the implied covenant of good faith and fair dealing in the Google Play Agreement in at least two respects: (1) by removing Dreamstime's mobile Buyer App from the Google Play app store purportedly for violating a policy against pornographic content that it did not violate; and (2) by de-indexing Dreamstime's Buyer App for the most common search for stock photo apps, effectively removing it from the app store.

187.   Dreamstime has at all times performed all its significant duties and obligations under the AdWords Agreement and the Google Play Agreement except to the extent that Dreamstime was excused or prevented from doing so by the acts and omissions of Google.

188.   Google's breaching conduct noted above was the result of fraud or willful injury to Dreamstime, was in violation of law, and/or was at least negligent, such that any limitation of liability clauses in the AdWords Agreement and the Google Play Agreements are void pursuant to California Civil Code § 1668.  At most, it has acted intentionally and with reckless disregard for Dreamstime's rights.

189.   As a direct and proximate result of Google's breach of the covenant of good faith and fair dealing, Dreamstime has suffered direct, actual, compensatory, and consequential damages in an amount to be determined at trial, plus prejudgment interest at the maximum legal rate.  These damages include but are not limited to lost profits and other consequential damages that are not waivable by contract as a matter of law due to Google's heightened culpability.

## FOURTH CAUSE OF ACTION

### (Unfair Competition in Violation of California Business
### and Professions Code § 17200 *et seq.*)

190.    Dreamstime realleges the preceding paragraphs of this First Complaint as if fully set forth herein.

191.    This Court has jurisdiction over this Fourth Cause of Action based on diversity and supplemental jurisdiction.

192.    Section 17200 *et seq.* of the California Business & Professions Code ("UCL") is written in the disjunctive and broadly covers three varieties of unfair competition – acts that are unlawful, unfair and/or fraudulent.  The UCL statute's intent and purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.  The coverage of section 17200 *et seq.* is broad and intended to enjoin on-going wrongful business conduct in whatever context such activity might occur.

193.    Plaintiff Dreamstime is a "person" within the meaning of California Business & Professions Code § 17201.  Google's principal place of business is located within California.  Plaintiff Dreamstime is a "consumer" of certain of Google's online search advertising services, including a purchaser of AdWords services.  Dreamstime is also a competitor to Google's "Google Images" service on Google's search website and Google is an actual/potential competitor of Dreamstime for the bidding and acquisition of AdWords key search words related to online stock photos/images.

194.    As alleged herein, defendant's exclusionary, predatory, discriminatory, suppressive, deceptive, monopolistic and/or wrongful conduct constitutes "unfair" business practices.  When a UCL claim is brought by a "consumer," as here, the defendant's conduct may be deemed "unfair' where "the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[46]

---

[46] *Hodson v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018); *see also South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 856 (1999).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

195.     To the extent Dreamstime is also deemed to be a potential or actual competitor to Google, as described above, the business competitor "unfairness" test enunciated in *Cel-Tech* is applicable.  There the California Supreme Court articulated that conduct that significantly threatens or harms competition, violates the policy or spirit of an antitrust law, or threatens an incipient violation of an antitrust law, may be deemed "unfair" under the UCL.[47]

196.     A practice may be deemed "unfair" even if not specifically proscribed by some other law.  Under the "unfair" prong of the UCL, the federal antitrust laws and the UCL are not co-dependent.  In other words, an actionable "unfair' claim need not be predicated on a viable antitrust violation.[48]

197.     As alleged herein, defendant's anticompetitive conduct is also "unlawful" under the UCL.  Within the meaning of section 17200, virtually any violation of any civil or criminal federal, state or municipal, statutory, regulatory, court-made or local law can serve as a predicate offense for an "unlawful" claim.  The violations of the federal antitrust laws and/or other suppressive, and deceptive conduct as alleged herein, satisfies the "unlawful" prong of section 17200.

198.     In addition, Dreamstime has pleaded "fraudulent" conduct with the requisite specificity, which is an independent basis for UCL liability.  In the allegations set forth above, it has alleged: (1) specific misrepresentations and material omissions; (2) knowledge of the falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage.

199.     Dreamstime has standing to pursue this claim as Dreamstime has suffered an injury in fact and has lost money or property resulting from Google's unfair and/or unlawful actions.  Dreamstime has paid tens of millions of dollars for Google's AdWords advertising

---

[47] *Cel-Tech Communications, Inc. v. Los Angeles Cellular Co.*, 20 Cal. 4th 163, 187  (1999).
[48] *DocMagic, Inc., v. Ellie Mae, Inc.*, 745 F. Supp. 2d 119, 1147 (N.D. Cal 2010) ("On its face, the California definition of 'unfair' competition appears to embrace conduct that might not violate the Sherman Act."); *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992, 999-1000 (N.D. Cal. 2000); Korea Kumho *Petrochemical v. Flexsys Am. LP*, 2008 WL 686834, at *9 (N.D. Cal.  Mar. 11, 2008); *In re Google AdWords Litigation*, 2011 WL 7109217 (N.D. Cal. Mar. 17, 2011).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

and other online services.  Google only provided its services selectively to benefit itself at Dreamstime's expense.  Google also selectively applied its disapproval and removal policies to injure Dreamstime and benefit others such as Shutterstock and Getty Images, Google's favored partners. Google's anticompetitive and discriminatory actions constitute unfair and/or unlawful business practices and a scheme of unfair competition with respect to Google's advertising services and contracts.

200.    Google has engaged, and continues to engage, in business acts that are unfair, fraudulent unlawful, exclusionary, discriminatory, deceptive, or misleading with respect to the AdWords purported bidding process and the paid online advertising search services it provided to Dreamstime.

201.    The harm to consumers and competition caused by Google's unfair and/or unlawful conduct is substantial.  There is no legitimate or procompetitive justification for defendant's anticompetitive and discriminatory conduct.

202.    Because of, and as a direct and proximate result of, defendant's unfair and/or unlawful business practices and conduct, Dreamstime has suffered, and will continue to suffer, financial injury to its business and property.  Pursuant to the provisions of the UCL (sections 17203 and 17535), Dreamstime is entitled to restitution from Google for its injuries.

203.    Defendant's unfair, fraudulent and/or unlawful conduct has caused economic harm to plaintiff, competition and consumers.  The UCL is a strict liability statute and it is not necessary to show that defendants *intended* to injure or harm Dreamstime.

204.    Whether a business practice is unfair, fraudulent or unlawful is a question of *fact* for the fact-finder to determine.

205.    An act may violate the UCL even if the unfair, fraudulent or unlawful practice affects only one victim.

206.    Pursuant to Business & Professions Code section 17203, the entry of permanent and mandatory injunctive relief against Google is necessary to enjoin its on-going unfair and/or unlawful business conduct.  An injunction is needed to enable and

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

FIRST AMENDED COMPLAINT

restore consumer choice and competition in the market.

## **PRAYER FOR RELIEF**

WHEREFORE, Dreamstime respectfully requests that this Court adjudge and decree and enter judgment in Dreamstime's favor and against Google, as follows:

1.    The conduct alleged in the First Cause of Action herein be adjudged to constitute unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

2.    The conduct alleged in the Second Cause of Action be adjudged to constitute an unjustified breach of contract;

3.    The conduct alleged in the Third Cause of Action be adjudged to constitute a breach of the covenant of good faith and fair dealing;

4.    The conduct alleged in the Fourth Cause of Action herein be adjudged to constitute a violation of section 17200 *et seq*. of the California Business & Professions Code as an unfair and/or unlawful business practice;

5.    Pursuant to Section 4 of the Clayton Act (15 U.S.C. §15), plaintiff recover treble the actual amount of its damages sustained by reason of defendant's antitrust violations;

6.    Pursuant to Section 4 of the Clayton Act (15 U.S.C. §15), plaintiff be awarded its reasonable attorneys' fees and costs of litigation;

7.    Pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), the anticompetitive, discriminatory, and/or exclusionary conduct be permanently enjoined to abate actual and threatened irreparable injury to Dreamstime's business and property;

8.    Plaintiff be awarded direct, actual, compensatory, and/or consequential damages on its breach of contract and breach of the implied covenant of good faith and fair dealing claims;

9.    Pursuant to section 17203 of the California Business & Professions Code, the unfair, unlawful and/or fraudulent business practices of defendant be permanently enjoined;

10.    Pursuant to sections 17203 and 17535 of the California Business &

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

FIRST AMENDED COMPLAINT

Professions Code, plaintiff be awarded monetary restitution;

11.   Pursuant to section 1021.5 of the California Code of Civil Procedure, plaintiff be awarded reasonable attorneys' fees;

12.   Award plaintiff prejudgment interest at the maximum legal rate; and

13.   For such other and further relief that this Court deems just and proper.

Dated:  September 28, 2018             BAKER MARQUART LLP

By: _____
             Jaime Marquart
             Attorneys for Plaintiff
             Dreamstime.com, LLC

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff hereby demands, pursuant to Fed. R. Civ. P. 38(b) and Local Civil Rule 3-6,

3     a trial by jury of all issues which are subject to adjudication by a trier of fact.

4

5     Dated:  September 28, 2018                    BAKER MARQUART LLP

6

7                                                     By:_____

8                                                          Jaime Marquart
                                                        Attorneys for Plaintiff
9                                                       Dreamstime.com, LLC

10

11

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT