IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DREAMSTIME.COM, LLC, a Florida LLC,

    Plaintiff,

  v.

GOOGLE, LLC, a Delaware LLC; and DOES 1-10,

    Defendants.

No. C 18-01910 WHA

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

## INTRODUCTION

In this antitrust action, plaintiff accuses defendant of using its monopoly power to discriminate against plaintiff. Defendant now moves to dismiss all claims. For the reasons stated below, the motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

**1. THE PARTIES.**

Defendant Google, LLC owns and operates the world's largest internet search engine using a number of proprietary algorithms that Google claims will help consumers find pages with relevant information. When you type a word search into the Google search bar, Google's product responds by producing lines of results drawn from all over the internet. Google shows approximately ten lines of results per page and provides as many pages as needed to show the hits. As potential hits can run into the thousands, a website's ranking on Google's line of results has a direct, measurable impact on the amount of web traffic to that website. In a nearby

tab to the Google search bar, Google also operates a search engine for images ("Google Images"). An essential driver of web traffic to Google, Google Images has become the biggest repository of images in the world (Dkt. No. 50 at ¶¶ 2, 4, 18–20, 26).

Google has partnered with two photography businesses, Shutterstock as of July 2016 and Getty Images as of February 2018, who together represent 70% of the stock photography market. Google's partnership agreement with Shutterstock in particular provides Google license to integrate Shutterstock's library of hundreds of millions of online images into its search advertising network. Google then uses those images together with advertisements running through Google's advertising platforms, further driving web traffic through Google while also providing Shutterstock with free advertising for their images. Nowhere does the amended complaint allege that these agreements *prohibit* Shutterstock and Getty Images from also dealing with Google's rivals, Yahoo! and/or Bing — stating solely that "Yahoo! and Bing are unable to obtain the same access to licensed stock photos for their competing ad networks." That inability may simply be due to the absence of any deal (as yet) between Shutterstock and Getty Images on the one hand, and Yahoo! and Bing on the other (*id*. at ¶¶ 32–34, 50, 104).

Plaintiff Dreamstime is a heavyweight in image repositories in the stock photography industry. A supplier of high-quality digital images since 2000, Dreamstime has a repository of millions of high-quality stock images. As of March 2018, Dreamstime had 20 million registered members (and counted clients in the Fortune 100 companies), more than 400 thousand contributing photographers, and over 75 million photos, illustrations, clip art images, and vectors (*id*. at ¶ 28).

**2. SPONSORED ADS.**

Google does not charge its search engine users money. Rather, companies pay Google to have advertisements for their websites prominently displayed in Google's search results. These are sponsored ads. The complaint estimates that this advertising program (called AdWords by Google) accounts for over 80% of Google's revenue. Google's share of the United States online search advertising market is approximately 80%. To use AdWords, advertisers must agree to several adhesive agreements (*id*. at ¶¶ 23, 66–68).

2

The AdWords program uses an auction system to determine which advertisements are shown and how much each advertisement costs. Advertisers bid for relevant search term keywords such as "stock photo" or "digital image" and AdWords then allegedly assigns each advertisement a "quality score" based on multiple factors such as: the quality of the advertiser's website, the click-through rate (the percentage of users who not only viewed the ad but also clicked on it), and relevance to the search keywords. Each time a Google user enters search terms that include relevant keywords, the AdWords program determines which of the competing advertisements to display (*id.* at ¶¶ 67, 71–73).

In 2004, Dreamstime entered into the AdWords Agreement with Google, paying Google to display its advertisements on Google, and engaging in several different marketing campaigns to promote its advertisements with the best combination of quality score, bid amount, and resulting customer acquisitions. Dreamstime paid Google daily to determine which of its advertisements are the most effective and to increase its circulation accordingly. Dreamstime subsequently saw a predictable and steady number of customers resulting from these campaigns (*id.* at ¶¶ 74–77).

### 3. DREAMSTIME PLUMMETS ON GOOGLE SEARCH.

Dreamstime relies heavily on online search engines and search engine advertising to build its name recognition and generate new customers. Indeed, roughly two-thirds of Dreamstime's customers come to Dreamstime's website by way of a search-engine result. Consistent with Dreamstime's AdWords spending, from approximately 2005 to 2015, Dreamstime consistently ranked in the top three in Google's line of search results for searches related to stock photography, never appearing lower than the first page. Dreamstime's website traffic during that time also reflected that many people who searched "online stock photography" on Google used and purchased stock photographs from Dreamstime (*id.* at ¶¶ 29, 38–40).

In 2015, however, Dreamstime's search ranking on Google plummeted (this order pauses here to note that Google's agreement with Shutterstock was announced in July 2016). For example, Dreamstime's rank on Google for the generic search term "stock photos" in June

3

2017 sank from what had been either the second or third *overall result* down to the fourth *page*. Such a drop in Google search results can be catastrophic for businesses; falling from page one to page two alone reduces website traffic by 95%, according to the amended complaint. In April 2016, Dreamstime's fall in Google's search ranking had taken a quantifiable toll, as the number of new Dreamstime customers who signed up and made a purchase within one month fell by 30% from that point the prior year (*id*. at ¶¶ 40–44).

### 4. DREAMSTIME'S ATTEMPTED SOLUTIONS.

In an effort to steer away from the impending iceberg, Dreamstime followed every guideline and suggestion provided by Google's documentation to boost Dreamstime's rankings on Google search. Specifically, Dreamstime switched to https and http2, disavowed links, improved website quality, diversity, and quantity of content, invested in dedicated hardware for a caching system, and dramatically increased the crawl rate and number of pages on the site. When those efforts did not restore Dreamstime's ranking, Dreamstime also invested numerous development hours to rebuild its entire site to be mobile-friendly, diverted resources from other projects in its business plan and doubled its hosting costs, engaged with and followed the advice of external agencies, hired its own in-house Search Engine Optimization expert, spent millions of dollars on website hosting to increase the content on its website by adding more images, and launched a second website — Megapixl.com — to get more exposure. Dreamstime also spent millions of dollars on new Google AdWords campaigns (increasing its budget by 50%) both for itself and for Megapixl.com. Still, Dreamstime's Google rank continued to decline through the end of 2017 and Megapixl.com did not gain traction (*id*. at ¶¶ 63–64, 77–78, 105).

To date, no one, including "guru" search engine optimization companies, have identified any issues with Dreamstime's site that would explain how Dreamstime came to be marginalized in Google's search rankings. To its knowledge, Dreamstime improved every metric critical to search ranking: Dreamstime's user engagement improved over the relevant period, Dreamstime's bounce rate (a metric that indicates the percentage of people who land on a web page and then leave without clicking anywhere else on the website) has declined, and the

average amount of time users spend on Dreamstime's website has stayed constant. Yet, Dreamstime's growth has slowed by approximately 50% since its peak (*id.* at ¶¶ 60, 64, 105).

This drop in rankings, moreover, continues to be unique to Google's search engine: a recent search demonstrated Dreamstime's search ranking for "stock images" was fifth on Bing's search engine, fourth on Yahoo!'s search engine, and third on Baidu's search engine. On Google's search engine, by contrast, Dreamstime found itself ninety-first, behind websites such as an obscure site with only 30,000 free images (compared with Dreamstime's more than two million free images), yet another site with only 140 images total, and a blog article that had not been updated since 2014 entitled "Stock Photos That Don't Suck." Yet, when comparing Dreamstime to Google's partner Shutterstock by measure of accuracy, Dreamstime returned completely accurate, if not more accurate results than companies like Shutterstock. Dreamstime continues to maintain it has no internal answers for these vast discrepancies in search results (*id.* at ¶¶ 41, 44, 55–58).

### 5. SUBVERSION BY GOOGLE IN DREAMSTIME'S ADVERTISING CAMPAIGNS.

Dreamstime contends that throughout this time, Dreamstime's advertising campaigns were actively subverted. Specifically, Google canceled Dreamstime's most successful advertising campaigns without notice or explanation and willy-nilly suspended Dreamstime's account based on accusations of policy violations. Google also prevented Dreamstime from running its advertisements altogether (but simultaneously allowed the exact same advertisements to be placed by Dreamstime's competitors). Most subversively, Google caused Dreamstime's daily spending limits to be exceeded systemically and on a regular basis by over-delivering on the advertisement campaigns (using more of the allocated advertising budget in a shorter period of time) (*id.* at ¶¶ 8, 79–80, 86, 90–91, 172).

Moreover, Google selectively applied its policies to Dreamstime's detriment. For example, Google removed Dreamstime's mobile application because it featured lingerie photographs but allowed Google partner Shutterstock's mobile application to remain active despite featuring explicitly nude photographs. In another example of selective policy enforcement, Google removed Dreamstime's lowest cost per acquisition advertisements but

5

allowed Dreamstime's high cost per acquisition display advertisements *of the same type* to remain active (translating to more income for Google) (*id*. at ¶¶ 53, 81, 86, 93).

The amended complaint is silent as to whether or not Dreamstime continued to win its AdWords campaigns for search terms. Dreamstime eventually determined that the spending on AdWords did not help Dreamstime's search ranking, and so, "Dreamstime recently resolved to significantly lower its advertising spending" (*id*. at ¶ 65 n.26).

### 6. THIS ACTION.

Dreamstime filed this lawsuit in March 2018 asserting four claims for relief: (1) violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; and (4) violations of Section 17200 of the California Business and Professions Code (Dkt. No. 1). Google moved to dismiss all claims (Dkt. No. 25). At oral argument (following full briefing), the undersigned judge provided Dreamstime an opportunity to amend the complaint before issuing an order on Google's motion to dismiss. Dreamstime elected to amend (Dkt. No. 44).

In September 2018, Dreamstime timely filed the amended complaint, asserting the same four claims for relief (Dkt. No. 50). Google again moved to dismiss (Dkt. No. 53), and following full briefing (Dkt. Nos. 60, 61), another hearing was held in December 2018. Orders subsequently issued seeking clarification from both Dreamstime and Google (Dkt. Nos. 66, 70). Having received clarifications from both sides, this order follows (Dkt. Nos. 68, 69, 71).

**ANALYSIS**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Plausibility requires pleading facts, as opposed to conclusory allegations or the "formulaic recitation of the elements of a cause of action," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief. *Iqbal*, 556 U.S. at 678–79.

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and quotation omitted). Nor is it enough that the complaint is "factually neutral"; rather, it must be "factually suggestive." *Twombly*, 550 U.S. at 557 n.5.

### 1. MONOPOLY MAINTENANCE UNDER SECTION 2 OF THE SHERMAN ACT.

Section 2 of the Sherman Act prohibits monopolization, attempted monopolization, and conspiracies to monopolize. More specifically, Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2.

The original complaint appeared to allege an unlawful monopoly leveraging theory based on the market for online stock photography and its dependence on the online search advertising market which Google purportedly monopolized. But both in Dreamstime's briefing and when directly asked during the first oral argument in September 2018, Dreamstime explicitly disavowed any such leveraging theory stating: "we are not alleging a two-market monopoly leveraging theory." Instead, Dreamstime insisted "it's a simple, straightforward monopoly maintenance case in which Google, with a market share of 70 percent plus, has maintained that monopoly power and abused it . . . " (Dkt. No. 49 at 37, 38).

But even the maintenance theory had not been adequately alleged. The Court thus gave Dreamstime another chance to revise the unwieldy complaint to set forth its antitrust theory, observing that the best shot for Dreamstime appeared to be a leveraging claim. Dreamstime accepted the opportunity to amend, but the amended complaint made clear: "Dreamstime is advancing a traditional monopoly maintenance antitrust claim" (Dkt. No. 50 at ¶ 111). Later, Dreamstime affirmatively disavowed any leveraging theory: "plaintiff Dreamstime is not asserting a separate Section 2 of the Sherman Act two-market 'monopoly leveraging' claim" (Dkt. No. 68 at 1). It is plain that plaintiff foreswears asserting a leveraging theory, attempting instead (for whatever reason) to pigeonhole this claim under the guise of unlawful monopoly maintenance.

7

The amended complaint alleges a relevant product market of online search advertising (Dkt. No. 50 at ¶ 119). Dreamstime's monopoly maintenance theory centers on an intertwined relationship between stock photographs and the online search advertising market. That is, stock photographs "are a critical component of search-based display ads (ads that include pictures related to keyword searches). The use of stock photos in search-based display ads allows online search advertisers to create high-quality, engaging display ads that pop up when users enter certain keywords" (*id.* at ¶ 2b). Google purportedly therefore maintains its monopoly in the online search advertising market by taking "control over online stock photo supply . . . to sell in its advertising network, giving it a crucial competitive advantage over its competitors, such as Yahoo! and Bing" (*id.* at ¶ 4). Moreover, "[n]ow that Google has access to all of Shutterstock and Getty Images' stock photos, it has instantly become one of the largest distributors of stock photos to customers looking to use those photos in online ads" which "provide it with a key advantage over its online search advertising competitors, by allowing it to integrate hundreds of millions of licensed images into its search advertising network" (*id.* at ¶¶ 32, 34). Critically, Google then targets Dreamstime and other stock photography companies "by removing an important supplier of stock photos for search advertisers" (*id.* at ¶ 7).

As Google's rivals in the online search advertising market have their own image services that have failed to gain traction, Google's monopoly in online search advertising is further secured:

> Competition in online search advertising is harmed by Google's promotion of Google Images over Dreamstime and others. Google's competitors, such as Bing and Yahoo!, offer competing search and image services. However, they have been unable to achieve the volume of traffic and associated historical data capable of allowing their image-based services to compete with Google Images. Google's elimination of Dreamstime and other stock photography websites enhances and entrenches Google Images' dominance and secures its competitive advantages over Bing and Yahoo!.

(*id.* at ¶ 102). As alleged in the amended complaint, therefore, Google's mechanism for restricting competition in the online search advertising market is to exclude Dreamstime and

8

other stock photography companies from engaging in both Google's search function and sponsored ads:

> Google intends to restrict competition among itself, Yahoo! and Bing, and to extend its dominance over chief rivals. Its vehicle for doing so is the exclusion of Dreamstime and several other non-partner stock photography websites . . . As these tactics injure competition in Google's market, they simultaneously cause material injuries to Dreamstime and other stock photo suppliers in the form of decreased or eliminated visibility in Google's search and ad results, overcharges for AdWords, lost revenue, lost customers, potential search engine optimization ("SEO") penalties, and loss of goodwill.

(*id*. at ¶ 10). In other words, the importance of stock photographs to Google means vanquishing smaller rivals in the stock photography industry:

> Google has undertaken its . . . exclusionary conduct with the . . . purpose of maintaining and abusing its monopoly in the online search advertising market (by increasing Google Images' dominance and increasing its own stock photo offerings within its ad network) and to vanquish . . . smaller rivals in the online stock photography industry . . . Google's conduct discourages, prevents and/or precludes consumers from finding, accessing and/or buying services from Dreamstime and other online stock photo repositories directly, which in the long-run would erode Google's standing as the first place to go via its Google Images feature to search for . . . stock photos on the Internet.

(*id*. at ¶¶ 125, 126). In sum, Dreamstime has most recently clarified the theory as follows:

> [P]laintiff Dreamstime *is* alleging that defendant Google is a monopolist and has engaged in an overall scheme consisting of various predatory and exclusionary acts to maintain its monopoly position in the online search advertising relevant market. This conduct is directed at harming Dreamstime as a consumer/participant of services in the online search advertising market. This conduct simultaneously harms competition and consumers, and enhances Google's monopoly in the online search advertising market . . . As Dreamstime has alleged, its exclusion harms competition and consumers and enhances Google's monopoly in the online search advertising market notwithstanding that Dreamstime does not directly compete with Google in that market. While not a direct competitor in the online search advertising market, Dreamstime does compete for the same web traffic and offers similar functions to Google (in particular, Google Images) with respect to image-related searches, and its exclusion is a means by which Google increases its image-related search dominance and therefore its foothold in the online search advertising market.

9

(Dkt. No. 68 at 1–2).

Dreamstime's theory, however, fails because it does not plausibly allege harm to competition in the relevant market. As the Supreme Court has made clear: "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of *anticompetitive conduct*." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis added). Our court of appeals defines anticompetitive conduct as "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985).

Dreamstime alleges the following eight predatory acts committed by Google, which, taken as a whole, purportedly combine to impose anticompetitive conduct: (1) rigging the AdWords auction bidding process to control the purchase of Google's AdWords advertising services; (2) downgrading and distorting Dreamstime's online search ranking (raising Dreamstime's costs of competing and threatening to drive it out of business); (3) favoring contractual partners (Shutterstock and Getty Images) with opportunities not available to other smaller stock photography suppliers; (4) selectively enforcing its rules and terms governing its online AdWords advertising program to disadvantage Dreamstime, thereby further undermining its ability to supply stock photos to its customers and Google's rivals; (5) elevating inconsequential websites ahead of Dreamstime and other online stock photography repositories; (6) suspending Dreamstime's mobile application purportedly for policy violations (that the application did not violate), and later de-indexing Dreamstime's mobile application for the most common searches for stock photos within the Google Play Store; (7) allowing users to bypass Dreamstime's licensed images and obtain them directly on Google Images without paying for them; and (8) engaging in unlawful activity to capture and use privacy protected data of its consumers and advertisers (Dkt. No. 50 at ¶ 133).

But the pattern of conduct that appears to be predatory here, is not in and of itself injurious to competition in the relevant market. The theory advanced by plaintiff is that

Dreamstime is a victim of a series of predatory acts — but the only harm to competition alleged is that it hurt Dreamstime and Dreamstime's ability to act as a consumer in that market. In the auction process, it would be to the advantage of Google to have more bidders. Facially, it does not make sense that Google would want to benefit from losing a customer.

What would make sense, is that Dreamstime is a potential competitor to Google in the online search advertising market with respect to images. Dreamstime could have its own search engine for images and sell sponsored ads and thus compete with Google as a rival. But Dreamstime has expressly disavowed that theory (Dkt. No. 68 at 1).[*]

Taking the synergistic effect of the alleged predatory acts together as an overall scheme, this maintenance theory still does not succeed as a Section 2 monopolization claim as "there can be no synergistic result" if none of the acts alleged is an antitrust violation. *Cal. Computer Prods. v. Int'l Bus. Machs., Corp.*, 613 F.2d 727, 746 (9th Cir. 1979). Although "a finding of some slight wrongdoing in certain areas need not by itself add up to a violation," Dreamstime still needs to meet every element of the antitrust claim. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). A showing of anticompetitive conduct is missing.

Much of the amended complaint focuses on the mistreatment of Dreamstime as a customer of Google in the online search advertising market. But such mistreatment, even by a monopolist, does not necessarily reduce competition in the relevant market. It is true that "reduction of competition does not invoke the Sherman Act until it harms consumer welfare." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (citations omitted). But showing harm to one customer does not on its own demonstrate anticompetitive conduct. As one leading treatise states: "[t]he real intent of a consumer welfare test is to identify practices that both exclude rivals from the market and harm consumers." The treatise further illustrates:

---

 * This theory is suggested by language in the amended complaint (*see, e.g.*, Dkt. No. 50 at ¶¶ 36, 126). At oral argument in December 2018, the district judge asked Dreamstime whether or not this was its theory. Dreamstime dodged the question at the time (Dkt. No. 65 at 4) ("Well, we think we should have been a stronger competitor in the image market, not taking Google head on in the search market"), but later affirmatively disavowed the theory: "plaintiff Dreamstime is not alleging it is a future potential or actual direct competitor to defendant Google (or Yahoo! or Bing) in the online search advertising market" (Dkt. No. 68 at 1).

11

> Suppose that Microsoft, which has a monopoly in its Windows operating system, should develop a new version that was particularly buggy and prone to crashes. Clearly, consumers as a group would be harmed because they have a few good alternatives to Windows. But developing a bad version of Windows is not a monopolistic practice *because no one is excluded*. Microsoft's mistake . . . might simply impose harm on consumers until Microsoft fixed the problems and restored the status quo, *but the one thing that the practice would clearly not do is exclude rivals from the market. As a result, the practice is not 'monopolistic,' even though it causes consumer harm.*

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651 (4th ed. 2015) (emphasis added). Although this example differs from the predatory acts alleged in the amended complaint in that Google is purportedly acting nefariously here, the fatal flaw in both theories remains the same: by destroying Dreamstime, no rival and no competition has been excluded from the online search advertising market, and therefore, no anticompetitive conduct has been adequately alleged.

To circumvent this problem, Dreamstime engages in some sleight of hand. Dreamstime asserts itself in the amended complaint not only as a customer whose welfare has been harmed, but also as a competitor to Google for web traffic and stock photographs. The relevant market alleged, however, is sponsored ads, not stock photographs. Dreamstime has repeatedly made clear, it is not, nor does it intend to be, a rival to Google in the relevant market: the online search advertising market (*see* Dkt. No. 68). Although Google may have reduced competition on the merits in the online stock photography market or "the online search advertising market for photography for images" (as the district judge asked Dreamstime at the December 2018 hearing), Dreamstime disavowed any such relevant market, insisting that the relevant market is "online search advertising, and we are in that market as a participant because we are a contractual customer of Google" (Dkt. No. 65 at 23).

Scrutinizing the predatory actions alleged that are broader than mere harm to Dreamstime results in the same conclusion and do not "exclude[] some potential," or "limit[] some actual, competition." *United States v. United Shoe Machinery Corp.*, 110 F. Supp. 295, 343 (D. Mass. 1953) (Judge Charles Wyzanski), *aff'd per curiam*, 347 U.S. 521 (1954). In fact, some alleged conduct are more likely to have the opposite impact. The rigging of the AdWords

12

bidding process and the general selective enforcement of Google's rules, for example, are more likely to steer customers towards existing rivals or to foster competition by encouraging others to enter the market.

Turning to the sole remaining alleged predatory act, Google's capturing of data, Dreamstime has not demonstrated that this data is captured through a means other than Google's "ability, economies of scale, research, natural advantages, and adaptation to inevitable economic laws." *Ibid*. Although the data collection likely gives Google an advantage in the online search advertising market over its rivals, a monopolist utilizing its competitive advantage does not equate to anticompetitive conduct. *Trinko*, 540 U.S. at 415–16. Other than couching the data collection practice as "unlawful," Dreamstime has not specified how or in what way Google's data collection practice is anticompetitive.

Despite not listed as part of the eight predatory acts alleged in the amended complaint, this order pauses to explore the following possibility grounded in the facts alleged in the amended complaint: if, as Dreamstime states, it is true that the pipeline of stock photographs is the mechanism by which Google maintains its monopoly in the online search advertising market, then agreements between Google and stock photography companies streamlining that pipeline further allow Google to maintain its strength in the relevant market. This strength is further aided by Google's vast trove of data, including data shared between Shutterstock/Getty Images and Google as part of their agreements (Dkt. No. 50 at 103–104). This conduct, moreover, causes antitrust injury by increasing spending in the AdWords bidding campaigns for stock photography sites such as Dreamstime.

Even this conduct, however, would not be anticompetitive. Returning to the Supreme Court's opinion in *Trinko*: "Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers." *Trinko*, 540 U.S. at 407. A company providing a platform for businesses to sell advertisements must be expected to *efficiently* produce the best possible product to its customers. Thus, if in the online search advertising market, this means making stock photographs readily available to businesses seeking to advertise, a company will likely attempt to enter into agreements to make those stock

13

photographs as available as possible. The use of data and the securing of these agreements here are efficient business transactions that do not "attempt[] to exclude rivals *on some basis other than efficiency*." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (citations omitted) (emphasis added). The Sherman Act, moreover, "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

Of course, Google could not enter into an agreement that violates Section 1 of the Sherman Act (agreements in unreasonable restraint of trade). But a Section 1 violation is not alleged here. Under Section 2, nothing Dreamstime has alleged demonstrates that Google has maintained its monopoly by engaging in conduct to "chill[] vigorous competition" *in the relevant market*. *American Needle, Inc. v. National Football League*, 560 U.S. 183, 190 (2010). Google may position itself to leap ahead of its rivals in the relevant market on the merits. It is telling that not a single fact in this 76-page first amended complaint (with 19 exhibits attached) specifies how Google's rivals or potential rivals are denied online search advertising market share due to the agreements between Google and Shutterstock/Getty Images. Dreamstime has not met its burden to show that the reason Google's rivals are unable to obtain the same access to licensed photos as Google is because of Google's anticompetitive action. Again, for all the amended complaint alleges, Shutterstock and Getty Images are perfectly free to enter into licensing arrangements with Yahoo! and Bing.

Nor do the antitrust laws require Google to enter into those same agreements with every stock photography company in the world. Or, as the Supreme Court stated: "The Sherman Act is indeed the Magna Carta of free enterprise, but it does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Trinko*, 540 U.S. at 415–16 (emphasis in original) (quotations and citations omitted). Dreamstime's amended complaint misses a critical element in failing to allege a plausible monopoly maintenance claim — namely, injury to competition in the online search advertising market. The antitrust claim is dismissed without leave to amend.

14

## 2. BREACH OF CONTRACT.

To allege a breach of written contract, a plaintiff must plead: (1) the existence of a contract; (2) plaintiff's performance or excuse of performance; (3) defendant's breach; and (4) damages. *See Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). Dreamstime alleges Google breached two contracts: (1) the AdWords Agreement and (2) the Google Play Agreement.

Under the AdWords Agreement, Dreamstime alleges that Google breached its contract by providing Dreamstime advertising campaigns that did not work and did not meet Dreamstime's expectations, applied its policies and procedures unevenly towards Dreamstime, cancelled some of Dreamstime's ad campaigns for violating stated policies that the ad campaigns did not violate, and overcharged and overdelivered the ad campaigns (Dkt. No. 50 at ¶ 169). As to the Google Play Agreement, Dreamstime alleges that Google breached the agreement both by removing Dreamstime's mobile Buyer App from the Google Play app store unfairly and by de-indexing Dreamstime's Buyer App for common search terms (*id*. at ¶ 171).

Dreamstime's requirement at this stage is solely to identify with specificity the contractual obligations allegedly breached by Google sufficient to put Google on notice of the claims and plausibly allege a right to relief. *See Kaar v. Wells Fargo Bank, N.A*, 2016 WL 3068396 (N.D. Cal. 2016) (Judge William Alsup). Dreamstime does so. In the amended complaint, Dreamstime alleges that the AdWords Agreement incorporated by reference the AdWords program policies, various FAQ answers, and support pages describing Google's policies. Taking the amended complaint as true, these policies provide in part that overdelivery is a breach of contract, that Google "intended the policies and descriptions of the services Google was to provide to apply equally to all who executed it," and that the policies include a specific list of prohibited conduct that would subject an advertisement to rejection or removal (such as "ads that mislead or trick the user into interacting with them[,]" and that "an account may be suspended if you have several violations or a serious violation") (Dkt. No. 50 at ¶¶ 164–167). As to the policies incorporated by reference into the Google Play Agreement, the

15

amended complaint provides the specific policy section (Section 8.3) that Dreamstime is alleging Google breached.

Thus, the listings made by Dreamstime in the amended complaint are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The amended complaint accordingly puts Google on notice as to what provisions of the AdWords and Google Play Agreements have been breached.

Google contends provisions in the agreements undercut Dreamstime's theories for recovery, rendering the theories implausible. It is true that both the AdWords Agreement and Google Play Agreement contain "catch-all" provisions that may undercut the viability of the alleged claims (Dkt. No. 50 at Exh. F Section 1, 8, 12; Exh. O). But Google cites no authority requiring resolution at this stage. At this juncture, Google has been adequately notified of the provisions and facts at issue. The breach of contract claim may move forward.

### 3.  BREACH OF IMPLIED GOOD FAITH AND FAIR DEALING.

"[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 363 (1997) (citations and quotations omitted). The undersigned has previously held that "absent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery." *See, e.g.*, *Total Recall Techs. v. Luckey*, 2016 WL 199796, at *6 (N.D. Cal. Jan. 16, 2016) (citations omitted).

As alleged in the amended complaint, however, this action plausibly may be one of the aforementioned limited cases. Enough has been shown to support the notion that Google took affirmative steps to frustrate the purpose of the agreements. *See Cobb v. Ironwood Country Club*, 233 Cal. App. 4th 960, 966 (2015). For example, Google pretended to work to resolve purported "policy issues" with Dreamstime's ads while actually subverting and frustrating the ability of Dreamstime to realize the benefits of its contract. Google also is alleged to apply a

double standard to Dreamstime's low cost and high cost advertising campaigns and a double standard in Google's treatment of Dreamstime compared to Dreamstime's competitors.

Further, the alleged conduct may go beyond the reach of a breach of contract claim. After all, a possibility exists that in scrutinizing the AdWords and Google Play Agreements, the "catch-all" provisions included therein would undercut any potential claim for breach of contract (Dkt. No. 50 at Exh. F Section 1, 8, 12; Exh. O). Dreamstime's cause of action of the breach of implied good faith and fair dealing therefore may move forward.

### 4. VIOLATION OF SECTION 17200.

Section 17200 of the California Business and Professions Code provides a remedy for unlawful, unfair, and fraudulent activity. The amended complaint alleges claims under all three prongs. The claim under the unlawful prong is derivative of the breach of contract and breach of the implied covenant of good faith and fair dealing and therefore may move forward.

Turning to the unfairness prong, California courts have applied unfairness under two different tests: *Cel-Tech* and *South Bay*. Our court of appeals has applied both tests. *See, e.g.*, *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 865–67 (9th Cir. 2018). *Cel-Tech* held that to be unfair under the unfairness prong, the alleged conduct must be "tethered to some legislatively declared policy" or have some effect on competition. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 186–87 (1999). Under *South Bay*, a challenged business practice qualifies as unfair when the practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *South Bay Chevrolet v. General Motors Acceptance Corporation*, 72 Cal. App. 4th 861, 886–87 (1999) (citation omitted).

Here, applying both tests, the unfairness prong is satisfied. Dreamstime plausibly alleges that Google, for example, pretended to work in good faith to resolve purported "policy issues" with Dreamstime's ads while actually intending at all times to remove them arbitrarily. Such action, taken as true, both plausibly breaches the contract through the breach of the implied covenant of good faith and fair dealing thereby tethering the alleged conduct to a legislatively declared policy and is a sufficiently alleged unscrupulous behavior substantially injurious to Dreamstime. Allegations under the unfairness prong may therefore move forward.

Turning to the fraud prong, Dreamstime alleges that Google mislead Dreamstime with various false assertions as to its ad campaigns. Indeed, the complaint documents numerous times Google falsely told Dreamstime the ad campaigns were working as they were supposed to (Dkt. No. 50 at ¶¶ 78, 90).

To determine if the elements of fraud have been pleaded to state a cause of action, the court looks to state law. In California, the elements of a cause of action for fraud are: "(a) misrepresentation (false representation, concealment, or *nondisclosure*); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (citing *Engalla v. Permanente Med. Group*, 15 Cal.4th 951, 974 (1997)) (emphasis in original). Rule 9(b)'s heightened pleading standards apply here. *See Kearns*, 567 F.3d at 1125. Under Rule 9(b), a pleading is sufficient if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). The false statements alleged in the amended complaint that Dreamstime relied on to pour more money into its AdWords campaign, at the very least, sufficiently put Google on notice of the circumstances constituting fraud. The claim for fraud has therefore been pled with sufficient particularity and may move forward.

**CONCLUSION**

For the above-stated reasons, Google's motion to dismiss is **GRANTED IN PART AND DENIED IN PART**. The motion to dismiss is granted as to the antitrust claim without leave to amend. The motion to dismiss is denied as to the breach of contract claim, the breach of the implied covenant of good faith and fair dealing claim, and the Section 17200 claims.

The answer is due within 10 calendar days. Both sides should be taking discovery and preparing themselves for summary judgment and/or trial. Reasonable discovery relevant to the allowed claims shall be permitted even if it is also relevant to the Section 2 claim. Further leave to amend will be allowed only if further investigation or discovery reveals facts not previously known that would change the analysis.

**IT IS SO ORDERED.**

Dated: January 28, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE