BAKER MARQUART LLP
Jaime W. Marquart (State Bar No. 200344)
jmarquart@bakermarquart.com
Donald R. Pepperman (State Bar No. 109809)
dpepperman@bakermarquart.com
Brian T. Grace (State Bar. No. 307826)
bgrace@bakermarquart.com
777 S. Figueroa Street, Suite 2850
Los Angeles, CA 90017
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

BAILEY DUQUETTE P.C.
James Bailey (*pro hac vice*)
james@baileyduquette.com
104 Charlton St., Suite 1W
New York, NY 10014
Telephone: (212) 658-1946
Facsimile: (866) 233-5869

*Attorneys for Plaintiff*
DREAMSTIME.COM, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DREAMSTIME.COM, LLC, a Florida LLC,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, LLC, a Delaware LLC; and DOES 1-10,<br><br>Defendants. | **Case No.: 3:18-CV-01910-WHA**<br><br>**PLAINTIFF DREAMSTIME.COM LLC'S MEMORANDUM IN OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. William H. Alsup<br><br>Hearing Date: June 18, 2020<br><br>Time: 8:00 a.m. |

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

**TABLE OF CONTENTS**

Page(s)

I.    INTRODUCTION……………………………………………………1

II.   STATEMENT OF ISSUES TO BE DECIDED……………………..……………2

III.  BACKGROUND OF GOOGLE'S SEARCH AND ADWORDS SCHEMES…..………2

    A. Google Demoted Dreamstime in Organic Search Then Defrauded Dreamstime as to That Fact, All to Induce Dreamstime to Overspend on AdWords……………..………2

       1. In late 2015, Google Knowingly Altered Its Algorithm and Harmed Dreamstime by Concealing Material Facts…………………………………………………2

       2. Google Uttered Half-Truths and Fraudulently Concealed with Regard to Organic Search to Cause Dreamstime to Overspend……………………………………4

    B. Google's Deceptive Scheme to Retain Dreamstime as a Large AdWords Customer..7

       1. The AdWords Reps Promised They Were "Experts" to Gain Dreamstime's Trust…………………………………………………………………………7

       2. AdWords Reps Concealed Their True Agenda  ………..……………….…..8

       3. Google's Panoply of Material Misrepresentations and Half-Truths……………9

          a) Google's Target ROAS and Sign-Up Conversion Overcharge Shakedown....9

          b) Google's Dynamic Remarketing Ad Debacle……………………………13

          c) Google's Overhyped Foreign Localized Ads Program……………………14

          d) Google's HTML 5 Banner Ads Blunder……………………………….....15

IV.  LEGAL STANDARD APPLICABLE TO SUMMARY JUDGMENT MOTIONS…...16

V.   LEGAL ARGUMENT………………………………………………………..16

    A. Dreamstime Has Proven Its Unfair Competition Claim……………………16

       1. Fraudulent Prong of UCL……………………………………………17

          a) Google Affirmatively Lied and Concealed Facts to Induce Dreamstime to over spend………………………………………………………17

          b) Google Also Defrauded and Conned Dreamstime with Half-Truths……….19

          c) Google Had Superior Knowledge……………………………………..21

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

2. Unfair Prong of UCL……………………………………………………22

3. Unlawful Prong of UCL…………………………………………..…23

B. Dreamstime Has Also Proven Its Contract-Based Claims………………………....23

C. Google's Fraud & Breaches Are Not Immune Under The First Amendment……...25

VI. CONCLUSION………………………………………..……………...…25

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................... 16

*Badie v. Bank of America*,
   67 Cal. App. 4th 779 (1998) ........................................................................................ 25

*Boland, Inc. v. Rolf C. Hagen (USA) Corp.*,
   685 F. Supp. 2d 1094 (E.D. Ca. 2010)......................................................................... 24

*Carma Developers (California), Inc. v. Marathon Development California, Inc.*,
   2 Cal.4th 342 (1992) .................................................................................................... 25

*In re Carrier IQ, Inc.*,
   78 F. Supp. 3d 1051 (N.D. Cal. 2015) .......................................................................... 18

*Cel-Tech Communication, Inc. v. Los Angeles Cellular Telephone Co.*,
   20 Cal.4th 163. (1999) ............................................................................................ 22, 23

*In re ChinaCast Education Corp. Securities Litigation*,
   809 F.3d 471 (9th Cir. 2015) ........................................................................................ 20

*Continental Airlines, Inc. v. McDonnell Douglas Corp.*,
   216 Cal. App. 3d 388 (1989) ........................................................................................ 21

*Cortez v. Purolator Air Filtration Products. Co.*,
   23 Cal.4th 163 (2000) .................................................................................................. 17

*Engalla v. Permanente Medical Group, Inc.*,
   15 Cal.4th 951 (1997) ............................................................................................ 21, 22

*Foley v. Interactive Data Corp.*,
   47 Cal.3d 654 (1988) ................................................................................................... 23

*Gafcon, Inc. v. Posner & Associates*,
   98 Cal. App. 4th 1388 (2002) ...................................................................................... 23

*Garter-Bare Co. v. Munsingwear, Inc.*,
   650 F.2d 975 (9th Cir. 1980) ........................................................................................ 22

*In re Google AdWords Litigation*,
   No. C 08-03369 JW
   2011 WL 7109217 (N.D. Cal. Mar. 17, 2011)........................................................ 19, 22

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

*Gutierrez v. Wells Fargo Bank, North America*,
  730 F. Supp. 2d 1080 (N.D. Cal. 2010),
  *aff'd in part, rev'd in part and remanded by* 704 F.3d 712 (9th Cir. 2012) .......................... 17, 19

*Hodson v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) .......................................................................................... 22

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990) ........................................................................................ 20

*InfoStream Group, Inc. v. PayPal, Inc.*,
  No. C 12_748 SI
  2012 WL 3731517 (N.D. Cal. Aug. 28, 2012) ................................................................ 25

*Intrieri v. Superior Court*,
  117 Cal. App. 4th 72 (2004) ........................................................................................... 20

*Kern v. Levolor Lorentzen, Inc.*,
  899 F.2d 772 (9th Cir. 1990) .......................................................................................... 24

*L.A. Printex Industries, Inc. v. Aeropostale, Inc.*,
  676 F.3d 841 (9th Cir. 2012) .......................................................................................... 16

*Lazar v. Superior Court*,
  12 Cal. 4th 631 (1996) .................................................................................................... 17

*Lovejoy v. AT&T Corp.*,
  92 Cal. App. 4th 85 (2001) ......................................................................................... 17, 18

*Lozano v. AT&T Wireless Services, Inc.*,
  504 F.3d 718 (9th Cir. 2007) .......................................................................................... 17

*Mattei v. Hopper*,
  51 Cal. 2d 119 (1958) ..................................................................................................... 24

*McKell v. Washington Mutual*
  142 Cal. App. 4th 1457 (2008) ................................................................................... 17, 22

*Merritt v. J.A. Stafford Co.*,
  68 Cal.2d 619 (1968) ....................................................................................................... 23

*Moore v. Wells Fargo Bank, North America*,
  39 Cal. App. 5th 280 (2019) ........................................................................................... 23

*Mundy v. Household Finance Corp.*,
  885 F.2d 542 (9th Cir. 1989) .......................................................................................... 23

*Pasadena Live v. City of Pasadena*,
  114 Cal. App. 4th 1089 (2004) ....................................................................................... 24

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

*Perdue v. Crocker National Bank*,
   38 Cal.3d 913 (1985) ................................................................................ 25

*PhotoMedex, Inc. v. Irwin*,
   601 F.3d 919 (9th Cir. 2010) ..................................................................... 21

*R. J. Kuhl Corp. v. Sullivan*,
   13 Cal. App. 4th 1589 (1993) .................................................................... 24

*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133 (2000) ................................................................................... 16

*Reyes v. Wells Fargo Bank, North America*,
   No. C-10-01667 JCS
   2011 WL 30759 (N.D. Cal. Jan. 3, 2011) ................................................... 25

*South Bay Chevrolet v. General Motors Acceptance Corp.*,
   72 Cal. App. 4th 861 (1999) ...................................................................... 22

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
   100 Cal. App. 4th 44 (2002) ...................................................................... 24

*Swafford v. International Business Machines Corp.*,
   408 F. Supp. 3d 1131 (N.D. Cal. 2019) ..................................................... 22

*T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association*,
   809 F.2d 626 (9th Cir. 1987) ..................................................................... 16

*Terra Insurance Company v. New York Life Investment Management. LLC.*,
   717 F. Supp. 2d 883 (N.D. Cal. 2010) ....................................................... 21

*Third Story Music, Inc. v. Waits*,
   41 Cal. App. 4th 798 (1995) ...................................................................... 24

*Universal Health Services, Inc. v. United States*,
   136 S. Ct. 1989 (2016) ............................................................................... 20

*Vega v. Jones, Day, Reavis & Pogue*,
   121 Cal. App. 4th 292 (2004) ............................................................... 19, 20

*Williams v. Gerber Products, Co.*,
   552 F.3d 934 (9th Cir. 2008) ..................................................................... 17


**Other Authorities**

Fed.R.Civ.P. 56(a) ........................................................................................ 16

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Dobre Dec. | Declaration of Elena Dobre in Support of Opposition to Motion for Summary Judgment, dated May 15, 2015 |
| Enache Dec. | Declaration of Serban Enache in Support of Opposition to Motion for Summary Judgment, dated May 15, 2015 |
| Jianu Dec. | Declaration of Bogdan Jianu in Support of Opposition to Motion for Summary Judgment, dated May 14, 2015 |
| Lehman MSJ Dec. | Declaration of Eric Lehman in Support of Defendant Google LLC's Motion for Summary Judgment, dated April 22, 2020 |
| Marquart Dec. | Declaration of Jaime W. Marquart in Support of Opposition to Motion for Summary Judgment, dated May 15, 2015 |
| Stricchiola Dec. | Declaration of Jessie Stricchiola in Support of Opposition to Motion for Summary Judgment, dated May 14, 2015 |

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

## I. **INTRODUCTION**

Plaintiff Dreamstime.com, LLC ("Dreamstime") submits this memorandum in opposition to defendant Google LLC's ("Google") Motion for Summary Judgment ("Motion"). Dreamstime has paid Google over $60 Million on Google's advertising platform, AdWords, over $25 Million during the time period covered by this litigation. It overpaid substantially because Google misrepresented various material facts (and breached other duties) to induce Dreamstime to overpay.

Google's Motion misconstrues the law. This is no longer an antitrust case. There is no need to show harm to competition or targeting of Dreamstime. This case centers on what Google told (and did not tell) Dreamstime about its organic search performance and about how specific types of ads worked, not on any anticompetitive motives. Google's motive here was one of the oldest in the book – greed – and the evidence of that motive comes from Google's own internal communications. Google misrepresented material facts to Dreamstime to induce it to spend more on AdWords than it would have if it had known the true facts. Google's representatives held themselves out as experts with superior knowledge and information, and Dreamstime relied upon that stated expertise and superior knowledge, often by giving Google the keys to the kingdom (e.g., unprecedented control of its account). It turns out Google's representatives did not have the expertise they claimed, did not understand how the technology worked, and most importantly told many specific lies about how certain ads worked and why Dreamstime's organic search performance was suffering. Those lies lured Dreamstime to overspend on AdWords. Dreamstime wants its overpayment back. A jury must decide whether it is entitled to it and how much.

Google's Motion follows three motions on the pleadings, after which any issues regarding the legal bases for Dreamstime's allegations were surely exhausted. The Motion fights the uphill battle of attempting to eliminate any genuine issue of material fact as to *each and every* one of Dreamstime's claims. But Google does not address many of Dreamstime's allegations or the true scope of its claims. Dreamstime has submitted hundreds of pages of testimonial and documentary evidence in support of this opposition that raise genuine issues of fact as to several material misrepresentations Google made with respect to organic search issues and specific ad campaigns. This compelling evidence shows a consistent pattern of Google representatives saying one thing to Dreamstime and candidly admitting

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

it was untrue in internal emails or depositions. And, unsurprisingly, Dreamstime's witnesses hotly dispute the testimony of Google's witnesses about what was said between them. The documentary evidence supports Dreamstime's account, but such conflicts must be resolved by the trier of fact.

## II. STATEMENT OF ISSUES TO BE DECIDED

Do genuine issues of material fact preclude summary judgment against Dreamstime on its claims for violations of the "unfair," "fraudulent" and/or "unlawful" prongs of California's Unfair Competition Law or its contracted-based claims?

## III. BACKGROUND OF GOOGLE'S SEARCH AND ADWORDS SCHEMES

### A. Google Demoted Dreamstime in Organic Search Then Defrauded Dreamstime as to That Fact, All to Induce Dreamstime to Overspend on AdWords

Google misconstrues Dreamstime's claims regarding its organic search rankings, which are premised upon Google's statements and omissions to Dreamstime about algorithmic changes Google made that negatively impacted Dreamstime's search performance (rather than Google's original purpose for altering its algorithms). The facts are: (1) in late 2015, Google *knowingly* altered its algorithm in a way that it knew would negatively affect Dreamstime (its own testing said so); (2) in late 2015, Dreamstime's drop in organic search performance began; (3) in late 2016, Dreamstime told Google it could no longer keep up its AdWords spending if its organic issues were unresolved, so Google made false and misleading statements to Dreamstime that omitted the algorithmic change and other related material information with the express intent to induce Dreamstime to spend more on AdWords; and (4) Dreamstime did invest millions of dollars more in AdWords.

### 1. In Late 2015, Google Knowingly Altered Its Algorithm and Harmed Dreamstime by Concealing Material Facts

Until late 2015, Dreamstime's Google search traffic grew with its library and business. (Enache Dec. ¶¶ 82, 84.) But in late 2015 its organic traffic began to drop significantly. (*Id*.) By the beginning of 2016, it was experiencing an inexplicable and significant reduction in traffic from Google organic search. (*Id*.) It measured its drop with *Google's* data, in its Google Analytics account. This data shows a steady downward trend (reversing a huge upward trend) in traffic and revenue from Google organic search beginning just after October 2015. (*Id*., Ex. CC.) Third party data also showed that

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Dreamstime's ranking for key queries like "stock photos" plummeted thereafter. (*Id*. ¶ 81.)

Unbeknownst to Dreamstime, Google made a change to its algorithm in October 2015, right when Dreamstime's drop began. In testing related to this algorithmic change, Google flagged a Dreamstime product page as a "███ loss." (Stricchiola Dec. ¶ 69, Ex G.) **REDACTED** ████████████ (*Id*. ¶ 70.) The affected page also had the same format as essentially all of Dreamstime's product pages, because Dreamstime sells tens of millions of similar photo items. (*Id*.)

Dreamstime was a "███ loss" because Google changed a part of its algorithm – called the "Salient Terms" signal – that **REDACTED** so it can match it to users' searches. (*Id*. ¶¶ 71-73.) The signal **REDACTED** ██. According to Google's discovery responses, before this algorithmic change, critical terms including **REDACTED** ████████████ ████████████ ██████ were in the top six most salient terms for the webpage. (*Id*.) After the change, all three of these terms dropped out of the top six and others were dramatically demoted **REDACTED** ████████████ (*Id*.) In their place were some meaningless numbers and very specific terms like ███ REDACTED ██████ (the item page was selling an illustration of a flamingo couple). In other words, the terms that showed the purpose and context of the page **REDACTED** ██████ were demoted and specific terms unrelated to stock photography replaced them. In so doing, the algorithm **REDACTED** . (*Id*.) **REDACTED** ████████████ ████████████ Deprived of buyers from organic search, Dreamstime had to pay (through AdWords) for visibility in search results to compensate for its organic loss.

Google claims this change was immaterial (a question of *fact*), but its actions in this case prove otherwise. After discovery and depositions were over, it was apparent what this evidence meant:

**REDACTED**

**REDACTED**

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

**REDACTED** (*Id.*) Then, Google did something telling. It produced purportedly new "evidence" *after the discovery cutoff* that it claimed shows the salient terms were not re-ordered as Google's verified response and deposition testimony had shown. (Lehman MSJ Dec. ¶¶ 44-50.) Regardless of whether that is true, Google's sudden change in story shows that *it* knows this evidence was very material (and very unfavorable).[1] Suffice to say, Dreamstime's search expert, Jessie Stricchiola, and Google's witness, Eric Lehman, disagree as to the materiality of the algorithmic change. Their declarations speak for themselves and clearly present fact issues as to whether the change was a "minor tweak" (per Lehman) or significant. (*Id.* ¶¶ 67-86, 122.)

### 2. Google Uttered Half-Truths and Fraudulently Concealed its Conduct With Regard to Organic Search to Cause Dreamstime to Overspend

While Google claims it has a "strict wall" that prevents it from disclosing facts about its algorithm to its advertisers, it regularly answered Dreamstime's organic questions before the 2015 algorithmic change. And, even after that, it leaped over its "wall" to provide deceptive answers to Dreamstime as soon as Dreamstime said it had to reduce its AdWords spending. Rather than admit the 2015 algorithmic change affected Dreamstime, Google instead pointed the finger at Dreamstime.

Dreamstime first discussed its drop in organic search results with its Google reps in the first half of 2016. In the second half of 2016, it repeatedly raised the issue to Google reps in meetings and emails. (Enache Dec. ¶ 85.) Its CEO Serban Enache spoke with high-ranking Google country managers and other reps and expressed that he suspected Dreamstime's drop was due to a Google algorithmic change. (*Id.*) They assured him this was not the case, and that the problem likely lied with Dreamstime's website. (*Id.*) In September 2016, Dreamstime saw another big drop in its organic traffic and revenue. (*Id.* ¶ 86.) On September 27, 2016, Enache met with his AdWords rep Ana Sipciu and her manager Josko Mrndze to discuss Dreamstime's organic issues. They reiterated that the problem must lie with Dreamstime but said they were sure they could help. (*Id.*)

In early October 2016, Enache emailed Sipciu and Mrndze, asking to be put in touch with Gary Illyes, from Google's organic search team, who answered his questions in the past. Sipciu claimed Illyes would no longer speak directly with Enache due to policy. On October 7, 2016, Enache replied:

---

[1] Notably, this bizarre turnabout followed after Google had already claimed that other rankings data was "corrupt" (leading this Court to say it sounded "fishy to me"). (November 27, 2019 Hearing Transcript at 10-12; Marquart Dec., Ex EE.)

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

We have reached the point where *we ask ourselves whether it makes sense to continue to invest in Adwords*... Our decline for new customers in August was slowing down at -19%YOY after a disastrous -36%YOY in July. Another Penguin [core algorithm update] hit and we're now at -25%YOY. It's the level we had in 2013 and this has long term impact. *The only source that is down is organic*. It baffles me that Google remains passive to our struggle and I can't help but notice that Shutterstock remains untouched. . . (*Id*., Ex. FF.) (emphasis added).

Immediately after Enache's email, the Google AdWords reps, including Mrndze and Sipciu, and a "country" manager, Goetz Trilhaas, exchanged several internal emails citing their concerns over Dreamstime's future AdWords "investment" and the potential negative effects on their own targets (and bonuses) should Dreamstime reduce its AdWords spending. (Marquart Dec., Exs. O, P, Q, S.) Then, on October 11, Sipciu emailed Enache about planning an event in Dublin where Google would present new ways for Dreamstime to spend more. (Enache Dec., Ex. HH.) Enache responded that, unless and until the organic issues were resolved, Dreamstime was not interested. (*Id*.) Sipciu replied, stating that the whole Google team understood and that they were checking internally with all available sources for a solution (*Id*.) She then wrote to her team:  REDACTED

REDACTED

REDACTED

(Marquart Dec., Ex. O.)

Soon thereafter, Trilhaas and Sipciu sought, vetted and endorsed an expert opinion on purported reasons for Dreamstime's organic traffic drop. (*Id*., Ex. T.) Trilhaas handpicked the expert, Professor Mario Fischer, because he  REDACTED  (*Id*., Ex. R.) Google knew Dreamstime suspected an algorithmic change, as Trilhaas admitted  REDACTED  (*Id*., Ex. T.) However, Google did not provide any information about Google algorithmic changes to  REDACTED  (*Id*.)

Before sending it to Enache, Sipciu made sure that the analysis matched what Illyes told Dreamstime in the public forum. She wrote Trilhaas:  REDACTED

REDACTED

*Id*.) She also emailed her manager to say she finally had some answers for Dreamstime and that  REDACTED

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

REDACTED (*Id.*, Ex. S.) (emphasis added.) Clearly, her intent was not altruistic.

Sipciu's email transmitting the analysis to Dreamstime touted Fischer as "one of the highest rated specialists" in the market and reiterated that Fischer's analysis "seems to confirm [Illyes'] suggestion made on the forum – [Dreamstime's website] content can be improved." (*Id.*, Ex. DD.) The analysis ruled out some algorithmic causes ("[t]he last core update. . .was well accepted and generally did not register any issues"), focusing on Dreamstime's content as the most likely cause ("the real problem lies in the weak content of the site"). (*Id.*, Ex. CC.) Instead, it recommended adding and varying text in Dreamstime's tens of millions of product pages (the same ones demoted by the 2015 algorithm change). (*Id.*) It did *not* indicate that Google had failed to examine Google's prior algorithmic changes, or that Fischer was kept in a vacuum. The message to Dreamstime was clear: the cause of your problems is *your* weak content (not Google's algorithm), so keep spending millions of dollars on Google ads while you fix your self-inflicted website problem.

Aside from omitting the 2015 algorithmic change, the analysis contained affirmative statements that were false, misleading and/or reckless as to the truth. Most notably, it concluded that weak content explained the drop. This was false, as Google's own search employee, John Mueller, admitted. (Stricchiola Dec. ¶ 120.) Fischer eliminated one key algorithm update (implying algorithms were not to blame) and Google endorsed his opinion without even employing tools at its own disposal. REDACTED (*Id.* ¶¶ 100-102.) Google's verified interrogatory response and document production, and the fact that Dreamstime's product pages use the same template, suggest that the 2015 algorithmic change likely had a drastic effect on Dreamstime's search ranking. (*Id.* ¶¶ 67-86, 122.)

Google may claim (though it is irrelevant) that its ad reps had no access to search information, but others who communicated with Dreamstime did. In November 2016, Enache contacted Brian Lam, an executive at Google's Mountain View headquarters, regarding the organic issues. (Marquart Dec., Ex. L.) Lam roped in another executive, Josh Capilouto, and they both spoke with Sipciu and reviewed her previous response to Dreamstime. (*Id.*, Exs. K-L.) In consultation with Google's Search Product Counsel (special in-house counsel to the search team), Capilouto drafted Lam's response to Dreamstime that reiterated Sipciu's prior response. (*Id.*) Capilouto admitted in internal emails that

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

he had access to **REDACTED** and that a more specific response was an option (*Id.*, Exs. K, M.), but chose to reiterate Sipciu's response instead. (*Id.*, Ex. M.) Thus, Lam's statements and omissions were not based upon any lack of access to information.

Finally, Google continues to claim that other causes related to Dreamstime's website design were to blame, but the Fischer analysis eliminated such issues as bad linking profiles, DDoS attacks and other causes. (*Id.*, Ex. CC.) If these *were* issues, the analysis falsely stated they were not.

Dreamstime relied on Google's misrepresentations and omissions by investing millions in additional spending in AdWords and website upgrades. (Enache Dec. ¶¶ 94-97.) Ultimately, its fixes failed, it continued to lose traffic, and it sued. But, due to Google's hiding the ball, Dreamstime continued to second-guess itself and mistakenly fear that something on its end was the culprit. (*Id.*) Ironically, Google cites to candid emails from Dreamstime's employees expressing this fear as if it reflects poorly on their capabilities (Motion at 6-7), but those emails are the best evidence of Dreamstime's detrimental reliance on Google's blame shifting. To this day, due to AEO designations, Dreamstime is largely unaware of critical details about the cause of its ranking drop. (*Id.* ¶ 82.)

## B. Google's Deceptive Scheme to Retain Dreamstime as a Large AdWords Customer

In addition to its misrepresentations about the reasons for Dreamstime's organic drop, Google made multiple misrepresentations, omissions and half-truths with respect to Dreamstime's AdWords performance. First, Google misrepresented the knowledge and expertise of its AdWords representatives (the "reps") and concealed their true purpose and intent (to sell ads, not provide "support" or "consulting"). Google presented the reps as an added benefit to Dreamstime under the contract, when in fact they were only a benefit to Google. Then, having gained Dreamstime's trust, the reps misrepresented how specific advanced tools they were pushing worked, as well as their own understanding of them and how they would perform.

### 1. The AdWords Reps Promised They Were "Experts" to Gain Dreamstime's Trust

Google told Dreamstime its dedicated AdWords team was there to help it understand and utilize advanced advertising. The reps held titles such as "Account Strategist", "Account Manager," "Display Specialist" and "Measurement and Attribution Specialist." They claimed to be experts in AdWords with superior knowledge, experience, and access to more information than Dreamstime.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

(Marquart Dec. Ex. H, 277:20-278:19; Ex. B, 69:19-70:7, 93:20-94:6, 95:20-96:10; Ex. J, 43:13-44:4; Ex. I, 92:25-93:2, 93:11-16, 93:25-94:6; Ex. C, 15:22-23, 18:7-7, 92:4-8.)

The reps also agreed they intended Dreamstime to rely upon their expertise. Dreamstime's "account strategist" Tudor Marian believes Dreamstime sought his advice because he had access to knowledge and information in order to offer support, including campaign translation and implementation and optimization. (*Id*. Ex. H, 277:20-278:19.) He knew he was the person explaining how Google products worked to Dreamstime and that Dreamstime was looking for his expert advice. (*Id*., 279:2-7.) Marian admitted that it was reasonable for Dreamstime to rely on his advice. (*Id*,. 278:21-25.) "Account manager" Maria Stroe claims to have been an expert in Google search ads and display ads when she oversaw Dreamstime's account. (*Id*,. Ex. B, 69:19-70:7.) She did not consider Dreamstime to be a sophisticated user of AdWords and, with respect to Dreamstime's account, she believes [REDACTED] (*Id*., 93:20-94:6.) When she made recommendations to Dreamstime she intended that Dreamstime would follow them. (*Id*., 137:16-138:9.) "Display specialist" Olga Pavliuk gave recommendations to Dreamstime she expected Dreamstime to follow. (*Id*. Ex. C, 117:15-118:1.) Google's AdWords reps convinced Dreamstime that their superior experience, knowledge, and access to information uniquely suited them to decide what to do with Dreamstime's ad campaigns. (*Id*. Ex. A, 102:11-103:7.) Contrary to their testimony, they *did* at times also take control of the account, making various changes directly. (Enache Dec. ¶¶ 25, 65, 67; Marquart Dec. Ex. A, 106:7-22; Jianu Dec. ¶¶ 9, 32, 34, 35.)

## 2. AdWords Reps Concealed Their True Agenda

Dreamstime trusted the reps as if they were a part of its advertising team. But, notwithstanding their titles, every member of Dreamstime's AdWords support team was part of Google's sales team and received bonuses based upon their clients hitting quarterly revenue targets. (Marquart Dec. Ex. H, 77:6-17, 79:11-15; Ex. B, 81:17-24; Ex. J, 31:12-14; 273:2-5; Ex. I, 117:17-118:22; Ex. C, 76:9-77:7.) No aspect of their bonus was based upon Dreamstime's satisfaction. (*Id*. Ex. J, 69:4-10; Ex. H, 78:22-79:15.) Each quarter, Google told each of them the revenue targets required to make their bonus. (*Id*. Ex. H, 79:17-80:12; Ex. J, 76:19-77:14; Ex. I, 117:17-118:22; Ex. C, 77:21-78:8.) Dreamstime's spending was tracked in a platform that they could access. (*Id*. Ex. J, 76:19-77:14.)

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

Members of Google's dedicated team assigned to Dreamstime were secretly pressured to induce Dreamstime to spend more. For example, in June 2017, the AdWords reps admitted internally that the team was highly dependent on Dreamstime's business health, i.e., AdWords spending, and that they were **REDACTED** in 2017 from Dreamstime. (*Id*. Ex. I, 277:19-279:25; Ex. U.) In September 2018, Google's country manager for Romania emailed Dreamstime's Industry Manager, **REDACTED**

**REDACTED** (*Id*. Ex. I, 324:8-326:15; Ex. V.) Their unspoken priority was to push new products, increase the budget and then spend the whole budget quickly. (*Id*. Ex. A, 99:11-100:19.) Google's AdWords reps constantly advised Dreamstime to increase its AdWords budget to improve account performance. (Enache Dec. ¶ 14; Dobre Dec. ¶ 14; Jianu Dec. ¶ 36.) Yet some of the reps could not remember ever advising Dreamstime to lower its ad budgets or pause campaigns. (Marquart Dec. Ex. I, 188:15-19; Ex. B, 110:23-111:4.)

### 3. Google's Panoply of Material Misrepresentations and Half-Truths

After setting the trap with the illusion of expert support and consulting, and concealing their personal bonus motives, the AdWords reps engaged in a fraudulent scheme to cause Dreamstime to overspend on ads. The subsections that follow detail many of the specific misrepresentations the reps made to Dreamstime, organized by the type of campaign or bidding strategy.

#### a) Google's Target ROAS and Sign-Up Conversion Overcharge Shakedown

In 2014, Google reps Tudor Marian and Adriana Puchianu misrepresented to Dreamstime that switching to Google's new smart bidding strategy, Target ROAS (Return on Ad Spend), and making account-wide changes to track sign-ups to the website as conversions (instead of actual sales) would improve its account performance. Dreamstime had been successfully using another smart bidding strategy called "Conversion Optimizer" for years for almost all of its ad campaigns and was achieving its desired cost-per-acquisition ("CPA") of between $50-$60 in its main account. (Enache Dec. ¶ 10.) Google convinced Dreamstime to switch, with intentional deceit and devastating effects. Marian and Puchianu knew that an average account-wide CPA of no more than $70 was a necessity and repeatedly assured Dreamstime that switching to Target ROAS and counting sign-ups as conversions would achieve this goal. (*Id*. 18.) To convince Dreamstime to make these changes, Marian and Puchianu

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

told Dreamstime that: (1) they were well-trained on Target ROAS and fully understood how it worked; (2) sign-ups (or leads) had to be tracked across all accounts to activate Target ROAS; (3) the changes were just a "test" that could be reversed without any lasting damage to the account or any damage to existing campaigns; and (4) the they were "convinced" it fit within Dreamstime's advertising strategy and budget constraints.  (*Id.* ¶¶ 19-25.) These statements were verifiably false.

Though Marian and Puchianu assured Dreamstime that they understood this sophisticated tool very well and were well-trained on it, this was untrue.  Marian had not been sufficiently trained on it, and Dreamstime was one of the first clients to whom he recommended it.  (Marquart Dec. Ex. H, 33:24-36:4; 28:4-19; 36:5-38:9.)  More importantly, Puchianu incorrectly told Dreamstime that to use Target ROAS it "need[ed] to set up in the account the 2 types of conversions (lead [i.e., sign-up] and purchase)." (Enache Dec., Ex. E.; Marquart Dec. Ex. H, 166:15-167:6.) Marian also told Dreamstime the system needed sign-ups tracked to work effectively.  (Enache Dec. ¶ 21.) Marian now admits he knew Target ROAS did *not* require sign-ups to be counted. (Marquart Dec. Ex. H, 136:24-138:19.) Dreamstime expressed concerns about counting sign-ups (because its goal was to attract purchasing customers and not ones that only signed up) and tried to assign no value to sign-up conversions, but Puchianu told them "we must have a value for leads." (Enache Dec., Ex. F.) The reps assured Dreamstime that the system would optimize for purchases and that any sign-ups were just a bonus. (*Id.* ¶ 22.)  Following their advice and instructions, Dreamstime began counting sign-ups as conversions and switched to Target ROAS.  (*Id.* ¶ 24.)

The Google reps did not explain that an account-wide change to track sign-ups as conversions could easily damage most of Dreamstime's other campaigns that were using "Conversion Optimizer" by favoring meaningless sign-ups over actual purchases and drastically increasing Dreamstime's cost per purchase. (*Id.* ¶¶ 25, 28.) The high value assigned to sign-ups based upon Google's advice ($10, then $4-5, then $2) resulted in what Marian called "chaos," and damaged the whole account in lasting ways. (Marquart Dec. Ex. H, 220:2-21; Enache Dec. ¶¶ 28, 31, Ex. I.)  Google knew Dreamstime did not value sign-ups and continued to measure its performance based upon purchases. (*Id.* ¶ 26.)  Yet, because of this change, all of the historical data that the Conversion Optimizer had used to generate purchase conversions below $70 was irreversibly tainted by an influx of thousands of low valued

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

(and, to Dreamstime, essentially *no-value*) sign-up conversions. (*Id.* ¶ 28.)

Nevertheless, Marian assured Dreamstime that he was "convinced" things would improve as the system "learned." (*Id.* ¶ 29.) Marian set up and activated Dreamstime's Target ROAS campaigns and, over the next several months, he and Puchianu oversaw the account performance. (*Id.* ¶¶ 30-42.) Dreamstime was surprised to see it could not assess the CPA for purchase conversions. (*Id.* ¶ 28.) Marian had failed to disclose that Google's system made it prohibitively difficult to track the performance of purchase and sign-up conversions separately, and that Dreamstime would not be able to see detailed information about its real CPA for these campaigns. (*Id.*)

The initial results were "chaotic" according to Marian, but for months he and Puchianu repeatedly assured Dreamstime that they would improve once the system had time to "learn."[2] (*Id.*¶ 39. Exs. F, G.) Puchianu cautioned Dreamstime that pausing sign-up tracking was an "extreme" solution and Dreamstime needed to wait for the system to adapt, and Marian again assured Dreamstime that Target ROAS would improve soon. (*Id.* ¶ 34, Ex. I; Marquart Dec., Ex. AA.) Throughout this time, Marian continued to make manual changes to the campaigns in an (ultimately futile) effort to make them work. (*Id.* Exs. Z, AA; Enache Dec., Exs. G, I, J.) He also told Dreamstime he was consistently informed by Google's technical specialists (*Id.* ¶ 37), but he now admits he did not even know what the specialists were doing. (Marquart Dec. Ex. H, 186:17-187:6, Exs. Y, AA.) In other words, Marian's statement that he was actively resolving issues with tech support was false.

After months of following the reps' advice and giving them control over the strategy, the results were terrible. Marian told Dreamstime that "the status of sign-ups is very chaotic, there's no clear trend." (Enache Dec., Ex. K.) Dreamstime, concerned that tracking sign-up conversions had caused an increase in the CPA for purchases, asked if it could stop counting sign-ups. (*Id.* ¶ 39, Ex. I.) Marian finally responded that Dreamstime did not have "something [i.e., anything] to lose" by pausing them. (*Id.*). Dreamstime then paused counting sign-ups. (*Id.*) A significant drop in volume for the Target

---

[2] Google frequently compounded and disguised its fraudulent scheme by mispresenting the extent to which various machine learning tools had to "learn," usually claiming this took between two weeks and one month for desired results. (Marquart Dec. Ex. H, 164:2-165:4; Ex. C, 114:20-118:1, 119:16-120:18; Ex. BB; Ex. W.) The Google reps used this an excuse to explain away performance issues and to obscure the reasons why campaigns were not working as represented. Internally, they admitted that they had misrepresented the system's learning period to Dreamstime. Radu Stoica wrote, " REDACTED " (*Id.*, Ex. X.)

ROAS campaigns and in the number of purchase conversions immediately followed. (*Id.*) Worse, by then the other Conversion Optimizer campaigns had to re-learn based upon new data, and lasting damage had occurred to the whole account. (*Id.* ¶¶ 41-42; Ex. M.)

Google's internal communications show it was *intentionally* misrepresenting facts about Target ROAS. A Marian email with Google support later in 2014 shows that he did not understand how Target ROAS worked and was surprised it had affected the volume and costs of Dreamstime's purchases. (*Id.*, Ex. L.) REDACTED

(emphasis added). When he finally switched the campaigns back to Conversion Optimizer, he admitted internally that REDACTED

(*Id,.* Ex. M.) In other words, the Conversion Optimizer had to start over, and it was unable to use the historical data it had built for years to meet Dreamstime's $60-$70 CPA. (*Id.*) In another email with technical support, Marian summed up the true facts: REDACTED

(Enache Dec., Ex. N.)

In the end, despite Marian's repeated assurances that "there is nothing irreversible and no technical problem for the current situation" and that "the situation will quickly improve" (*Id.. ¶* 44, Ex. M.), Dreamstime's average CPA never returned to $70 and grew steadily over the ensuing years as the system "re-learned." (*Id.* ¶ 44.) Thus, it was objectively not true (and Google knew it) that: (1) Google' reps were well-trained on Target ROAS, were meaningfully accessing tech support and other information, and fully understood how it worked; (2) sign-ups had to be tracked; (3) the changes were just a "test" that could be reversed without any lasting damage; and (4) the strategy fit within Dreamstime's CPA targets. If Dreamstime had known the true risks or the reps' lack of expertise, it would not have made these changes and would have saved millions of dollars (*Id.* ¶ 21.)

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

b)  **Google's Dynamic Remarketing Ad Debacle**

In June 2014, Google reps recommended that Dreamstime begin using another sophisticated machine-learning tool, dynamic remarketing display ads.  (Enache Dec. ¶¶ 47-49; Jianu Dec. ¶¶ 18-19.)  Stroe explained that Google can remarket users in a dynamic, customized way by showing them, upon later visits to the web, ads containing the exact (or at least very similar) images they had interacted with on Dreamstime's website. (*Id.*) Dreamstime was interested in this feature as described, because for it to be effective for Dreamstime the remarketed image needed to be either the exact same image the user had previously seen or at least something very similar. (*Id.*) Dreamstime explained this to Stroe and other Google reps on multiple occasions before agreeing to this program. (*Id.*)

Stroe confirmed in writing with Dreamstime that, with dynamic marketing, "we're retargeting every user, in a customized manner, with banners that show him the exact image or category of images that he left in the Lightbox or viewed on the website but didn't download . . .."  (Enache Dec. ¶ 49, Ex. O.)  Stroe explained that, to use Google's dynamic remarketing, Dreamstime needed to create a remarketing feed that included the items or images it wanted to remarket to users.  (*Id.* ¶¶ 48-49.) Google focuses on a single reference in an early Stroe email to a feed size limitation of 450,000 items, but this misses the point.  Regardless of the feed's size, Dreamstime was concerned about how and whether images would be shown to users.  Stroe assured Dreamstime that the limited feed was sufficient even though Dreamstime had **tens of millions** of items for sale on its website. (*Id.* ¶¶ 48-49, Ex. O.)  This was wrong and she knew it.

Stroe knew Dreamstime required an exact image, a very similar image, or else *no image at all* be shown to a past user.  (*Id.* ¶ 47.)  Nevertheless, she intentionally omitted that, if the exact or very similar image was not viewed by the user, Google's automated system would *still* pick an image (even a wholly unrelated one) to show the user in that instance.  (*Id.* ¶¶ 47-49, 52.)  Now, Stroe has admitted that she knew that REDACTED then the system would show the user REDACTED REDACTED"  (Marquart Dec. Ex. B, 178:9-179:20.)  Hence the images presented to most users were completely unrelated, without any other signal of similarity.

Aside from that direct lie about how the system worked, Google intentionally (or at least

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

recklessly) misrepresented the appropriateness of the tool for Dreamstime. Knowing the feed size limitations (less than 5% of Dreamstime's total products), Google's reps told Dreamstime the system was appropriate. They quickly learned this was not true, but they hid this fact. Google's own tech support told Puchianu in July 2014 that a feed size of less than 25% was inappropriate, and Stroe now admits she knew that optimal performance required 100%. (Enache Dec. ¶¶ 53-54, Ex. Q.) The reps did not mention this to Dreamstime, instead assuring it that the system would select and serve only images that sufficiently matched what the user had viewed on Dreamstime's site and never explaining that Google would serve an irrelevant image if all else failed. (*Id*.) As a result, Google remarketed totally unrelated images to users in a way that made the remarketed images inappropriate. (Enache Dec. ¶¶ 56-57, Exs. T, U, V; Jianu Dec. ¶ 24.)

More recently, in February 2017, Google promised Dreamstime a feed that would include all items on Dreamstime's website, but that too proved false. Olga Pavliuk, another Google AdWords rep, made this promise only after Dreamstime began using a competitor. (Marquart Dec. Ex. C, 183:24-184:22; Enache Dec., Ex. W.) As it turned out, Google could not transform the feed Dreamstime was using with Google's competitor due to technical limitations and Pavliuk did not check with tech support before telling Dreamstime that it could. (*Id*. ¶¶ 59-60.) Pavliuk now admits she just "assumed" that Google could handle this feed size. (Marquart Dec. Ex. C, 183:24-184:22.) Internal communications show she was under intense pressure to convert the competitor's feed to keep Dreamstime's business. (*Id*. Ex. C, 188:4-189:25, 193:1-194:1, 198:2-199:20; Enache Dec., Exs. X, Y.) These events caused Dreamstime to overpay for campaigns that did not work as represented and caused irreparable reputational harm. (Enache Dec. ¶¶ 61-62; Jianu Dec. ¶ 25.) Thereafter, Dreamstime continued to uncover more lies about how the feed really worked, as detailed in its declarations (*Id*.) Now it uses remarketing in a limited context when appropriate but would not have employed it so broadly if it knew the true facts and risks. (Enache Dec. ¶ 62.)

### c) Google's Overhyped Foreign Localized Ads Program

Google's reps induced Dreamstime to invest in foreign language and localized ads that performed far worse than represented. (Enache Dec. ¶¶ 63-67; Jianu Dec. ¶¶ 30-36.) In meetings and correspondence in 2017, Google pushed Dreamstime to create foreign language and localized ad

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

1  campaigns according to the Google reps' specifications, even though similar campaigns created by

2  Google reps for Dreamstime in the past had delivered lackluster results. (Jianu Dec. ¶¶ 30-33; Dobre

3  Dec. ¶¶ 61-64; Enache Dec. ¶¶ 63-66.)  Google's reps assured Dreamstime that, this time, they had

4  the experience and training necessary to deliver excellent results with these campaigns and that the

5  technology had advanced. (*Id*.)  At Google's request, Dreamstime granted the reps full control over

6  the campaigns. (Jianu Dec. ¶¶ 32, 34.) Google created the campaigns, translated them, and made

7  creative decisions. (*Id*. ¶ 33.) When they did not work as stated, Google's reps could not provide an

8  explanation. (Jianu Dec. ¶ 35; Dobre Dec. ¶¶ 63-64.) Google's internal communications show the

9  reps did not know how they worked as they falsely claimed. (Jianu Dec. ¶ 35; Marquart Dec., Ex. X.)

10           d)  **Google's HTML5 Banner Ads Blunder**

11      In 2015 and 2016, Google disapproved many of Dreamstime's display banner ads as "trick to

12  click" even though Google had not disapproved nearly identical banner ads with higher CPAs.

13  (Enache Dec. ¶ 68; Dobre Dec. ¶¶ 27-28.)  Dreamstime's competitors also ran similar ads. (*Id.*)

14  Dreamstime asked for an explanation but received no clear answer until late 2016.  (Dobre Dec. ¶ 28,

15  Ex. C.)  Google rep Raul Altarescu told Dreamstime that Google's own policy reviewers could not

16  agree as to whether the ads with search boxes were trick to click and told Dreamstime it could just

17  re-submit the same banner ads and Google might re-approve them.  (*Id.*)  Following this advice

18  resulted in ads being approved that ultimately had a higher CPA. (Dobre Dec. ¶ 28; Jianu Dec. ¶ 26;

19  Enache Dec. ¶ 69.)  Google then offered a "solution" and again intentionally misrepresented facts

20  about how this new solution worked. (Dobre Dec. ¶¶ 29-35; Jianu Dec. ¶ 29; Enache Dec. ¶¶ 70-72.)

21      Specifically, in December 2016, Altarescu recommended that Dreamstime create banners

22  programmed in HTML5, which were functional search bars that, according to Altarescu, actually

23  performed a search. (Dobre Dec. ¶¶ 30-34.)  He told Dreamstime that he confirmed with Google's

24  policy teams that these HTML5 banner ads would be approved and would not require any additional

25  costs or third-party services to operate.  (*Id.*)  This was not true. Dreamstime followed his instruction,

26  creating and submitting the banners. (*Id.*)  In December, Altarescu learned in December 2016 from

27  tech support that the ads would not work shortly after he recommended them – but did not tell

28  Dreamstime. (Dobre Dec. ¶¶ 37-35, Ex. F.) Google claims Altarescu told Dreamstime to take a pause

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

in December but, in January 2017, other reps gave Dreamstime the all clear to submit more. (*Id.* ¶¶ 39-40, Exs. H, I.) It did so. The usual pattern followed: a series of technical issues (including the disapproval of better performing banner ads), followed by a series of false promises of solutions from the Google reps, which triggered significant delays and costs. (Dobre Dec. ¶¶ 41-49; Jianu Dec. ¶¶ 28-29; Enache Dec. ¶¶ 71-72.) It was not until April 2017, after months of frustration and poor performance, that Google's reps finally told Dreamstime what it knew in December – it was not technically possible to run these ads as Altarescu stated. (*Id.*) Later, when Google's management waded into this misinformation to craft an excuse for Dreamstime, a country manager wrote internally to her team that "we are talking about a law suite (sic) here." (Marquart Dec., Ex. N.) Google places undue reliance, and misconstrues, an early 2017 internal email from Ms. Dobre to Enache to bolster its defense. (Motion at 10, 23.) However, Ms. Dobre was addressing only three points in a long list of issues, and many of the misrepresentations pre-date Ms. Dobre's arrival (e.g., Target ROAs, sign-up change) while others were revealed later (e.g., HTML5 ads.) (*See* Dobre Dec. ¶¶ 50-60.)

## IV. <u>LEGAL STANDARD APPLICABLE TO SUMMARY JUDGMENT MOTIONS</u>

Summary judgment is only appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012). "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). The trial "court must draw all reasonable inferences in favor of the nonmoving party, and it may not . . . weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## V. <u>LEGAL ARGUMENT</u>

### A. Dreamstime Has Proven its Unfair Competition Claims

Section 17200 of the California Business & Professions Code, the Unfair Competition Law ("UCL"), covers acts that are "unfair" or "fraudulent" or "unlawful." *People ex rel v. Fremont Life*

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

*Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002). "Each prong of the UCL is a separate and distinct theory of liability … [and] offers an independent basis for relief." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). The UCL is a *strict liability* statute and it is not necessary to show that Google intended to harm or injure Dreamstime, competitors, or consumers. *See Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 181 (2000). Consequently, Google's arguments that it did not change its organic search algorithms to harm Dreamstime, or "had no motive to harm Dreamstime's search ranking," do not provide any defense. (Motion at 4, 15.) Google's clear plan, which was successful over an extended period, was to lure Dreamstime into spending more and more money on ads, as represented by a CPA over the relevant period that doubled the CPA that Google represented would not be exceeded. Moreover, "[w]hether a practice is deceptive, fraudulent, or unfair is generally a question of fact not appropriate for resolution on the pleadings." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008).

### 1. Fraudulent Prong of UCL

Dreamstime has presented sufficient evidence to show that Google has engaged in fraudulent business practices.[3] As this Court summarized previously, Dreamstime claims that it detrimentally relied on Google's "false statements" and "pour[ed] more money into its AdWords campaign" as a result. Dkt. 72 at 18. The following subsections analyze Google's affirmative lies, half-truths and false "expert" advice, all of which are actionable under the fraud prong, on the fully-developed record.

### a) Google Affirmatively Lied and Concealed Facts to Induce Dreamstime to Overspend

Under the UCL's "fraud" prong, "[a] fraudulent business practice is one which is likely to deceive the public." *McKell v. Wash. Mutual* 142 Cal. App. 4th 1457, 1471 (2008). "Intent" does not require the intent to injure the plaintiff, but merely the intent to induce "reliance." *See Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996); *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 93 (2001). A claim "can be based upon representations that deceive because they are untrue *as well as representations that may be accurate on some level but nonetheless tend to mislead or deceive*. As such, a perfectly true statement couched in such a manner that is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under Section 17200." *Gutierrez v. Wells*

---

[3] It does not appear from its Motion that Google is challenging the causation or restitution elements of Dreamstime's UCL claims.

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1  *Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1127 (N.D. Cal. 2010), *aff'd in part, rev'd in part and*

2  *remanded by* 704 F.3d 712 (9th Cir. 2012) (emphasis added). "Omissions can form the basis of a

3  fraudulent UCL claim." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1112 (N.D. Cal. 2015). "[W]here

4  a failure to disclose…is calculated to induce a false belief," the distinction between an affirmative

5  misrepresentation and an intentional concealment claim is "tenuous. Both are fraudulent." *Lovejoy*,

6  92 Cal. App. 4th at 97 (quoting *Stevens v. Super. Ct.*, 180 Cal. App. 3d 605, 609 (1986)).

7      Dreamstime has presented numerous fraudulent statements and omissions made by Google about

8  how certain ads and strategies worked which induced it to overpay for AdWords. Google's reps knew

9  Dreamstime did not (and could not) fully understand how these technologies worked, so Google

10  touted its expertise, superior knowledge and special access to tech support to induce Dreamstime to

11  go forward. Its reps misrepresented these facts *and* specific facts about how the technologies worked.

12      For example, Google induced Dreamstime to make the account-wide change to tracking sign-ups

13  as conversions as part of an effort to sell Target ROAS. Google told Dreamstime: (1) its reps were

14  well-trained on Target ROAS, had special access to tech support and other information, and fully

15  understood how it worked; (2) sign-ups had to be tracked across all accounts to activate Target ROAS;

16  (3) the changes were just a "test," and Dreamstime could reverse course without any lasting damage

17  to the account or any damage to existing campaigns; and (4) the reps were "convinced" it fit within

18  Dreamstime's advertising strategy and budget constraints (an overall CPA of $70 per *purchase*

19  transaction). These statements were all false and deceptive. The fact that Google reps *knew* they

20  were misrepresenting these facts to Dreamstime when they made them is evident from Google's

21  admissions in deposition and contemporaneous internal communications. They have now admitted

22  they knew sign-ups did not have to be counted at all to employ Target ROAS. In addition, the Google

23  rep (Marian) admitted in internal emails with Google tech support that he did not understand how

24  Target ROAS functioned and was surprised it achieved such terrible results. In other words, Google's

25  reps did *not* understand how it worked, tracking sign-ups was *not* required, it *did* cause lasting

26  damage, and it did *not* improve Dreamstime's stated CPA (in fact, it increased it greatly).

27      The same is true for several other campaigns. For example, Google presented dynamic

28  remarketing ads (another machine-learning tool) as a great fit for Dreamstime by misrepresenting

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

how it worked. Google told Dreamstime it worked by retargeting a user in a "customized" way, by showing the user an exact or very similar image to one he viewed, but failed to mention that Google would serve a completely unrelated image if no exact or very similar image was in the feed. The product did not work as promised, and the reps knew that. Stroe admitted at deposition that the system did not work this way – it would serve some image even if no exact or very similar one were available. Puchianu also exchanged emails early on with tech support showing she knew the limited feed size made it technologically inappropriate in this case, but did not share this information. Google focuses on Stroe's reference to a feed limit in one email as "proof" she was being honest. However, it ignores that Stroe (and others) knew for years hid the most important facts about how Google *served* images and hid the inability of the system to serve at least a very similar image or no image at all. Even after Stroe's email, Google continued to misrepresent how these ads worked. Dreamstime has presented similar evidence regarding HTML5 display ads and other localized ads (among others).

Google also concealed material facts about its organic search performance from Dreamstime. Countless internal emails make Google's intent crystal clear – keep Dreamstime spending (and it did). Knowing Dreamstime suspected an algorithmic change, they instead persistently called attention to issues related to Dreamstime's website, assuring Dreamstime that Google's algorithm was not the culprit. It has taken years of litigation to finally learn how Google made material changes to its search algorithm *right when Dreamstime's drop began to occur*.[4] In addition, other affirmative statements in the expert analysis Google provided to Dreamstime regarding its organic drop have now been debunked by *Google*. Its primary conclusion that Dreamstime's weak content was to blame for its drop was refuted by Google's own witness. (Stricchiola Dec. Ex. N, 174:2-178:7.) And, while Fischer was unaware of the 2015 algorithmic change, he ruled out Dreamstime's other suspected algorithmic change, strongly implying no algorithm was to blame. These deceptive statements sent Dreamstime on a multi-million-dollar wild goose chase to fix itself while it poured more into AdWords to try to regain visibility. Even if technically accurate, these statements were clearly misleading. As this Court has already said, that is enough. *Gutierrez*, 730 F. Supp. 2d at 1127.

---

[4] "Active concealment or suppression of facts. . .'is the equivalent of a false representation, i.e. actual fraud.'" *Vega v. Jones, Day, Reavis & Pogue,* 121 Cal. App. 4th 292, 295 (2004).

Google spoke actionable half-truths to Dreamstime. "One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud." *Intrieri v. Super. Ct.*, 117 Cal. App. 4th 72, 86 (2004) (quoting *Cicone v. URS Corp.*, 183 Cal. App. 3d 183, 201 (1986)). The Supreme Court has made clear that, if a "defendant does speak, he must disclose enough to prevent his words from being misleading." *Universal Health Servs., Inc. v. United States,* 136 S. Ct. 1989, 2000 n.3 (2016); *see also Vega,* 121 Cal. App. at 292 ("Even where no duty to disclose would otherwise exist, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated.").

Many of Google's statements about its ad tools and strategies, if not outright lies, are at least half-truths. For example, Google did not inform Dreamstime that counting sign-ups as conversions and implementing Target ROAS would destroy the rest of its ads, or inform it of the various risks of these changes. Marian now admits he was aware of these risks, such as lasting effects on machine learning ads from counting sign-ups, or the problems with tracking sign-ups when one is only interested in purchases. (Marian Dec. ¶ ¶ 16, 39.) But, though claims he did, he did not share those serious risks with Dreamstime. (Enache Dec. ¶ 32.) This destroyed the ads' performance and badly damaged many other ads. Likewise, with respect to dynamic remarketing campaigns, Google did not tell Dreamstime that a feed size of less than 5% of its total products was not remotely appropriate, or that Google's system would serve almost any image if an exact or very similar image was unavailable. This, again, caused irreparable damage. And, with HTML5, Google literally advertised a feature that did not work and *sat* on information about this fact for several months as Dreamstime spent away on these ads.

Finally, Google argues it has no obligation to speak about organic issues as a matter of its own policy. But when it breached its own so-called wall of "strict separation between its search engine and its ads business" (Motion at 3) and provided "some" information (albeit erroneous), it was obligated to tell the *whole* truth about the causes of Dreamstime's organic drop.[5] Google cannot

---

[5] Google also cannot be heard to try to isolate itself from liability by erecting artificial walls and donning ear muffs. A corporation can only act through its employees and agents. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015). Indeed, a corporation cannot "know" or "intend" anything, it is the intent of its employees that must be imputed to the corporation through traditional agency principles. *Id.* at 475-76; *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 n.28 (9th Cir. 1990) (A corporation is responsible "for a misleading statement made by an employee or other agent who has actual or apparent authority.").

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

dispute that it told Dreamstime only half the truth (if that). Dreamstime asked whether an algorithm or something on its end was to blame for its organic troubles. Google time and again responded by pointing to various problems related to Dreamstime's website. Then Dreamstime said it could not keep up its AdWords investment. So, Google provided it an "expert" opinion that eliminated one algorithmic change and listed problems with Dreamstime's content, adding that this analysis "confirmed" what a Google engineer said to Dreamstime on a public forum. Then, Google executives with access to search employees ignored that access and chose to reiterate prior messages. If Google had even searched its files for "dreamstime," it would have identified the 2015 algorithmic change that resulted in a "_____ loss" to Dreamstime's tens of millions of product pages. **REDACTED**

**REDACTED** No one told Dreamstime that Google had not even checked its algorithmic changes – while Dreamstime continued to spend millions on Google ads. Should any one individual plead ignorance, these statements were still actionably reckless.[6]

### c) Google Had Superior Knowledge

Google argues that its representations were not "promises" but mere "recommendations" that are not actionable as fraud. However, "when 'a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact.'" *Terra Ins. Co. v. New York Life Inv. Mgmt. LLC.*, 717 F. Supp. 2d 883, 891 (N.D. Cal. 2010) (quoting *Neu-Visions Sports, Inc., v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 308 (2000)). This Court, quoting *Pacesetter Homes, Inc. v. Brodkin,* 5 Cal. App. 3d 206, 211 (1970), likewise held that "'circumstances resulting in expressions of opinion being treated as misrepresentations have been found where the one expressing the opinion does not in fact entertain it.'" *Terra Ins.*, 717 F. Supp. 2d at 891.[7]

This is true of the various AdWords strategies explained above. Dreamstime told Google it did

---

[6] "[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 51, 974 (1997) (A statement is "carelessly and recklessly made" when it is made "in a manner not warranted by the information available to the defendant."); *see also, Cont'l Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal. App. 3d 388, 428 (1989).
[7] Whether a statement is a nonactionable opinion or an actionable misrepresentation, is a *fact* question for the jury. *See PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 931 (9th Cir. 2010).

not understand technologies like Target ROAS or the effects of changes to conversions types on all of its ads, but Google's reps (claiming superior knowledge and information) told Dreamstime that the strategies they were pushing would meet its overall CPA and that the ads worked in ways that they simply did not. The reps continued to say they were "convinced" in the strategy and never admitted their lack of understanding even when the strategy resulted in "chaos." These statements were not opinions, they were statements by purported experts with unique knowledge and exclusive access to technical support. They were also wildly wrong, as Google reps often secretly admitted.

It is also universally accepted that Google's search algorithms are a "black box." Google goes to great lengths to ensure that neither the public nor Dreamstime is made aware of their inner workings. Thus, when Google stated that something on Dreamstime's end (not an algorithm) was the cause of its organic traffic loss, these were not mere opinions. Dreamstime reasonably relied upon them.

In sum, the record contains multiple instances of conflicting witness testimony on material issues of fact, and many other candid admissions by Google that evidence its fraudulent intent. Whether Google conned Dreamstime into to overspending on numerous AdWords campaigns, and the materiality and falsity of Google's misrepresentations/omissions, are issues of *fact*.[8]

### d) Unfair Prong of UCL

As to the "unfair" prong, "a practice may be deemed unfair even if not specifically proscribed by some other law." *Cel-Tech Commc'n, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180. (1999) When a UCL claim is brought by a "consumer," as here, courts deem conduct "unfair" where "the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Hodson v. Mars, Inc*., 891 F.3d 857, 866 (9th Cir. 2018); *see also McKell,* 142 Cal. App. 4th at 1473; *S. Bay Chevrolet v. Gen. Motors Acceptance Corp*., 72 Cal. App. 4th 861, 866 (1999). The record of Google's alleged conduct, including its breaches of the implied covenants in the AdWords contracts and which flowed from the parties' extended contractual relationship, certainly satisfies one or more of these "unfair" criteria. Significantly, in *In re Google AdWords Litig.,* 2011 WL 7109217 (N.D.

---

[8] *See, e.g., Garter-Bare Co. v. Munsingwear, Inc.,* 650 F.2d 975, 981 (9th Cir. 1980) ("Fraud claims normally are so larded with fact issues (including issues as to intent) that summary judgment is seldom possible."); *Swafford v. Int'l Bus. Machs. Corp.*, 408 F. Supp. 3d 1131, 1142-43, 1146-47 (N.D. Cal. 2019) (Whether a statement is false and whether a plaintiff's reliance is reasonable, are questions of facts reserved for the jury); *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 977 (1997).

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Cal. Mar. 17, 2011), a consumer class action asserting that Google's AdWords practices were fraudulent or unfair under the UCL, Judge Ware found that plaintiffs stated an actionable UCL claim.

The Ninth Circuit has also applied the *Cel-Tech* test for "unfairness" when conduct is "tethered to some legislatively declared policy." Dkt. 72 at 17. This Court previously articulated that Google's alleged breaches are tethered to "a legislatively declared policy and is a sufficiently alleged unscrupulous behavior substantially injurious to Dreamstime." *Id.*

### e) Unlawful Prong of UCL

With respect to the "unlawful" prong, virtually any "civil or criminal, federal, state or municipal, statutory, regulatory, or court-made" or local law can serve as the predicate. *Gafcon, Inc. v. Posner & Assocs.*, 98 Cal. App. 4th 1388, 1425 n.15 (2002) (internal citations omitted). This Court found at the pleading stage that: "[Dreamstime's] claim under the unlawful prong is derivative of the. . .breach of the implied covenant of good faith and fair dealing and therefore may move forward." Dkt. 72 at 17. Consequently, if the Court denies Google's present Motion as to this claim, the breaches constitute viable predicate acts for imposing UCL liability under the "unlawful" prong.

### B. Dreamstime Has Also Proven its Contract-Based Claims

Dreamstime claims that Google violated the implied covenant by, among other things, making misrepresentations about its AdWords program and Dreamstime's search performance, inducing it to overspend on AdWords.[9] In fact, without Google providing this support and advice, Dreamstime would not have entered into these advanced campaigns. In denying Google's motion to dismiss, this Court previously ruled that: "Enough has been shown to support the notion that Google took affirmative steps to frustrate the purpose of the agreements," and that "Google pretended to work to resolve purported 'policy issues' with Dreamstime's ads while actually subverting and frustrating the ability of Dreamstime to realize the benefits of its contract." Dkt. 72 at 16-17. Dreamstime has now provided the evidence to prove this claim, or at least raised disputed fact issues. Indeed, "[t]he issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily a

---

[9] Implied in every contract is a covenant of good faith and fair dealing such that neither party will compromise the rights of the other to receive the contract's benefits. *Merritt v. J.A. Stafford Co.*, 68 Cal.2d 619, 626 (1968); *Mundy v. Household Fin. Corp.*, 885 F.2d 542, 544 (9th Cir. 1989); *Locke v. Warner Bros.*, Inc., 57 Cal. App. 4th 354, 363 (1997); Dkt. 72 at 16. The covenant aims to effectuate the contract's purposes and promises, and to protect the parties' legitimate expectations. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 683-84 (1988).

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

question of fact unless only one inference [can] be drawn from the evidence." *Moore v. Wells Fargo Bank, N.A.*, 39 Cal. App. 5th 280 (2019) (internal quotations omitted).[10]

Google fleetingly refers to Dreamstime's implied covenant claim but does not identify its elements or seriously challenge Dreamstime's proof. (Motion at 9.) Instead, buried at the end of the Motion is an argument that Dreamstime has not shown "bad faith." (Id. at 24.) However, "a breach does not require subjective bad faith or a breach of the contract's express terms." *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1103 (E.D. Ca. 2010). Rather, "[t]his covenant [of good faith and fair dealing] not only imposes upon each contracting party ***the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own***, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." *Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1093 (2004) (emphasis added).

Google offered Dreamstime premium "support" in performance of the AdWords contract, but then made systematic misrepresentations, omissions and misdirection regarding Dreamstime's AdWords and search performance (the "see" to the AdWords "saw"). Honesty is at the heart of good faith. *See Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 59 (2002) ("A lack of good faith . . . suggests a moral quality, such as dishonesty, deceit, or unfaithfulness to duty."); *R. J. Kuhl Corp. v. Sullivan*, 13 Cal. App. 4th 1589, 1602 (1993) ("Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.") (quoting Restatement (Second) of Contracts § 205 (1981)). More specifically, "The covenant requires cooperation in carrying out the contract and honesty in creating or settling disputes." *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 777 (9th Cir. 1990). Google was aware it was in conflict with Dreamstime, but rather than address the issue forthrightly, it continually provided misinformation to Dreamstime, inducing it to spend more and more on AdWords.

Google points to a "no guarantees" clause in its adhesion Ad Agreement and the lack of any express obligation requiring it to provide Dreamstime with effective and honest service or support as shielding it from any liability.[11] But once Google decided to exercise its discretion under the contract

---

[10] *See also Locke*, 57 Cal. App. 4th at 367 (Whether defendant "violated the implied covenant … is a question for the trier of fact.").

[11] With respect to the "no guarantees" clause specifically, as previously briefed, an exception exists, as here, when one party is given absolute or unfettered discretion over whether or not to perform. *Third Story Music, Inc. v. Waits,* 41 Cal. App. 4th 798, 805 (1995). In such cases, the

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

and voluntarily undertook to provide advice and support to Dreamstime, it had to do so in good faith (i.e., honestly), whether or not such conduct was prescribed by the contract. *See, e.g., Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 795 (1998) ("the *exercise* of discretionary powers conferred on a party by contract must also be evaluated under the implied covenant") (emphasis in original).[12] Failure to do so is a breach of the covenant. Google may not initially have been obligated to explain Dreamstime's drop in search performance, or to provide service that would purportedly improve the efficacy of Dreamstime's ads to offset its drop in search ranking, but once it set out to do so it had to do so in good faith, to deal fairly. There is at least a question of fact as to whether Google did so.

### C. Google's Fraud and Breaches are Not Immune Under the First Amendment

Dreamstime's claims do not infringe Google's editorial judgment, right to alter its search algorithms, or decisions on search rankings. They are premised on Google's misrepresentations, half-truths and omissions made to Dreamstime concerning the causes for the demotion of Dreamstime's website, and Dreamstime's detrimental reliance thereon. This Court already foreclosed Google's First Amendment defense in this case: "Just like a fast talking con-artist cannot hide behind the First Amendment, neither can Google." Dkt. 85 at 3. "Victims [of a violation of general laws] can sue all day long." *Id.* at 4. Accordingly, Google's fraudulent conduct and breaches strip any immunity.

### VI. **CONCLUSION**

Defendant Google's Motion for Summary Judgment should be denied in its entirety.

---

performance of one party's obligation is dependent on that party's own discretion, rendering the contract illusory. *See Mattei v. Hopper*, 51 Cal. 2d 119, 122 (1958) ("[I]f one of the promises leaves a party free to perform or to withdraw from the agreement at his own unrestricted pleasure, the promise is deemed illusory and it provides no consideration."). To save such contract terms, courts will engraft the implied covenant into the term. *See, e.g., Reyes v. Wells Fargo Bank, N.A.,* 2011 WL 30759, at *16 (N.D. Cal. Jan. 3, 2011) (contract allowing termination of agreement at defendant's sole discretion at any time would be illusory unless the Court implies the covenant into it) (*citing Storek,* 100 Cal. App. 4th at 57 ); *see also Locke.,* 57 Cal. App. 4th at 376 (where contract allowed studio discretion to develop the plaintiff's projects, the implied covenant obligated studio to exercise that discretion honestly and in good faith); *InfoStream Grp., Inc. v. PayPal, Inc.,* 2012 WL 3731517, at *8 (N.D. Cal. Aug. 28, 2012).

[12] "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal. Inc.,* 2 Cal.4th 342, 372 (1992); *see Perdue v. Crocker Nat'l Bank,* 38 Cal.3d 913, 923 (1985).

PLAINTIFF'S OPPOSITION TO DEFENDANT GOOGLE'S MOTION FOR SUMMARY JUDGMENT

Dated: May 15, 2019

BAKER MARQUART LLP

By:    /s/ Jaime W. Marquart
           Jaime W. Marquart

BAKER MARQUART LLP
Jaime W. Marquart (State Bar No. 200344)
jmarquart@bakermarquart.com
Donald R. Pepperman (State Bar No. 109809)
dpepperman@bakermarquart.com
777 S. Figueroa Street, Suite 2850
Los Angeles, CA 90017
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

BAILEY DUQUETTE P.C.

By:    /s/ James Bailey
           James Bailey

BAILEY DUQUETTE P.C.
James Bailey (*pro hac vice*)
james@baileyduquette.com
100 Broadway, 10th Floor
New York, NY 10005
Telephone: (212) 658-1946
Facsimile: (866) 233-5869

*Attorneys for Plaintiff*
DREAMSTIME.COM, LLC