BAKER MARQUART LLP
Jaime W. Marquart (Bar No. 200344)
 jmarquart@bakermarquart.com
Donald R. Pepperman (Bar No. 109809)
 dpepperman@bakermarquart.com
Brian T. Grace (State Bar No. 307826)
 bgrace@bakermarquart.com
777 S. Figueroa Street, Suite 2850
Los Angeles, CA 90017
Telephone:    (424) 652-7800
Facsimile:    (424) 652-7850

BAILEY DUQUETTE P.C.
James Bailey (*pro hac vice*)
 james@baileyduquette.com
104 Charlton St., Suite 1W
New York, NY 10014
Telephone:    (212) 658-1946
Facsimile:    (866) 233-5869

Attorneys for Plaintiff
Dreamstime.com, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DREAMSTIME.COM, LLC, a Florida LLC,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, LLC, a Delaware LLC; and DOES 1-10,<br><br>Defendants. | Case No. 3:18-CV-01910-WHA<br><br>**DECLARATION OF BOGDAN JIANU IN SUPPORT OF PLAINTIFF DREAMSTIME.COM, LLC'S OPPOSITION TO DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. William H. Alsup<br><br>Hearing Date: June 18, 2020<br>Time:               8:30 a.m. |

DECLARATION OF BOGDAN JIANU                                              CASE NO.: 3:18-CV-01910-WHA

I, Bogdan Jianu, declare as follows:

1. I am the marketing manager for plaintiff Dreamstime.com, LLC ("Dreamstime.") I have personal knowledge of the facts set forth herein and if called as a witness I could and would competently testify thereto. I submit this declaration in support of Dreamstime's Opposition to defendant Google LLC's ("Google's") Motion for Summary Judgment.

2. I was deposed in this action in my individual capacity on January 10, 2020.

3. I began working for Dreamstime in May 2012. Dreamstime is a stock photo website that offers tens of millions of stock images, illustrations, photographs, clipart and videos for purchase. Dreamstime primarily sells renewable subscriptions to users at set prices depending on the length of subscription. Since approximately January 2014, I have worked as Dreamstime's marketing manager. As marketing manager, my role is to oversee Dreamstime's subscription pricing policy, coordinate with local distributors of Dreamstime's products, and run the company's promotions. I also work closely with Dreamstime's CEO Serban Enache to help manage Dreamstime's Google AdWords account (Google recently changed the name to Google Ads).

4. I first started to help manage Dreamstime's Google AdWords account in 2013. During that time, it was primarily Mr. Enache and I who oversaw Dreamstime's AdWords account. At the end of 2014, Dreamstime hired Elena Dobre as a consultant to assist with the AdWords account. Ms. Dobre is a digital marketing consultant with experience from previously working at Google and managing AdWords accounts. Since Ms. Dobre started working for Dreamstime she has been the primary contact for Dreamstime's AdWords account.

5. Throughout the time I have worked for Dreamstime, the company's advertising strategy has remained mostly unchanged. Dreamstime spends around 90 percent of its advertising budget to place ads on Google using AdWords (Google Ads). For most of Dreamstime's AdWords campaigns, Dreamstime has used a Google automated bidding strategy named "Conversion Optimizer" (later named Target CPA). My understanding, which is based on what Google's AdWords representatives told me and Google's publicly available information, is that Conversion Optimizer works to maximize the number of conversions for an ad campaign. As the advertiser, Dreamstime sets a target CPA (cost-per-acquisition) and determines what Google's system should

consider an "acquisition." Google uses the terms "acquisition" and "conversion" interchangeably. Dreamstime's advertising strategy has always been to maximize purchase conversions (a customer purchase on Dreamstime's websites), as opposed to other types of conversions like newsletter or website sign-ups. Dreamstime has used the average CPA achieved in its account one of the primary ways to measure account performance.

6. Shortly before I joined Dreamstime in May 2012, Google assigned Dreamstime a dedicated AdWords support team with personnel based on Dublin, Ireland and Bucharest, Romania. The first members of the dedicated support team that I worked with were Tudor Marian, Adriana Puchianu and Bogdana Butnar. Since then I have worked with many more members of the AdWords support team because every few years Google assigned different people to support Dreamstime's account. They included Ana Sipciu, Maria Stroe, Radu Stoica, Carmen Punga, Andreea Simulescu, Natalia Domina, Olga Pavliuk, Stijn Tops, Raul Altarescu and others.

7. The AdWords support team had titles within Google's company such as "account strategist" and "measurement specialist." When speaking with me and others at Dreamstime, the AdWords team often referred to themselves as experts or consultants. They let us know they had special training and access to Google's internal technical teams and that they had a specialized understanding of Google's automated bidding technology. The Google representatives also had access to non-public Google data about the stock photo industry and our competitors. They told us they used these when giving us recommendations for improving Dreamstime's AdWords performance and when recommending Dreamstime use new Google products. Based on these representations, and Google's dominance and success in the online advertising business, Dreamstime looked to Google's representatives for recommendations, guidance and information on the various advertising programs and campaigns that Google developed and offered.

8. As long as I have worked at Dreamstime, the Google AdWords support team has had access Dreamstime's AdWords account. The AdWords support team could make manual changes to the account settings and see the same information Dreamstime's could see in the account. At times, the AdWords team was able to see information about the account that even Dreamstime could not. We also gave them access to Dreamstime's Google Analytics account so they could refer

to that performance data when making their recommendations to improve Dreamstime's AdWords performance.

9. I and the others at Dreamstime who helped manage the AdWords account trusted and relied on the advice and recommendations of the AdWords support team members, who all held themselves out to have expertise, specialized training, and access to Google's private information and technical support that we at Dreamstime did not. We also let them make manual changes to Dreamstime's account settings and bids. For some campaigns we gave the AdWords team complete control over the settings and optimizations. When new "specialists" joined the AdWords support team (often replacing others), we trusted them as well when they claimed to have expert training and knowledge about how the AdWords system or Google's related products worked and performed.

10. Mr. Enache and I (and later Elena Dobre) met regularly with the AdWords team via Google "Hangouts," a Google teleconference and videoconference platform. We held frequent meetings in Google Hangouts to discuss the AdWords teams proposed changes to Dreamstime's account, including new campaigns, bidding strategies, and budget adjustments. The AdWords team also met with us on average at least once per month either at Google's offices or at Dreamstime's European offices in Romania.

**The Target ROAS Program and Counting Sign-Up Conversions**

11. In early 2014, Mr. Enache and I met on Google Hangouts with the AdWords support team to discuss plans for Dreamstime's ad account for the coming year. Mr. Enache told the AdWords team of Tudor Marian, Adriana Puchianu and Bogdana Butnar that he was concerned that the average CPA in Dreamstime's main account had risen above $70. Dreamstime had historically had an average CPA in the main account of lower than $70, and Mr. Enache told the AdWords team that he did not want to make any changes to the account that would not improve (lower) upon the average $70 CPA. The AdWords team was well aware that Dreamstime's primary goals for the account were to increase purchase transactions (conversions) and to decrease the CPA. The AdWords team proposed several ideas for achieving Dreamstime's financial and budgetary goals. Mr. Enache and I made it clear that the maximum average CPA we could afford was $70, but that

our goal was to lower the CPA to $60 or less. There was a mutual understanding that the AdWords support team was to recommend only products and changes that furthered Dreamstime's desired key performance indicators ("KPIs").

12. In or around February 2014, Mr. Enache and I met again with Mr. Marian and Ms. Puchianu. They told us about a new smart bidding strategy Google had recently enabled in AdWords named Target ROAS (Return on Ad Spend). They told us they were very confident that this new machine learning bidding strategy would work really well for Dreamstime and improve Dreamstime's stated KPIs. We had a discussion about the capabilities of Target ROAS and how it would work. Mr. Marian and Ms. Puchianu explained that Target ROAS would allow Google to monitor both website purchases and website sign-ups and be able to bid differently for them based on the target return on ad spend Dreamstime selected. They told us that Google's system was advanced enough to bid for more keywords that bring purchases and less for those that bring only website sign-ups. They also assured us they understood the technology, that they had received special product training from Google's technical experts, and that if Dreamstime transitioned to Target ROAS based on their expert recommendations, Dreamstime's account performance would improve. The AdWords team knew that Dreamstime's goal was to lower the average CPA in the main account to below $60 at the time when they recommended Target ROAS. This was hailed by Google as a solution to Dreamstime's increasing CPA problem. We reiterated that a $70 CPA was the maximum that Dreamstime would pay for a conversion.

13. Mr. Marian advised us that Dreamstime needed to track website sign-ups as conversions to use Target ROAS; otherwise Google's automated bidding system would not have sufficient information to operate effectively. By counting sign-ups, Mr. Marian said the system would have more conversions to work with and be able to better optimize to gain more valuable purchase conversions. Mr. Enache and I were skeptical of counting sign-ups as conversions because Dreamstime did not value free website sign-ups and website sign-ups were not part of our marketing strategy. We did not express an interest in counting website sign-ups, as Mr. Marian inaccurately claims in his declaration. (Marian Decl. ¶ 28.) Dreamstime's marketing strategy focused on *purchase* conversions (customer purchases on Dreamstime's website that generated

revenue). We specifically explained to the AdWords team that website *sign-ups* were not our goal. In response, Mr. Marian assured us that Google's system was capable of focusing on optimizing for customer purchases (as Dreamstime had been doing) and also increase website sign-ups. The AdWords team also assured us that Dreamstime could go back to using the Conversion Optimizer bidding strategy (without any negative repercussions) after "testing" Target ROAS and achieve the same level of account performance as before, which at the time was an average CPA of approximately $70. Based on Google's many assurances, we agreed to implement the Target ROAS strategy. We learned later, however, that Google's various representations were not true. When Dreamstime stopped Target ROAS several months later because the account performance was a disaster, Mr. Marian revealed that the Conversion Optimizer had to start over (causing negative effects on the account) because the historical data the Conversion Optimizer relied upon had been lost. If we had known this information at the outset we would not have agreed to implement Target ROAS at all.

14. On February 25, 2014, the AdWords team provided us with instructions for what must be done to run Target ROAS in the account. The instructions stated that we needed to set up two types of conversions, purchases and website sign-ups (referred to as leads). The AdWords team also told us we needed to assign a value to both types of conversions. I know now looking back that both of these Google statements were false. I learned later that Dreamstime did not need to count sign-ups and conversions to use Target ROAS. Mr. Enache followed the AdWords teams' instructions but at first tried to enter "don't assign value" for the website sign-up conversion type because Dreamstime did not value website sign-ups. Ms. Puchianu responded that we had to input a value. Following Ms. Puchianu's instructions, Mr. Enache and I discussed what value to assign sign-ups. We calculated $4 to $5 because historically about 10% of users who signed up for Dreamstime accounted ended up making purchases. But we realized later this was far too high because at the time we did not realize that Google's Target ROAS system would drive users much less likely to make purchases to Dreamstime's website. Google's representatives told us the system would do the opposite. Marian later reduced the value to $2 following a flood of unexpected sign-up conversions. But that was still far too high and too late. If we knew Target ROAS did not

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

require Dreamstime to count website sign-ups as conversions we would not have done counted sign-ups as conversions. Dreamstime had no interest in increasing sign-ups and any potential future benefit from additional sign-ups was too speculative.

15. In early March 2014, Dreamstime began counting sign-ups as conversions before activating Target ROAS based upon the AdWords team's advice. The immediate results were alarming. The Conversion Optimizer campaigns began generating hundreds of website sign-ups. A few days later, in or around March 7, 2014, Mr. Marian set up the Target ROAS campaigns in Dreamstime's account. Over the next several months, he oversaw the campaigns and made manual changes in the account to purportedly try to optimize the campaigns. Mr. Enache and I tried to monitor the performance of the campaigns, but the AdWords interface did not separate the performance of purchase conversions and sign-up conversions. We wanted to see the average CPA for purchase conversions, but we could not see this important and needed information. We were forced to ask Mr. Marian to report it to us because he did have access to this critical information. When the Target ROAS campaigns did not perform well, each time Mr. Marian assured us that we needed to wait longer. He informed us that Google's system needed time to learn and that he was working with Google's technical specialists to input account optimizations to help the campaigns. Mr. Marian assured us that he and the AdWords team knew what was happening, that he was in contact with Google's technical specialists, that they were sure performance would improve, and that staying the course was what was best for Dreamstime's KPIs. We relied on Mr. Marian's assurances and Google's expertise and continued with the Target ROAS program despite the chaotic and damaging economic results.

16. In or around August 8, 2014, Mr. Enache expressed Dreamstime's concerns about the account performance because the Target ROAS strategy had not worked or performed as the AdWords team assured us it would. He asked Mr. Marian if Dreamstime could stop counting sign-up conversions because we believed that they might be the cause for the increase in CPA for purchase conversions. Mr. Marian responded that he would check with the Google specialists. Mr. Marian then told us that it was okay to pause sign-up conversions. Following that assurance, on August 12, 2014, Mr. Enache paused sign-up conversions. As a result, the Target ROAS campaigns

were left to optimize only for purchase conversions. This resulted in a large drop in volume for the Target ROAS campaigns. But significantly, it also caused a substantial drop in the number of purchase conversions the campaigns had been generating when we were still counting sign-ups as conversions. Mr. Marian did not warn us of such a substantial risk. He also assured us that this was normal and that Google's system just needed time to adjust.

17. In or around the end of August, 2014, Mr. Enache instructed Mr. Marian to revert from Target ROAS back to Conversion Optimizer. When Mr. Marian did this, the results were horrific. On September 11, 2014, Mr. Marian reported that the CPA for Dreamstime's main search campaign ballooned to over $300, several times more than the same campaign's CPA before switching to Target ROAS, and over four times more than Dreamstime's stated average $70 CPA limit. Mr. Marian claimed that changing the bidding manner reset the information used by the Google system and that it would need to collect new data to optimize again. In other words, the historical data the Conversion Optimizer used before when it delivered an average CPA of approximately $70 or less had been erased. Mr. Marian claimed none of the damage was "irreversible" and told us the system would "quickly improve." Unfortunately, our experience has proven otherwise. Dreamstime has not been able to return to the levels of account performance which were achieved before the Target ROAS switch even though we closely followed Google's instructions and advice. It is clear now that Mr. Marian and his team did not understand the Target ROAS technology when they convinced us to adopt it and spend our budgeted funds. Google urged us to implement Target ROAS based on the false assurances of its representatives, who utterly failed to advise Dreamstime fully and correctly as to the technologies requirements, capabilities and failings.

**Google's Dynamic Remarketing Ad Program**

18. In or around June, 2014, the AdWords team recommended that Dreamstime use Google's dynamic remarketing display ads technology. During a meeting attended by me and Mr. Enache, Dreamstime's "Account Manager" from Google, Maria Stroe, recommended that Dreamstime begin using Google's sophisticated machine-learning display ads product named dynamic remarketing display ads. Stroe explained that Google's dynamic remarketing display ads

remarket users in a dynamic, customized way by showing them the *exact* images they interacted with while browsing on Dreamstime's website. Mr. Enache and I were very interested in this feature the way Ms. Stroe described it to us because we recognized that users who came to Dreamstime's website but did not purchase anything would be likely to return and purchase if we reminded them of something they had previously viewed. But as a company selling stock photos online, for this seemingly valuable marketing product to work well for Dreamstime, the remarketed photo needed to be the exact same photo the user interacted with or at least something substantially similar

19. Ms. Stroe emailed Dreamstime with information following our initials discussions. She told us we would have to use a remarketing feed that included the items from Dreamstime's website we wanted to remarket to users. She also mentioned that the feed would be limited to 450,000 items per account. But Ms. Stroe did not explain that the limited feed size would prevent Google from showing Dreamstime's visitors the exact photo they viewed on the website or a very similar one. In follow up emails and discussions, Ms. Stroe continued to emphasize that Google would show the user the exact image view on Dreamstime's website or something similar. On June 10, 2014, she wrote "we're retargeting every user, in a customized manner, with banners that show him the exact image or category of images that he left in the Lightbox or viewed on the website but didn't download it." She also sent us an information packet which we carefully reviewed.

20. In June 2014, Dreamstime offered on its website tens of millions of images for purchase. Ms. Stroe had been our Google account manager for many months at that point. She either knew or should have known how many items Dreamstime made available for sale on its website as one of the largest stock photography websites in the world. However, Ms. Stroe did not express any concerns to us about the remarketing feed size being limited or that it would negatively affect the ability of the program to perform as described. Stroe assured us that Google's dynamic remarketing display ads were a good fit for Dreamstime's KPIs. Based on her assurances, Dreamstime agreed to create dynamic remarketing campaigns with the help of the AdWords support team, who approved our remarketing feed of images, set up the campaigns and set the optimizations. Neither Mr. Enache nor I were capable of setting up the campaign, only Google was.

We fully trusted her when she said the dynamic remarketing campaign would show users the exact images they interacted with or ones that were very similar. We learned later, however, based on our own experience that Google's "dynamic" system did not work as Stroe told us it would. Google's remarketing system remarketed to users that interacted with an item on Dreamstime's website even if that exact item or a similar item did not exist in the remarketing feed. Stroe and her Google colleagues did not explain this important fact to us. The information she provided also did not explain this inadequacy of Google's program for Dreamstime's purposes. Google's system worked to show a remarketing ad to as many users that visited Dreamstime's website as possible even if the remarketing feed did not include a similar image. This resulted in subpar campaign performance but also caused many users to be upset because Google's system decided to show them a completely unrelated image that appeared inappropriate given the user's past visits to Dreamstime's website.

21.  Dreamstime's dynamic remarketing campaigns performed poorly at first. We thought initially that the problem with the performance might have been due to the limited size of the remarketing feed Google provided us. On December 4, 2014, I asked Radu Stoica at Google if it was possible for Google's system to remarket by targeting users who had downloaded certain images and serve them with similar images. He responded that it was not because the only way to give Google's algorithm information is through the remarketing feed. He said to do what I asked would require one feed with an image for each image available on Dreamstime's website and that was not possible. Attached as **Exhibit A** is a true and correct copy of a document previously-marked Exhibit 49, which includes my email exchange with Mr. Stoica. This response dramatically conflicted with how Ms. Stroe explained Google's dynamic remarketing product worked.

22.  After learning this, my colleagues and I at Dreamstime asked many times for Google to increase the size of the remarketing feed available to Dreamstime. The AdWords representatives told us they would check, that new features were on the way, and that the feed size limitation would likely increase in the future. It was not until June 26, 2016, that Google gave Dreamstime an opportunity to increase, to a limited extent, the feed size. A Google representative named "Lisa" emailed me to tell me that Google's remarketing platform had changed and could now

accommodate up to 5 million items in the dynamic remarketing feed. She did not explain why the feed size available to Dreamstime had increased. Attached as **Exhibit B** is a true and correct copy of this email. *See id.* at P-0000638. We welcomed the increased feed size but knew that it was still far too small to include all items on Dreamstime's website for the remarketing program to perform optimally.

23. In February 2017, Dreamstime switched some of its dynamic remarketing efforts to another advertising company named Criteo. Unlike our past experience with Google, Criteo was able to create a remarketing feed with all of Dreamstime's available items. When Google's representative Olga Pavliuk learned of this, she told us to send her the Criteo feed and Google would transform it into AdWords so Dreamstime could remarket all of its images on AdWords. We sent her the Criteo feed but Google failed to transform all of it after many months. We were told it was due to technical limitations. This raised doubts in my mind as to whether our AdWords representatives told us the truth when we asked previously for Google to increase the size of the remarketing feed and the AdWords representatives told us it was technically not possible.

24. As I stated above, the more significant problem with Google's dynamic remarketing system was that it elected to show images to users even if the exact image or a similar image was not in Dreamstime's remarketing feed. We learned based on our own testing and from customer complaints that Google's system showed images completely unrelated to a user's past behavior on Dreamstime's website. That was not how the technology was explained to us when Ms. Stroe induced us to create the dynamic remarketing campaigns. This resulted in Google showing Dreamstime's former or potential customers irrelevant images that appeared inappropriate when viewed from the user's perspective. This was obviously not an effective way to generate conversions and if we knew this was how the technology worked from the outset we would not have used it in the way we did.

25. Google misled us to believe its dynamic remarketing system was good for Dreamstime's business and induced us to increase investment in AdWords. When we discovered poor performance or that the system was not working in the way Google's representatives presented it, Google's representatives assured us they would investigate, told us improvements were coming,

or told us they could improve the performance. When we told them we were considering closing our dynamic remarketing campaigns, they warned us it would hurt our account performance and we would lose the valuable historical data already collected. It is clear to me now that Google's representatives misrepresented how the product worked and its capabilities to induce Dreamstime to spend more on Google ads and keep spending on Google ads.

**HTML5 Banner Ads**

26. Google's representatives also misled us about its ability to display Dreamstime's banner ads with HTML5 enabled search bars. In 2015 and 2016, Google disapproved many of Dreamstime's display banner ads as being in violation of Google's "trick to click" policy even though Google had not disapproved nearly identical display ads with higher CPAs. When we asked for explanations to avoid disapprovals, the Google representatives' explanations were unclear. At one point we were told to just re-submit the same banner ads because Google's Policy team may find them acceptable the second time around even though the ads had not changes.

27. In late 2016, a member of our AdWords support team from Google named Raul Altarescu proposed a solution to this problem. He told us we could design dynamic ads using HTML5 technology to include functional search bars. In December 2016, he told us he checked with Google's policy teams and this would not violate the trick to click policy. Dreamstime proceeded to create HTML5 banner ads according to the AdWords team's instructions. We followed Altarescu's directions and submitted them to be served in AdWords. Altarescu notified us that there was a technical problem that prevented the ads from working properly, but he believed he could solve the problem with help from Google's technical specialists. Altarescu did not respond to our requests for additional information.

28. In January 2017, Dreamstime's new AdWords account manager told us to submit the newly designed HTML5 banner ads and that they could be used for all campaigns. Over the months that followed, Google disapproved several of our better performing HTLM5 banner ads but left the worse performing ones active. We asked for explanations but did not receive clear answers. Our Google account manager Natalia Domina told us the issue was with the way we designed the HTML5 banners, but as far as we could tell we had created them as Google instructed.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

29. It was not until April 12, 2017, that Google's representatives told us it was technically not possible to run HTML5 banner ads the way Mr. Altarescu told us we could. It was not a problem with the way Dreamstime designed the ads, as Ms. Domina advised us, but rather a technical limitation in the AdWords system. We did not learn until discovery in this litigation that Mr. Altarescu received this same information from Google's technical specialist in December 2016 (the same time frame that he sold Dreamstime on the HTML5 searchable box ad program) but failed to share that critical information with us. The misrepresentations and inconsistent advice from Dreamstime's AdWords representatives, and the fact that Dreamstime's most successful display ads were being cancelled while less efficient ones were allowed to run, caused Dreamstime to overspend for these inefficient ad campaigns. If the AdWords team had not misled us as to the capabilities of HTML5 ads, Dreamstime would not have created the HTML5 banner campaigns.

**Foreign and Localized Ads**

30. In meetings and Hangouts, Google representatives pushed Dreamstime to create foreign language and localized ad campaigns according to the Google representatives' specifications. In or around late Spring of 2017, the Google "industry manager" assigned to Dreamstime's AdWords account was Carmen Punga. Ms. Punga visited Dreamstime's office to meet with me and Mr. Enache. We discussed various topics during the meeting, among them was Ms. Punga's apology for Olga Pavliuk's misrepresentation to us a few months earlier that Google could transform Criteo's remarketing feed into an AdWords feed, as I discussed above. Ms. Punga also recommended that Dreamstime create new foreign and localized campaigns in Germany, France and the United Kingdom. She assured us that implementing these campaigns would allow Dreamstime to gain valuable new customers and meet Dreamstime's KPIs. I raised doubts with Ms. Punga's idea because the prior AdWords support teams had already created foreign ad campaigns targeting those countries and they had not been successful. In fact, Mr. Marian himself created an entire new account for Dreamstime's German and French language campaigns. He created campaigns, set bids, and oversaw optimization, yet the account did not delivery conversions at a CPA that was beneficial to Dreamstime. When we asked for explanations from our AdWords

support team as to why the foreign language campaigns delivered poor results, we did not receive any clear explanations or solutions.

31.  Given Dreamstime's prior lack of success in foreign localized campaigns created at the insistence of and overseen by the AdWords Support team, I asked Ms. Punga how we can trust her representations that new campaigns of the very same type that were previously unsuccessful would be a great fit or benefit for Dreamstime.  Ms. Punga told us that she and her new team should not be held responsible or accountable for what our prior AdWords support team members did or their shortcomings.  She told us her team had the experience and training necessary to deliver excellent results using foreign language and localized campaigns.  She also claimed Google's product had improved.  Ms. Punga brought up all of these things as reasons why Dreamstime should follow her strong recommendation.  She eventually convinced Mr. Enache and me that her team was capable and that these new campaigns would improve Dreamstime's overall AdWords account performance.

32.  On May 25, 2017, as a follow-up to our meeting with Ms. Punga, Andreea Simulescu, one of our Google account managers, sent us her analysis of Dreamstime's Germany and France campaigns and the reasons they had not been successful. *See* **Exhibit C** at P_009037-46. She told us improve the landing pages and create more compelling ad texts.  She also told us her team could improve the overall performance from these campaigns through certain optimizations. In our discussions with Ms. Punga and Ms. Simulsecu that followed, they convinced Mr. Enache and me that her team was capable and that these new campaigns would improve Dreamstime's overall AdWords account performance.  Rather than testing these foreign campaigns in all of the countries as Ms. Punga wanted us to commit to, Mr. Enache and I agreed to allow Ms. Punga to create a campaign for the German market only.  We granted Ms. Punga and her team total control over the campaign, and agreed to provide several landing page options and whatever was needed from our end.  We told her that if the German campaign is successful we can expand out and do the same of France and the United Kingdom. Also at Ms. Punga's request, we prepared a lifetime customer value calculation for the German market and shared it with the AdWords support team so they could fully understand our goals for the campaign.  We calculated the value at $74.21, which

meant the CPA for the German language campaign had to be in that range for Dreamtime to see profits. Attached as **Exhibit D** is a true and correct copy of the spreadsheet I share with the AdWords support team with this calculation that was produced in discovery with the number P_0166217. I made a few follow-up attempts on this topic, but Google never answered.

33. The Google representatives created the campaign in Dreamtime's account, were in charge of the language translations, and designed the texts of the ads. These were a few of the areas identified for improvement from Dreamstime's prior campaigns. On May 30, 2017, the AdWords support team even selected the landing page for the German campaign after I sent them examples per their request. Attached as **Exhibit E** is a true and correct copy of a document previously-marked Exhibit 211 which includes this email correspondence. *See id*. at P_0031590. The AdWords team assured us that the campaign would work because she and her expert team had set everything up.

34. A few months earlier, in April 2017, Ms. Punga, Ms. Simulescu and Radu Stoica strongly advised a new localized campaign named referred to as Creative Hubs. During a meeting regarding potential new campaigns, Ms. Punga explained that Dreamtime was losing out on many high-value potential customers living in large metropolitan cities. The AdWords team told us that the CPA Dreamstime was achieving from its current campaigns in specific, large cities could be improved with their help. Following that recommendation, Dreamstime chose to start with New York and London. Like the German language campaign, Dreamstime gave full control of the Creative Hubs campaign to the AdWords support team. The Google representatives assured us the results would improve Dreamstime's KPIs. Even though we followed Google's specific advice, set a single keyword, and assigned a large budget with a very high bid, the Creative Hubs campaign did not generate conversions.

35. Despite Google having total control over the German language campaign and the Creative Hubs campaign, the results were poor. We asked for an explanation from the Google as to why the campaigns were not performing how the Google representatives' described and assured us it would. On September 4, 2017, Elena Dobre emailed the AdWords team to ask specifically why both the Creative Hubs and German language campaigns under the AdWords team's guidance were

not performing well. Attached as **Exhibit F** is a true and correct copy that email which I was copied on. *See id.* at P_0004182. We did not receive an explanation from Google. A review of Google's internal communications produced in discovery in this litigation now reveals that Andreea Simulescu sought help from Google's technical specialists back in October 2017 seeking an explanation for why the German language campaign had not delivered conversions from August 2017 to October 2017. Google's technical specialist responded that the campaign had been set to a manual CPC bidding strategy which was an inappropriate setting because it did not optimize for conversions. *See* **Exhibit G** a document previously-marked as Exhibit 215 at GOOG-DRMSTM-00003784 (campaign ID: 894636468 designates the German language campaign). In other words, Dreamstime's AdWords support team failed to select the correct bidding strategy for Dreamstime's KPIs, failed to realize this was the problem, and had to be told by a technical specialist. (*See id.*) In response, Simulescu asked for other ███████ because ███████████████████████████████████████ (*See id.*) Google's technical specialist responded that other reasons that might cause poor performance are the keyword quality score was low and the landing page experience was poor. *See* **Exhibit H** at GOOG-DRMSTM-00010851-53. But these are things or criteria that the Google representatives set up in the campaign or knew about beforehand. Simulescu did not, however, disclose this important information with us, apparently choosing instead to keep her and her team's failure a secret from us.

36. Google has persistently continued to suggest increased bids or budgets or for Dreamstime to wait for better performance results where Dreamstime has previously had very poor results. By following Google's advice and assurances, Dreamstime was delayed for many months while communicating with Google's representatives. Often problems remained unsolved, which left Dreamstime no choice but to pause the problematic advertising campaigns (leading to total loss), disruption to its business, and slowed growth. In most cases, these strong recommendations (which we heeded and followed) returned results that were nowhere near those contemporaneously represented by Google.

//

//

1  //
2        I declare under penalty of perjury under the laws of the United States of America and the
3  State of California that the foregoing information is true and correct.  Executed on May 14, 2020, at
4  Bucharest, Romania.

_____

_____
Bogdan Jianu

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850