BAKER MARQUART LLP
Jaime W. Marquart (Bar No. 200344)
 jmarquart@bakermarquart.com
Donald R. Pepperman (Bar No. 109809)
 dpepperman@bakermarquart.com
Brian T. Grace (State Bar No. 307826)
 bgrace@bakermarquart.com
777 S. Figueroa Street, Suite 2850
Los Angeles, CA 90017
Telephone:      (424) 652-7800
Facsimile:      (424) 652-7850

BAILEY DUQUETTE P.C.
James Bailey (*pro hac vice*)
 james@baileyduquette.com
104 Charlton St., Suite 1W
New York, NY 10014
Telephone:      (212) 658-1946
Facsimile:      (866) 233-5869

Attorneys for Plaintiff
Dreamstime.com, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DREAMSTIME.COM, LLC, a Florida LLC,<br><br>             Plaintiff,<br><br>      v.<br><br>GOOGLE, LLC, a Delaware LLC; and DOES 1-10,<br><br>             Defendants. | Case No. 3:18-CV-01910-WHA<br><br>**DECLARATION OF ELENA DOBRE IN SUPPORT OF PLAINTIFF DREAMSTIME.COM, LLC'S OPPOSITION TO DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:  Hon. William H. Alsup<br><br>Hearing Date:   June 18, 2020<br>Time:           8:30 a.m. |

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

I, Elena Dobre, declare as follows:

1.      I have personal knowledge of the facts set forth herein and if called as a witness I could and would competently testify thereto.  I submit this declaration in support of Dreamstime's Opposition to defendant Google LLC's ("Google's") Motion for Summary Judgment.

2.      I was deposed in this action in my individual capacity on January 23, 2020.

3.      I am a digital marketing consultant.  Part of my job is to advise clients regarding Google Ads (previously named Google AdWords).  I am the owner and founder of Zarbi Marketing SRL ("Zarbi"), located in Romania, a company that provides digital marketing consultant services to clients.  Dreamstime is Zarbi's largest client.  I spend about 80 percent of my consulting time working with Dreamstime.  Dreamstime is an online stock photography agency that sells and licenses stock images, clipart and videos through its website, www.dreamstime.com.

4.      In November 2014, I began to provide digital marketing consultant services to Dreamstime as an independent contractor.  Since I began working with Dreamstime, Dreamstime's main goal with Google Ads has been to generate conversions at the lowest possible cost-per-conversion.  For Dreamstime, a conversion refers to customer transactions on Dreamstime's website in the form of subscription plans or credits for online stock photo packages.

5.      Since November 2014, when I first started working with Dreamstime, I have worked closely with Dreamstime's CEO, Mr. Serban Enache, and Dreamstime's marketing manager, Mr. Bogdan Jianu, to help manage Dreamstime's Google Ads account.  Before working with Dreamstime, I understand that Mr. Enache and Mr. Jianu were Dreamstime's primary points of contact for the Google Ads support team assigned to Dreamstime's account.  When Dreamstime hired me, I became the primary point of contact for the Google Ads support team with respect to Dreamstime's account.  While I provide advice and recommendations to Dreamstime regarding its Google Ads account, Mr. Enache and Mr. Jianu are in charge of Dreamstime's overall marketing strategy and are the decision-makers for Dreamstime.  I help Dreamstime execute its digital advertising strategy, which includes overseeing Dreamstime's Google Ads campaigns.

6.      My work for Dreamstime does not involve SEO (search engine optimization).  I have not been involved in any efforts to improve Dreamstime's organic search ranking.  My work for

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Dreamstime relates to Dreamstime's online marketing, which primarily consists of Dreamstime's placement of digital ads through Google Ads.  The majority of Dreamstime's total advertising budget has been spent on Google Ads.  I am primarily responsible for managing the advertising programs (Google Ads, Bing Ads, Yahoo Ads, Social media ads etc.), implementing new commercial campaigns, adjusting budgets, integrating the recommendations received from Google representatives, and reporting the monthly overall results and set-up to Dreamstime.

7.     Before founding Zarbi and working with Dreamstime, from March 2010 to February 2013, I worked for Google as a Google Ads account manager and account strategist.  My duties included reviewing ads, providing account support to help solve issues advertisers experienced with their Google Ads accounts, and making advertising recommendations to Google Ads customers.  It was also part of my duties to recommend new Google products to Google Ads customers to try to achieve the customer's key performance indicators ("KPIs").  As an account manager at Google, I had access to information that advertisers did not, such as the reason for ad disapprovals, Google's policy limitations for ad delivery, market trends, auction levels by industry, and technical details in the backend of the Google Ads user interface.

8.     I stopped working for Google in large part because of the pressure Google placed on me and others in my position to meet Google's sales targets.  Part of my job was to pitch new products and features to advertisers in order to make them spend more with Google Ads.  All the interactions I had with clients were evaluated based on the number of recommendations I made to the clients that were finalized/implemented by the clients.  This was also the way I was assessed for my performance within the team and it influenced my monthly salary.  Since the recommendations I was supposed to make were not completely aligned with the advertiser goals, I felt uncomfortable in that role.  I was the one that had the authority in front of the client to make recommendations and many of them were confident that my support will help.  I was allowed only to make suggestions, the implementation was made by the client, so the client would have full responsibility for his decisions (whether or not they were influenced by me).

9.     During my time working at Google, I worked with several Google Ads support personnel who have at some point provided Google Ads account support to Dreamstime.  They

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1    include Ana Sipciu, Tudor Marian, and Adriana Puchianu.  I had a friendly personal and working

2    relationship with them.  Ana Sipciu even recommended me to Dreamstime when Dreamstime was

3    looking for a consultant to assist with its Google Ads account. She described Dreamstime as a time

4    consuming client of Google that needed a consultant to manage the implementation of Google's

5    recommendations and optimizations to save some of the time spent of the Google representatives

6    managing Dreamstime's account.  She also described Dreamstime as being a valuable client and

7    important for the Google Romania portfolio.

8        10.    Google's representatives have at all times had complete access to Dreamstime's

9    Google Ads account.  The Google support team could (and did) make manual changes to

10   Dreamstime's account settings for the stated purpose of improving account advertising

11   performance.  I was surprised to find out that Tudor Marian was in complete charge of making

12   account adjustments, a different approach than all my previous experience at Google. The changes

13   done by Google representatives in Dreamstime's account are not visible in the user interface, so

14   Dreamstime was not able to check on the changes Tudor Marian or other Google representatives

15   made.  Dreamstime could refer only to the emails in which Marian or others described the changes

16   they made in the account.

17       11.    Dreamstime made efforts to ensure the Google support team had full transparency

18   with Dreamstime's information and goals so they could offer the best possible account advice.

19   Dreamstime granted the Google support team full access to all of the Google products Dreamstime

20   used, including its Google Analytics account.  Dreamstime even shared its internal data with the

21   Google support team.  Dreamstime did all of this so they could have a holistic image of

22   Dreamstime's Google Ads account and its contribution to Dreamstime's online presence and

23   visibility.

24       12.    Part of my job for Dreamstime was to implement the account changes urged by

25   Google's support team.  Starting in December 2014, I was present in all bi-weekly meetings with

26   Google when the representatives were giving development directions and suggested test campaigns

27   or different account adjustments (increase bids, add new keywords, change ad texts, create user

28

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

audiences etc.) The recommendations from Marian and Adriana were very specific (increase budget to $x, change bid to $x to be on the first page).

13.     Dreamstime has heavily relied on the advice and recommendations of the Google Ads support team assigned to Dreamstime's account because they claimed to have expertise in Google Ads.  However I was surprised to notice that some basic optimizations were not yet done in the account when I joined forces with Dreamstime.  I removed many adult content keywords for which Dreamstime used to pay even though they did not generate transactions.  Also, the localized content that had been created and designed by Google representatives had several inefficiencies. The account was also structured in a way that reported a cost per acquisition that appeared low but was actually much higher for important keywords.  Neither Mr. Enache, nor Mr. Jianu knew that they needed to separate between the cost in brand campaigns versus non-brand campaigns to account for the CPA for non-brand campaigns (which Dreamstime made clear to the Google representatives it was interested in).  The cost per acquisition reported by Google representatives was low because it contained all type of campaigns.  When I arrived as a consultant, I made a clear separation between the brand cost per acquisition and non-brand cost per acquisition. I also separated the keyword targeting: brand keywords versus non-brand keywords campaigns, because in the past they were all mixed together and certain generic stock photo campaigns seemed profitable only because it generated transactions from user searches containing "dreamstime."

14.     The members of the support team have specialized training in new Google products and access to data and information that Dreamstime and I did not.  They had access to Google's private data that showed the behavior of products used by other Google clients, knew the average bid amounts in stock photo industry, the budgets of Dreamstime's competitors, and knew the size of the market for stock photos in the digital environment based on the Google's internal statistics.  We trusted the data Google presented to us regarding where Dreamstime stood in comparison to other stock photo companies.  The Google representatives frequently referred to these things when offering recommendations for improving Dreamstime's account performance.  Google's recommendation was often to increase spending.  Because Google has access to and owns crucial

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

non-public data and information, including a much more complete image of the stock photo industry, Dreamstime believed and relied on Google's representations.

15. Google often changed the members of the support team assigned to Dreamstime's account. The team members often switched roles within the team as well. When I first started working with Dreamstime, the support team included Tudor Marian, Adriana Puchianu, Ana Sipciu. After that, various others with specialist titles were assigned to the Dreamstime's account, including Radu Stoica, Raul Altarescu, Stijn Topps, Olga Pavliuk, Andreea Simulescu, Carmen Punga, Maria Stroe, Jacek Ewiak, Kyrl Boltenko, and Natalia Domina. There were others as well. When new Google representatives joined the support team touting themselves as specialists with expertise in certain products, Dreamstime trusted them and the new ideas they brought to the table. As a way to get Dreamstime to implement new products and strategies, new team members sometimes blamed poor past performance and praised the experience the new team members had on other large clients. I understand now that this is one of the ways Google influenced Dreamstime to continue to trust its representatives and to continue spending large amounts of money (millions of dollars) on Google Ads. Given the fact that Mr. Enache always said that his budget is unlimited as long as the account is performing well, the Google team was enthusiastic to find ways to spend that budget event though they were not accountable on the performance side. Each new team member came with new tests and ideas. Every time I mentioned that we already tried something and it didn't work there were arguments from Google: the products Google uses evolved, they are better now and you should use them; your competitors already use them, you should use them too, we have experience with the product, we will help you to make it profitable. For example, in the first quarter of 2015, Ms. Puchianu recommended for Dreamstime to enable its ads on mobile devices. We followed her advice but the results were poor. Despite this, in August 2016, Mr. Marian and Ms. Stroe recommended Dreamstime run ads on mobile devices again, disregarding the past poor performance and offering assurances that under their guidance it would work. In September 2016, Ana Sipciu and Raul Altarescu pushed dedicated language campaigns even though previous attempts under their supervision failed to produce good results.

16.     Dreamstime frequently held teleconference and videoconference meetings with the Google representatives using Google Hangouts, a Google communication platform.  During these meetings, Mr. Enache repeatedly reminded the Google representatives of Dreasmtime's KPIs, which since I began working with Dreamstime have remained the same: to generate transaction conversions while maintaining or lowering the cost-per-acquisition/conversion.  The Google representatives made recommendations for account optimizations and pitched new Google products always with the assurance that they would improve Dreamstime's KPIs.

17.     The Google support team also met with us on a quarterly basis in Bucharest, Romania.  During these quarterly meetings, the Google Ads representatives presented us with a "Quarterly Business Review" to recap Dreamstime's past performance and provide advice and recommendations for future account improvement.  Although they did not guarantee specific results, like the number of conversions or that the target CPA would be met, they assured us that if Dreamstime implemented their recommendations Dreamstime's ad campaigns performance would improve. Google's presentations often made reference to Dreamstime's budget compared to its competitors' budgets and urged Dreamstime to invest more in order to be as visible as the rest of the players in the stock photo industry.

18.     Because Dreamstime's online marketing strategy focused on the cost per acquisition/conversion, Dreamstime mostly used Google's automated smart bidding technology named Target CPA (cost per acquisition).  Google currently describes the technology as "a Google Ads Smart Bidding strategy that sets bids to help get as many conversions as possible at or below the target cost-per-action (CPA) you set." (*See* https://support.google.com/google-ads/answer/6268632?hl=en).  Dreamstime started using Target CPA before I began working as its consultant.  Dreamstime set the target CPA for its campaigns, but did so almost always following the assumed learned advice of the Google Ads representatives.  Google does not promise the actual target CPA, but affirms that Google will do their best to reach the target.  Google advised Dreamstime to set the target based on the historical data in the account, which Dreamstime did under the close observation of the Google support team.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

19.     When I started working with Dreamstime in November 2014, the CPA was very high (the account average was $120), considering Mr. Enache stated the goal for profitability was a conversion for $50.  Decreasing the CPA from $120 by setting a target CPA of $50 on existing campaigns was not possible with Google's system.  Such a large decrease caused Google's automated bidding system to stop showing ads.  I explained to Mr. Enache that I had to set target CPAs to higher levels than the ultimate goal and try to reduce the actual CPAs incrementally.

20.     I reviewed the declaration of Tudor Marian submitted in support of Google's motion. He includes an email I wrote to him on January 27, 2015 as Exhibit B.  In that email I list a few campaigns with target CPAs over $70.   It is true that Dreamstime set target CPAs above $70 for certain campaigns, but it is also true that Dreamstime's CEO told Mr. Marian that Dreamstime's desired or goal average CPA for its main account was $70 or less.  Mr. Enache told Mr. Marian that he only wanted changes that brought Dreamstime closer to that average CPA goal.  When I joined Dreamstime, several of Dreamstime's campaigns had CPAs that had ballooned far over $70 during the time Mr. Marian had full control over making adjustments to Dreamstime's ad account.  Based on my review of Dreamstime's account records, Dreamstime's main account had an average CPA $79 in 2013 (for non-branded campaigns) and an average of CPA $71.66 for entire account (including brand campaigns).  In January 2015 when I wrote that email, we were working to lower the CPAs back to historic levels (which had been much lower).  We were having difficulties doing that because under Mr. Marian's supervision Dreamstime lost the historical data used by its Target CPA campaigns when they delivered CPAs in under $70.  In October 2014 the non-brand CPA was $131.15, and it increased to $139 in December 2014.  Mr. Marian was aware that Dreamstime was trying to reduce its CPA levels.  To do that, he advised Dreamstime to continue to set target CPAs 10% less than the current CPA.  This was a consistent a Google recommendation.  Carmen Punga later advised us to lower CPA by only 15% of the current CPA.  Mr. Marian assured us that by doing this we would slowly lower the CPA and avoid causing a shock to the Target CPA algorithm that would result in ever worse results.  The target CPA of $300 mentioned in my email was for a campaign we were trying to bring back to past levels and we had set the CPA following Google's advice.  There were certainly other target CPAs set by Dreamstime after I joined that were over $70,

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

but these targets were set following Google's best practices, and as I mentioned before, and came after Mr. Marian destabilized Dreamstime's account performance which resulted in unprecedentedly high CPA levels we were trying to reduce.

21.     Google also advised Dreamstime not to make frequent changes in the account to avoid interfering with the Google algorithms.  According to Google's representatives, any change required at least 14 days before deciding whether it was a good or bad decision.  During this time period Dreamstime had to pay for results, good or bad.  Many times when the results were bad after the 14 day learning period was up, Google's representatives instructed us to continue to wait and assured us Google's algorithms would deliver the results we wanted. For example, Olga Pavliuk advised us, "In terms of test period I'd recommend at least 3-4 weeks to get the results which can be estimated. I understand that it might seem to be long but usually we need this period to exclude any kind of seasonality, sudden competition changes and conversion lag (but the last one is not a problem as your conversion lag is not that long).") Attached as **Exhibit A** is a true and correct copy of a document previously-marked Exhibit 241, which includes Ms. Pavliuk's message.

22.     While working on Dreamstime's Google Ads account we kept the Google team constantly informed about every change and we consulted with them as to all changes we planned to do.  Since Google was very strict with the frequency of changes and wanted us to avoid making abrupt changes (especially at budget level) I used to ask them about all our future steps and wait for their confirmation.  Even when we had underperforming campaigns, I used to ask for their expertise and help before pausing the campaigns (situations where the CPA was $3800 and the campaign was still running without any flag from the Google team). *See* Marian Decl., Ex. B.  Even though Mr. Enache almost always followed Google's advice regarding account changes, there were a few times Mr. Enache lowered the budgets beyond Google's recommendation because the costs could no longer be sustained by the revenue based on Dreamstime's financial goals and constraints.  Attached as **Exhibit B** is a true and correct copy of a document previously-marked Exhibit 112 in which Mr. Enache admits he lowered the budget for very urgent return on investment (ROI) reasons.  *See* at P_0008597.  These were reasonable business decisions that Google's representatives criticized Mr. Enache about.  We knew this would mean less conversions.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Dreamstime's decisions were swayed by Google's many tools to convince Dreamstime to do what Google wants.

23.     In the second half of 2017, Dreamstime had to start cutting its ad budget because of economic constraints.  This accelerated in 2018.  I paused Google Ads campaigns, including ones that had run for a long time with no results. In January 2018, I also paused all the brand campaigns as the budget was too high.  Carmen Punga and Andreea Simulescu warned me this will drastically lower Dreamstime's entire account performance, but it has done the opposite.

24.     But Dreamstime does not really have the ability to completely say no to Google because Google is number one in search in the search world.  Saying no would mean not being visible on Google's website to Dreamstime's audience.  The Google representatives used to come to us with new solutions in the form of the perfect product that could solve Dreamstime's ad account issues.  They were called beta-products and were not-publicly launched products that Google was testing on big, high-spend advertisers.  The benefit sold to us was that we were the first ones to try and that Google was confident that we will have a visibility advantage.  The budgets invested in those tests were generally high as Google representatives asked us to invest large amounts of money to have relevant test results. The majority of test campaigns never worked for Dreamstime, the money was spent on a Google product that was not reliable for advertisers and the entire learning experience that Google obtained was paid by Dreamstime.  Google received the testing results while Dreamstime only received low quality traffic from these ads and even deteriorated the past account performance.

25.     Based on my knowledge and experience, Google wanted Dreamstime to spend more money because Google's main goal is to sell Google products, make profits, and build a dependency of advertisers on Google ads.  Also Dreamstime was probably the largest (or among the largest) client that the local Bucharest Google office managed.  It was an account that helped the local office to gain more visibility locally and gain more marketing financial resources from the head offices.  The success of Dreamstime was secondary.  Most of the conversations with the Google representatives centered-around how Dreamstime was going to spend its advertising budget on Google ad campaigns and the eventual plans to increase the quarterly budgets.  I was often

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1    questioned by Google about how much Dreamstime was willing to spend in a certain quarter but not

2    how many transactions Dreamstime was planning to get in a certain quarter.   Mr. Enache

3    repeatedly told the Google Ads support team that Dreamstime's budget is unlimited as long Google

4    Ads platform deliver conversions at Dreamstime's desired CPA.  This encouraged Google

5    representatives to come with new ideas and solutions and make sure they got Dreamstime to use all

6    of its financial resources. Since Google representatives were incentivized financially based on the

7    size of their clients' budgets, they consistently tried to convince Dreamstime to spend more even if

8    doing so would not help Dreamstime achieve its KPIs.

9           26.     In the second half of 2016, there was an intense effort by Dreamstime's Google Ads

10   support team to bring Mr. Enache to Google's Dublin, Ireland headquarters to meet with the Google

11   specialists assigned to Dreamstime's ad account.  Mr. Enache elected not to go because, as I

12   understood it at the time, Dreamstime had dropped considerably in Google's organic search

13   rankings and that was really hurting Dreamstime's business.  Mr. Enache was focused on trying to

14   solve that issue.  In November 2016, I traveled to Dublin on Dreamstime's behalf to meet with

15   Dreamstime's assigned specialists.  I was introduced to many Google Ads managers and specialists

16   who assured me of their dedication to help Dreamstime.  There I met Maria Store, the measurement

17   and attribution specialist assigned to Dreamstime and her boyfriend Jacek Ewiak (Measurement and

18   Attribution Specialist), Export specialist Iulia Crisan, Anastasiia Stefanska (mentioned as Stasy in

19   emails) and Olga Pavliuk.  They invited me to a large brainstorming meeting about the

20   "Dreamstime situation" to offer their proposed solutions and strategy plans. During this meeting,

21   Google's disapproval of Dreamstime's display banner ads with search bars was one of the topics.

22   During the conversation the Google team explained that Dreamstime is a valuable client and that

23   they invest a lot of effort in finding solutions and helping with the account development. However,

24   much of the conversation centered on the Dreamstime's website content and less on the efficiency

25   of Google's products and tools. So part of the discussion was that Dreamstime should improve the

26   website not that Google should test its products before proposing them to Dreamstime.

27

28

1

**HTML5 Banner Ads**

2      27.     In 2015 and 2016, Google disapproved many of Dreamstime's display banner ads as

3  being in violation of Google's "trick to click" policy even though Google had not disapproved

4  nearly identical display ads with higher CPAs.   During that time, Dreamstime created a number of

5  banner ads that had a search field and search button graphic to inform the user that Dreamstime's

6  website features search capabilities.  When clicked, the ad would divert the user to Dreamstime's

7  website, which was normal behavior for a .jpg file of this type. Google rejected many of

8  Dreamstime's banners as being trick to click, although the explanations from Google's

9  representatives about why these ads were being disapproved varied greatly.

10      28.     In late 2016, I and others at Dreamstime began to notice that Google rejected and

11  disabled mostly those banners that performed well (with low CPAs) while allowing those with poor

12  performance (with higher CPAs and higher bids) to remain in operation.  This resulted in

13  Dreamstime paying more for conversions because Google's system automatically began displaying

14  Dreamstime's worse performing ads in place of the better performing ones that had been

15  disapproved.  We wanted to find a solution to this problem, as I was able to see similar ads from

16  Dreamstime's competitors running daily without restrictions, so I asked Google representative Raul

17  Altarescu to provide information about Google's disapproval process so we could understand why

18  this was happening. On October 14, 2016, Mr. Altarescu responded that he had received an answer

19  regarding Dreamstime's display ads that included an image of a search button.  Attached as **Exhibit**

20  **C** is a true and correct copy of that email.  He wrote that the white border around the search button

21  looks like a search field and the search button is borderline, so that resulted in some Google review

22  agents who considered it "trick to click" and others who did not.  *See id.* at P_0015333.  Mr.

23  Altarescu told us one of our options was "accept that ads will be disapproved and they will need to

24  be reuploaded."  *Id.*  He added, "I can assure you that the Dreamstime competitors face the same

25  problem. If they keep having ads that seem to be "trick to click", this means they choose the second

26  option" to re-upload the ads Google's reviewers previously disapproved.  *Id.*  Google's own policy

27  reviewers apparently did not agree as to whether Dreamstime's search button ads were trick to

28  click.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

29.     On or around November 17 or 18, 2016, during one the meetings with the Google Ads support team in Dublin, Google representative Raul Altarescu and Ana Sipciu told me they had a solution the disapprovals.  Altarescu told me that a banner ad with a functional search bar that allowed users to type in the search box of the ad and be taken to Dreamstime's search results page would not violate Google's policy.  He told me it was possible to display banner ads with functional search bars in Google advertisements using HTML5 technology.  Altarescu explained that one way to do this was through a third party service such as DoubleClick, but that this would cost more.  I told him Dreamstime was not interested such third party services because Dreamstime could not afford it. Altarescu then told me there was a way to do this in the AdWords interface without using a third party service that he would confirm with the necessary Google teams.

30.     In a Hangout session with Mr. Altarescu and Ms. Sipciu, Altarescu asked me to send him examples of when Google disapproved Dreamstime's better performing banner ads while allowing the banners with higher CPAs to remain in operation.  After the hangout session I sent him the attached screenshot demonstrating the issue, a true and correct copy is attached as **Exhibit D** and was included as an exhibit to Dreamstime's interrogatory responses.  The AdWords representatives agreed with us that this seemed unfair.  I continued to discuss with Altarescu his proposed solution of HTML5 banner ads with functional search bars.  I asked for instructions for how to create them so I could share them with Dreamstime's ad designer.  Mr. Altarescu and Ms. Sipciu directed me to online resources for creating the HTML5 banners according to Google's requirements and they told me and told me to test the functionality by creating and submitting the HTML5 banner ads for service to users in AdWords.  He told me he was checking with the necessary people at Google to confirm they would work as he believed they would.

31.     In or around November 22, 2016, I shared the information I received from the Google representatives for creating HTML5 banner ads with Dreamstime's ad designer Andrei Iancu. Mr. Iancu created HTML5 banners according the information ad specifications the Google representatives shared with us.  We confirmed that the ads worked correctly in Google's Web Design tool, but we were not able to confirm whether the ads worked as designed once uploaded to the AdWords interface.  We were able to confirm that the banner was designed correctly but we

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1   were not able to test it from the user's perspective after uploading to AdWords.  As instructed, we

2   uploaded the new HTML5 banner ads to AdWords and they were not disapproved by Google.

3       32.     On December 12, 2016, I reminded Altarescu that we were waiting on a

4   confirmation from him that Dreamstime's new HTML5 banners were compliant with Google's

5   policies. *See* Declaration of Elisabeta Moraru, Exhibit B at GOOG-DRMSTM-0008029.  Altarescu

6   responded that he had several meetings with Google's Policy team on this issue and that they had

7   made progress.  *See id.*  He told me that he would be having a final meeting with the Policy team to

8   determine the exact solution for continuing to use HTML5 without needing to use a third party

9   platform like DoubleClick. *See id.*

10      33.     On December 14, 2016, Altarescu told us "he had finished talks with the 2 entities in

11  the Policy team. (Review and Enforcement)" and "[i]n short, the banners containing a functional

12  search field are ok and can be used.  Dreamstime, is currently the first stock Photo Partner using this

13  version, so it will certainly help in terms of performance."  *See* Moraru Decl. Ex. B at GOOG-

14  DRMSTM-0008028.  Altarescu added: "I checked if they work, and unfortunately, they don't."  He

15  told us that instead of sending the user to the Dreamstime page the search results, the user clicks the

16  search field in the ad and types the search terms but is sent to Dreamstime's main page and not the

17  search results page. *See id.*  He concluded that "[a]t this time, although we have this situation, the

18  banners are active and they serve.  My proposal is not add any other banners until we know that the

19  HTML code is correct." *See id.* at GOOG-DRMSTM-0008029.  I told Altarescu that I had already

20  uploaded the newest version of the HTML5 banner and provided the location of the banner in the

21  account so that he could test it using Google's internal tools.  *Id.*  Altarescu did not instruct us to

22  disable the HTML5 banners ads that Google had already approved. *See id.* at 8027-28.  Altarescu

23  responded that he contacted one of Google's technical specialists named Sophia to review the

24  HTML5 code and he would "get back to us with information." *See id.* at 8027.  He told us that

25  "[c]urrently, it's still not working in the AdWords interface. You can type into the search tab but it

26  won't send you to the search results site" but that there was "a possibility for the Banner to be

27  correct, but requiring something specific for AdWords, so it's best to wait for Sophia with an

28  answer." *See id.* at 8027.

34.     My review of documents produced by Google in this litigation revealed that on December 14, 2016, Mr. Altarescu told Ana Sipciu he was sure the HTML5 banners could work in AdWords without a third party service once the code he was using changed.  Attached as **Exhibit E** is a true and correct copy of a document previously-marked Exhibit 196 that contains these communications.  *See id*. at GOOG-DRMSTM-00007896.  This is what he had told us.

35.     On the same day, Google's internal documents show that Altarescu received a response from Sophia (Google's technical specialist) a few hours after Altarescu told us he would "█████████" with the information she provided.  *See* **Exhibit F** attached hereto at GOOG-DRMSTM-00012890-91.  Google's technical specialist told him she tested Dreamstime's HTML5 banner ad and found that "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."  *See id.* at GOOG-DRMSTM-12890.  Sophia added "███████████████████████████████████████████████████████████████."  *See id.* at GOOG-DRMSTM-12891.  Neither Altarescu nor Sophia communicated this information to us.

36.     On December 19, 2016, I received an email from Ana Sipciu notifying us that she and Altarescu would be leaving Dreamstime's dedicated support team.  She told us to continue to copy her and Altarescu on all emails until January 1st when the new core team would fully be in place.  Attached as **Exhibit G** is a true and correct copy of that email, previously-marked as Exhibit 195.  She wrote that after January 1st, Natalia Domina and Andreea Simulescu would "take full ownership." *Id.*

37.     On December 21, 2016, I followed up with Altarescu because he had not reported to us what he had learned from Google's technical specialist.  *See* Moraru Decl, Ex. B at GOOG-DRMSTM-00008027.  Altarescu did not respond to my request for more information.  I did not hear from Altarescu again on this issue or any other.

38.     Following Altarescu's final email to me on December 14, 2016, I asked Dreamstime's ad designer Mr. Iancu to alter the HTML5 to try to fix the functionality issue.  Mr. Iancu told me he altered the HTML5 code to solve the issue.  We were able to test it in Google's

Web Design tool and it worked, but we could not determine whether it worked in the AdWords interface.

39.    In January 2017, I continued to follow up with on this issue with the newly installed account managers Natalia Domina and Andreea Simulescu, because Ana Sipciu told us they would be taking ownership of Dreamstime's account.  It was my understanding that the new support team members were informed of the outstanding issues Dreamstime had when they assumed "full ownership."  I asked for Google's position on the HTLM5 banner ads.

40.    On January 19, 2017, I wrote to Ms. Domina an email entitled "Banners DT – HTML5" to ask what should be done with Dreamstime's banners with search function and included that "I know Andreea is in charge of it and has a deadline for tomorrow."  Attached as **Exhibit H** is a true and correct copy. *See id*. at P_0007390.  I wrote to Ms. Domina that we had two types of banners already running in the account.  For one ad group, "the search function was not available, the banners were accepted and running."  *Id.*  For the other ad group, I told her "I added a new example with a single format where we think we solved the issue with the search bar but we received no feedback from you. The ad doesn't have a good exposure so I can't get to see it and test it."  *Id.*  Ms. Domina responded that her suggestion was to "run an Experiment in AdWords interface to test and compare this ad creative (with search function) with other image ads for new users.  If results (conversions, conversion rate and cost per conversion) are good, then you can add these banners to all other your Display campaigns.)"  *See id*. at P_0007389.  It was clear that this meant we had our Google account manager's approval to upload the HTML5 banners, and if Google approved them, we could use them for our campaigns.  The working document that Dreamstime and the Google support team shared during the first quarter of 2017 to keep track of assignments and tasks confirms this mutual understanding.  Attached as **Exhibit I** is a printout of a tab from the working spreadsheet document, produced in discovery as P_0166216, entitled "CLOSED PROJECTS".  The task described as "Banners HTML5 search function – what should we do with them? What is the next step? Should we implement them all over the account?" was assigned to "Project Owner" Natalia Domina with "extended Google Team support" from Andreea Simulescu.  *Id.*  The task was marked "solved" and "resolved" on January 20th.  *Id.*  Following Ms.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Domina's instruction, we uploaded additional HTML5 banners.  We believed these new HTML5 banners had search bars that were functional based on our own testing and Ms. Domina's response.

41.    On or around February 7, 2017, Ms. Domina made a presentation to us with Google's recommendations for improving Dreamstime's display banner ads.  A true and correct copy of the slides Ms. Domina used for the presentation is attached as **Exhibit J**.  In the presentation, Ms. Domina shared with us several types of display ads our competitors were using.  On one slide, she included examples of Shutterstock display ads with search bars and wrote, "Might be good to attract new using [sic] 'Search bar'.  Ideally the Landing Page should be 'Search Page' on your website." *See id*. at P_007513.  In the section of the presentation entitled "Dreamstime creatives: what can we test?"  Ms. Domina included a slide for "Search bar" with images of some of the previous HTML5 banner ads we had uploaded into the account.  *See id.* at P_0007525.  On the final slide Ms. Domina told us as a next step to "test different designs/themes for "search bar" image ads (with relevant Landing pages)." *See id..* at P_007528.  The presentation reinforced my understanding that the HTML5 banner ads we had uploaded and Google had were approved were working as Google required.  Following this Google presentation, Dreamstime focused more energy and resources on HTML5 banner ads.

42.    On February 16, 2017, I reported to Ms. Domina that 3 of the HTML5 banners with search function had been disapproved in Dreamstime's account for "misleading content" and asked her to help them get a re-review.  Attached as **Exhibit K** is a true and correct copy of the email chain.  *See id.* at P_0016138.  At the time I believed the disapprovals were a mistake because I believed the HTML5 banners functioned as required and Raul Altarescu confirmed to us that if they have functional search bars they are not in violation of any Google policy.  Ms. Domina told us to delete all the previously disabled static jpeg ads in our account and that she would ask Google's Policy Team to re-review the HTML5 banners once we deleted the static ads. *See id.* at P_0016135-37.  I followed Ms. Domina's orders and deleted over 400 static jpeg ads from the account.  *See id*. at P_0016134.

43.    On February 17, 2017, Ms. Domina told me she was going to request that Google re-approve all current HTML5 ads.  *See id.* at P_0016133-34.  She also told us to "double check" with

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

Dreamstime's ad designer "if it's possible to improve 'search bar' functionality (currently when use user [sic] makes first click on a bar – banner redirect [sic] him immediately to landing page)." *Id.* This was a surprise to me because I believed the HTML5 banners we submitted had functioning search bars.  I contacted Mr. Iancu to ask for confirmation our HTML5 banners worked as designed. He confirmed to me that he included the necessary "exit API" function and as far as he could tell the HTML5 banners had functional search bars using Google's validation tool.  Attached as **Exhibit L** is a true and correct copy of that email which was previously-marked as Exhibit 22.   In my response to Ms. Domina, I expressed my concern that Google's Policy team had disapproved 3 of our ads with good results but did not disapprove the other 2 in the ad group that had no results. *See* **Exhibit K** at P_0016133.  I also asked her "to help us with a feedback from a design specialist. Maybe he/she can analyze what is wrong with our banners and why they don't work in your platform as expected."  *Id.*  At the time I was frustrated because I had been searching for the same confirmation from our Google representatives for months and Ms. Domina and Ms. Simulescu previously told us to upload the HTML5 banners. Ms. Domina's response suggested the problem was with Dreamstime's design of the HTML5 ads when we would learn approximately two months later Google's system made it technically impossible to run HTML5 banner ads with functional search bars.  This of course was information Raul Altarescu knew in December 2016 but failed to share with us.

44.     On February 18, 2017, Ms. Domina told us "[i]f you had deleted those .jpg ads beforehand, than nothing would have happened with these 3 HTML5." *See* **Exhibit K** at P_0016131.  She then instructed us to change the text in the HTML5 banners.  *Id.*  We were confused by Domina's response that Google's system disapproved only 3 out of the 5 HTML5 banner ads in the ad group and elected to disapprove the 3 ads that were performing well.  We also did not understand why the presence of disabled static jpeg ads would cause Google's system to do this. Mr. Enache asked Ms. Domina to seek an official response from Google's Policy team.

45.     Ms. Domina reported that she conferred with Google's Policy team and that he HTML5 banners Google initially disapproved were now approved.  She did not provide us with a clear explanation as to why Google's Policy team changed its mind.  Internal documents produced

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

by Google in this litigation show Ms. Domina submitted a support ticket and conferred using with a specialist named Jamielyn in a hangouts chat.  Attached as **Exhibit M** is a support ticket submitted by Ms. Domina on February 18, 2017 regarding Dreamstime's HTML5 banners, previously-marked as Exhibit 199.  Attached as **Exhibit N** is a document labeled GOOG-DRMSTM-0003163-65, previously-marked as Exhibit 285.  It includes a message chat dated February 24, 2017, between Ms. Domina and ███████@google.com regarding Dreamstime's disapproved HTML5 banner ads. During the chat Mr. Domina brought up Shutterstock's use of similar ads.  *See* **Exhibit N** at GOOG-DRMST-0003164-65.  On February 27, 2017, a person identified as "Jamielyn" of gTech ads support notified Ms. Domina that the HTML5 ads had been approved, but did not explain why. See attached **Exhibit O**, a document previously-marked as Exhibit 284.  Ms. Domina thanked Jamielyn but did not ask for an explanation as Dreamstime had requested.  *Id*.  We did not understand why and Google's representatives could present to clear explanation to us.  Because Google reapproved our HTML5 banners we believed they functioned as required and did not violate any policy.

46.     Near the end of March 2017, we noticed that the same trend of disapprovals of the better performing (lower CPA) ads was occurring with the HTML5 banner ads.  We raised this issue with Andreea Simulescu.  A review of Google's internal policy discussions show that there was confusion within Google as to whether these ads were correctly disapproved.  Attached as **Exhibit P** is a document previously-marked as Exhibit 205 that appears to include an internal chat between Google policy reviewers named Prashanth and Anubhav.  *See id*. at GOOG-DRMSTM-0003410.  A policy team member named Prashanth later told Ms. Simulescu that the HTML5 banners did not function correctly because "████████████████████████████████████████ ████████████████████████████████████████████████████."  See **Exhibit Q**, previously-marked as Exhibit 202.  Ms. Simulescu later claimed to me the disapprovals were due to "█████████████████████████████████████████████████ ██████████████."  Attached as **Exhibit R** is a true and correct copy of that email, previously-marked as Exhibit 201.  She did explain to us what the Policy team member said regarding the functionality of the ads. There was no clear explanation.

47.     On April 12, 2017, Mr. Jianu of Dreamstime emailed the Google Ads support team regarding the HTML5 banner disapprovals. He forwarded the email we received from Raul Altarescu on December 14, 2016 in which he told us "the banners containing a functional search bar are ok and can be used." *See* Moraru Dec., Ex. E. Radu Stoica responded that he "talked to our colleagues in the technical department and they confirmed what I said in the call, that in the standard AdWords implementation that type of banner behavior is not possible." *Id.* I know now that this is information Mr. Altarescu received on December 14, 2016 just hours after he told us he would get back to us with information from Google's technical specialist. *See* **Exhibit F** at GOOG-DRMTSM-00012890-91. Altarescu failed to share this important information with Dreamstime. His successors then told us to submit Dreamstime's newly designed HTML5 banners and led us to believe it was our fault for Google disapproving the banners.

48.     In Google's internal emails that followed, Mr. Altarescu shared the December 14, 2016, response from Google's technical specialist Sophia with the rest of the Google Ads support team *for apparently the first time.* Attached as **Exhibit S** is true and correct copy of a document marked GOOG-DRMSTM-0009079-91 that contains the emails. *See id.* at GOOG-DRMSTM-009079. As noted by Carmen Punga's response, "████████████████████████████████████ ████████████████████████████████████████████████ ████████████████." *See* **Exhibit T** at GOOG-DRMSTM-0009153-54. Ms. Punga added it was her understanding that "████████████████████████████████████████ ████████████████████████████████████." *See id.* at GOOG-DRMSTM-0009154. Ana Sipciu responded that Dreamstime "████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████ *See id.* at GOOG-DRMSTM-0009152. Ms. Sipciu then wrote, "███████████████████ ████████████████████████████████████████████████ ██████████████████." (*Id.*) **But that is not true.** I followed up with Mr. Altarescu on December 21, 2016 on this issue and received no response. Then I followed up with the newly installed Google support team in January 2017 and also did not receive any indication the HTML5

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

banners would not work in AdWords without a third party service.  As Google's Romania country

manager Elisabeta Moraru wrote on April 27, 2017, Google's "███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████."  *See id.* at GOOG-DRMSTM-0009150.

49.    Google's inconsistent advice and misrepresentations about its polices, our HTML5

banners, and how its ad approval system functioned, coupled with the fact that Dreamstime's most

successful display ads were being cancelled while less efficient ones were allowed to run, caused

lasting damage to Dreamstime's accounts over an extended period of time.  At the direction of Mr.

Enache, I reviewed Dreamstime's account and created a report listing the disapproved Display ads

from September 1, 2014 to March 28, 2018 and that performing a comparison of the average CPA

for these to the average CPA for all such approved ads during the same period.  I understand the

report was produced in discovery in this litigation with Dreamstime's interrogatory responses and

disclosures as P_0164412.

**Email to Mr. Enache in March 2017**

50.    I have reviewed Google's Motion for Summary Judgment filed in this action.  In the

motion, Google in many respects misconstrues an email I wrote to Mr. Enache on March 5, 2017,

which was marked as Deposition Exhibit 144 and Google filed as Exhibit MM to the Declaration of

Brian Willen in support of Google's motion.

51.    I wrote that email in response to Mr. Enache's request that I share my thoughts on

three topics of concern Dreamstime had with Google.  Mr. Enache wrote that Dreamstime had been

contacted by someone "from AdWords Legal (who I believe is also connected to Policy) who would

like to help us with the items that are related to them." *See* Willen Dec., Ex. MM at P_0037512.

The three topics Mr. Enache asked me to discuss were part of a much longer list issues and

problems Dreamstime had with Google.  The topics Mr. Enache asked me to respond to included

(1) "Despite Dreamstime's implementation of all best practices recommended by Google,

automated optimization of AdWords campaigns consistently makes bad choices at Dreamstime's

expense"; (2) "Google drives up AdWords bill by over-delivery" and (3) "Google drives up

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

AdWords bill by running tests that spike the spending on particular campaigns without providing any adjustments or refunds afterwards." *See id.* at P_0037512-13.  I was not asked in this email exchange to weigh in on other topics in Dreamstime's list.

52.      My response to Mr. Enache's request was based on my understanding of the issues at the time I wrote them in early March 2017.  When I shared my thoughts with Mr. Enache he disagreed with me on several issues, especially those that pre-dated November 2014 when I started working with Dreamstime.  I was also giving my candid opinion about whether Google's actions as they related to those three topics could form the basis for legal claims based on my understanding of Google's terms and conditions and the way I was also trained during my work experience at Google. All the claims from clients were supposed to be pushed back with references from articles visible in the public help center.  Only the very insistent clients' requests were forwarded to specific departments (billing, technical, etc.).  But I am not a lawyer and know nothing about the American legal system.  I was also reluctant to be accusatory at that time considering some of the Google representatives were my former colleagues and friends.  As I testified at my deposition, *at that time* "I trusted Google . . . so my belief was that Google wouldn't spend more than what they say they would spend."  Deposition of Elena Dobre dated January 23, 2020 at Tr. 193:3-14.  I realized later that Google's main objective was to get Dreamstime to implement its products and spend money on ads. *Id*. at Tr. 99:22-25.

53.      In bullet point one of that email, I wrote "Google never does the changes in our account – they recommend and we apply their recommendation, nevertheless we don't have written emails with what we should do or not, mast [sic] conversations were via hangout.  Only recent interactions have written documents with instructions."  I understand now that before I started working with Dreamstime members of Google's support team did actually have full control of the account and implemented changes directly in Dreamstime's account at times without Dreamstime's prior consent.  Mr. Enache explained to me that this is what happened when Mr. Marian initiated and optimized Target ROAS campaigns for Dreamstime in 2014.  Dreamstime also gave Google full control after I wrote this email to design certain campaigns, as I mentioned in my deposition.

1   Dobre Tr. 249:9-250:1.  In those cases, Google itself created the campaign, ads, keywords, and set

2   the budget (and sometimes even entire accounts).

3       54.     I also noted in the email that many of Google's recommendations that Dreamstime

4   followed based on Google's assurances that the account performance would improve were not

5   memorialized in writing.  These were provided during conversations in Google hangouts meetings.

6   I noted this because it makes it very difficult to demonstrate Google's incorrect recommendations

7   and false assurances without written documents.  I also referred to the "*what to expect*" part of

8   Google's terms and conditions that says Google "doesn't promise a certain level of results, CPA nor

9   number of visits."  Willen Dec., Ex MM at P_0037511.  While it is also true that Google's support

10  team would not specifically promise Dreamstime would obtain a minimum number of conversions

11  or an exact CPA on a particular campaign, they did nevertheless assure Dreamstime that if we

12  implemented the changes they pushed on us the campaign performance would improve – in most

13  instances that meant either more conversions or a lower CPA, or both.

14      55.     In that email, I also wrote regarding the tests that spiked Dreamstime spending that

15  "Google generally asks us to sign agreements for tests and they have very specific terms &

16  conditions where they state that they are not responsible if a test doesn't work."  While that was the

17  case for some of the test campaigns Dreamstime tried for other tests the Google representatives

18  pushed us to do them without any signed agreement.   On the topic of Google returning CPAs much

19  higher than the target CPA Dreamstime set for the campaigns, I wrote in that email "here we have a

20  valid point regarding how much we are ready to spend and how much the system spends." I

21  included that Google's terms state that "your effective target CPA may be different from the target

22  CPA that you set", however, as I testified at my deposition, Google elsewhere affirms that although

23  "some conversions may cost more than your target and some may cost less, but altogether Google

24  Ads will try to keep your cost per conversion equal to the target CPA you set.  It is not a promise,

25  but it's an affirmation that they do the best in order to reach the Target CPA you set."  Dobre Tr.

26  200:18-201:4.  There were multiple instances in which Google's system return a CPA multiple

27  times higher than the target CPA Dreamstime set despite Dreamstime following all of Google

28  representative's instructions for setting up the campaign. Google's system provided results nowhere

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

close to the target CPA set by Dreamstime. For example, in 2016 Ana Sipciu designed a campaign for Portugal in which the ads and keywords were written and translated by Google's representatives. She sent me everything and all I did was uploaded what she created into the account.  The resulting CPA was $719.  Based upon these egregious examples, and my review of Google's internal communications produced in discovery in this lawsuit compared to what Google was telling us at the time, I have become more convinced that Google's representatives were not being honest with us at the time they presented many of the ad campaigns at issue in this case.

56.     Regarding overdelivery for monthly budgets, I wrote in the email that based on my reading of Google's policy I did not think there was overdelivery on a monthly basis.  But as I testified, I was not in charge of keeping track of Dreamstime's budgets and I trusted Google at that time.  I also understand now that Mr. Enache was also referring to the time period *before* Google updated its monthly overdelivery policy to limit spending to "the average number of days in a month (30.4) multiplied by your average daily budget."

57.     At the end of my email, I wrote to Mr. Enache that "the entire account management is 100% the customer's responsibility" and that "the decisions are made by the advertiser." I know now that in Dreamstime's case this was not true.  In actuality, the Google representative took full control over Dreamstime's account and made manual changes to it before I worked with Dreamstime that resulted in considerable damage to Dreamstime's campaign performance.  They also provided Dreamstime false information about Google's automated bidding systems.  Google also assumed responsibility for the campaigns the representatives urged Dreamstime to create based on their recommendations that failed to perform as they stated they would. This was all a ploy to get Dreamstime to spend more on Google Ad campaigns.

58.     I also wrote in that email that I felt that the fact Dreamstime was "benefitting from support from Google RO & DUB is just an extra service, but that does not mean they will be responsible for our results." The service is an extra but it was available to all large customers, even smaller than Dreamstime in terms of ad budget.  Clients of Dreamstime's size cannot manage properly their account without dedicated Google support as the call-center employees generally don't have access to advanced products and cannot advise.  I understand now that the support from

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1   Google pushed Dreamstime to implement incorrect optimizations induced by the promises and

2   assurances that the problems will be solved, incorrect optimization that harmed Dreamstime on a

3   long term basis, all while benefitting Google financially. Although Google did provide help to us in

4   some circumstances, Google should be held responsible for the times they overstepped their

5   boundaries and harmed Dreamstime by overpromising things they didn't control and describe

6   algorithms that they didn't know how worked for real. Although on the surface Google's intention

7   may appear to be good, in reality whenever Dreamstime had issues that were escalated to Google

8   technical teams there were rarely transparent explanations or fact-based explanations and refunds on

9   the budgets spent. Most of the time the reports and complaints I made to Google were lost in black-

10  holes and received no follow-up for the dedicated Google teams.

11      59.     Finally I wrote in that email to Mr. Enache that "the fact we do not find the right mix

12  for us and for a CPA that we are looking for, it cannot be imputed as sabotage, lack of involvement

13  or bad practice from Google."  Again, I still trusted Google at the time I wrote this email.  In the

14  months that followed I learned more about Google's misrepresentations, which Dreamstime relied

15  upon and which caused irreversible damages to Dreamstime's ad account performance. As I

16  mentioned before, these were my candid thoughts at the time that Mr. Enache did not necessarily

17  agree with because he as the CEO had a better more complete understanding and knowledge of the

18  history of Google's actions and the relationship, including for the many other topics that he did not

19  ask me to comment on, such as Dreamstime's organic search ranking.

20      60.     There were several things that Google did after March 5, 2017 when I wrote that

21  email that made me question the opinions I shared in the email with Mr. Enache.  As explained

22  above with respect to Dreamstime's HTML5 banner ads, it was not until April 2017 that we learned

23  from the Google representatives that all along the AdWords system made it impossible to run the

24  HTML5 banner ads we created at the suggested of our Google support team.  I know now that the

25  Google support team learned that information from Google's technical specialist in December 2016

26  but did not share it with us until April 2017, all while we were creating, altering, submitting and

27  seeking explanations for HTML5 banner ads.  I believe the Google support team deliberately hid

28  the information so Dreamstime continued to spend money on dysfunctional banners, as the priority

of Google was not the user's experience and Dreamstime's success, but rather increasing its revenue from underperforming banners.

61.    Google also urged Dreamstime to create foreign language and localized campaigns in 2017 that despite Google's full control failed to perform as Google represented them would.  In 2017 we held bi-weekly meetings with the support team to discuss Dreamstime's performance.  The Google representatives provided advice and assurances that their suggested implementations would help Dreamstime's KPIs.  During these meetings, they guided us through every aspect of the account with advice and assurances that the Google representatives suggested implementations would improve Dreamstime's KPIs.  The Google representatives provided very specific and granular instructions for changes to improve account performance.  Attached as **Exhibit U** is a true and correct coy of printout of a tab entitled "Q1Q2 QBR 2017" from the working task spreadsheet shared by Dreamstime and Google, marked P_0166216, that demonstrates Google assumed responsibility for certain campaigns launched in 2017 at our Google representatives' insistence.

62.    In June 2017, Google representatives Carmen Punga and Andreea Simulescu pushed Dreamstime to launch a new German focused campaign.  Dreamstime had already tried campaigns dedicated to the German market in years prior.  In fact, Dreamstime's former account strategist Tudor Marian created a separate German and French account for Dreamstime and oversaw its operation from the very beginning.  Despite his purported expertise, the German and French account did not perform as well as Dreamstime's main account.  When I and others at Dreamstime mentioned we had already tried a German language campaign and it did not meet Dreamstime's KPIs, Ms. Punga assured us that Google's product had evolved, that her team was more experienced with foreign ad campaign execution, and that Dreamstime's competitors were in the market so we needed to do it to maintain overall account performance. She convinced us that creating foreign localized campaigns (first in Germany and then in other countries), was what needed to be done to improve Dreamstime's Google Ads performance.

63.    After these discussions, Dreamstime gave Google complete control over designing the German market campaign.  The Google representatives created the campaign, selected the landing pages, were responsible for translating the ad keywords and text, and instructed us to set

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

specific bids and budgets.  Carmen assured us that the campaign would work.  Despite Google having total control over the German language campaign, the results were extremely poor.  When we asked for an explanation, we did not receive one.  This was yet another example of Dreamstime's Google representatives overselling their experience, expertise and ability in order to induce Dreamstime to spend more on Google Ads.

64.     Similarly, in June 2017, Dreamstime launched another campaign following Ms. Punga's strong advice to test targeting potential customers in specific cities.  It was a campaign Mr. Marian had already suggested and Dreamstime attempted in November 2015 with disappointing results.  For that reason we were skeptical, but Ms. Punga assured us she could do much better. We chose New York and London because of their importance to the stock photo market.  We followed all of Google's recommendations for setting up the campaign.  We used a single keyword, assigned a large budget and set a very high bid, all following Google's recommendations and assurances.  After we launched the campaign it generated no impressions and no clicks.  I followed Google's instructions to increase the bid to an even higher amount ($30 per click even though Google's platform suggested $1.47 for a first page bid).  Despite this the campaign generated little exposure and few clicks. Even though our ads had good quality scores, very high bids, and only a single keyword, Google's system did not allow us to compete with our competitors in two very important cities for the stock photo industry.  Our Google representatives could not explain it.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing information is true and correct.  Executed on May 14, 2020, at Bucharest, Romania.

_____

_____

Elena Dobre

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850