BAKER MARQUART LLP
Jaime W. Marquart (Bar No. 200344)
 jmarquart@bakermarquart.com
Donald R. Pepperman (Bar No. 109809)
 dpepperman@bakermarquart.com
Brian T. Grace (State Bar No. 307826)
 bgrace@bakermarquart.com
777 S. Figueroa Street, Suite 2850
Los Angeles, CA 90017
Telephone:    (424) 652-7800
Facsimile:    (424) 652-7850

BAILEY DUQUETTE P.C.
James Bailey (*pro hac vice*)
 james@baileyduquette.com
104 Charlton St., Suite 1W
New York, NY 10014
Telephone:    (212) 658-1946
Facsimile:    (866) 233-5869

Attorneys for Plaintiff
Dreamstime.com, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DREAMSTIME.COM, LLC, a Florida LLC,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, LLC, a Delaware LLC; and DOES 1-10,<br><br>Defendants. | Case No. 3:18-CV-01910-WHA<br><br>**DECLARATION OF SERBAN ENACHE IN SUPPORT OF PLAINTIFF DREAMSTIME.COM, LLC'S OPPOSITION TO DEFENDANT GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:  Hon. William H. Alsup<br><br>Hearing Date:  June 18, 2020<br>Time:        8:30 a.m. |

*(margin text)* BAKER MARQUART LLP · 777 SOUTH FIGUEROA STREET, SUITE 2850 · Los Angeles, CA 90017 · Tel: (424) 652-7800 • Fax: (424) 652-7850

I, Serban Enache, declare as follows:

1.      I am the Chief Executive Officer and co-founder of plaintiff Dreamstime.com, LLC ("Dreamstime.")  I have personal knowledge of the facts set forth herein and if called as a witness I could and would competently testify thereto.  I submit this declaration in support of Dreamstime's Opposition to defendant Google LLC's ("Google's") Motion for Summary Judgment.

2.      I was deposed in this action in my individual capacity on January 21, 2020 and in my capacity as the 30(b)(6) representative for Dreamstime on January 20 and 21, 2020.

3.      Dreamstime is one of the leaders among online stock photography repositories and has been a reliable supplier of stock photos since 2000 when the site was launched, and I co-founded the company Dreamstime.com, LLC in 2004.  Since then I have served as Dreamstime's Chief Executive Officer. Dreamstime is an e-commerce website that provides visual content for purchase or license.  Dreamstime's primary products are stock photos and illustrations, videos, and audio files.  Its website contains a repository of more than 130 million of these products, which a user can search for and then purchase without paying a continuing royalty.  Dreamstime's primary means of obtaining revenue is by selling download plans (renewable subscriptions or credits) to users at set prices.  As an e-commerce website Dreamstime has at all times in the last 10 years had tens of millions of product pages on its website translated into twelve languages that are based upon a common template and indexed within Google's index of webpages.  As a result, it has hundreds of millions in individual webpages (the overwhelming majority of which are product pages) indexed within Google's index and available to be searched for by Google users.  Recently, based upon Google's Web Search public records, Dreamstime's English version of its main website dreamstime.com had 90,400,000 pages indexed by Google.com, compared with 30,200,000 and 88,000,000 for its competitors gettyimages.com and shutterstock.com.  This reflects Dreamstime's large and diverse library of products.  Based on market research, Dreamstime's community ranks first for contributors and registered accounts and is in top 3 for the number of purchasing customers.

4.      In or around March 2004, Dreamstime opened an account with Google's online advertising service AdWords (which Google recently renamed to Google Ads).  Since then, Dreamstime has paid Google considerable sums to place advertisements within Google's search

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

engine results and on Google's network of internet properties or third party websites that display Google ads (Google Display Network).  Over its lifetime, Dreamstime has paid Google in excess of $60 million for these services.  From March 28, 2014 (four years prior to Dreamstime filing suit) through September 28, 2018 (the filing of the First Amended Complaint), Dreamstime paid Google over $26 million for these services.

5.     In or around December 1, 2005, following Dreamstime's increase in AdWords spending, I received an email from a Google AdWords representative offering Dreamstime AdWords support services, which I accepted.  Between December 2005 and March 2012, Dreamstime received AdWords support from U.S-based Google personnel.  Throughout this time period, I primarily managed Dreamstime's AdWords account.  I worked directly with the AdWords support personnel who provided assistance to Dreamstime by helping create and optimize Dreamstime's ad campaigns.  The Google support personnel changed frequently.  Every six months to a year Google assigned new personnel to Dreamstime's account.  The turnover was frustrating and disruptive because there seemed to be very little transfer of knowledge each time new personnel were added and I had to explain Dreamstime's marketing strategy each time to the newly assigned Google support personnel.  It also resulted in new Google personnel generating a lot of duplicated and overlapping ad campaigns.  All of the AdWords support personnel had access to Dreamstime's account and made changes to it directly, but the system asked for Dreamstime's approval before they were applied.  Later on this request for approval was removed.

6.     Also during that time period, Dreamstime began using one of Google's smart bidding strategies named "Conversion Optimizer."  Google later changed its name to Target CPA, which stands for "target cost per acquisition."  Based on explanations from Google's AdWords personnel and Google's publicly available information, my understanding is that the Conversion Optimizer is an automated bidding strategy that uses machine learning to maximize the number of conversions generated by ad campaigns.  In Dreamstime's case, a conversion meant a customer purchase on Dreamstime's website.  To use the Conversion Optimizer, a target cost per acquisition ("CPA") is set, which is the average CPA Dreamstime desired for the ad campaign.  As explained in the current version of the Help Center of Google Ads (support.google.com/google-

ads/answer/6268632?hl=en): "Target CPA is a Google Ads Smart Bidding strategy that sets bids to help get as many conversions as possible at the target cost-per-acquisition (CPA) you set.  It uses advanced machine learning to automatically optimize bids and offers auction-time bidding capabilities that tailor bids for each and every auction."  The current version of Google's explanation goes on to state that "[s]ome conversions may cost more than your target and some may cost less, but altogether Google Ads will try to keep your cost per conversion equal to the target CPA you set."  Dreamstime used Conversion Optimizer for most of its ad campaigns.  The Conversion Optimizer worked well initially for Dreamstime's online marketing strategy, which has always been to increase the volume of customer sales (purchases of stock photos) while minimizing the CPA.

**Google's AdWords Misconduct and Fraud**

7.     In or about March 2012, I was contacted again by a Google AdWords representative who offered to provide Dreamstime a dedicated European-based AdWords support team.  At this time, I was told by a Google representative that Dreamstime was one of the largest Google clients by ad spend in Romania, which is where Dreamstime's European offices are located.  Dreamstime accepted Google's offer and began working with a dedicated AdWords support team with personnel based in Dublin, Ireland at Google's European headquarters, and in Bucharest, Romania.  The first members of the dedicated support team included "Account Manager" Adriana Puchianu, "Account Strategist" Tudor Marian and "Industry Manager" Bogdana Butnar.  Ms. Butnar claimed her team has access to internal competitive information and that their experience and knowledge would improve Dreamstime's performance.  Over the years, several personnel changes were made to the team, but significantly less often than before, which I assumed provided for more accurate and efficient management of the account.

8.     Dreamstime's dedicated AdWords support team members have held titles including "Account Manager", "Account Strategist", and "Display Specialist."  I do not recall any of their email signatures disclosing that they were on Google's sales team.  Instead they referred to themselves as strategists, analysts and consultants providing help and support for our Google campaigns.  When speaking with us, the AdWords representatives frequently referred to themselves

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

as experts with specialized knowledge of Google's ad systems.  They also made me and my team aware that they had access to non-public information, private product trainings and specialized support from Google's internal technical teams that they used to help us create campaigns and to understand whether some of Google's more sophisticated machine learning technology or other advanced features were appropriate for an advertiser like Dreamstime.  It was only through Google's support team that Dreamstime was able to receive invites to most of Google's new advertising features not yet available to all advertisers.  It was not until this litigation that I learned the members of Google's support (sales) team received bonuses based upon Dreamstime's AdWords spending and that each quarter they worked toward a "target" for Dreamstime to spend and pay Google.  The AdWords support team also had access to Dreamstime's accounts at all times. They could view all of the information in Dreamstime's account and make manual changes to Dreamstime's account settings, changes that were not recorded by the Change History section of the AdWords account, a section created by Google for this purpose to track changes.  They also had direct access to Dreamstime's information through Google's internal tools, such as Google Search Console.  Dreamstime, at my direction and pursuant to Google's request, also granted Google access to Dreamstime's Google Analytics account to provide them full transparency to inform their advice and assist in their optimizations to the account.  For these reasons, I and my team at Dreamstime fully trusted and relied on the advice and recommendations of the Google AdWords support team members, who all held themselves out to have unique expertise, specialized knowledge and access to Google's proprietary data and information that Dreamstime did not. Consequently, during this time I and my team not only relied upon their recommendations but also allowed Google to directly make changes to Dreamstime's account and ad bidding strategies.

    9.    Since March 2012, I and others at Dreamstime have frequently met with the AdWords support team through Google Hangouts, a Google communication platform.  Also, beginning sometime in 2012, the AdWords team made quarterly visits from Dublin to Bucharest to present quarterly in-person "business reviews."  We also averaged at least one in-person meeting with the support team every two weeks.  During these frequent telephonic and in-person meetings, Google's AdWords representatives consistently held themselves out to be expert consultants.  They

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

presented new Google products they told us were a good fit for Dreamstime, analyzed

Dreamstime's account performance, and made various recommendations for improving account

performance, including advising and/or creating new AdWords accounts for our main website or

secondary websites.  As noted further below, Google frequently assured us that changes they

recommended to Dreamstime's campaign settings were a fit for Dreamstime's budget and would

result in improved performance.  Often these assurances were in writing, but often they took place

on telephone calls and during meetings.

10.     At the time Dreamstime was assigned the dedicated AdWords support team in or

around March 2012, Dreamstime had achieved an average CPA across its main account of

approximately $60.  The main account includes the ad campaigns that promote Dreamstime's main

website, www.dreamstime.com.  Dreamstime later maintained separate AdWords accounts for its

other website properties.  Once those were created, Dreamstime referred to its original account as

the "main account," as did the AdWords team.  A review of Dreamstime's main account records

confirms an average CPA of $55.09 for 2010 and $56.43 for 2011.  From the time we first met with

our dedicated AdWords representatives, I repeatedly told them that Dreamstime's key performance

indicators ("KPIs") have been to increase sales volume and reduce its CPA.  I also made clear that

the only conversions Dreamstime was interested in were for purchases of download plans on

Dreamstime's website.  When we discussed Dreamstime's CPA it was always in the context of

conversions for purchases.  I also told Google that as long as Dreamstime's desired CPA was met,

Dreamstime would generally have little restrictions on its AdWords spending as we could reinvest

most of the revenue gained from purchase conversions.  In 2012, Dreamstime's average CPA across

its main account increased slightly to $52.  In 2013, it increased slightly again to $66.   This was

slightly above Dreamstime's maximum, viable CPA of $70, which I shared with Tudor Marian and

the rest of his team.  I frequently discussed Dreamstime's average CPA with the AdWords

representatives and I expressed Dreamstime's desire to reduce it.  In January 2013, I told Google

that Dreamstime's goal was to reduce the average CPA to $50.  Attached hereto as **Exhibit A** is a

true and correct copy of a certified translation of my email exchange demonstrating this.  By late

2013 or early 2014, when Dreamstime's average CPA rose slightly above $70, I told the AdWords

---

DECLARATION OF SERBAN ENACHE              5              CASE NO.: 3:18-CV-01910-WHA

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

representatives during meetings that Dreamstime's desired CPA was $70 or less and that Dreamstime was only interested in account changes that resulted in an average CPA of $70 or less. At that time, on a number of occasions in late 2013 and early 2014, I expressed to Tudor Marian and others that a $70 overall CPA was the most Dreamstime could economically sustain or accept for long-term profitability, while ideally we would move later towards $50. I explained that, if the short-term CPA was under $70, Dreamstime could continue to increase its spending on Google ad products as its business grew. However, if the CPA level persisted for a significant period of time over this amount, Dreamstime would have to decrease its AdWords budget and limit its campaigns to those that achieved this goal. Of course, Dreamstime was persuaded to (and did) set CPAs for certain types of campaigns higher than this amount (sometimes at the instruction of the Google representatives) if they were particularly valuable or other circumstances warranted it, but the overall average CPA of $70 across the main account needed to be met. Tudor Marian assured me that, with the exception of those certain campaigns we agreed to in advance, he and his team would only recommend or implement campaigns that fit within the financial constraints I had laid out.

11.     This mutual understanding between Dreamstime and Google of Dreamstime's maximum CPA of $70 (and desire to improve upon it) was the guiding premise of every strategy that Google urged Dreamstime to employ thereafter. When Google representatives stated that a particular type of campaign or new strategy was a fit, it was understood by us both that this meant it was likely to meet Dreamstime's overall CPA goal, which we reminded them of often. In reality, as explained in more detail below, Google systematically induced Dreamstime to engage in strategies, campaigns, features and products that I now realize it knew were not a "fit" within the meaning we both shared for that term, and instead to increase Dreamstime's overall spending on ads.

12.     The AdWords team frequently pitched Dreamstime on new Google products and new ways to optimize Dreamstime's ad campaigns, always with the assurance that Dreamstime's account performance would improve. Many times these products did not perform as Google's representatives had represented they would and did not deliver the results the AdWords representatives assured us they would. Dreamstime was forced to take the risk of the changes made and/or strongly advised by the AdWords support team, and Dreamstime placed its trust in the team

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1    based upon our understanding of their vast expertise and specialized knowledge.  The AdWords

2    team also advised us when we created new campaigns to bid aggressively so Google's automated

3    bidding systems could gather a large volume of conversions faster, something they assured us was

4    necessary for the system to work and optimize faster.  In many cases they said that new features or

5    campaigns would not work unless a certain volume of conversions and clicks was met before

6    enabling.  Often these claims were not accompanied by a full explanation.  As we learned later, our

7    AdWords representatives either did not have access to this information or did not disclose it to us.  I

8    understand now that this was a strategy to increase Dreamstime's bids because Google's system

9    optimized based on the aggressive bids Dreamstime was induced to place based upon the AdWords

10   team's assurances.

11          13.    Repeatedly, when Dreamstime implemented one of the changes urged by Google's

12   AdWords representatives, we were told that Google's system required a "learning" period on

13   average between two weeks and one month in order to optimize and deliver the desired results.

14   When Dreamstime questioned the poor performance of a particular strategy implemented at the

15   assurances of the AdWords representative, the AdWords representatives frequently used this as an

16   explanation for why they claimed they could never pinpoint performance issues or determine the

17   cause-and-effect with respect to an ad campaign.  It remains unclear to us even today how long is

18   required for Google's systems to "learn" following account adjustments.  Google's initial estimated

19   "learning" period was often contradicted when the time was up and we were told to continue

20   waiting, sometimes weeks or months, past the original estimate.  Essentially, this meant that we

21   simply had to trust the Google system and trust our AdWords representatives' word even more than

22   we otherwise would have.  Because Google was either directly making or having us make multiple

23   changes on a regular basis, this learning period was always starting over on particular campaigns

24   and this made it difficult for us to assess or correlate performance for particular strategies.

25          14.    Now, with the benefit of the full history of Google's representations about how ads

26   would function being proven false time and again, and particularly with the benefit of hindsight into

27   Google's internal communications produced in discovery in this litigation, I now understand that

28   Google was engaged an overall scheme to increase Dreamstime's spending across its ad campaigns

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET   SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1   without regard to Dreamstime's desired CPA and without regard to the truth about how many of the

2   advanced campaigns really worked or were beneficial to Dreamstime.  The results contradicted the

3   repeated assurances of Google's AdWords representatives that they will help Dreamstime and that

4   new products and bidding strategies would not harm Dreamstime's account performance or cause

5   Dreamstime's average CPA to increase above and beyond the stated desired CPA of $70.  The

6   Google representatives often blamed the poor results on the fact that Dreamstime's budget was too

7   low and urged us to increase our budgets to achieve the promised results.  I now believe these

8   tactics were intentionally designed to keep Dreamstime's spending large sums on inefficient ad

9   campaigns and to increase Dreamstime's AdWords spending overall with no corresponding benefit.

10       15.     Following the initiation of this lawsuit, I and Elena Dobre (Dreamstime's digital

11   marketing consultant) reviewed all of Dreamstime's AdWords accounts together with the history of

12   our correspondence with the AdWords representatives.  At my direction, Ms. Dobre created a

13   spreadsheet that identified dozens specific ad campaigns that did not perform as represented by

14   Google and for which the CPAs were so high that Dreamstime seeks a full refund in the form of

15   restitution.  This spreadsheet was produced to defendant Google with Dreamstime's Initial

16   Disclosures.  A true and correct copy of the spreadsheet is attached as **Exhibit B**.  A true and

17   correct copy of Dreamstime's Third Amended Initial Rule 26(f) Disclosures is attached as **Exhibit**

18   **C**.

19       16.     Google's fraudulent scheme spanned several years, in which Google made various

20   misrepresentations to me and others at Dreamstime about how its campaigns would function that

21   induced Dreamstime to agree to hundreds of changes to its account.  These changes systematically

22   increased its CPA well beyond the $70 maximum CPA Dreamstime had expressed repeatedly to

23   Google, and that Google repeatedly referenced when telling me and others at Dreamstime that the

24   various strategies were a fit.  These misrepresentations were described in detail in Dreamstime's

25   interrogatory responses (which I verified), attached as **Exhibit D**, and several examples are

26   contained within this declaration for the purposes of opposing Google's motion.  Dreamstime is

27   now prepared to present all of the evidence of Google's varied misrepresentations at trial, with the

28

1    aid of expert testimony, and to present the full extent of the amounts it overpaid to Google as a

2    result of its misrepresentations/omissions and other breaches of duties.

3        17.    In March 2012, the "Account Strategist" on Dreamstime's new dedicated Google

4    AdWords support team was Tudor Marian.  Mr. Marian told me that his specialty was optimizing ad

5    campaigns for better performance and more efficiency.  Initially he and his team reduced

6    Dreamstime's average CPA which increased our confidence in the new team.  For the first 2 months

7    Dreamstime's YOY (year over year) performance improved (March $56, down from $58; April $57

8    down from $65).  But by the end of 2012, however, the performance indicators started to degrade.

9    In January 2013, I told the AdWords team that the CPA was too high and that our desired average

10   CPA was $50.   In early 2013, Mr. Marian told me that Dreamstime's account performance will

11   improve if overlapping ad groups and campaigns are reduced so as to decrease the number of

12   duplicate keywords Dreamstime bid on.  Mr. Marian explained that the process for doing this is

13   complicated, and I expressed that I was unsure if I or others at Dreamstime had the technical

14   knowledge to do it by ourselves.  When I told this to Mr. Marian, he assured us that he had the

15   technical capabilities and understanding of the AdWords system to handle the optimizations.  He

16   also stated that his and his team's expertise and special access to internal Google support and other

17   information would make them better suited than Dreamstime to make changes to certain

18   complicated settings in Dreamstime's account.  He then suggested that I give him permission to

19   make the necessary changes to "clean up" Dreamstime's account.  Based on his assurances, I

20   agreed, though I would not have done so with the benefit of what I know now.  Mr. Marian and

21   others on his team began making manual changes to Dreamstime's account to "optimize"

22   Dreamstime's campaigns.  Mr. Marian created a new AdWords account for certain types of

23   campaigns and beginning in April 2013 "cleaned up" Dreamstime's prior account by simplifying

24   campaigns and eliminating overlapping bids, while also creating new campaigns.  Mr. Marian

25   seemed to show an acumen and understanding of Google's AdWords platform beyond my and my

26   team's expertise.

27

28

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

**Target ROAS and Sign-up Change**

18.     In early 2014, I was generally satisfied with Dreamstime's experience using the Conversion Optimizer for years for almost all of its ad campaigns to increase the number of purchases at or around Dreamstime's desired CPA.  I closely monitored the average CPA across Dreamstime's account to evaluate account performance.  At that time, Dreamstime's average CPA across its entire AdWords account had increased to $70 despite Mr. Marian's optimization efforts in 2013.  I reiterated to Mr. Marian and others on the AdWords support team, which included the "Account Manager" Adriana Puchianu, that Dreamstime was only interested in making changes to its account if the changes furthered Dreamstime's KPIs, which were to increase sales volume as long as an average CPA of $60-$70 or less was maintained in the account, or to pause or decrease budgets for campaigns that were consistently not performing well as measured by Dreamstime's stated CPAs.  The Google representatives assured me that they understood and would only make recommendations that met our stated financial constraints.

19.     In or around February 2014, Mr. Marian and Ms. Puchianu recommended that Dreamstime implement a newly developed smart bidding strategy named Target ROAS (Return on Ad Spend).  In the calls and meetings discussing Target ROAS that were attended by Mr. Marian and Ms. Puchianu assured us that this newly developed bidding system was a great match for Dreamstime's marketing strategy and that it would help Dreamstime meet and stay below its maximum CPA by monitoring both purchases and website sign-ups and bidding differently for them in relation to the set target return on ad spend.

20.     Mr. Marian, Ms. Puchianu, and another member of the support team Maria Stroe assured us that they understood this new technology very well, that they had been trained by Google's internal tech team on its sophisticated technology, and that (with their assistance and expertise) it was an appropriate fit for Dreamstime's online advertising needs.  They explained that by switching to Target ROAS Dreamstime's account performance would improve because Google's system would bid more for keywords that bring purchases and less for ones that bring only website sign-ups.  They assured us that switching from Conversion Optimizer to Target ROAS could be reversed at any time without any irreversible, lasting damage to performance.  They also told us that

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

Dreamstime could revert back to the level of account performance from before the switch to Target ROAS, which meant a $60-$70 CPA average across the account.  As noted above, Mr. Marian and Ms. Puchianu knew that Dreamstime's goal was to obtain an overall average CPA of less than $60 and under no circumstances more than a maximum CPA of $70 per sales transaction and repeatedly assured Dreamstime that activating target ROAS would achieve this goal.   I now know that all of these statements from the Google representatives were demonstrably false.

21.     To test Target ROAS, the AdWords representatives told us that in addition to tracking customer purchases as conversions, we also needed to track Dreamstime website sign-ups as conversions.  Mr. Marian told us that without counting sign-ups as conversions, the system would not have enough data to work effectively.  Neither of these statements were true, as I now understand.  He told us that for our ad campaigns to be eligible for Target ROAS, they needed to have 30 recorded conversions within the previous 30 days.  By counting sign-ups as conversions, he said we could generate the additional conversions needed in order to make more of Dreamstime's ad campaigns eligible for Target ROAS.  Mr. Marian also said that the additional data from counting sign-ups would help Google's system optimize our campaigns by bidding more for conversions that brought higher value.  Mr. Marian and others on his team also assured us that the switch to Target ROAS would not negatively impact the performance of the Dreamstime ad campaigns that were not eligible for Target ROAS and would continue use Conversion Optimizer. These statements, I now know, were also false.  Among other things, sign-ups did not have to be counted in order for Target ROAS to be implemented.  The account-wide switch to count them *did* have lasting negative effects for Dreamstime's CPA performance that were not reversible. Dreamstime's most successful Conversion Optimizer campaigns would come to suffer lasting damage as they "learned" to favor meaningless sign-ups over actual transactions, and it was essentially impossible to return them to the state they were in before this change occurred. Knowing what I know now, as detailed below, Dreamstime would not have made the change to Target ROAS or the change to count sign-ups as conversions.

22.     Mr. Marian claims in his declaration that Dreamstime had expressed interest in increasing sign-ups, but that is not true.  Marian Decl. ¶ 28.  At that time, neither I nor anyone else

1   at Dreamstime expressed an interest in increasing Dreamstime's website sign-ups to Mr. Marian

2   and the idea to track sign-ups came from Mr. Marian and his team.  When Google brought up the

3   idea, I expressed serious concerns about counting sign-ups as conversions because Dreamstime was

4   interested in customers paying for stock photos and not simply signing up for a free account on

5   Dreamstime's website.  They assured us that this new system was advanced enough to still optimize

6   for customer purchases and that any website sign-ups would only provide  additional information

7   for the system to improve its ability to know which users are more likely to make purchases and at a

8   higher value or frequency.  We clearly explained to them in each of these conversations that sign-

9   ups were not Dreamstime's goal.  Now I understand that Google's incentive for adding sign-ups

10  was to increase the number of clicks without concern for Dreamstime's purchase transactions.  This

11  is not what Dreamstime expected from the relationship.

12       23.     On February 25, 2015, as a follow up to our discussions, Ms. Puchianu sent me an

13  email with instructions for setting up Target ROAS.  She wrote "we need to set up in the account 2

14  types of conversions (lead and purchase)" and "we need to set up static values for every conversion

15  type."  Attached as **Exhibit E** is a true and correct copy of a certified translation of that email,

16  previously-marked as Exhibit 305.  *See id.* at P_0161801.  A "lead" in this context meant a website

17  sign-up.  Ms. Puchianu also wrote that "AdWords will bid more for word/websites that bring in

18  purchases and less for those that only generate leads."  *See id.*  She also told us that "in order to start

19  testing it", meaning Target ROAS, we needed to do these things.  This confirmed what she had told

20  us in prior calls.  I understood from those prior calls and this email that sign-ups or leads *must* be

21  counted in order for the Target ROAS strategy to be employed.

22       24.     In or around this time, I spoke with Mr. Marian about how to set up the Target

23  ROAS bidding parameters in Dreamstime's existing ad campaigns.  I explicitly asked Mr. Marian if

24  he could set the Target ROAS parameters based on a CPA (computed using transactions) of $60 to

25  $70 USD.  He said he could.  Based on his and his team's assurances, their claimed expertise and

26  their unique access to technical information regarding the system, I agreed to test Target ROAS

27  with that understanding, and most importantly, with the understanding that Dreamstime could revert

28

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

back to the prior Conversion Optimizer bidding strategy and achieve similar results at any point without any lasting negative effects.

25.     I learned much later that much of what Mr. Marian and Ms. Puchianu told us was false and that they failed to explain several features that presented significant risks to Dreamstime's account performance.  For example, Marian failed to disclose that Google's system made it prohibitively difficult to track the performance of purchase and sign-up conversions separately which meant Dreamstime would not be able to track the real CPA across the account.  He failed to warn us to lower the target CPA of our Conversion Optimizer campaigns or to switch them to manual bidding to avoid the disruption from what should have been a foreseeable massive influx of newly counted sign-up conversions.  Marian and Puchianu also failed to disclose to us that Dreamstime did not have to count sign-up conversions for Target ROAS to work well; or at the very least, that Dreamstime could assign a very low static value for sign-up conversions.

26.     On or around March 3, 2014, following the advice of Ms. Puchianu and Mr. Marian, Dreamstime began counting sign-ups as conversions.  Consistent with what I had told them in our prior discussions, that Dreamstime did not value website sign-ups, I told them that "we set up the second type of conversion.  For conversion value, I entered 'Don't assign a value.' If we have to change it, please let us know." Attached as **Exhibit F** is a true and correct copy of a certified translation of that email chain previously-marked as Exhibit 306.  *See id* at P_0161826.  Ms. Puchianu replied that "[t]he idea of this Beta is to assume that each conversion has a different value" and that consequently, "we must have a value for leads." *See id.* at P_0161824.  I learned much later that this statement was false.

27.     As noted above, Dreamstime initially assigned "no value" for the value for leads/sign-up conversions.  After Ms. Puchianu told us we were required to assign a value, and a value was set at $10.  I and others at Dreamstime decided to lower the value to $4-$5.  We computed that based on the existing traffic to Dreamstime's website.  At that time approximately 10% of users who signed up for an account made purchases.  Because our goal was a desired real CPA of $40-$50, we set the sign-up value to $4-$5.  We discovered later that Google's Target ROAS system drove less and less quality traffic to Dreamstime's website so that significantly less

than 10% of new user sign-ups from AdWords actually resulted in purchases.  The static value of sign-ups was later reduced by Mr. Marian to $2 to address a flood of unwarranted sign-up conversions but that was still far too high.  In fact, as we found out later, that pushed the Target ROAS system to focus more on attracting sign-ups, which was completely opposite to what we were initially advised by Google.  I know now looking back that the AdWords representatives should have advised us to not count sign-ups at all, or to assign no value for sign-ups.

28.     Mr. Marian states in his declaration that he made sure Dreamstime understood both the risks and benefits of using Target ROAS, but that is not true.  Marian Decl. ¶ 32.  Marian and his team did not explain to me that by tracking sign-ups as conversions we were making an account-wide change that would significantly affect all of the campaigns that were using Conversion Optimizer at that time, and I did not understand this to be the case until well after the damage laid out in this declaration was already done.  As soon as we realized these performance issues, we stopped counting sign-ups.  Google also did not advise me to lower the Target CPAs that Dreamstime had set in its Conversion Optimizer campaigns to account for the fact that those campaigns would be valuing sign-ups equally with transactions on the website.  The immediate result was an alarmingly high number of sign-up conversions and a sharp increase in the CPA value for purchase-based conversions, which we learned only after we asked Mr. Marian to access the data and tell us what the cost per purchase was because we could not perform this function ourselves.  We learned much later (after it was too late) that our initial concerns were valid, the Conversion Optimizer had begun optimizing for website sign-ups because they were valued in the account at ($4-$5 and later $2), which was over ten times less than the previously set Target CPA when only purchases were counted as conversions.  Mr. Marian later admitted that this created "chaos."  The historical data that the Conversion Optimizer had used to generate purchase conversions below $70 was irreversibly tainted by an influx of thousands of low valued (and, to Dreamstime, essentially no-value) sign-up conversions.  Based upon Mr. Marian's deposition and declaration in this case, I now know that he knew all of these significant risks when he originally presented Target ROAS to Dreamstime; however, he never shared any of them with me or anyone else at Dreamstime when presenting Target ROAS to us.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET   SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

29.     On March 7, 2014, I raised concerns about the "huge increase in the real CPA (cost/purchase)." *See* Marian Dec. **Exhibit E** at P_0161862.  By "real" I meant the CPA for purchases and not website sign-ups.  My use of the word "real" of course indicates that Dreamstime did not consider non-purchase conversions to be of any real use, and I know Mr. Marian fully understood Dreamstime's position on this important point.  Mr. Marian responded that "[i]t seems that the optimizer was affected by the high volume of signups more than we expected." *See id.*  He then told me that he was moving Dreamstime's eligible ad campaigns to Target ROAS, that he "was convinced the cost will improve" and that he was "in contact with a product specialist who monitors the situation." *See id.*  At the time, I had no reason to doubt Mr. Marian's assurances and I continued to rely on those assurances by giving him control over this strategy and our account.  Now I know that Marian fully expected a large number of sign-ups to register as conversions when he sold us on Target ROAS, but that was the opposite of what he told me then.

30.     Marian manually enabled Dreamstime's Target ROAS campaigns in Dreamstime's account.  On March 10, 2014, following a worrying initial performance trend, I asked Marian to "please explain to me again how you set the parameters for ROAS to make sure that we obtain a similar value for cost/purchase that we had before ($60-70 CPA)."  Attached as **Exhibit G** is a true and correct copy of a certified translation of that email chain, previously-marked as Exhibit 309. *See id*. at P_0161876.   I specifically included the $60-$70 amounts because I wanted to reiterate Dreamstime's desired goal of $60-$70 CPA *for purchases* that I discussed with Marian before initiating Target ROAS. I was also concerned because I was not able to track all of the details for the CPA for purchases in the account like I had been able to before.  The following day I told him "the most important problem is that we don't see what is the real CPA." *See id* at P_0161875. Marian claimed to have access to the complete information (although I cannot know for sure if he did) and over the next several months we had to ask Marian for the real CPA for certain campaigns. This made it very difficult for Dreamstime to measure the effects of the changes the AdWords representatives were making in Dreamstime's account.  In any event, we could see that the cost was increasing and we repeatedly notified the Google representatives about it.  Again, Marian assured

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

me the system was working as it should and that we would see improvements very soon.  Again, I trusted and relied on his assurances.

31.     On March 11, 2014, I also told Marian and Puchianu that the cost of the Google ad campaigns were too high and asked them if they had a solution to "make sure again that we have only purchases as a target for CO?"  *See* **Exhibit G** at P_0161875.  I also asked for a refund based on the fact that the system bid aggressively for signups at very high values.  *Id.*  After stating that he consulted with a "Target ROAS Product Specialist", Marian responded with a set of recommendations that included reducing the value registered for sign-ups to $2 because he believed the "signup registration caused the most chaos in this case."  Marian assured me that following his recommendations "will bring the total spend to normal values, without a major impact on the operation of target roas."  *See id.*  Trusting Google's expert advice, I agreed to the changes.

32.     I understand now, based on my reading of Mr. Marian's declaration, that he contends my and Dreamstime's focus on purchase-based CPA was misguided after initiating Target ROAS, and that he thought this at the time he was discussing it with us.  This was the first time that I heard Mr. Marian say this.  We continued to focus on CPA because that is how we always evaluated account performance, so that is also how we evaluated whether Target ROAS was working as promised.  Not once did Mr. Marian or his colleagues advise against Dreamstime evaluating its account performance in that way.  They were well aware that CPA for purchases was what Dreamstime valued given our many discussions on the topic.  The fact that Marian now admits it was "misguided" to focus solely on purchase-based CPAs after making the changes he suggested tells me that he was intentionally telling us to engage in a strategy that he knew at the time would not meet our stated needs.  Furthermore, the countless emails from that time quoted in part in this declaration show that he did *not* explain to us that this was misguided – to the contrary, he persistently measured the performance based upon purchases on multiple occasions when we asked.

33.     On March 13, 2014, I was still not aware if the remaining active Conversion Optimizer campaigns in Dreamstime's account were optimizing only for purchase conversions, given that we had now assigned the sign-up value Mr. Marian advised us we needed to input for the Target ROAS campaigns to be effective.  I asked Mr. Marian "as for ROAS, you are 100%

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

convinced that, at this moment, CO takes into account only purchases?  Because the CPA shows converted clicks as reference, while registrations are also counted as converted clicks."  Attached as **Exhibit H** is a true and correct copy of a certified translation of that email chain, previously-marked as Exhibit 310.  *See id.* at P_0161896.

34.     Mr. Marian responded that "it is clear that things are not going well now."  *See id.* at P_0161891.  He and Ms. Puchianu suggested that Dreamstime continue to use campaigns that were not on Target ROAS but remove them from Conversion Optimizer.  *See id* at P_0161890-91.  Ms. Puchianu also said one "extreme solution that we can use as a last resort" was to "give up signup registration."  However, Ms. Puchianu told us not to take this extreme measure because we needed to wait for the system to adapt and we would see many users who had signed-up for accounts make purchases later because there was a 30 day window for conversions to register in the account.).  We eventually had to pause the non-ROAS campaigns to avoid further harm and ended up switching most of them to Target ROAS.

35.     By the end of March 2014, the results were poor but Mr. Marian assured us that he had no reason to believe that we will not have good results if we continued on with Target ROAS.  Attached as **Exhibit I** is a true and correct copy of a certified translation of that email chain, previously-marked as Exhibit 311.  *See id.* at P_0016444.  He told us that we needed to wait a few weeks longer for Google's system to gather enough data to optimize our campaigns after the most recent changes (i.e. removal of sign-ups and switching nonROAS campaigns to ROAS).  *Id.*  Marian continued to make manual changes to the campaigns in what we believed to be an effort to optimize them.  *See id.*  Sometimes he was doing this without consulting Dreamstime in advance and these changes were not visible to Dreamstime because they were not viewable to us in our account's history of changes.  Yet Mr. Marian states in paragraph 16 of his declaration that bid increases are considered "significant campaign changes" that "can disrupt performance because the algorithm can no longer rely on historical data about the about the campaign settings, but instead must learn about and adjust to new settings."  If true, Mr. Marian's own frequent changes to Dreamstime's account may have been the cause of the hindered campaign performance and caused Google's system to re-enter the "learning" period over and over.  Mr. Marian did not explain to

Dreamstime that his changes to the Target ROAS campaigns might trigger new "learning" periods. However, based upon his deposition and declaration testimony, I now know that he knew these facts back then and appreciated these risks at the time but intentionally failed to disclose them to Dreamstime.

36. In the calls and meetings that followed, the AdWords team continued to reassure us that they fully understood the technology and that Target ROAS will improve Dreamstime's KPIs. Mr. Marian and Ms. Puchianu told us they were "convinced" the system is working for Dreamstime and that the results will "surely" improve. I relied on Google's expert representations and trusted that what they told me was true and because these campaigns were presented by Google as having strong potential for Dreamstime.

37. On or about May 8, 2014, I and Dreamstime's marketing manager, Bogdan Jianu, met with AdWords support team members Marian, Puchianu, Stroe and the newly appointed Ana Sipciu (who replaced Bogdana Butnar) to discuss Dreamstime's campaign performance. During and before this meeting, Mr. Marian suggested additional changes to the campaign settings to improve CPA and purchase volume. Attached as **Exhibit J** is a true and correct copy of a certified translation of that email chain, previously-marked as Exhibit 312. *See* at P_0021705. He blamed the lower performance of the Target ROAS strategy on the fact that some campaigns were switched over later and had less time to adjust. Mr. Marian and his team stressed that the Target ROAS system was complex but that they fully understood it, that they were in constant contact with technical support to ensure it was working as expected, and that it needed time to optimize based on various factors.

38. On July 11, 2014, Mr. Marian shared a CPA analysis (based on sales transactions) he had prepared for one of Dreamstime's campaigns. Attached as **Exhibit K** is a true and correct copy of that email, previously-marked Exhibit 313. He told us the CPA value was up while the volume of purchases on Dreamstime's website was down. He also wrote that the status of signups is very chaotic and there is no clear trend. He again referred to the period after switching to ROAS as "rather chaotic." None of this was good news or consistent with what Google had initially told us.

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

39.     On August 8, 2014, I expressed concern because Dreamstime's ad campaign performance was still poor five months after switching to Target ROAS and countless changes. What was initially presented to us as a "test" had been extended over and over due to Marian and Puchianu's assurances that Google's system just needed time to learn and that Dreamstime's account performance would surely improve.  After five months, I asked Mr. Marian if we could stop counting sign-ups as conversions because I was concerned the large number of sign-up conversions caused an increase in the CPA for purchases that was not reported by Google in Dreamstime's account. *See* Marian Dec., Ex. I at P_0023609.  This was a concern that I had repeatedly shared with Mr. Marian.  On August 11, 2014, Mr. Marian said he checked with his colleagues then told me that he did not "think we have something to lose if we interrupt . . . the recording of signups." *See id.* at P_0023608.  As a result, I paused counting sign-up conversions on August 12, 2014.  *See id.*  This resulted in a significant drop in volume for the Target ROAS campaigns, including a significant drop in purchase conversions.

40.     Mr. Marian states in his declaration that his team warned Dreamstime that by stopping counting sign-ups as conversions Dreamstime would likely see its CPA rise.  Marian ¶ 38. Of course, removing low-value sign-ups would increase the reported CPA because it would only include purchase conversions.  However, Marian and his team did not warn us of any significant risk to the account or that the CPA for *purchases* would rise and the volume of purchase conversions would decrease.  I now see from a September 5, 2014, internal Google support ticket Mr. Marian submitted to Google's technical team that was produced in this litigation that Mr. Marian sought help on this issue.  He wrote: "A███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."  Attached as **Exhibit L** is a copy of that support ticket.  *See id.* at GOOG-DRMSTM-00000706-08. Mr. Marian, however, did not explain to Dreamstime that what had happened was not to be expected.  In fact, Marian did the opposite.  He assured us this was how Google's system worked

and we just needed to sit back and be patient.  Seeing his candid internal  admission, which was months after recommending Target ROAS to Dreamstime, that he did not understand how the system would affect something as critical as purchase conversions makes me certain now that he was misrepresenting how the system functioned and his knowledge of how it worked when he presented and sold it to us.

41.     In or around the end of August, 2014, I instructed Mr. Marian to deactivate Target ROAS.  Mr. Marian suggested that we switch to manual bidding, see how that performed for one week, and then decide what to do based on the performance.  Attached as **Exhibit M** is a true and correct copy of a certified translation of that email, previously-marked as Exhibit 315.  *See id.* at P_0023632.  Based on his recommendation, I allowed Mr. Marian to manually set bids to try to improve the performance.  Over the next few weeks, as the campaigns were switched back to Conversion Optimizer, and with sign-ups no longer tracked as conversions, Marian told us that the Conversion Optimizer would perform as it had prior to the Target ROAS switch.  But to our dismay it did not.  The consequences were catastrophic and campaigns failed to generate hardly any conversions.  In Mr. Marian's September 5, 2014 internal support ticket he acknowledged this and asked for help to "████████████████████████████."  *See* **Exhibit L.**  This, again, convinces me that Marian was intentionally misrepresenting the true facts about Target ROAS to us at the time.

42.     On September 11, 2014, Marian informed us that the CPA for Dreamstime's main search campaign was $322, over *four* times our maximum stated CPA.  Attached as **Exhibit M** is a true and correct copy of a certified translation of that email, previously-marked as Exhibit 316. This was obviously a very shocking number to me, in light of our multiple conversations about a maximum $70 CPA and Dreamstime's financial constraints.  Marian concluded that "[c]hanging the bidding manner has reset somehow the information used by the system to estimate the conversion opportunities of every word, however, as data is gathered, it will self-optimize." *Id.*  This contradicted what Marian had told us before Dreamstime switched to Target ROAS when he said we could quickly revert to our prior account performance by switching back to Conversion Optimizer.  Marian also noted that he thought it was strange that we had a very small number of

conversions once we stopped counting sign-ups as conversions with Target ROAS activated.  He advised that his team was still trying to find out why purchases were affected by no longer counting the sign-ups.  We never got an answer to Google which perpetuated the risk that these problem or mistake would repeat itself on other ad campaigns.  It is clear now that Mr. Marian and Ms. Puchianu did not understand the Target ROAS technology and process as well as they told us they did when they introduced it as a new advertising product to us several months prior and did not access any meaningful tech support to ensure that it was working as expected.  The strong decline in purchases confirmed our initial worries, which Marian and his team initially dismissed and shrugged off.  Marian concluded that "there is nothing irreversible and no technical problem for the current situation" and that "the situation will quickly improve." *Id.*  This representation to induce Dreamstime to buy into the Target ROAS program also turned out to be false.

43.    As further illustration, I see now from a rather candid internal support ticket Mr. Marian submitted to Google just 5 days later that he did not understand what was happening.  On September 16, 2014, he asked Google's technical support for advice: ████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ Attached as **Exhibit N** is a copy of that support ticket. *See id.* GOOG-DRMSTM-0000709-10.  It is now infuriating for me to read Marian's candid admissions from that contemporaneous time period about how little he actually understood or comprehended about how this complicated online advertising technology worked.  His indecision and confusion was in stark contrast to the complete confidence he conveyed when making the false promises to Dreamstime (a big customer spending millions of dollars on Google ads) noted above.  Marian's apparent incompetence is also at odds with the image Google projects to the world as the most advanced, respected, reliable and popular search website.  In fact, Google's AdWords reps were willing accomplices in a system that seems intentionally

designed to hide the ball, because it denies advertisers critical information about how campaigns work and how they are performing, forcing advertisers to rely more on their reps.

44.     Despite Marian's earlier statements that "there is nothing irreversible and no technical problem for the current situation" and that "the situation will quickly improve" (*see* **Exhibit M**), Dreamstime's average CPA never returned to $70 despite Dreamstime's diligent and consistent efforts.  As Marian admits in his declaration, in the final quarter of 2014, after reverting back to the account settings before the Target ROAS change, Dreamstime spent more for Google ads and received less purchase conversions. *See* Marian Decl. Ex. J.  The Google representatives admit "[w]hilst the number of conversions have decreased, CPA has increased."  Marian Decl., Ex. J at P_0024969.  This was the polar opposite of Dreamstime's stated KPIs.  Also, Marian's comparison between the average CPA of the fourth quarter of 2014 and the fourth quarter of 2013 is misleading.  As explained further below, in 2014 Dreamstime did not segregate low cost brand keyword conversions from more expensive, more valuable generic conversions.  In the fourth quarter of 2013, Dreamstime did much less branded advertising.  As a result, the fourth quarter 2014 average CPA appears artificially lower than the "real" CPA.

45.     The spreadsheet referenced in Dreamstime's Initial Disclosures and the disclosures themselves (*see* **Exhibit C** attached hereto) calculate and describe the before and after effect on Dreamstime's purchase-based CPA value related to the Target ROAS and sign-up conversions changes.

46.     In his declaration, Mr. Marian disputes that I and others at Dreamstime told him that Dreamstime's stated maximum average CPA was $70.  Marian Decl. ¶ 18.  Mr. Marian refers to a January 27, 2015 email written by Elena Dobre to try to prove his point.  Marian Decl., Ex. B.  That email, however, was part of the discussion ***after*** the Target ROAS and sign-up change chaos.  As discussed above, following the switch back to Conversion Optimizer, Google's system was no longer able to refer to the historical data from when Dreamstime's account averaged $70 CPA (which Marian and his team failed to explain until the damage was done).  It had to start over based upon the recently compiled data from the post-Target ROAS era.  With less volume and worse data to optimize from, in some campaigns the CPA for purchases continued to increase while in others

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

the campaigns failed to produce any conversions.  Mr. Marian knew we were trying to rein in the CPAs for these campaigns back to their levels in late 2013 and early 2014.  However, given the damage that had been done, his advice to us was to gradually reduce the CPA by setting the target CPA in increments of 10% less than the current CPA.  This is a practice commonly recommended by Google for decreasing budgets, CPAs or other KPIs, but never in the other direction (i.e. increasing budgets is not subject to this limitation).  He assured us the CPA would gradually reduce back down to prior levels.  According to Marian (and many others from Google in other instances), this would avoid a "drastic" change that would shock Google's system.  The January 27, 2015 email shows we were following Mr. Marian's advice.  For example, with respect to the "Content Sites Manual Bidding campaign," the monthly average CPA in December 2013 was $58, January 2013 was $83 and February 2014 was $46.  Following the Target ROAS and sign-up change disruption, the CPA for the same campaign in January 2015 was $338.  To try to reverse the damage, we set the target CPA to $300 (10% less) following Marian's advice and our experience because we knew that drastically decreasing the CPA would cause us to lose all exposure.  Ms. Dobre asked Marian in the email if reducing the target CPA to $120 would restrict the distribution of the campaign too much.  It was never Dreamstime's intent for this campaign's CPA to be $300, and Marian fully understood that our goal remained to achieve our stated CPA of $70 or lower.  There are other outlier instances in which Dreamstime set a CPA of considerably higher than $70, but those were either discrete, specialized campaigns for which we agreed a higher CPA was appropriate or were other instances in which the AdWords team assured us that a higher Target CPA on that particular campaign should be set in order to achieve our desired CPA or gain volume.  However, we never deviated from our KPIs or desired account wide average CPA, and Google knew this.

**Dynamic Remarketing**

47.     For much of its history, Dreamstime has used various ways to remarket to past website visitors.  Dreamstime has also used various ways to show those past visitors more dynamic and customized ad content (ideally related to the user's visit, hence more useful).  In or around June 2014, Dreamstime's "Account Manager" Maria Stroe recommended that Dreamstime begin using another machine-learning Google product named dynamic remarketing display ads.  In our initial

1    discussions, Stroe explained to us that with dynamic remarketing display ads, Google can remarket

2    users in a dynamic, customized way by showing them later the exact images they interacted with on

3    Dreamstime's website. We were interested in this feature as Ms. Stroe described it because we

4    wanted to be able to remarket the stock photos that users interacted with on Dreamstime's website

5    but did not purchase. But for this reminder feature to be effective for Dreamstime the remarketed

6    photo needed to be the exact same photo the user interacted with or at least something very similar.

7    We explained this to her on multiple occasions prior to and after signing on to Google's dynamic

8    remarketing program.

9            48.    In the preliminary emails after our initial discussion, Ms. Stroe explained that to use

10   Google's dynamic remarketing we needed to create a remarketing feed that included the items or

11   images we wanted to remarket to users. Stroe also referenced that the feed was limited to 450,000

12   items per account. Attached as **Exhibit O** is a true and correct copy of a certified translation of that

13   email, previously-marked as Exhibit 297. *See id.* at P_0022441. At that time Dreamstime's website

14   had tens of millions of stock photos and other items for purchase. In her declaration, Ms. Stroe

15   states she explained that given the feed size limitation, dynamic remarketing ads would not

16   necessarily show the exact image the customer had previously viewed on Dreamstime's website.

17   Declaration of Maria Stroe ("Stroe Decl.") ¶ 13. That is not entirely true and is certainly

18   misleading. Ms. Stroe mentioned the feed size limitation once in one of her first emails on the topic

19   on June 6, 2014, but did not explain that if an exact or very similar image was unavailable, the

20   system would still serve some other image in the feed not even remotely related.

21           49.    On June 10, 2014, Ms. Stroe sent me and others at Dreamstime an email with more

22   information regarding dynamic remarketing. She wrote with dynamic marketing, "we're retargeting

23   every user, in a customized manner, with banners that show him the exact image or category of

24   images that he left in the Lightbox or viewed on the website but didn't download it." *See* **Exhibit O**

25   at P_0022440. This conformed to how Ms. Stroe had described the Google remarketing advertising

26   product in our initial meetings and calls. Ms. Stroe did not explain in this email, or in the calls we

27   held following it, that the limited available size of the remarketing feed could result in Google's

28   system showing irrelevant images to Dreamstime's potential customers that had no relation to the

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
Los Angeles, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

customer's viewing history on Dreamstime's website.  To my memory, the feed size limitation was also not mentioned in any of Google's public information about dynamic remarketing so we had to rely on our Google representatives' statements, which were contradictory in several ways.  In any event, Ms. Stroe understood that Dreamstime's main concern was with the process by which Google decided to *serve* an image to a user.  Regardless of any feed size limitation, Stroe understood that Dreamstime's business was such that, if the exact image in a feed was not viewed, then at the very least a very similar image needed to be served or no image at all should be served.  As noted below, Stroe and others consistently assured us that the ways Google chose to select and serve dynamic remarketing ads would sufficiently match what the user had previously viewed on our site, and never explained that Google would simply serve even an unrelated image if no exact or very similar image was possible.  Even more, Stroe knew Dreamstime's marketing goal was to generate conversions and she knew Dreamstime intended to use a Target CPA (conversion optimizer) bidding strategy for its remarketing campaigns.  Dreamstime's stated goal was to generate purchase conversions, but Google's system nevertheless showed users completely unrelated images (seemingly random) that were unsurprisingly less likely to result in conversions and which could, and did, annoy and alienate some users.

50.    Stroe recommended that we set up categories of similar images in the remarketing feed.  She told us that if a user viewed an image or video on Dreamstime's website but that exact image or video was not in the remarketing feed, then Google's system will show the user a very similar image or video from the same category.  We understood this to confirm that Google's system would only remarket images that users viewed on the website or images that were very similar.

51.    The AdWords team reviewed Dreamstime's feed and created the dynamic remarketing campaign in Dreamstime's account. Attached as **Exhibit P** is a true and correct copy of a certified translation of a document previously-marked Exhibit 299, which includes the email confirmation. *See id.* at P_0022121.  We trusted Google's assurances and claimed expertise when they set up the program and trusted that it would function and perform as represented.  Google's

1  claim and testimony to the effect that Dreamstime was in complete control of the set up for dynamic

2  remarketing is completely false.

3        52.     On June 24, 2014, Stroe restated her explanation of how dynamic remarketing was

4  designed to work in Dreamstime's campaign, stating that "items played from feeds are not

5  determined based on performance, but based on what the user previously saw on Dreamstime's

6  website.  If the user saw the video with the aspirin glass on Dreamstime's website, then the video

7  will appear on the banner, if it exists in the feed.  If the exact one doesn't exist, then another one,

8  from the same category, will be played."  *See* **Exhibit P** at P_0022101.  I learned later that due to

9  the very large size difference between the remarketing feed and the number of items available on

10  Dreamstime's website, Google's system could not in fact remarket the exact or very similar image

11  to a visitor to Dreamstime's website.  Stroe knew, because it was obvious from our business and

12  because we expressly told her, that the failure of this functional requirement would make an ad

13  completely useless to Dreamstime and a waste of money.

14        53.     The dynamic remarketing ad campaign performance was poor.  A review of

15  Google's internal emails produced in discovery this action confirms to me they understood that the

16  limited feed size would prevent the level of performance the Google representatives assured us we

17  would achieve.  For example, in July 8, 2014, Ms. Puchianu internally asked Google's technical

18  specialist why the campaigns were not generating conversions and to '█████████████████

19  ████████████████████████████████████████"  Attached as **Exhibit Q** is a copy of that

20  email chain previously-marked as Exhibit 300.  *See id.* at GOOG-DRMSTM-0000618.  The

21  technical specialist advised Puchianu to wait another 1 to 2 weeks to assess performance but also

22  asked Ms. Puchianu to "███████████████████████████████████████████████

23  ███████████████████████████████████  *See* at GOOG-DRMSTM-0000617-

24  18.  In fact, Dreamstime had included far less than ████ of the items.  Ms. Puchianu did not share

25  this information with us.  She did not explain why the technical specialist claimed to see only ████

26  of the items in our remarketing feed or what items made up the ████ that was supposedly missing.

27  Instead, she waited two weeks and responded to the technical specialist that the campaigns

28  performance had not improved and did not mention that we needed to ███████████████████

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1  ██████████████████████ *See id.* at GOOG-DRMSTM-0000617.  She wrote, ████████

2  ████████████████████████████████████████████████████████████████

3  ████████████████████████████" *Id.*  Ms. Puchianu did not tell us the specialist's advice to

4  improve performance.  Instead she saw that Dreamstime continued to spend inefficiently with these

5  campaigns to her personal benefit (she, like the other members of her team, received a bonus based

6  upon our spend, something that was also never disclosed to us).

7        54.  On or around December 4, 2014, we received notice from AdWords representative

8  Radu Stoica that to show exact images to users we would need a feed with an image for each item

9  available on Dreamstime's website and that was not possible.  This conflicted with what Ms. Stroe

10  had told us.  On January 7, 2015, a different Google technical specialist internally wrote to

11  Puchianu that '███████████████████ required to increase conversion volumes was that '████████

12  ████████████████████████████ Attached as **Exhibit R** is a copy of that message,

13  previously-marked as Exhibit 301.  *See id.* at GOOG-DRMSTM-0000858-59.  ████████████████

14  ████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████ *Id.*  The

16  technical specialist told Puchianu "this should be the first and immediate step to try and improve

17  performance."  *See id.*  This is the same core problem identified by the other technical specialist 6

18  months earlier.  Ms. Puchianu again did not share this explanation for a '████████" with

19  Dreamstime.  On January 8, 2015, Puchianu sent us an email regarding the dynamic remarketing

20  feed but failed to mention it.  Attached as **Exhibit S** is a true and correct copy of a certified

21  translation of that email, previously-marked as Exhibit 50.  *See id.* at P_00025087.  It appears

22  Google was able to use an internal system to export Dreamstime's product IDs to compare to the

23  items in the feed.  Sharing this with us would have allowed us fix the feed to improve the match

24  rate.  On January 13, 2015, in response to the technical specialist, Ms. Puchianu expressed surprise

25  when she wrote:█████████████████████████████████████████

26  ████████████████████████████."  *See* **Exhibit R** at GOOG-DRMSTM-000857.

27  Puchianu also noted that █████████████████████████████████

28  █████████████████████████ *See id.*  In fact, it was not ████████" that were was such a

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

███████████" because a feed of 100,000 image feed was less than 1% of Dreamstime's library of images. Puchianu clearly did not understand how Google's remarketing system worked. As discussed above, Dreamstime was not using a comprehensive feed and it was not possible due to the feed size limitations Google placed on us.  This might have been acceptable if the system had served exactly the same images as Stroe had earlier described.  Ms. Stroe also testified in her deposition that it is recommended to have as close to 100% of the offered products included in the remarketing feed.  Deposition of Maria Stroe dated February 27, 2020 ("Stroe Depo") Tr. 218:19-25.  Obviously, as noted above, this was the opposite of what she recommended to us – namely, that Dreamstime should go forward with a very limited feed size relative to its library because the system was capable of serving appropriate images and only in appropriate circumstances.  Her deposition testimony tells me that she and the other Google representatives intentionally withheld this important information from Dreamstime to convince it to implement the program and to keep Dreamstime spending on these inefficient ad campaigns.

55.      Over the months that followed, we asked the Google representatives to increase our dynamic remarketing feed size.  The Google representatives told us there were possible solutions but did not follow through with any of them, despite our insistence.  On June 26, 2016, a Google representative identified only as "Lisa" emailed Bogdan Jianu of Dreamstime to inform Dreamstime of a recent change to the remarketing platform that supposedly allowed Dreamstime to provide up to 5 million images for dynamic ads that would be targeted to customers based upon their prior browsing history. *See* Declaration of Bogdan Jianu, Exhibit B.  Bogdan showed me the email after he received it.  Although this feed size number was still apparently grossly inadequate for serving exact matches from Dreamstime's inventory of stock images, it was nevertheless a welcome improvement and since Dreamstime had already committed to the program it was sufficient for Dreamstime to continue trying the campaigns based upon its understanding that only exact or very similar images would be served to a customer.  "Lisa" did not explain why the feed size available to Dreamstime increased nor did the AdWords support team explain why this feature was not offered before this. But even with a larger remarketing feed size (which was still incomplete), the results did not improve.

56.     More importantly, the remarketing campaign also did not work or deliver as Google explained, despite the increased feed size simply because Google's system remarketed totally unrelated images to users in a way that made the remarketed images seem (or be to some) inappropriate.  Stroe and her team did not explain to us that Google's system remarketed to users that interacted with an item on Dreamstime's website *even if that exact item or a similar item did not exist in the remarketing feed*.  From our own experience obtained when we later grew suspicious and began running our own tests, we know that the Google system actually serves images that are not remotely appropriate or relevant when no specific image is available.  I have now seen that Ms. Stroe's deposition testimony confirmed what we learned from our later experience in performing our own tests.  She stated that ███████████████████████████████████████████ ██████████" then the user would be shown "█████████████████████████████████ ████████████████." Stroe 178:9-179:20.  In those instances, ██████████████████ ██████████████████████ *Id.*  This has resulted in images being served that were not remotely like what the user had viewed on our site, potential customers being extremely offended by certain images served to them and a loss of business and tarnished reputation that is difficult to quantify. *See* e.g. **Exhibit T** (user searched for "drone footage" remarketed images of girls in bathing suits); **Exhibit U** (user shown remarketing ad with image of couple in bed alongside images of puppies and kittens); **Exhibit V** (image of two men kissing alongside unrelated images flagged for policy at GOOG-DRMSTM-0007730).

57.     For example, a perverse consequence of this was that Google frequently served what could be perceived as adult-themed images to customers who were not in the least bit interested in that content, leading to ads being taken down on the basis that they may contain adult themes and to customer complaints about the content.  Dreamstime complained to Google that the ad banners being served through remarketing lacked any relevance to the website image the customer was viewing or the content the customer had searched for on Dreamstime, but this complaint went unresolved.  This caused Dreamstime to take the drastic measure of removing all images with people from these ads, which lowered the performance results of the campaign (images of people

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

are the most popular in stock photography and the vast majority of images of people on Dreamstime's site are of general audience type).

58.     These issues caused harm to Dreamstime's goodwill and reputation.  For a very limited set of images that were displayed to most visitors, we had to explain to angry customers what had happened and that we were not "following" them with completely unrelated images because we were not the ones who selected the images.  These issues also resulted in Dreamstime's remarketing feed being taken down for purported violations of Google's policies for adult content.

59.     By February 2017, Dreamstime had started using a competitor remarketing service named Criteo for some of its remarketing display campaigns because Criteo had the technical capacity to remarket all of the millions of items on Dreamstime's website.  When Google's "Display Specialist" Olga Pavliuk learned of this, she told me and others at Dreamstime that Google could transform the Criteo's remarketing feed into a Google AdWords feed.  Attached as **Exhibit W** is a true and correct copy of that email previously-marked Exhibit 248.  *See id.* at P_0008307.  After we told Ms. Pavliuk that Criteo's feed included *all* of the items on Dreamstime's website, she wrote "If Criteo's is bigger and covers more pages we can actually transform their feed into ours.  Please send it to me and our engineers with transform it so you will have all the items for AdWords as well." *Id.*  This was another false promise made by Google to keep Dreamstime spending on its ad services, rather than one of its competitor's.  Either that, or Google was lying to us about the feed size limitation in the years before when we repeatedly asked to increase the limit.

60.     Google's internal emails reveal that Ms. Pavliuk was under pressure to keep Dreamstime spending with Google.  On March 3, 2017 she wrote Google's technical support ███ ████████████████████████████████████████████  Attached as **Exhibit X** is a document previously-marked Exhibit 249 that contains her message.  *See id.* at GOOG-DRMSTM-0003188.  On March 8, 2017, she still was trying writing to technical support, ████████ ███████████████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████ █████████████████████████████████████

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

███████████        Attached as **Exhibit Y** is the document containing her message, previously-marked Exhibit 251.  *See id.* at GOOG-DRMSTM-0003229.  For months we were told Google was working to transform the feed but it never did, all while Dreamstime continued to spend and spend on non-functioning and ineffective Google ad campaigns and programs.  Google promised to transform the feed without having the ability to do so.

61.    This was a failure induced by Google's misrepresentations about how its dynamic remarketing system worked and misrepresentations about how our campaigns should perform.  Dreamstime wasted years of time, and significant scarce economic resources, on inefficient ads.

62.    Ms. Stroe states in her declaration that Dreamstime had full control over selecting the specific images to include in its feeds.  Stroe Decl. ¶ 15.  But even that is not completely true.  In or around October 2018, an undesirable image (of two elephants copulating) was identified and removed from Dreamstime's remarketing feed.  Radu Galesanu of Dreamstime updated its feed to remove the image and confirmed this with me.  Over a month later, the file continued to appear.  Attached as **Exhibit Z** is document containing the image in a Dreamstime remarketing feed that was removed from the feed.  *See id.* at P0000873.  Google had clearly not refreshed the feed despite Google's claim that it did so every four days. Elena Dobre of Dreamstime showed me she then removed the image manually, but it was still displayed by Google well over 24 hours after she had done so, despite Google customer support claim's that manually removed images will not show up in dynamic remarketing banner ads after 24 hours of being removed.  Ms. Dobre asked Google's ad support representatives how often the feed was refreshed, and their response then was that they did not know.  She showed me these communications. Though Google had elsewhere told Dreamstime that the feed was updated every four days, based upon this recent experience I now believe that Google simply manually installed one of the original feeds and that it did not update according to Dreamstime's maintenance and removal of images.  Dreamstime has expended tremendous efforts to update and refresh the feed, to remove unwanted images and add desirable ones.  Dreamstime also continually revised and updated its images feed, going as far as removing a vast number of well performing images simply due to Google's inability to upgrade its algorithm, based upon Google's original assurances that dynamic remarketing would show a user either the same image or a relevant

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850

1   image similar to one the user had earlier viewed.  This was clearly not the case. Dreamstime still

2   uses remarketing in a limited context when appropriate, but we would not have employed it so

3   broadly if we knew the true facts and risks noted above.

4

5

6   **Foreign and Localized Ad Campaigns**

7        63.     Dreamstime's dedicated Google AdWords support team also overhyped and

8   misrepresented their knowledge and expertise to induce Dreamstime to implement and pay for

9   foreign and localized ad campaigns that failed to perform as the AdWords support team represented.

10  Dreamstime first tested ad campaigns focused on specific foreign countries while Tudor Marian was

11  a member of the Google support team.  At Marian's request, Dreamstime permitted him to create an

12  entire separate account for ads designated for Germany and France.  In June 2012, Mr. Marian

13  created the account and optimized the campaigns.  Mr. Marian assured us the new foreign language

14  campaigns would improve upon Dreamstime's KPIs, but the performance was worse than many of

15  Dreamstime's other campaigns and returned a higher CPA.  Dreamstime subsequently attempted

16  other foreign language campaigns pursuant to the recommendations and guidance of the AdWords

17  support team, but they **rarely** delivered results that fit within or improved Dreamstime's KPIs.

18       64.     In spring 2017, Carmen Punga, the "industry manager" assigned by Google to

19  Dreamstime's account, visited Dreamstime's offices to meet with me and Bogdan Jianu.  Ms. Punga

20  strongly recommended that Dreamstime engage in new efforts to run ads in foreign countries

21  including Germany, France and the United Kingdom.  Ms. Punga was very confident this was a

22  strong opportunity for Dreamstime to capitalize on to improve ad account performance. Mr. Jianu

23  and I were very resistant to the idea because of Dreamstime's past dismal experience with Google

24  ad campaigns focused on those countries.  We discussed the past performance of those campaigns

25  but Ms. Punga told us that the situation would be different and that under her team's supervision the

26  campaigns would perform much better.  Ms. Punga insisted that the performance of past campaigns

27  should not be held against her and her team, that she had an expertise in these types of ads, and that

28  performance of foreign language campaigns had since improved in Google's system.  She

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1  convincingly assured us in this meeting as well as the Hangout meetings that ensued that the

2  campaigns would improve Dreamstime's KPIs.

3      65.    Accordingly, at the request of Ms. Punga and the AdWords support team, we

4  provided them information related to Dreamstime's prior foreign ad campaigns and completed a

5  questionnaire regarding the German market.  We agreed to allow the AdWords support team to

6  create a localized ad campaign for Germany and advised them if it performed as promised we

7  would expand to campaigns in France and the United Kingdom, like they initially wanted.  We

8  granted the AdWords Support team full control over the campaign.  They translated the keywords

9  and ad text, and even selected the landing page on the Dreamstime website users were directed to

10  after clicking on the ads.  Ms. Punga was pleased to be given such control and freedom.  She

11  assured us the campaign would meet Dreamstime's KPI requirement.

12      66.    In Spring 2017, the AdWords Support team also urged Dreamstime to create a new

13  ad campaign focused on specific large cities with potential high value customers.  As noted in the

14  Declaration of Elena Dobre, as with the German language campaign, we agreed to create this

15  campaign based on Ms. Punga's recommendations and assurances.  Dreamstime selected New York

16  City and London, two of Dreamstime's most popular hubs for buyers, as the two cities to target on a

17  single important industry keyword.  We named the campaign Creative Hubs.  Ms. Punga and her

18  team were responsible for optimizing the campaign.

19      67.    The results and economics of both the German language and Creative hubs ad

20  campaigns were very poor.  When we sought explanations from the AdWords Support team they

21  could not provide a clear explanation as to why, despite the Google experts having complete

22  control, these campaigns did not perform as promised.  This was yet another example of the

23  AdWords support team misrepresenting their capabilities and the Google product to induce

24  Dreamstime to adopt and spend more on ad campaigns.

25  **HTML5 Banner Ads**

26      68.    Google representatives also misled Dreamstime with respect to banner ads.

27  Frequently in both 2015 and 2016, Google rejected some of Dreamstime's banner ads as they

28  purportedly violated Google's "trick to click" policy.  The rejected ads included white rectangles

with suggestions to search or download buttons to indicate the user could search for or download images on Dreamstime's website.  However, Google did not apply its rejection policy evenly and in fact, did not disapprove Dreamstime's banners until Dreamstime alerted Google of competitors using true trick to click ads.

69.     While many of Dreamstime's best performing banner ads were disapproved by Google some of its worse performing banners that looked nearly identical were left running.  This resulted in Dreamstime paying more for conversions because Google's system automatically began displaying Dreamstime's worse performing ads in place of the better performing ones that had been disapproved.  This of course was not an economically efficient spend of Dreamstime's advertising budget, transferring it from a low CPA banner ad to one with a high CPA.  Prior to the first disapprovals I and others at Dreamstime also noticed that Dreamstime's competitors were successfully serving banner ads that seemingly violated Google's guidelines for trick to click, displaying text input boxes and operating system checkboxes in their banner ads.  We sought explanations from Google for the disparate treatment of our ads and the ads of our competitors, but the response was never clear or made sense.

70.     Members of our AdWords support team told us they agreed that Google's review policy and its application was unfair.  In or around October 2016, Raul Altarescu of Google told us that Google's policy reviewers were somewhat undecided on whether Dreamstime's ads violated the trick to click policy and that we could, and did, simply resubmit disapproved ads to see if they would clear review after resubmission.  In December 2016, Altarescu told us he had a solution to this confusion and hit-and-miss reoccurring problem.  He advised us that if Dreamstime created banner ads with HTML5 new technology they could include a functional search bar which would avoid any potential for disapproval due to Google policy violation.  In or around December 14, 2016, Altarescu informed us he checked with Google's policy teams and that HTML5 banners with functional search bars could be created, implemented and used.  Based on Altarescu's representations, Dreamstime created HTML5 banners following the instructions of the AdWords support team.  Although the HTML5 banners had search bars that functioned as designed when we tested them using Google's Web Designer tool, Altarescu informed us they were not functioning

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

correctly once uploaded to the AdWords interface.  He advised us he was confident they would still work but that he needed to consult with Google's technical specialists.  Altarescu did not report back and did not respond to our follow up requests for information.  I learned later from discovery produced in this litigation that Altarescu received a response from Google's technical specialist the day he requested it and was definitely informed that technical limitations of the AdWords system prevented HTML5 banners from functioning in the way Altarescu represented to us that they could.

71.     In January 2017, the AdWords support team seemingly approved Dreamstime's newly created HTML5 banner ads.  Google account manager Natalia Domina told us we could submit and use them in our ad campaigns.  Nevertheless Google disapproved Dreamstime's new HTML5 banner ads unevenly just as it had with Dreamstime's former static ads.  The AdWords support team offered many different explanations for the disapprovals, but always one that cast blame on Dreamstime.  First it was purportedly because Dreamstime still had disabled static banners in the account, an explanation that made no sense.  Then it was the text in the ads and that Dreamstime's ad designer made a programming or design error.  Anxious to get past the disapproval problem and utilize these new ads, we made the changes as instructed and again confirmed with the ads were designed according to Google's requirements.  But Google's disapprovals of our better performing HTML5 banner ads persisted.

72.     Incredibly, in or around April 12, 2017, the AdWords support team advised us for the first time that the AdWords system technically could not support HTML5 banner ads with functional search bars.  The AdWords support team failed to transmit this information to us in December 2016 when Altarescu received it from the Google technical specialist.  Instead, Google's representatives approved Dreamstime's HTML5 banner ads and instructed us to submit them (all the while knowing it was not technically possible for them to function as designed), inducing Dreamstime to spend more money on these wasted campaigns.

**Brand Keyword Bidding**

73.     In or around March 2012, when Dreamstime transitioned to the European-based dedicated AdWords support team, the AdWords representatives urged Dreamstime to place bids on Dreamstime's brand keywords, which included "dreamstime" and similar variations, after

Dreamstime began removing its ads from searches for its own brand by adding brand keywords to a negative keyword list that prevents Google's automated bidding system from placing ads when users searched for keywords within the negative list.  According to. Marian, these branded ads were necessary to bring in additional traffic that searched directly for Dreamstime website in a Google search but instead followed a search result or ad from a different website.  He represented that these ads will be cost-effective because their cost-per-click and CPA will be very low.  A member of Dreamstime's previous support team told me that Google strongly recommended that Dreamstime at the very least add brand keywords where Dreamstime's organic listing was not on the first page, i.e. when a competitor is bidding on the term and winning the top spot. Bogdana Butnar said that including branded keywords will improve the overall performance of the account.  I was reluctant and allowed only minimal brand bidding following these conversations.

74.     In or around July 24, 2013, Mr. Marian created the first dedicated branded keyword campaigns in Dreamstime's account.  The AdWords representatives claimed that a comprehensive brand bidding strategy would improve the overall performance of Dreamstime's account, including campaigns that did not bid on Dreamstime's brand.

75.     But it was not until later in 2014 that Dreamstime increased its brand bidding activity following the advice of AdWords representatives Marian and Puchianu.  But by doing this it artificially lowered the reported overall CPA in the account.  The AdWords representatives did not advise us to create separate campaigns for brand bidding and did not advise use to separate branded keywords from our generic campaigns.  This worked to mask the real CPA reported in Dreamstime's account.  Brand bidding generated many more conversions at a much lower CPA than bidding on generic keywords like "stock photos" or "stock images" that all industry members bid on.  The CPA for branded keywords was around $2 whereas the CPA for generic keywords (such as "stock photos" or "stock images") was much higher, approximately $60-$70.  By blending these in the same campaign and by allocating the winning bid to a different keyword than "dreamstime," the CPA appeared lower.  The CPA for brand bidding was lower, of course, because it was generally unnecessary.  A customer typing "dreamstime" in a query was already looking for Dreamstime.  I initially expressed this concern to our Google representatives on a few occasions

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

and told them we were against it, and they explained that brand bidding was definitely an effective way to ensure additional conversions.  The brand bidding campaigns drastically reduced the CPAs reported by Google and masked in several ways the terrible inefficiency of other campaigns being pushed upon Dreamstime by Google's representatives.

76.    In or around 2015, Dreamstime structured its ad campaigns so that bids related to its brand keywords were grouped into separate campaigns so that it could track the CPA of branded campaigns separately from generic campaigns.  For an extended period of time, Dreamstime continued (based upon Google' repeated representations that the strategy was improving its overall ad performance) to employ the strategy and to optimize according to Google's recommendations. However, after this extended period of attempting this brand bidding strategy, Dreamstime suspected that even the low cost of each click or conversion did not justify the expense, because the people engaging with these ads were people who were going to Dreamstime's website anyway (therefore, even a CPA of a few dollars was too much).

77.    When I raised the prospect of stopping all brand bidding again, Carmen Punga of Google strongly advised against it.  Later Dreamstime did pause the strategy in or around January 2018.  When we did Ms. Punga and Andreea Simulescu warned us it would negatively impact Dreamstime's account performance. The opposite happened.  Dreamstime's account CPA decreased. The spreadsheet referenced in Dreamstime's Initial Disclosures and the disclosures themselves (see **Exhibit C** hereto) calculates and describes the negative impact on Dreamstime's non-branded, purchase-based CPA related to the brand-bidding strategy and explain brand bidding artificially lowered the reported CPA for Dreamstime.

78.    My team and I at Dreamstime trusted the AdWords representatives and their expertise when they presented new Google products and bidding strategies to us.  We trusted and relied on the assurances of the new members of the AdWords support team when they touted they had specialized expertise and training.  But over time we began to lose confidence and trust in the AdWords representatives as we discovered more of their representations were false or misleading and Dreamstime's account performance continued to suffer under their guidance.  By the middle of 2017, we began to seriously question Google's recommendations, but it was not until this lawsuit

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

and discovery was conducted that we fully understood the overall scheme Google employed to induce Dreamstime to overspend and spend more on AdWords.  Now, with the benefit of Google's contemporaneous internal communications – many of which directly contradict the statements they were making to Dreamstime at the time – I am convinced that Google's representatives were intentionally misrepresenting both their knowledge of how these sophisticated technologies worked and several specific details about how they actually worked and performed (in addition to misrepresenting that they were an appropriate fit for Dreamstime's budget goals).  Based upon my experience, these persistent misrepresentations were not a bug but a feature of Google's system, which seems designed to increase bids artificially by encouraging advertisers to bid on campaigns that are wholly inappropriate for them or even bidding in their place through broad an automatic matching (https://support.google.com/google-ads/answer/6324?hl=en).

**Google's Organic Search Misconduct and Fraud**

79.     During our first decade as a Google advertiser, Dreamstime was generally ranked in the top three to five positions for the most important industry queries and for longer queries that included those terms (referred to in the industry as "longtail queries") on Google's search website.  During this first decade, we also generally received direct answers from Google to any organic search-related issues that came up, in some cases being directly contacted by members of their organic search team.  For example, attached as **Exhibit AA** is an email exchange I had directly with Google search engineer Gary Illyes in 2013 regarding an issue related to search indexing.  We also regularly communicated with our AdWords representatives about these types of issues, and it was understood between all of us that our organic traffic was intertwined with our AdWords strategies and budgeting.  Our AdWords team sent us reports that included both organic and paid advertising traffic data. In some cases, they shared offices and interacted with members of the organic search team and often passed them reports from us, sometimes connecting us with them.  See **Exhibit A** attached hereto which is a certified English translation of an email exchange from 2013 between me and my AdWords representatives confirming this relationship.  In it, I reference a conversation I was separately having with Illyes regarding search, and expressly mention that our CPA in our big AdWords campaigns was tied to our organic search performance.  As shown in the email, all parties

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 • Fax: (424) 652-7850

understood that organic traffic referrals were a necessary component of our AdWords strategy and budgeting.  Of course, this point is obvious, as the paid advertising from AdWords is displayed together on the same page of results in response to the same user query, the only difference between the two being that one entry is a free "directory" entry of what the user is searching for and the other is a suggested advertisement related to what the user is searching for.  Organic search referrals were an essential and integral part of our AdWords relationship with Google.  Accordingly, whenever our AdWords team sent us quarterly "business review" presentations, the presentations frequently began with an analysis of our brand exposure in the market compared to our competitor, using data from brand queries search by users of Google's organic search.  The reports were not limited, of course, only to users who clicked on paid advertisements, but instead include *all* results.

80.    Attached as **Exhibit BB** hereto are Google Organic Search Sessions reports from Google Analytics ("GA") data for the Dreamstime.com website covering the time period of February 2013 through September 30, 2018.  The original source of this data is data gathered and maintained by Google and provided to webmasters as an additional product.  Dreamstime, in part with Google's assistance (for example, to make sure on occasion that the configurations were appropriate), set up its GA system to track certain sources of traffic to its website and measure revenue attributed to that traffic.  At all relevant times, various Google representatives assigned to Dreamstime's account had access to this information, including (among many others) Tudor Marian, Bogdana Butnar, Adriana Puchianu, Maria Stroe, Radu Stoica, Jacek Ewiak and Carmen Punga.

81.    This data shows the absolute amount of sessions and revenue in Dreamstime's account.  While it shows a significant loss in both metrics from October 2015 to September 2018, Dreamstime's projected traffic and revenue based upon its prior history was even more pronounced.  Dreamstime subscribed to various other third party services that tracked ranking and estimated traffic loss during part of the period of its organic traffic decline, and it has produced relevant documents in its possession in response to Google's document requests that it intends to present at trial.  A true and correct graphical representation of Dreamstime's ranking for "stock photos" over time obtained from third party service SEMrush is located at page 20 of Dreamstime's First

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1  Amended Complaint in this action (Dkt. 50.)  However, for the purposes of evidencing

2  Dreamstime's drop in organic performance in this declaration, I have used GA data, which was the

3  same data to which I referred in my communications described below with Google about

4  Dreamstime's decline in organic performance.

5  82.  The graph attached as **Exhibit CC** shows the GA data for Dreamstime's total

6  monthly sessions for the October 2015 through September 2018 time period.  The graph illustrates

7  the overall downward trend of Google organic session data for Dreamstime.com during this time

8  period.  Though I am unaware of various details with respect to Google's organic search algorithms

9  due to the fact that Google has labeled them ATTORNEYS' EYES ONLY in this litigation, I

10  understand from evidence I am allowed to review that Google made a change to a signal in its

11  algorithm in or about October-November 2015.  The red arrow depicts the point at which I

12  understand Google launched this change and how it correlates with Dreamstime's organic traffic

13  decline.

14  83.  When assessing potential causes for Dreamstime's organic drop beginning in late

15  2015, I also used industry-accepted public sources such as SEO websites, forums, including Google

16  Forum, to determine various dates when Google made changes to its algorithm.  In most cases of an

17  official or rumored Google update as noted in these sources, I have observed that the date of the

18  update has an immediate impact on our overall traffic.  Dreamstime's total organic traffic from

19  Google began to drop in late 2015, had a slight improvement in March 2018 following the removal

20  of the View Image button in Google Images (after Google settled the lawsuit with Getty Images),

21  but then it continued to drop.

22  84.  As depicted in the data in **Exhibit CC**, until late 2015, Dreamstime's Google search

23  traffic grew with its library and business.  Beginning in late 2015, Dreamstime began to experience

24  less Google search traffic.  Dreamstime noticed some drops in its homepage's ranking for certain

25  industry queries in or about August 2015, but its overall traffic (and particularly longtail traffic)

26  seemed to meaningfully start dropping after November 2015.  This became very apparent to

27  Dreamstime by the beginning of 2016, and by then Dreamstime was experiencing an inexplicable

28  and significant reduction in the number of sessions from Google organic search.  More troubling,

Dreamstime had been measuring major declines in purchases from new buyers (people who sign up and purchase their first credits or subscription plan) during late 2015, early 2016 and thereafter.

85. After several months of investigating these problems on our end and excluding any reasonable possibility of an on-site problem, I personally began to discuss this issue with Dreamstime's Google representatives in the first half of 2016 in a number of in-person meetings with them. The first written record I could locate of identifying the issue and seeking answers from Google was an email that I sent to Tudor Marian on May 12, 2016. A true and correct copy of that email is attached hereto as **Exhibit DD**. In the second half of 2016, I repeatedly raised the issue of Dreamstime's loss of organic search driven traffic to Google representatives in several meetings with them. Specifically, I have spoken directly about these issues with a number of account managers and high-ranking country managers, including but not limited to Tudor Marian, Ana Sipciu, Carmen Punga, Dan Bulucea, Elisabeta Moraru, Goetz Trilhaas, Josko Mrndze and Phillip Justus. In most of these meetings, I expressed that I suspected Dreamstime's organic drop was the result of some change to Google's search algorithm that negatively affected Dreamstime. In each instance, Google representatives assured me this was not the case, and that instead the problem was most likely some other issue with Dreamstime's website. Many of them offered specific solutions, all aimed at Dreamstime's website content or even its very business model. In some instances, they gave me a few tips about how a website could improve its organic ranking based upon eliminating instances in which users click on our website in search results, do not like what they find, and then navigate back to search results to click another website. For example, Elisabeta Moraru recommended that we fix some encoding from our international URLs. In another more extreme example, Trilhaas, whom I believe at the time was a Google regional manager for new markets, went as far as to say Dreamstime should "stop whining" and reinvent its entire business, making changes to its revenue model and pricing scheme, raising prices, offering new types of products and services and employing different types of people. Ms. Carmen Punga suggested and recommended new persons to hire or consultants who would fly first class to give us recommendations. In no instance did any of them tell me that an algorithmic change occurred in late 2015 that could have affected Dreamstime's diminished performance. Instead, they each told me that the Google team in

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1  charge of our account was very capable and would do everything in its power to help address the

2  problem, while they would also help somehow fix our organic problem.  However, none of their

3  solutions worked or were fits for our business.

4        86.    In September 2016, Dreamstime experienced another significant drop in its average

5  position and resulting organic traffic and revenue, which I observed in our GA account.  On

6  September 27, 2016, I was invited to have a lunch meeting with my Google representative, Ana

7  Sipciu, and her country manager Josko Mrndze with the specific purpose of discussing

8  Dreamstime's ongoing organic issues.  With our recent GA performance data specifically in mind, I

9  explained to them in detail my belief that there appeared to be some kind of an algorithmic change

10  or a technical glitch on Google's end that would explain Dreamstime's loss in organic traffic.

11  Again, they told me that the problem must be something on Dreamstime's end, but assured me they

12  could help solve these problems.  They also promised to follow up with more answers.  I followed

13  up that lunch with another email on October 3, 2016, asking to be put in contact with a Gary Illyes

14  (whom I could not recall at the time had answered some of my questions directly in 2013, as noted

15  above), to see if he could help resolve our issues.  Attached as **Exhibit EE** hereto is email

16  correspondence between me, Sipciu and Mrndze from October 3 to 5, 2016.  In this correspondence,

17  I asked Sipciu to put me in touch with Illyes to signal a technical glitch we found, and she told me

18  that he would not speak directly with me and required that I post my issues on Google's public

19  forum.  Sipciu claimed that the search engineers were not likely to communicate directly with me,

20  citing Google policy.  I was surprised by her response in light of our prior interactions with Google

21  teams on these issues, but Sipciu soon assured me that posting in the public forums was just a

22  technicality and that Google would be able to provide more answers to me privately as soon as I

23  went through the formality and exercise of posting the question publicly.

24        87.    Sipciu's sudden reference to Google's policy (the "Honest Results Policy") was in

25  contrast to our long history (as noted above) of asking and receiving answers, albeit not secrets, to

26  organic questions directly from Google (and, even specifically, Illyes).  Previous Google teams

27  frequently answered our questions and there were few problems.  In event, as noted below, Sipciu

28

---

quickly confirmed for me that she was going to answer our questions about organic search regardless of a policy.

88.     At this point, I was losing my patience with the insufficiency of Google's answers and the obscurity of its responses. We did run into technical problems before with Google and other search engines, and things were solved professionally by communicating and/or addressing the issue. Never did I seek to gain an unfair advantage as to how Google's search engines operated or any other unfair competitive advantage. We were simply confronted with results that deviated greatly from our long history and from Google primary stated objective of serving the most relevant results to queries (our site had only become more relevant to key industry queries as its offerings grew and the market consolidated). If Dreamstime had violated some policy or the problem could be fixed in some fair and meaningful way, we wanted to know that too. I was also running out of patience and money to invest in AdWords as Dreamstime's traffic and revenue were dwindling. Late 2016 was the first time since 2004 that our business had lost money over an extended period of time and the loss was fully attributable to Google. I felt the pressure of our community, with regular messages from photo contributors saying they were no longer earning money. As stated in the beginning of my declaration, Dreamstime is a marketplace with the largest community of photographers in the world, 600,000 contributors, many of whom make a living selling their visual or audio content to ad agencies and designers. I had hit a personal limit, and if Google was unwilling to provide any further answers then I had reached the point where Dreamstime would have to stop spending as it was on AdWords.

89.     On October 7, 2016, I emailed Sipciu and Mrndze to express my and Dreamstime's frustrations. A true and correct copy of that email is attached hereto as **Exhibit FF**. I wanted them to know, in writing, that if Google insisted upon giving unsatisfactory answers to a question that it seemed Google of all others should be able to answer, Dreamstime was not going to be able to continue to invest in AdWords like it was. Among other things, I wrote:

> *We have reached the point where we ask ourselves whether it makes sense to continue to invest in Adwords.* So far we were making profit after 12 months. With the organic going downhill for 12 months in a row (last update on Penguin brought another major hit, we lost 5% more in just 2 weeks), it's now unclear whether we have any positive margin left. We have invested $500k in our main account (a total of $700k) in the last 30 days, but converted only $144k. If we deduct the branded

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

campaigns, we gained $70k in sales for $500k invested. This is simply unsustainable. The organic traffic has a 20% YOY decrease and its downhill trend accelerates. In Oct 2014 organic sales were above $300k vs Adwords $70k. In Oct 2016 we will probably have $150k in organic sales and $80k in Adwords. Our decline for new customers in August was slowing down at -19%YOY after a disastrous -36%YOY in July. Another Penguin hit and we're now at -25%YOY. It's the level we had in 2013 and this has long term impact. ***The only source that is down is [Google] organic.***

It baffles me that Google remains passive to our struggle and I can't help but notice that Shutterstock remains untouched. Other sites go up or down, Shutterstock's rank is always preserved. It may be that they are not favored, but it certainly looks that way. No matter how many times we reported them for being favored, other competitors for using black-hat SEO tricks, no visible measures were taken against any of them. Even when the rules were clearly broken no visible penalty was applied. They are definitely born under a lucky star.

As my email above confirms, I was clear with Google that Dreamstime was monitoring reported and leaked updates to its algorithms and that we suspected these updates to be the cause of Dreamstime's harm.  In addition, as my email makes clear, I was constantly surprised to see that these updates never seemed to affect certain competitive sites like Shutterstock.

90.     The figures in my email related to Google traffic came from my quick review at the time of our Google Analytics account and our internal reports on new buyers.  The traffic data was sourced from the same GA data noted above, some of which is attached hereto.  As noted above, Dreamstime's Google representatives had access to this same GA account traffic data at the time I sent that email (and at all relevant times thereafter).  None of them questioned the accuracy of my statements as to Dreamstime's diminished organic performance, and Sipciu acknowledged at the time.

91.     Based upon Sipciu's statement that we could obtain more direct answers from Illyes after posting on the public forum, Dreamstime did post its question on the public forum for Illyes on October 7 and, on October 11, I confirmed that we had done so in writing to Sipciu and Mrndze. Attached as **Exhibit GG** is a true and correct copy of our post and Illyes' later reply.  We did investigate his advice and communicated to him that we shared the same content (and challenges) with all other stock agencies in the world.  When I first received it, I took his reply as dismissive and insensitive to our struggles and to the quality of the search engine's results, as he didn't seem to have even checked the specifics of our website content versus similar sites or search results.  Later,

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1    Sipciu would send me a more detailed explanation that she said "confirmed" in more detail what

2    Illyes meant.

3          92.      At this same time in early October 2016, Sipciu's AdWords team was preparing and

4    pitching a "Dreamstime Day" in Dublin, Ireland to present Dreamstime with new Google AdWords

5    products they were excited to share and sell.  Sipciu reached out to me shortly after my October 7

6    email quoted above to discuss it, and I explained to her that I was not at all interested in a large-

7    scale presentation of more AdWords products until I had some answers to our organic questions.

8    She told me she would pass this along to her team and would prioritize getting us more answers on

9    those issues.  A true and correct copy of an email exchange between Sipciu and me on October 11,

10   2016 is attached hereto as **Exhibit HH**.  Around this same time, Elisabeta Moraru replaced Dan

11   Bulucea as a country manager assigned to our account, and I had brunch with Moraru and Sipciu on

12   October 26, 2016.  Again, I reiterated our organic traffic issues and the need to have those resolved

13   before considering new AdWords spending.  Again, they told me that they believed something on

14   Dreamstime's end with its website (rather than Google's) should explain it and they were working

15   on giving us a more direct answer from Google within a couple of weeks.  Moraru also suggested

16   the Dreamstime changes I described above.

17         93.      On November 7, 2016, the same day that I escalated our matter to an executive at

18   Google's Mountain View headquarters as described below, Sipciu finally responded with more

19   detailed answers from Google.  Attached hereto as **Exhibit II** is a certified translation of Sipciu's

20   November 7, 2016 email to me which included the analysis performed by Professor Mario Fischer.

21   Sipciu's email described Professor Fischer as "one of the highest rated specialists" in the market.

22   She also reiterated that Fischer's analysis "seems to confirm Gary's [Illyes'] suggestion made on

23   the forum – content can be improved."  I took this to mean that Google's response was coordinated

24   or aligned with Illyes and/or others on the Google search team.  In separate conversations before

25   and after her providing me the report, Sipciu expressed excitement over Fischer's conclusions, in

26   light of the fact that they matched what Illyes and the other managers I referenced above had been

27   telling Dreamstime for a while – namely, that the problem appeared to lie in Dreamstime's website

28   content rather than in a Google algorithmic change or glitch.  She encouraged me to work with

1  Fischer to resolve these issues, and told me she was confident that they would help solve our

2  Google organic search problems.

3       94.    The Fischer analysis ruled out the potential causes I had mentioned in my prior

4  emails to Google, including Google's most recent core update to its algorithm.  Instead, it focused

5  on Dreamstime's website content as the only issue and recommended adding and varying text in

6  Dreamstime's tens of millions of product pages.  Nothing in Google's response indicated that

7  neither anyone at Google, nor Fischer, had looked into Google's prior algorithmic changes, and

8  nothing in the response indicated to me that Google had not considered algorithmic factors and had

9  not consulted with Google search engineers as it had in all cases before.  I reasonably assumed and

10  took the analysis, coming from Google, to mean that no Google algorithmic change or glitch was

11  the source of the devastating problem we were experiencing.  To the contrary, I was led to believe

12  there must be some problem on Dreamstime's end as the Fischer analysis purportedly suggested.

13  Given that I had no access or insight into the inner workings of Google's proprietary and secret

14  algorithm, I took the analysis Google provided at face value and had no basis at the time to doubt it.

15  Of course, I did not just accept all of the conclusions in the analysis, but the fact that it came from

16  Google and generally matched prior (albeit, more obscure) responses from Google caused me to

17  direct Dreamstime to spend millions of dollars attempting to investigate and fix what turned out to

18  be nonexistent problems with our website and to pour more and more money into AdWords, as

19  noted further below.  All of my conversations with Sipciu and others at Google both before and

20  after the Fischer analysis led me to believe that Google had eliminated the possibility of a problem,

21  algorithmic or otherwise, on Google's end, and caused me to focus once again on potential

22  problems on our end.  Knowing what I now know, I would not have wasted those valuable

23  monetary and management resources on a non-existent problem Google sent me chasing my tail

24  after. Making matters worse, just as I feared in my October 7, 2016 email, Shutterstock somehow

25  was still not harmed by any changes Google made to its algorithm, despite that our website and

26  theirs are extremely similar in structure and content and both of them are highly relevant to the

27  same commercial queries.  On the other hand, I have become aware, as a member of the trade

28  association CEPIC and by other market research, that the majority of other stock agencies also

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

suffered rankings declines during this same time, many of them with varied content.  This, to me, suggests an algorithmic change.  Moreover, Dreamstime has a larger community of content contributors than top ranking sites.  Yet Dreamstime's homepage disappeared from the rankings in 2017 and for some time thereafter. This result seems to violate the primary tenet of Google's Honest Results Policy, which states "Our results reflect what the online community believes is important." https://www.google.com/about/honestresults/.

95.     I also contacted Brian Lam, an executive at Google's Mountain View headquarters with whom I had worked in the past, seeking to connect our respective legal counsels and find ways to communicate our feedback to the right product teams at Google more directly.  Attached as **Exhibit JJ** is my email to Brian Lam dated November 7, 2016.  The same day that I sent that email, I received the Fischer analysis email from Sipciu.  Lam replied the next day that he would identify the right person to set up a meeting with Dreamstime.  He responded on November 16, 2016 and scheduled a "business-to-business call (no legal)" with Dreamstime on November 21, 2016, where I again discussed in detail our serious issues with organic losses and other issues we were having with AdWords at the time.  The meeting was held as scheduled on November 21 with Amir Kaspi, head of Google's Display Advertising Partnership business.  Lam told me he would check with others at Google on our issues and get back to me shortly.  Eventually, Lam simply wrote me an email saying that his Partnerships team was not the right team to respond to our problems, but reiterating Sipciu's prior recommendations (fix the Dreamstime website) in the Fischer analysis. Attached as **Exhibit KK** is Lam's email response to me dated December 15, 2016.  While Lam's response did not provide any further details, it did reiterate the response that Sipciu had previously provided me and suggested that Dreamstime follow the suggestions therein. Specifically, he wrote, "I'm aware that Ana's team has referred Dreamstime to outside SEO evaluators in the past, so I would continue to work with those parties and consider implementing their findings and recommendations."  We did, based on Google's recommendation.

96.     In response to Google's insistence and mantra in multiple in-person meetings throughout the second half of 2016 that something on Dreamstime's end was the likely cause of its organic issues – confirmed by Illyes's forum post and the Fischer analysis provided by Sipciu and

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

1    reiterated by Lam – I began to seriously doubt my suspicions that an algorithmic change was the

2    real cause and instead focused my energy upon potential Dreamstime website issues like those

3    Google had highlighted.  Consequently, at my direction, Dreamstime took several actions in

4    reliance on these statements that demonstrate that we took Google's message seriously.  First,

5    Dreamstime immediately contacted Professor Fischer to get further help directly from him.  He was

6    unavailable, and on November 14, 2016, he recommended another company, Eology, that he

7    claimed was founded by some of his former students.  I have only recently learned that Eology was

8    formed just before we hired them, and that Fischer is listed as a partner in the entity, but I was not

9    informed of this at the time.  Dreamstime ended up hiring Eology shortly thereafter, along with a

10   number of other outside consulting firms, to attempt to address content and design issues with its

11   site, spending millions of dollars combined on these companies and other upgrades to its site in the

12   ensuring years.  Fischer had said that Dreamstime's website was like a Porsche, running slowly

13   because of an engaged handbrake, and the handbrake was either missing or duplicate text on our

14   webpages.  So, we focused on our site and performed a long list of changes, adjustments and

15   upgrades of a technological and strategic nature.  We redesigned the site to increase the number of

16   images we accepted, changed our editorial policies and upgraded servers.  More specifically, to

17   address what the Fischer analysis called "weak content," Dreamstime made several changes to

18   Dreamstime's website design and content, attempting to remove potential duplicative content on its

19   tens of millions of product pages and to add additional content to its webpages and images'

20   metadata, diversifying their content relative to our competitors and increasing Dreamstime's quality

21   score (becoming the first-ranked website in our industry on all relevant metrics) as reported by

22   Google and other third party tools.  Attached as **Exhibit LL** are screenshots showing how

23   Dreamstime scored against top stock photo competitors that received a much better ranking despite

24   having a very low Google page speed score.  According to Google guidelines industry standards,

25   page speed an important metric related to search ranking.  *See*

26   (https://webmasters.googleblog.com/2010/04/using-site-speed-in-web-search-ranking.html) ("here

27   at Google we're obsessed with speed…").  Most importantly, in reliance upon Google's various

28   statements noted above the, Dreamstime continued to invest millions of dollars more in AdWords to

DECLARATION OF SERBAN ENACHE                48                CASE NO.: 3:18-CV-01910-WHA

1   obtain visibility and traffic than it would have based upon the realistic belief that our organic

2   visibility and performance would return in the near future if we addressed problems on our end.  For

3   example, in November and December of 2016, Dreamstime spent approximately $1.4 Million on

4   AdWords, compared with approximately $640,000 in those same months in 2019.

5       97.     For a number of years, as various potential fixes were discovered and then failed,

6   Dreamstime see-sawed between believing that something on our end was to blame and (as each

7   potential fix failed) returning to suspect that something in Google's algorithm (or specific

8   favoritism of its favored partners) was instead creating the insurmountable hurdles for

9   Dreamstime's organic performance.  Nevertheless, over that same time, Dreamstime continued to

10  budget well above an appropriate amount for AdWords in order to offset the loss from organic and

11  to make further changes to our website to improve its content in what ultimately became a futile

12  attempt to regain our prior organic ranking, traffic and revenue.  Though we were growing more

13  skeptical of Google as time went on and various fixes failed, the millions of dollars sunk into

14  AdWords and upgrades to our sites aimed directly at improving our organic ranking is clear proof

15  that Dreamstime was reasonably relying upon what Google was telling us (and, I now know, *not*

16  telling us) about the true causes of our diminished organic performance.

17      98.     As our skepticism of Google's organic search conduct and as the AdWords issues

18  described above mounted, Dreamstime began to reduce its AdWords spending accordingly

19  (particularly in light of Dreamstime's lowered revenue and profits).  However, even after formally

20  bringing a lawsuit against Google, it was not commercially feasible for Dreamstime to simply

21  terminate all AdWords spending.  Dreamstime continues to optimize its AdWords accounts by

22  investing only in AdWords campaigns that make sense in light of its current economic situation.

23  However, this process is not as simple as stopping all spending or reducing spending across all

24  accounts and campaigns.  Based upon our past experience with AdWords, this has to be done

25  incrementally over a longer period of time than even the two years since Dreamstime filed suit

26  against Google will allow.  Optimization (and budget reduction), by Google's own representatives'

27  admissions and explicit instructions to Dreamstime, takes time.  This is particularly true once an

28  advertiser reaches the breadth and scope of overall spending, campaigns, smart bidding strategies

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800 ● Fax: (424) 652-7850

and keywords associated with bidding.  The system "learns" based upon past history and takes on a life of its own.  This is not easily or quickly undone.  Dreamstime's past experience suggests that abrupt, sudden and dramatic changes to lower its total budget or targeted CPAs end in less exposure and worse overall results.  To mitigate against this damage, Dreamstime has gradually improved its efficiency and lowered its spending, with the ultimate goal of eliminating the need for AdWords as an essential source of advertising.  Further, Google is by far the largest and most successful search website in the world, and because Dreamstime has lost its visibility on the organic search side, it must still spend at some level on Google AdWords to maintain some visibility despite its relationship with Google having been mired with Google's fraud and greed.  So, even though this mitigation and budget reduction is still in process, Dreamstime's current spending now compared to its spending from the middle of June 2016 through the time of this lawsuit confirms the fact that Dreamstime would have budgeted millions less for AdWords were it not for Google's statements and omissions about the causes for our diminished organic performance.

99.      I now understand (still to a very limited extent, due Google's ATTORNEY'S EYES ONLY designations in this case), that Google did in fact make a change to its organic search algorithm and that Google's own testing identified a Dreamstime product web page – which is the foundation of hundreds of millions of templated pages, and by far the most served type of page on our site – as being negatively impacted.  The reason, as I understand it in a general sense from the information I have been allowed to see, was that the page demoted certain "salient terms" that were on our product pages, including some terms that relate to the commercial purpose of the pages.  Had I had known this information back in 2016, when I was asking questions of Google and receiving the above-described misdirecting, evasive and/or false answers, I would have taken steps to dramatically reduce Dreamstime's AdWords spending (and, of course, would also not have spent millions of dollars on futile "fixes").  This is evident from Dreamstime's historical AdWords expenditures, as noted above.

100.     The evidence provided here is just a sampling of the instances in which Dreamstime has fallen prey to Google's unchallenged market dominance and unfair business tactics toward Dreamstime and similarly situated online advertisers in recent years.  Though Dreamstime provides

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET  SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  ●  Fax: (424) 652-7850

useful stock photography products that remain as attractive to its contributors and users as ever, for a long period of time it was essentially invisible in critical search results that Google claims are supposed to deliver the "most relevant" and "most useful" results.  This lack of visibility and exposure on Google's popular search website has caused irreparable damage to Dreamstime. Google attempts to claim it keeps advertising and organic search results separate, telling the public in its Honest Result Policy that, "while we believe relevant ads can be as useful as actual search results, we don't want anyone to be confused about which is which."  In reality, Google has increasingly deceived the public by blurring the lines between ads and search results.  The layout difference between the paid ad and unpaid search results is so minimal that a user can hardly distinguish between the two: a two letter small font marks Ads, nothing more.  Attached as **Exhibit MM** is a printout of an article from The Verge dated January 23, 2020 regarding the blurring of ads and search results. Clearly, Google understands that pushing potential (and long-time) advertisers out of high ranking organic results literally forced them to purchase Google ads to buy visibility. This practice distorts markets and competition unfairly and ends up providing less valuable results to consumers.

101.     In another unfair business practice, public market researchers have detailed how Google keeps more and more visitors on its website when they search by displaying (often with no license) other publishers' content (a phenomenon popularly called "zero-click" searches). As of August 2019, 50% of the clicks within Google are "zero-click." (https://sparktoro.com/blog/less-than-half-of-google-searches-now-result-in-a-click).  This has resulted in many lawsuits and in some instances, Google has acquiesced and paid publishers for their content.  In my industry, stock photography content is still generally extracted by Google and offered on Google Images for free, making it the largest repository of images on the Internet.

102.     For any company, and especially e-commerce sites like Dreamstime, being included in Google's organic search results is as vital as air to a living person.  As Dreamstime's case shows, no economically feasible amount of AdWords spending can offset a severe loss of organic search performance.  Google became the largest search engine in the world (serving as much as 94% of all searches) by claiming to the public that its goal is to serve the most useful and relevant results, and

1   by claiming to advertisers that it does not favor its own product/service offerings or particular

2   advertisers' products in search results.  Google's public mission statements, together with the

3   deceptive statements Google made directly to Dreamstime about its ranking drop (and the critical

4   explanatory information it failed to disclose), caused Dreamstime to rely upon them and continue to

5   overspend on AdWords under that mistaken belief that Google was acting in good faith and being

6   truthful and fair.  Justice and equity dictate that Google should not be allowed to have it both ways.

7

8       I declare under penalty of perjury under the laws of the United States of America and the

9   State of California that the foregoing information is true and correct.  Executed on May 14, 2020, at

10  Bucharest, Romania.

11  _____

12                                                         _____

13                                                                      Serban Enache

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER MARQUART LLP
777 SOUTH FIGUEROA STREET, SUITE 2850
LOS ANGELES, CA 90017
Tel: (424) 652-7800  •  Fax: (424) 652-7850