UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DREAMSTIME.COM, LLC, a Florida LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>GOOGLE LLC, a Delaware LLC, and DOES 1–10,<br><br>  Defendants. | No. C 18-01910 WHA<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Once an antitrust action, plaintiff now hangs its fraud- and contract-based claims on a miscellany of alleged misrepresentations. Defendant moves for summary judgment. For the reasons stated herein, the motion is **GRANTED**.

## STATEMENT

Plaintiff Dreamstime.com LLC, a leading supplier of digital stock images based in Romania, filed this lawsuit in response to an unexplained fall from its top-ranked position on defendant Google LLC's search engine. A prior order dismissed Dreamstime's first explanation — that Google deliberately torpedoed Dreamstime's search rankings for its competitive advantage, violating the Sherman Act (Dkt No. 72). A subsequent order further trimmed the pleadings, entering judgment for Google on Dreamstime's claims stemming from one of the two contracts between the parties (Dkt. No. 85). Both orders, however, left

Dreamstime's Section 17200 and remaining contract claims unrestricted, trusting discovery to tease out what happened.

### 1. GOOGLE'S SERVICES.

This dispute involves two separate Google services: Google's free organic search engine and Google's paid-for advertising service.

#### A. *Organic Search.*

Google Search, the world's most used internet search engine, indexed trillions of webpages, allowing a user to search the internet for particular information specified by the user's query. When a user typed a query into the search bar, the website generated a list of responsive webpages ranked by Google according to factors such as the page's relevance, usability, and age, as well as user-specific factors, including the user's past behavior and browser settings. Under the hood, the search engine employed hundreds of proprietary algorithms to interpret both the search query and Google's index of webpages in order to deliver a responsive list of results in seconds (Decl. Lehman ¶¶ 4, 6).

Google's search engine generated *organic* search results, as opposed to *sponsored* search results (advertisements). Still, like the alphabetical advantage a company named "AABACO" could gain in a phonebook, webmasters could design websites with ranking algorithms in mind to increase a webpage's visibility on search engines — a practice known as search engine optimization (SEO). But unlike the alphabetical ordering phonebooks rely on, the confidentiality of Google's ranking algorithms guarded against easy manipulation. Google did, however, provide public information, through its Webmaster Guidelines, about its search practices. The guidelines explained, in general and broadly applicable terms, what webmasters could and could not do to help ensure that Google would index their websites and make them eligible to rank in Google's search results, as well as provided general guidance about how to make pages that would be useful to users (Decl. Lehman ¶¶ 13–14).

##### (i) *Google's Honest Results Policy*

To avoid any appearance of favoritism or impropriety, Google's Honest Results policy prohibited the search team from acting upon reports of flawed search results for which a

reasonable person might perceive an ulterior motive, such as fostering a current or potential business relationship; delivering targeted benefits of any kind to Google employees, friends, or family; and presenting Google products in a more favorable light. As Senior Search Engineer Eric Lehman explains in his declaration (Decl. Lehman ¶ 9, Exh. C):

> A fundamental principle for Google is the separation between organic search and Google's advertising business. Google does not allow websites to buy their way to the top of search results, it does not alter the ranking of its search results to benefit its commercial partners or to induce companies to buy advertising, and it even avoids prioritizing fixing known issues with its search ranking when they are reported through channels that are available only to advertisers. On the contrary, Google maintains a strict wall between its organic search engine and its advertising business. The search team does not base ranking decisions on advertising considerations, and the ads sales and support teams have no visibility into how ranking or other search decisions are made.

The search team is thus forbidden in most situations from giving special consideration or favors to Google's advertising or business partners on search-related issues (Decl. Lehman ¶ 10).

Search Engineer Lehman appends a selection of internal emails demonstrating Google employees refusing requests to modify its search results for the benefit of third-party clients, including some with advertising budgets far in excess of Dreamstime. Lehman further swears that he conducted a search of the messages sent to the email alias for organic search requests from Google's business partners and found no documents indicating that Google had been asked to or did provide any private search-related advice to Dreamstime competitors Getty Images or Shutterstock (Decl. Lehman ¶ 11–12).

### B. Google Ads.

In sum, money could not buy a higher organic search ranking. Money could, however, buy access to Google's audience through its separated online advertising service called Google Ads (formerly, AdWords). Google Ads allowed advertisers to bid for available advertisement space across Google websites (including Google's search results pages) and third-party websites in Google's "advertising network" through near-instantaneous, real-time auctions. But the advertising service provided more than mere access to an online billboard. Taking

advantage of troves of user-generated data, Google Ads offered automated tools for advertisers to target specific audiences. For example, advertisers chose keywords to describe their advertisements and bid on them. When the selected keywords matched a user's search query, the advertisement could land as a sponsored result alongside the organic search results, as pictured (Decl. Moser ¶¶ 3, 11, 15–16; Decl. Marian ¶ 44):



The advertising service also provided bidding tools to determine when and at what price an advertiser would bid for available ad space. Manual bidding tools allowed an advertiser to price its bids based on specific advertising goals, like generating web traffic or increasing brand awareness. Google also provided automated bidding tools that used a variety of auction-time signals, such as the viewer's device, location, time of day, language, and operating system to target specific actions users would take after interacting with an ad, such as making an online purchase or calling a business phone. Dreamstime employed a variety of these manual and automated bidding tools (Decl. Moser ¶¶ 18–24).

4

An advertiser's bidding strategy did not determine its monthly bill from Google. Rather, Google required advertisers to set average daily budgets, which Google then multiplied by the average number of days in a month (30.4) to determine an advertiser's monthly charging limit. This system allowed Google to outspend the set daily budget on a given day ("overdelivery") to account for daily fluctuations in online traffic, while never exceeding the total monthly charging limit (Decl. Moser ¶¶ 25–32).

### 2. DREAMSTIME BECOMES A GOOGLE CUSTOMER.

Dreamstime opened its advertising account with Google in 2004, quickly becoming one of Google's largest advertising clients in Romania. Google's Advertising Program Terms governed the parties' advertising relationship. Dreamstime agreed to three successive versions of the Ads Agreement throughout the relevant time period — March 2014 to September 2018, according to Google — but neither side claims that any material difference between the three versions exists. Each agreement expressly authorized Google to suspend or remove specific advertisements from its network, to cancel advertising accounts, and to otherwise enforce Google's advertising policies. None of the three agreements made any guarantees about how advertisements or advertisers would perform on Google Ads. And, importantly, none of the agreements included any statement about Google's separate organic search engine, let alone any guarantees about how an advertiser's website would appear in search results (Decl. Moser ¶¶ 4–9, Exhs. A–C).

Over the course of the relationship, Google responded to Dreamstime's substantial business by offering it personalized advertising support services. By 2012, Google offered Dreamstime a dedicated, European-based ad-support team (Decl. Enache ¶ 3–5, 7).

Dreamstime's CEO Serban Enache swears that Google generally provided direct answers to any search-related issues that came up in the first decade of Dreamstime's relationship with Google. In support, CEO Enache provides emails he exchanged with Google Ads personnel discussing the possibility of meeting with the organic search team, as well as an email exchange with Google Search Engineer Gary Illyes in December 2012. Although Engineer Illyes responded in English, CEO Enache emailed Engineer Illyes in Romanian and

Dreamstime provides no translation. Although the record is unclear due to the lack of translation, it appears CEO Enache initiated the conversation himself, rather than through a sales channel in violation of Google's Honest Results Policy. Engineer Illyes responded in English, answered a search-related issue, and ended the email, "I'll reply on the public thread as well to hush away some myths" (Decl. Enache Exhs. A, AA).

### 3. DREAMSTIME'S SEARCH-RANKING DROP.

During Dreamstime's first decade with Google, the stock-images website generally ranked in the top three search results positions for key industry search terms, such as "stock photos." Beginning around October 2015, however, Dreamstime slipped to the bottom of the first page of search results for these terms and eventually further. This drop coincided with a drop in Dreamstime's organic search traffic (Decl. Enache ¶¶ 79, 84, Exh. CC).

CEO Enache first discussed Dreamstime's search-ranking drop with its ad-support team in the first half of 2016. In the second half of 2016, CEO Enache repeatedly raised the issue to Google representatives during meetings and by email. CEO Enache swears that during most of the meetings, he raised his suspicion that an algorithmic update caused the drop and Google representatives assured him that was not the case. Instead, the Ads representatives told CEO Enache that the problem likely had to do with Dreamstime's website (Decl. Enache ¶ 85–86, Exh. DD).

When another significant search-ranking drop came in September 2016, CEO Enache asked his ad-support team to put him in touch with Search Engineer Illyes, whom he had spoken with previously, to signal a technical glitch Dreamstime found. Google Ads Representative Ana Sipciu replied, telling CEO Enache that Engineer Illyes would not speak directly with him and required that Dreamstime post its issues on Google's public forum, citing Google's Honest Results Policy. Ads Rep Sipciu explained, "Internal policy forbids the Search teams to intervene directly on *any* issues escalated through sales . . . unfortunately I can't put [Engineer Illyes] in direct contact with you, it's against the policy and it would not help the issue here at all (quite the contrary — as they wouldn't be able to investigate the issue because it was originally signaled through a sales person)" (Decl. Enache ¶ 86, Exhs. EE, FF).

In response, CEO Enache sent the following email (Decl. Enache ¶ 89, Exh. FF):

> I wasn't aware he is in the organic team, my message was meant as a reply to his comment. Ok, we will try to post through the link you sent us, hopefully someone will read it this time.
>
> I really can't understand why someone would pay attention to an anonymous post, but ignores a legit complaint/ticket etc. I realize this is the policy, but nevertheless it is a frustrating situation. We have reached the point where we ask ourselves whether it makes sense to continue to invest in Adwords. So far we were making profit after 12 months. With the organic going downhill for 12 months in a row (last update on Penguin brought another major hit, we lost 5 % more in just 2 weeks), it's now unclear whether we have any positive margin left. We have invested $500k in our main account (a total of $700k) in the last 30 days, but converted only $144k. If we deduct the branded campaigns, we gained $70k in sales for $500k invested. This is simply unsustainable. The organic traffic has a 20 % YOY decrease and its downhill trend accelerates. In Oct 2014 organic sales were above $300k vs Adwords $70k. In Oct 2016 we will probably have $150k in organic sales and $80k in Adwords. Our decline for new customers in August was slowing down at -19 % YOY after a disastrous -36 % YOY in July. Another Penguin hit and we're now at -25 % YOY. It's the level we had in 2013 and this has long term impact. The only source that is down is organic.
>
> It baffles me that Google remains passive to our struggle and I can't help but notice that Shutterstock remains untouched. Other sites go up or down, Shutterstock's rank is always preserved. It may be that they are not favored, but it certainly looks that way. No matter how many times we reported them for being favored, other competitors for using black-hat SEO tricks, no visible measures were taken against any of them. Even when the rules were clearly broken no visible penalty was applied. They are definitely born under a lucky star.
>
> Please don't get me wrong, I know you can't change these things or the policy. But it is the only way to provide our feedback.

Dreamstime also followed Ads Rep Sipciu's direction and posted on Google's public forum to receive a response from Engineer Illyes. While Engineer Illyes did respond, his full response is not included in the exhibit CEO Enache provides to his declaration (Decl. Enache ¶ 91, Exh. GG).

This order pauses to note that Dreamstime, at oral argument, highlighted CEO Enache's email as triggering Google's duty to reveal information it allegedly concealed concerning Dreamstime's search performance. This email, according to Dreamstime, sent shockwaves

7

through Google's ad-support team, worried that Dreamstime would begin cutting its advertising spending if its search ranking did not improve (Decl. Marquart Exhs. O, P, Q, S).

Around the same time, Ads Rep Sipciu invited Dreamstime's advertising team to Dublin for a meeting with its Google ad-support team and specialists. CEO Enache responded "I don't know how to approach the organization of such a meeting because, as you know, we are suffering a lot from the fall of the organic . . . I don't want to refuse the invitation, but I don't believe that we can organize anything until we solve this problem." Sipciu responded (Decl. Enache ¶ 92, Exh. HH):

> Yes, I know, the entire team is aware of the situation: ( - and we are doing everything we can to send all the signals that we can internally about this issue. I hope that somebody from the organic team contacts you soon, I sent them the forum link.

Ads Rep Sipciu then emailed her team explaining that she doubted anything could be done on the advertising side to make up for the organic issues and noted that she remained open to any ideas the team had to somehow help address Dreamstime's organic complaints (Decl. Marquart Exh. O).

4. **GOOGLE CONNECTS DREAMSTIME WITH SEO CONSULTANT.**

A month later, Sipciu emailed CEO Enache explaining that she had been "trying to understand if/where there is a SEO problem," and sought out an external specialist from Germany, Professor Mario Fischer, to prepare an initial analysis to explain Dreamstime's search-ranking decline. Professor Fischer, an academic and consultant specializing in search engine optimization, came recommended by Google's German team and provided the initial assessment free of charge. Sipciu noted that "at a first glance [the analysis] seem[ed] to confirm [Engineer Illyes's] suggestion made on the forum — content [could] be improved." Sipciu also offered to give CEO Enache Professor Fischer's "contact details so [Dreamstime and Fischer could] work together, *without any Google involvement*" (Decl. Marquart Exh. R, T, S; Decl. Enache ¶ 93, Exh. II) (emphasis added).

Professor Fischer summarized his findings as follows (Decl. Enache Exh. II):

> The site has some good rankings and is good in terms of external links. There shouldn't be any penalties, the backlink profile is clean.

[¶]

About the second assumption (error in the [core algorithm] Penguin update) I also think it doesn't stand. The last core update, into which Penguin was integrated, was well accepted and generally did not register any issues. As far as I know, it didn't downgrade any website. Many good sites were pushed up, including Dreamstime, as you can see in the slides.

The rollout of the update ran somewhat longer, it didn't only take a day. But we can see that during the period of the rollout the ranking went up significantly. The decrease came after this, with no relation with the Google update.

It's possible that [Dreamstime] tampered with the Disavow file without really knowing what they were doing and this could possibly be a reason for the decline.

In my opinion, the real problem lies in the weak content of the site. The individual pages are not rich enough — only 30 descriptive words for a picture.

This is enough for a user choosing a photo, but search engine robots/indexers need more text. The pages have an average of less than 600 words, but 90% of them repeat on all pages. So Google naturally marks it as "doubled" content and stops taking it into consideration. So there is not much left over to index.

The new websites ranked above (startupstockphotos.com is very weak, butpexels.com is better than Dreamstime) are not a measure of an error in the algorithm. It would be too easy if just a few key figures could explain the different rankings of domains. [].

Getting good ranking is naturally more difficult for an image platform in text searches. []. But we need to investigate further and to know exactly what the client did, we can't assess this from the exterior by making a few simple investigations.

Discussing Professor Fischer's analysis, CEO Enache swears: "I reasonably assumed and took the analysis, coming from Google, to mean that no Google algorithmic change or glitch was the source of the devastating problem we were experiencing. To the contrary, I was led to believe there must be some problem on Dreamstime's end as the Fischer analysis purportedly suggested. Given that I had no access or insight into the inner workings of Google's proprietary and secret algorithm, I took the analysis Google provided at face value and had no basis at the time to doubt it" (Decl. Enache ¶ 94).

### 5. CEO ENACHE CONTACTS GOOGLE EXECUTIVES.

In November 2016, around the same time Dreamstime received Professor Fischer's initial analysis, CEO Enache contacted executives on Google's Partnerships team, seeking to be put in touch with Google's legal team to discuss a host of issues that eventually materialized into this lawsuit. Initially, Google Partnerships Executive Brian Lam met for a "business-to-business call (no legal)" with CEO Enache and another Google advertising executive. Following the call, CEO Enache provided a list of the issues Dreamstime then had with Google, including those related to its organic search decline. Eventually, Executive Lam responded in part (Decl. Enache ¶ 95, Exh. KK):

> The Partnerships team isn't the right organization to address concerns about search ranking. As [Ads Rep Sipciu] has communicated in the past, we cannot provide guidance to our clients/partners around search ranking. I'm aware that [Sipciu's] team has referred Dreamstime to outside SEO evaluators in the past, so I would continue to work with those parties and consider implementing their findings and recommendations.

CEO Enache responded with confusion, noting that its initial request had been for a contact from Google's legal team, and again asked for a legal contact, which Executive Lam provided.

Internally, Executive Lam had worked with Ads Rep Sipciu and another Partnerships executive, Josh Capilouto. Executive Capilouto, before Executive Lam sent a generic response to CEO Enache explaining Google's honest results policy, wanted to review Dreamstime's concerns closely, speak with the "relevant Search product folks, and connect with Search p-counsel" to see if Google could and would provide a more substantive response. Due to redactions for privilege, it is unclear what Executive Capilouto learned from his investigation. Ultimately, the record reflects that after meeting with "legal," Executive Capilouto provided the draft email Executive Lam sent to CEO Enache (Decl. Marquart Exhs. K–M)

Relying on discussions with Google representatives in Europe and Mountain View, as well as the third-party analysis of Dr. Fischer, Dreamstime CEO Enache swears he started to doubt his suspicions of an algorithm change and instead invested millions in Ads spending to offset the loss in organic search traffic while hiring additional SEO consulting firms to assess

10

its website's issues.  Using the consultant reports, Dreamstime began investing in website upgrades to resolve its content issues (Decl. Enache ¶¶ 94–97).

### 6. UPDATE TO GOOGLE'S SALIENT TERMS ALGORITHM.

Although both sides now agree that Google did not deliberately demote Dreamstime's search ranking, Dreamstime insists that a late 2015 update to one of Google's algorithms did cause Dreamstime's search-ranking drop.  For its part, Google insists that the update is extremely unlikely to be the explanation for any ranking changes Dreamstime may have experienced (Decl. Lehman ¶ 29).

The update in question tweaked one part of a multipart algorithmic signal known as the salient terms signal.  For each webpage in Google's search index, the salient terms signal generated terms that should have been associated with that webpage, helping Google's search engine find an appropriate list of webpages that might be responsive to a search query.  The change was straightforward:  The update would cause the portion of the algorithm in question to "give more weight to (and thereby make more "salient")" certain words based on how the webpage displayed them (Decl. Lehman ¶¶ 30–32, Exh. M).

Google's search team conducted several experiments to test the proposed change.  The primary experiment, one long employed by Google to test whether proposed changes made search results better or worse, involved showing before and after results to outside raters based on various randomly generated search queries.  The raters there found the proposed update to the salient terms algorithm to be positive.  The experiment included no mention of Dreamstime or any of its webpages (Decl. Lehman ¶ 33).

In addition to the primary experiment, the testing process involved a "novel side-by-side . . . experiment in which outside search raters compared the top 25 salient terms generated by the . . . algorithm both before and after the proposed algorithmic change for various randomly selected test webpages."  Raters evaluated 400 English language webpages and 2,300 webpages in total.  One of these webpages belonged to Dreamstime, a page selling an image of two flamingos.  The raters determined that the flamingo webpage constituted a "loss" because the update would result in a different set of salient terms with more numbers than English

words. More specifically, out of the top twenty-five terms, six became numbers, rather than words — without the change, only three of the top terms had been numbers.

Dreamstime's webpage was not the only loss identified by the raters in the side-by-side experiment. Among the various other webpages found to be "losses" by the raters included webpages belonging to a Dreamstime competitor and Google's own properties, including YouTube and Google+ webpages (Decl. Lehman ¶ 35).

Google's Search Engineer Eric Lehman opined that the change to the salient terms signal remains "extremely unlikely to be the explanation for any ranking changes that Dreamstime may have experienced in Google Search" referencing contemporaneous notes accompanying the launch report that stated there had been no "correlation between [the change] and any effect on ranking" (Decl. Lehman ¶ 29, Exh. M).

Dreamstime's expert, on the other hand, opined "that a Google algorithmic change, such as the change to the . . . Salient Terms signal . . . is the most likely cause for Dreamstime's organic traffic loss beginning in November of 2015." Specifically identifying "what Google knew, or could have known, but failed to disclose," Dreamstime Expert Stricchiola opined that "[a]s of at least [November 2015], Google had in its possession documentation that showed that a search algorithm change it had pushed live to its search engine had a direct, and negative, impact on the Dreamstime website" — referring to the launch report (Stricchiola Dec. ¶¶ 70–73, 101, 123).

    **7.    INCREASED ADVERTISING SPENDING.**

According to Dreamstime, Google concealed information about the salient terms update to induce Dreamstime to spend more on Google Ads. But Dreamstime produces no evidence showing that any of Google's advertising employees knew of the salient terms update. Instead, the inducement half of Dreamstime's theory is based on general assertions that Google provided an ad-support team to Dreamstime and the Google representatives on that team held themselves out as having superior knowledge they did not in fact possess. Google purportedly hid the fact that these ad-support personnel remained members of Google's sales team, secretly pressuring Dreamstime to spend more.

Still, CEO Enache swears that "Dreamstime would have budgeted millions less for [its Google advertising campaigns] were it not for Google's statements and omissions about the causes for [Dreamstime's] diminished organic search performance." For proof, CEO Enache notes that "in November and December of 2016, Dreamstime spent approximately $1.4 [m]illion on AdWords, compared with approximately $640,000 in those same months in 2019" (Decl. Enache ¶¶ 96, 98).

* * *

Dreamstime filed this action in March 2018. As discussed, extensive Rule 12 practice ensued, eventually trimming away Dreamstime's antitrust claims and one set of contract claims. Dreamstime's unilateral recasting of its claims also bears mentioning. Dreamstime opens its opposition to the pending motion as follows (Opp. at 1):

> This is no longer an antitrust case. There is no need to show harm to competition or targeting of Dreamstime. This case centers on what Google told (and did not tell) Dreamstime about its organic search performance and about how specific types of ads worked, not on any anticompetitive motives. . . . Google misrepresented material facts to Dreamstime to induce it to spend more on AdWords than it would have if it had known the true facts. . . . It turns out Google's representatives did not have the expertise they claimed, did not understand how the technology worked, and most importantly told many specific lies about how certain ads worked and why Dreamstime's organic search performance was suffering. Those lies lured Dreamstime to overspend on AdWords.

In line with its opening statement, Dreamstime now foregoes any argument that Google deliberately torpedoed Dreamstime's search ranking. Dreamstime also foregoes any argument that Google breached any express contract terms, either by charging Dreamstime more than allowed by its advertising budgets or that Google unfairly disapproved certain Dreamstime advertisements.

Dreamstime is left with two claims, one for violation of Section 17200 under all three of its prongs, and the other for breach of the covenant of good faith and fair dealing implied in the parties' advertising agreement. Each of these claims are based on both search-related and ad-related alleged misrepresentations.

Google now moves for summary judgment. Dreamstime opposes.

13

This order follows full briefing and a telephonic hearing.

## ANALYSIS

Summary judgment is appropriate when there is no genuine dispute as to any material fact. A genuine dispute of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

1. **ORGANIC SEARCH CLAIMS.**

As stated, Dreamstime claims that Google fraudulently concealed the reasons for Dreamstime's search ranking drop in order to boost its advertising revenue. Whether dressed as a breach of the covenant of good faith and fair dealing implied in the parties' Ads Agreement or as an unfair, unlawful, or fraudulent business practice in violation of Section 17200, Dreamstime's concealment theory has no merit.

  A. *Dreamstime's Organic Search Issues Fell Beyond the Scope of the Advertising Agreement's Implied Covenant.*

Every contract imposes on each of the parties a duty of good faith and fair dealing in the performance of the contract such that neither party shall take any action that effectively destroys or injures the right of the other party to receive the benefits of the contract. "[T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma Developers, Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 373 (1992).

The advertising agreement governed the parties' advertising relationship, providing Dreamstime access to Google's network and advertising products for a price. Unsurprisingly, as stated, the agreement made no promises related to Google's separate organic search engine, nor did Google affirmatively disclaim or limit its liability concerning any potential promises related to organic search. Indeed, Google repeatedly informed Dreamstime of its policy against giving special consideration or favors to Google's advertising partners on search-related issues. The implied covenant cannot write into the advertising agreement a duty or promise related to organic search (Decl. Moser ¶ 9; *see* Hearing Tr. at 33; Decl. Enache Exhs. L, FF).

Dreamstime nevertheless attempts to hinge its implied covenant claim on Google's provision of free, "premium 'support' in performance of the AdWords contract[.]" Under this theory, Dreamstime argues that although "Google may not initially have been obligated to explain Dreamstime's drop in search performance . . . once it set out to do so it had to do so in good faith, to deal fairly." For support, Dreamstime quotes *Badie v. Bank of America*, 67 Cal. App. 4th 779, 795 (1998), which noted that "the exercise of discretionary powers conferred on a party by contract must also be evaluated under the implied covenant[.]" *Badie* and the decisions it relied on involved contracts that expressly provided one side with discretion to perform (or not). This is not our situation. The advertising agreement neither required nor conferred upon Google the discretion to provide a dedicated ad-support team to Dreamstime, let alone support on search issues beyond the scope of the agreement. Even if Google did knowingly misrepresent the cause of Dreamstime's search-ranking drop, the ads agreement does not provide Dreamstime's remedy.

This order finds that the alleged misinformation about Dreamstime's organic search performance fell outside the scope of the advertising agreement and thus could not (and does not) breach the covenant of good faith and fair dealing implied in that agreement. Summary judgment on the search-related implied covenant claim is **GRANTED**.

### B. Section 17200: Google Had No Duty to Disclose What it Did Not Know or Believe to be True.

Section 17200 proscribes practices which are unlawful, unfair, or fraudulent. Dreamstime claims that Google engaged in all three. The claim under the unlawful prong is derivative of Dreamstime's breach of the implied covenant of good faith and fair dealing and falls with it. Dreamstime likewise tethered the alleged unfair conduct to its implied covenant claim, so it falls as well.

Turning to the fraud prong, to establish a Section 17200 violation for "fraudulent" business practices, "it is necessary only to show that members of the public are likely to be deceived." *In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009). Unlike common law fraud, which requires proof of falsity, scienter, and actual reliance, it is not necessary for a plaintiff to

prove that a fraudulent deception under Section 17200 was actually false, known to be false by the perpetrator, or reasonably relied upon by a victim who incurs damages. *Ibid.*; *see also Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025–26 (9th Cir.2008). Rather, "[t]he determination as to whether a business practice is deceptive is based on the likely effect such [a] practice would have on a reasonable consumer." *Morgan v. AT & T Wireless Services, Inc.*, 177 Cal.App.4th 1235, 1256 (2009).

For an omission to be actionable under Section 17200, "the omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty v. Am. Honda* Motor *Co.*, 144 Cal.App.4th 824, 835 (2006). A defendant has a duty to disclose information in four circumstances: (1) When the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; or (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed. *Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018) (relying on *Collins v. eMachines, Inc.*, 202 Cal.App.4th 249, 255, (2011)).

Dreamstime's fraud claims fail for one simple reason. Nobody at Google, either on the advertising or the organic side, ever believed that Dreamstime's ranking dropped as a result of the update to Google's salient terms algorithm. While fraudulent practices under Section 17200 do not require proof of scienter, an omission theory does require that the defendant possess actual knowledge of the concealed fact.

The best evidence Dreamstime has to show that Google knew the update affected Dreamstime's search ranking is the flamingo webpage and corresponding launch report. But the evidence still falls short. The launch report indeed demonstrates that at least some members of the organic search team knew that some testing of the salient terms update indicated a possible negative effect on one of Dreamstime's product pages (of which, Dreamstime has millions) *as to the salient terms algorithm*. What the launch-report evidence fails to demonstrate, however, is that anybody at Google believed that whatever negative effect

the update had as to the salient terms algorithm also translated to a drop in Dreamstime's search ranking. To the contrary, contemporaneous notes to the launch report stated that there existed no "correlation between [the change] and any effect on ranking" (Decl. Lehman ¶ 29, Exh. M).

Dreamstime makes a number of claims based on its belief that Google and Professor Fischer, the third-party SEO consultant Google suggested to Dreamstime, constituted the same entity. But the record reflects that Google did not pay for Professor Fischer's analysis and Ads Rep Sipciu expressly noted that Dreamstime could contact Fischer without Google. Nor is their evidence demonstrating that Google weighed in on the results of the analysis or otherwise determined Professor Fischer's findings. Dreamstime attempts to claim that Google vetted the report, but Ads Rep Sipciu merely noted that the Fischer analysis seemed to draw the same conclusion Search Engineer Illyes reached responding to Dreamstime's post on the public forum.

At oral argument, Dreamstime argued that CEO Enache's October 2016 email to the ad-support team and the team's response thereto imposed a duty upon Google to disclose details concerning the salient terms update. In other words, through threats and incessant demands, Dreamstime cajoled Google's ad support team into trying to help Dreamstime with its search issues. By suggesting Professor Fischer to Dreamstime to help address its organic search issues, Dreamstime asserts that Google then gained a duty to disclose the launch report. Ad Rep Sipciu's gesture, however, did not change the fact that Sipciu had no knowledge of the launch report, nor did it demonstrate that anybody at Google believed an algorithmic update caused Dreamstime's search-ranking drop.

In any event, the alleged fraudulent business practices here are each variations on the same theme: Google refused to hand over, to one of its advertiser clients, confidential information concerning a global update to its salient terms algorithm. Dreamstime had no right to it. This order finds that Google's refusal to relinquish confidential data to its advertisers was *not* likely to deceive members of the public.

2. **ADS-BASED CLAIMS.**

Google further moves for summary judgment on Dreamstime's ads-based claims asserting that the AdWords Agreement disavows any guarantees about advertisement results, and assigns to advertisers the risks of disappointing results. Section 9 of the AdWords Agreement provided (Dkt. No. 50-1) (emphasis added):

> Disclaimers. To the fullest extent permitted by law, google, on behalf of itself and its partners and affiliates, disclaims all warranties, whether implied, statutory or otherwise, including for non-infringement, satisfactory quality, merchantability and fitness for any purpose, as well as any warranties arising out of any course of dealing or usage of trade. *To the fullest extent permitted by law, the programs and Google and partner properties are provided "as is," "as available" and "with all faults," and customer uses them at its own risk. Google, its* affiliates*, and its partners do not make any guarantee in connection with the programs or program results.* Google makes no promise to inform customer of defects or errors.

The disclaimer reflected what Google sees as the fundamental unpredictability inherent in online advertising, where many different factors and players have a role in determining an ad's success. On Google's platform, advertisers, not Google, make the ultimate decisions about campaigns, further necessitating this disclaimer. Dreamstime does not directly challenge the enforceability of Google's disclaimer. During oral argument, Dreamstime even noted "[w]e take Google's point. There's a lot out of their control" (Hearing Tr. at 28).

Instead, Dreamstime focuses on two primary points. *First*, Dreamstime argues that the advertising misrepresentations it alleges, and that form the basis for its breach of the implied covenant of good faith and fair dealing claim, were not guarantees of a specific result. Yet Dreamstime's own CEO swears that Dreamstime's claims are in fact about "dozens [of] specific ad campaigns that did not perform as represented by Google and for which the [average automated bid amounts] were so high that Dreamstime seeks a full refund in the form of restitution" (Decl. Enache ¶ 15). Implying a promise or term into the agreement to cover Dreamstime's claims would be directly at odds with the express disclaimer in the advertising agreement.

*Second*, as it did in connection with the search-related claims, Dreamstime calls attention to a line of decisions holding that where a discretionary provision gives one party absolute and

18

unfettered discretion to perform or not, the implied covenant must be read into the term. *See, e.g.*, *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 805 (1995). These decisions are inapplicable. The no-guarantee provision provides neither party with any discretion to perform its obligations under the contract.

## CONCLUSION

For the reasons stated herein, summary judgment in favor of Google on all of Dreamstime's remaining claims is **GRANTED**. The clerk shall please **CLOSE THE** file.

**IT IS SO ORDERED.**

Dated: July 3, 2020.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE